Criminal Notice of Appeal - Form A

# NOTICE OF APPEAL

**United States District Court**

Southern _____ District of New York _____

Caption:
United States of America v.

Sean Combs

Docket No.: 1:24-cr-542

Andrew L. Carter, Jr.

(District Court Judge)

Notice is hereby given that Sean Combs _____ appeals to the United States Court of

Appeals for the Second Circuit from the judgment ____ other ✓ Order denying release on conditions

entered in this action on September 18, 2024.

(date)                                                                              (specify)

This appeal concerns: Conviction only |___| Sentence only |___| Conviction & Sentence |___| Other |✓|

Defendant found guilty by plea | | trial | | N/A |✓|.

Offense occurred after November 1, 1987? Yes | | No |___| N/A |✓|

Date of sentence: _____ N/A |✓|

Bail/Jail Disposition: Committed |✓| Not committed | | N/A |

Appellant is represented by counsel? Yes ✓ | No | | If yes, provide the following information:

| | |
|---|---|
| Defendant's Counsel: | Alexandra A.E. Shapiro |
| Counsel's Address: | Shapiro Arato Bach LLP |
| | 1140 Avenue of the Americas 17th Floor, New York, NY 10036 |
| Counsel's Phone: | (212) 258-4881 |
| Assistant U.S. Attorney: | Emily Johnson |
| AUSA's Address: | US Attorney's Office, SDNY |
| | 1 St. Andrew's Plaza, New York, NY 10007 |
| AUSA's Phone: | (212) 637-2409 |

Signature

Generated: Sep 30, 2024 2:17PM                                                                          Page 1/1

# U.S. District Court

## New York Southern - Manhattan

Receipt Date: Sep 30, 2024 2:17PM

SEAN COMBS

Rcpt. No: 33291                          Trans. Date: Sep 30, 2024 2:17PM                      Cashier ID: #JE

| CD | Purpose | Case/Party/Defendant | Qty | Price | Amt |
|----|---------|----------------------|-----|-------|-----|
| 203 | Notice of Appeal/Docketing Fee | | 1 | 605.00 | 605.00 |

| CD | Tender | Amt |
|----|--------|-----|
| CC | Credit Card | $605.00 |
| | Total Due Prior to Payment: | $605.00 |
| | Total Tendered: | $605.00 |
| | Total Cash Received: | $0.00 |
| | Cash Change Amount: | $0.00 |

**Comments**: 24CR00542 ALC

Only when the bank clears the check, money order, or verifies credit of funds, is the fee or debt officially paid or discharged. A $53 fee will be charged for a returned check.

O9IHComC

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4               v.                          24 Cr. 542 (ALC)

5    SEAN COMBS,

6       a/k/a "Puff Daddy,"
        a/k/a "P. Diddy,"
7       a/k/a "Diddy,"
        a/k/a "PD,"
8       a/k/a "Love,"

9               Defendant.
                                           Bond Appeal
10   ------------------------------x

11                                         New York, N.Y.
                                           September 18, 2024
12                                         3:30 p.m.

13   Before:

14                    HON. ANDREW L. CARTER, JR.

15                                         District Judge

16                         APPEARANCES

17   DAMIAN WILLIAMS
          United States Attorney for the
18        Southern District of New York
     BY:  EMILY JOHNSON
19        CHRISTINE SLAVIK
          MADISON SMYSER
20        MITZI STEINER
          MEREDITH FOSTER
21        Assistant United States Attorneys

22   AGNIFILO INTRATER LLP
          Attorneys for Defendant
23   BY:  MARC AGNIFILO
          TENY R. GERAGOS
24
     Also Present:  Francesca Tessier, Pretrial Services Officer
25                  Joshua Rothman, Pretrial Services Officer

O9IHComC

```
 1              THE DEPUTY CLERK:  Criminal cause for a bail appeal
 2    hearing in case No. 24 Cr. 542, United States v. Sean Combs.
 3              Counsel, please state your appearances for the
 4    government.
 5              MS. JOHNSON:  Good afternoon, your Honor.  Emily
 6    Johnson, Madison Smyser, Christy Slavik, Mitzi Steiner, and
 7    Meredith Foster, for the government.  Behind us, from Pretrial
 8    Services, are Officers Francesca Tessier and Joshua Rothman.
 9              THE COURT:  And for the defendant.
10              MR. AGNIFILO:  Yes.  Good afternoon, your Honor.  Marc
11    Agnifilo with Teny Geragos and Mr. Sean "Love" Combs is with us
12    today as well.
13              THE COURT:  OK.  All right.  Good afternoon.
14              I've seen the submissions.  I reviewed the previous
15    submissions that the parties made to Magistrate Judge
16    Tarnofsky.  I've looked at the transcript from the bail hearing
17    yesterday.  Let me just share with you my initial thoughts to
18    help counsel perhaps cabin your comments appropriately.
19              The government primarily seeks detention based on a
20    risk of flight and the danger of obstruction of justice or
21    witness tampering.  Regarding those two bases, first, my lesser
22    concern here is risk of flight, although that is a concern.
23    Certainly, Mr. Combs is a risk of flight.  Defense counsel has
24    submitted evidence regarding the efforts that he and his client
25    have made to try to show the Court and the government that he
```

O9IHComC

| 1 | is not a risk of flight.  The government has again attempted to |

1    is not a risk of flight.  The government has again attempted to

2    prove that he is a risk of flight, and the government has to do

3    more than just simply prove he's a risk of flight.  They must

4    prove that he is a risk of flight such that no condition or

5    combination of conditions will reasonably assure his return to

6    court.

7         The package that's been submitted by Mr. Combs, I

8    think, does not give the Court a reasonable assurance that he

9    would return to court.  Regarding the issue of whether or not

10   the government has proven risk such that no condition or

11   combination of conditions would reasonably assure his return to

12   court remains a bit of an open question in my mind, but

13   certainly, the package that's been submitted is not sufficient

14   to reasonably assure his return to court given his wealth.

15        My bigger concern deals with the danger of obstruction

16   of justice and the danger of witness tampering.  That is a real

17   concern that I have here.  And I've seen the parties'

18   submissions, but I just wanted to give counsel my thoughts as

19   to what I am primarily concerned about.

20        Having said that, I'll now hear from the parties,

21   starting with the government, since the government has the

22   ultimate burden here.

23        MS. JOHNSON:  Thank you, your Honor.  Would it be

24   acceptable if I spoke from the lectern?

25        THE COURT:  You can speak from the lectern.  You can

(6 of 231), Page 6 of 231    Case: 24-2606, 09/30/2024, DktEntry: 1.1, Page 6 of 74
Case 1:24-cr-00542-ALC    Document 19    Filed 09/30/24    Page 4 of 68        4
O9IHComC

1    stand there.  You can sit there.  Wherever you're comfortable

2    is fine with me.

3          MS. JOHNSON:  Thank you, Judge.

4          Your Honor, this case is about Sean Combs' physical

5    and sexual violence against women and others.  This physical

6    and sexual violence has gone on for decades.  It's also about

7    the vast efforts he undertook, using his extensive resources,

8    to cover up his crimes.  In other words, the very conduct he's

9    charged with shows his dangerousness, his resources, and his

10   willingness to lie and obstruct.

11         Yesterday, Judge Tarnofsky recognized this when she

12   found that there were no conditions or combination of

13   conditions that could assure the safety of the community or the

14   defendant's appearance in court, and she detained the

15   defendant.  The government respectfully submits that your Honor

16   should reach the same conclusion today.

17         As the Court just said, you have, obviously, read our

18   papers in detail and the transcript from yesterday.  I want to

19   be clear that we are seeking detention on, in addition to risk

20   of flight and risk of obstruction of justice, but also just on

21   dangerousness generally.  All of those factors to be considered

22   in ordering detention weigh in our favor here.

23         As I know the Court knows, in this case detention is

24   presumed under the Bail Reform Act because the defendant is

25   charged with sex trafficking, which is an offense under Chapter

O9IHComC

```
 1   77 of Title 18.  It's the defendant's burden to rebut that

 2   presumption, and the magistrate court already found that he did

 3   not do so.

 4           So I want to start with dangerousness and obstruction,

 5   and I'd like to talk about the seriousness of the offenses

 6   first, which reflects both the defendant's dangerousness and

 7   the risks of obstruction if released.  Many of the facts are

 8   set forth in our submission and were on the record yesterday,

 9   so I only want to briefly review a few with your Honor before I

10   dive in.

11           The defendant used force, threats of force, and

12   coercion to cause female victims to engage in sexual activity

13   with male commercial sex workers that he referred to as "freak

14   offs."  These were elaborate sexual performances that he

15   arranged, directed, masturbated during, and often

16   electronically recorded.  These began in and around 2009, at

17   least, and lasted until at least this year and often took place

18   over multiple days and frequently with more than one escort.

19   These freak offs were arranged with the assistance of members

20   of his enterprise who set up the rooms, stocked the rooms with

21   supplies, arranged the travel, delivered the cash to pay the

22   escorts, among other tasks.

23           The defendant used narcotics so that female victims

24   could continue to participate in freak offs despite exhaustion

25   and fatigue that they began to experience as these were
```

O9IHComC

1    sometimes multiday events.  These narcotics included ketamine,

2    ecstasy, GHB, and others.  And victims themselves, in

3    communications that the government has seized, described

4    themselves as being "drugged" during these freak offs.

5        I mentioned that the defendant electronically recorded

6    the freak offs, and he did that at least in part so he could

7    keep the recordings and use them as blackmail against his

8    victims, so I want to pause on that for a moment.  In addition

9    to witnesses who would testify to this fact, it's also in black

10   and white in communications that the government has seized.

11   For example, in December of 2015, a victim texted the defendant

12   and makes explicit reference to this type of extortion.  This

13   is the quote:

14       "You know what sick and disgusting shit I was reminded

15   of the other day?  You forcing me to" — do something else,

16   which I'm not going to mention on the public record — "or you

17   were going to leak some FO shit."  FO standing for freak off.

18       The defendant recorded these women engaged in freak

19   offs.  He threatened them with those very videos to get them to

20   engage in even more.  And the defendant makes a lot of claims

21   yesterday and in his papers about the victims' motives in

22   speaking up now, but that message is from nine years ago.  And

23   I suspect that we'll hear that we should ignore these types of

24   things because they're old, but this isn't the only time

25   there's communications that explicitly reference this kind of

O9IHComC

```
 1    blackmail.  In fact, the same thing happened much more recently
 2    several years later, after 2015, when a different victim said,
 3    and here's a quote:  "He just threatened me about my sex tapes
 4    that he has of me on two phones.  He said he would expose me,
 5    mind you these sex tapes where I am heavily drugged and doing
 6    things he asked of me for the past three years."
 7             That's just two examples of the defendant's egregious
 8    conduct in extorting and blackmailing victims that happened
 9    years apart, and so it's rich when the defense submission filed
10    today accuses the victim of extorting the defendant.  Let me be
11    clear.  The only person who is engaged in extortion in this
12    case repeatedly is the defendant.
13             At least a dozen witnesses will confirm that they
14    personally observed the defendant's violence towards women or
15    the injuries that were sustained as a result.  And in addition
16    to that physical violence towards women, there's also evidence
17    of other violent acts, including physical assaults on other
18    individuals, including employees and witnesses to violence,
19    kidnapping, and arson.
20             The defendant surrounded himself with and used
21    firearms, including three defaced AR-15s and a high-capacity
22    magazine loaded with 59 rounds of ammunition that was seized
23    from his LA and Miami residences this year.  Yesterday, defense
24    counsel argued that these were the same guns used by the
25    defendant's professional security team, but what we hadn't told
```

O9IHComC

1    the Court yet was that we did seize the guns used by his

2    professional security team.  We took six of them.  They were

3    licensed guns that were registered to the security team.  They

4    were stored in the defendant's homes, and he had access to

5    them.  But, for obvious reasons, we're much more concerned

6    about the defaced firearms hidden in his personal closet, and

7    that was our focus.  But it's worth noting that the defaced

8    guns have nothing to do with security and have everything to do

9    with dangerousness.  And even beyond that, when we consider the

10   additional guns that his security team has, he has even greater

11   access to firearms.

12          One more point on this is that the security team is

13   now the same team that he suggests be allowed to monitor him

14   while he's on bail.  His head of security was served yesterday

15   with a search warrant for his devices because of what our

16   investigation has revealed about his own personal involvement

17   in the offense conduct and in offenses under investigation by

18   the government.

19          As the Court knows from the transcript of yesterday's

20   proceeding, I spoke then about an incident that occurred on

21   March 5, 2016, at the InterContinental Hotel in Los Angeles,

22   and yesterday the government attached publicly released

23   surveillance footage to our submission as an exhibit.  And as I

24   said yesterday, this is a critical incident to assessing both

25   danger and obstruction.  I'm going to talk about it a little

O9IHComC

1    bit more today with some additional detail.

2              Contrary to defense counsel's argument yesterday,

3    which attempted to inaccurately recast this incident as just a

4    fight in a relationship, the events of March 5, 2016, are

5    powerful evidence of trafficking, a recorded example of

6    defendant's use of force in connection with a freak off.  So

7    I'm going to summarize the evidence again with some additional

8    details that I did not mention yesterday.

9              In short, the evidence shows that the defendant had a

10   freak off at the InterContinental Hotel in Los Angeles on

11   March 5, 2016.  The defendant contends that this incident only

12   involves the defendant and the victim, but this is wrong.  We

13   have multiple sources of evidence that demonstrate there was at

14   least one commercial sex worker who was with the defendant and

15   the victim in the hotel room prior to the assault that's

16   recorded on camera and remained in the room while the assault

17   was being captured.

18             Following the freak off, the defendant violently

19   assaulted a victim who was sneaking out of the room to leave

20   the hotel.  You can see in the hallway surveillance video that

21   she isn't even wearing shoes as she is leaving.  She's leaving

22   as fast as she can because she's trying to get out of there.

23   She's in danger.  In the video, the defendant storms out of the

24   room in nothing but a towel.  He comes up to her, he punches

25   her, he throws her to the ground, he kicks her, he attempts to

O9IHComC

1    drag her back to the hotel room, and then he throws a vase at

2    her.

3            Text messages in the hours and days that follow

4    confirm the injuries caused by the incident.  These are quotes:

5            "I have a black eye and a fat lip.  You are sick for

6    thinking it's OK to do what you've done."

7            "I still have crazy bruising."

8            This is clear evidence of the dangerousness of the

9    defendant, and it's evidence that he has to try to minimize it.

10   He casts it as a misdemeanor assault arising out of a lover's

11   quarrel based on the fact that he wanted to get his clothes

12   back, but that's not what happened here.  The evidence shows

13   that the victim tried to escape the hotel room where the

14   defendant and an escort were without even putting on her shoes.

15   The defendant then violently beat her and tried to drag her

16   back to the hotel room.  It was only when hotel security staff

17   intervened that the victim was able to leave the hotel.

18           So this is just one example of violence being used in

19   connection with a freak off, but this incident is also

20   important because of everything that happened after the

21   assaults, because that's when the cover-ups started.

22           First, the defendant tried to bribe a hotel security

23   officer with a handful of cash in exchange for that officer's

24   silence.  The security guard refused to be bought.  Then the

25   defendant's staff got involved, contacting hotel security to

O9IHComC

```
 1   get the footage of the incident and keep it from being seen by
 2   anyone.  And by March 8, three days later, the surveillance
 3   video somehow disappeared from the hotel server.
 4          The defense has argued that there was no criminal
 5   investigation, so there couldn't have possibly been
 6   obstruction, and the defendant was just trying to prevent
 7   something embarrassing from becoming public.  But that's not
 8   what the evidence shows.  In fact, what the defendant himself
 9   was saying immediately after the assault on March 5, here's a
10   few messages he sent right after that timestamp on the
11   surveillance video recording:
12          "Call me.  The cops are here."
13          "I got six kids."
14          "Yo, please call.  I'm surrounded."
15          "You gonna abandon me all alone?"
16          While we don't have evidence that the police were
17   actually there, the point is that the defendant knew he had
18   done something that could elicit a law enforcement response,
19   and he had to cover it up.  And critically, his staff knew that
20   police had responded to the victim's apartment.  They have
21   photographs of the responding officer's Los Angeles Police
22   Department business card in their text messages, and those
23   staff members remained in contact with the victim to ensure
24   that she would not talk to the police.
25          So these communications, the video disappearing, none
```

O9IHComC

1    of this is a coincidence.  It's a result of defendant's

2    employees trying to cover up his crimes, all at his direction.

3    And the cover-up continued until last year, after the civil

4    suit was filed in November that, among other allegations,

5    detailed this assault at the InterContinental.  The defendant

6    responded, and I quote:  "I did not do any of the awful things

7    alleged."

8           There is no other way to read this but as an

9    unequivocal denial of his participation in this incident.  It's

10   also yet another way that he continued obstructing and covering

11   up what he did.  In this year, after CNN released the

12   surveillance video, the defendant ultimately admitted that he

13   was actually the person on that video, but only after it was

14   leaked to the media and only after there was indisputable proof

15   of his identity on tape and his violence on tape.

16          But yesterday we got more to the story.  That

17   apparently this assault was precipitated by the defendant being

18   hit in the head, while he was sleeping, by a cell phone and his

19   clothes being taken in a small overnight bag that you can see

20   the victim walking down the hall with in addition to her purse.

21   This is apparently why he runs out of the hotel in nothing but

22   a towel.  But our evidence will show that's just not what

23   happened.  Assuming, for the sake of argument, that it did,

24   which it didn't, but assuming that, punching, kicking, and

25   dragging someone in and of itself is a crime, and covering that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O9IHComC

1   up is an act of obstruction.  And if it's about the clothes and

2   wanting to get the clothes back, which again it's not, why drag

3   the victim back down the hall to the room?  And you can see

4   that on the tape.  That's what he does.  This explanation is

5   just another cover-up.  It's just more lies, and it's just more

6   obstruction.

7        This sequence of events and all the indisputable

8   evidence —— from the videos to the text messages to the

9   photographs that are in communications —— makes clear that you

10   cannot take the defendant at his word when he denies his

11   criminal conduct.  But make no mistake, March 5, 2016, is far

12   from the defendant's lone act of violence and obstruction, so

13   let's talk a little bit more about that.

14        Freak-off activity is the core of this case, and freak

15   offs are inherently dangerous.  They use force, coercion, and

16   drugs to coerce the victims into doing the freak offs.  The

17   defendant controlled aspects of their lives, used significant

18   physical force against them, and all to compel them to engage

19   in these lengthy sex acts.

20        Yesterday, the defense said they interviewed about

21   half a dozen escorts who would dispute the government's account

22   of what happened during the freak offs.  Our investigation is

23   ongoing, and so I can't say too much about this, but I will

24   note that half a dozen escorts is just the tip of the iceberg

25   of the number of escorts who have participated in freak offs.

O9IHComC

```
 1                And yesterday, the defense also spent a lot of time

 2     talking about how these freak offs were between consenting

 3     adults and how the government was not claiming sex without

 4     consent.  Abuse occurred in the context of at least one

 5     long-term relationship, which we acknowledge, but the

 6     government's theory does involve a lack of consent.  This case

 7     is charged, at least in part, in Count Two as sex trafficking

 8     by force, fraud, and coercion.  When a woman is being beaten

 9     and coerced in order to get her to engage in commercial sex

10     activity, those sex acts are not consensual.

11                And as I said yesterday, it is really important to

12     note that long-term relationships and abusive relationships are

13     not mutually exclusive.  The government expects to introduce

14     the testimony of expert witnesses regarding the dynamics that

15     appear in almost all sex trafficking and sex abuse cases.

16     Similar testimony has been introduced in several cases in this

17     district.  A few examples are *United States v. Hadden*, *United

18     States v. Ray, United States v. Maxwell*, and *United*

19     *States v. Rivera*.

20                We expect that these expert witnesses will explain

21     issues of apparent consent and how abusers control their

22     victims, even in the context of long-term relationships in

23     which the victims express love for their abusers and continue

24     to go back to them.  We further expect that these expert

25     witnesses will discuss various forms of coercion, including
```

O9IHComC

1    isolation, intimidation, violence, manipulation, surveillance,

2    narcotics, grooming behaviors, and others, and generally why

3    victims do not leave their abusers and immediately report their

4    crimes.

5          The focus of today's proceeding, however, is not and

6    should not be on the dynamics of abusive relationships.

7    Today's proceeding is squarely focused on the defendant alone

8    and whether the defendant presents a danger to the community,

9    whether the defendant threatens the integrity of these

10    proceedings, and whether the defendant presents a risk of

11    flight, all of which he does.

12          Defense counsel has made much yesterday and today in

13    his letter about his misinformed view that there was not a sex

14    crime here, and therefore, the nature of this offense doesn't

15    weigh in favor of detention.  He's argued, in essence, that

16    anyone who was participating in a freak off wanted to be there.

17    That flies in the face of the evidence in this case, much of

18    which we've laid out to the Court, but it also shows a

19    misunderstanding of the law.

20          When participants in commercial sex activity are

21    threatened with the release of collateral videos, like those

22    two text messages I read, when they are threatened with the

23    loss of their livelihood and housing —— we'll get to that in a

24    minute —— and when they're beaten both during and outside freak

25    offs —— you saw video of that —— they cannot consent.  That is

O9IHComC

1    trafficking.  This view was especially evident when counsel

2    spent time minimizing and horrifically understating the

3    defendant's violence.  The video from March 5, 2016, is far

4    more than a misdemeanor assault, as he claims.  When force or

5    coercion is used in connection with commercial sex, as it is

6    here, again, that's trafficking.

7        The defendant's decades-long history of violent

8    conduct makes clear that even the most stringent bail

9    conditions will not suffice to ensure the safety of the

10    community.  The inquiry in this context is focused on the

11    danger to any real person, and the evidence shows that there is

12    a risk of physical danger towards victims, employees, and other

13    individuals.

14        The investigation has revealed evidence of numerous

15    assaults against female victims and other individuals.  These

16    assaults involved choking, hitting, kicking, dragging victims

17    sometimes by their hair.  They sometimes occurred in cars where

18    victims heads were slammed against the car window or on the

19    floor of a car.  And again, independent evidence like text

20    messages confirms this type of violence.  Without attributing

21    any of these messages, I'm going to read four that make my

22    point:

23        "I turn my head for a second, and you get fucked up,

24    and you drag me down the hall by my hair."

25        "I have bleeding cuts."

O9IHComC

1                "You hit me in the head two good times."

2                "When you get fucked up the wrong way, you always want

3      to show me that you have the power and you knock me around.

4      I'm not a rag doll.  I'm someone's child."

5                And we don't just have the texts.  We also have

6      witnesses who can confirm, because they witnessed this violence

7      and they witnessed the injuries.  And this conduct took place

8      behind closed doors ── in houses, in hotel rooms, in cars, in

9      settings that are not easily monitored by even the most

10     stringent conditions of release.  And I note that Judge

11     Tarnofsky was particularly concerned about this point and also

12     about the next one: that the defendant's violence was

13     premeditated and spontaneous.  And I think the text messages I

14     just read highlight that.  And the defendant's violence, the

15     spontaneity exacerbate the difficulty of crafting conditions of

16     release to ensure the safety of any person.  How do you craft

17     bail conditions that can address the defendant's tendency to

18     become violent at the slightest provocation and to become

19     violent, as the text messages say, when he "gets fucked up the

20     wrong way"?

21                In fact, Judge Tarnofsky found that she did not

22     believe defense counsel had the ability to control the

23     defendant, given his substance abuse and anger issues.  There

24     is a long-standing pattern of abuse here, a pattern that has

25     been entirely undeterred by threat of public exposure or law

| | |
|---|---|
| 1 | enforcement intervention, and it's probative of whether the |
| 2 | defendant will continue to engage in that pattern. |
| 3 | I note we cite this case in our paupers, but the |
| 4 | *Mercedes* case in the Second Circuit, 254 F.3d 433 (2d Cir. |
| 5 | 2001), talks about the danger of releasing defendants with a |
| 6 | history of domestic violence, noting that a domestic violence |
| 7 | history is probative of a dangerousness determination because a |
| 8 | willingness to strike a loved one is evidence of a tendency to |
| 9 | be violent and dangerous towards others.  And in that case, the |
| 10 | circuit reversed the district court's order of release for a |
| 11 | defendant with a history of domestic violence but no criminal |
| 12 | history. |
| 13 | So let's turn to obstruction now, and I know that your |
| 14 | Honor is particularly interested in this point. |
| 15 | So the risk of obstruction in this case is heightened |
| 16 | because of the defendant's power.  It gives him a unique |
| 17 | ability to influence people and to intimidate witnesses and |
| 18 | victims.  Witnesses have universally, one for one, expressed to |
| 19 | us their extreme fear of the defendant, extreme.  His influence |
| 20 | makes it so difficult to convince witnesses to share their |
| 21 | experiences and to trust that the government can keep them safe |
| 22 | from him. |
| 23 | I talked about some of it before with the March 5 |
| 24 | incident, but we have evidence that further indicates that the |
| 25 | defendant and his coconspirators will deflect, minimize, and |

O9IHComC

1    lie about his conduct.  Defense counsel spent time trying to

2    recast his, what I submit to the Court are obvious, obstructive

3    efforts as just maintaining contact with people.  So before we

4    dive in, I want to be clear about a few principles of

5    obstruction based on the statutes that have been charged in

6    this case.

7           There need not be an existing investigation or

8    official proceeding, and the defendant need not know about it.

9    What we will also show that the defendant knew about this

10   investigation at least as of January 2024, and he certainly

11   suspected the possibility of an investigation after November of

12   2023 when civil lawsuits were filed alleging, among other

13   offenses, sex trafficking.

14          So following that November civil suit, when the

15   defendant certainly had reason to suspect the possibility of an

16   investigation, he and his coconspirators continued their

17   efforts to reach out to potential victims or witnesses.  This

18   outreach has included directly contacting at least one victim

19   in November of 2023, constant contact with witnesses to the

20   charged conduct, and with contacting of witnesses, including

21   those who received grand jury subpoenas, prior to dates of

22   testimony or government meetings.  And this contact is as

23   recent as July of 2024, so well after the government has

24   definitive proof that the defendant knew about this

25   investigation.

O9IHComC

1          So two of those examples are there were communications

2     between the defendant and a witness who received a grand jury

3     subpoena.  These communications are both prior to and following

4     the witness' meeting with the government, and the government

5     has evidence that the defendant knew that this witness had

6     received a grand jury subpoena.  And both between —— before the

7     meeting with the government and after the meeting with the

8     government, there were 14 total contacts between the two of

9     those people.

10          In another case, a witness was served with a grand

11    jury ——

12          THE COURT:  Hold on just a second.  Go back for a

13    second.  You said there were 13 contacts between two of those

14    people.  You mean two witnesses or just between the defendant

15    and the witness?

16          MS. JOHNSON:  I'm sorry for not being precise, your

17    Honor.  There were 14 total contacts between the defendant and

18    the witness.

19          THE COURT:  OK.

20          MS. JOHNSON:  And my second example, a witness was

21    served with a grand jury subpoena in June of 2024; thereafter

22    was contacted multiple times by the defendant by phone and text

23    in June and July of 2024, despite the fact that the two had not

24    spoken in several years.  They were suddenly back in contact

25    leading up to the defendant's —— sorry, in the aftermath of the

O9IHComC

1   witness receiving a grand jury subpoena.

2           And these efforts by the defendant were also crafted

3   to avoid detection.  He used intermediaries to reach out to

4   people.  And in an instance I'll describe in detail, he

5   recorded conversations with a victim on the device of a

6   coconspirator.  These kinds of efforts, these kinds of means,

7   make obstruction even more difficult to detect when it's being

8   done through other people and on other devices.

9           We know from the evidence we've collected that the

10  purpose of these calls was to spread false narratives.  So

11  here's an example.  The instance that I mentioned where the

12  defendant directly contacted a victim in November 2023, he

13  placed two calls to the victim, both of which are recorded on

14  the coconspirator's phone.  And as background that will help

15  explain some of the things that are discussed in the call, the

16  defendant provides financial support to this person.  So early

17  on November 19, which is three days after the filing of the

18  civil lawsuit by another victim, the defendant received a text

19  from this other person in response.  It reads:

20          "I feel like I'm reading my own sexual trauma.  It

21  makes me sick how three solid pages, word for word, is exactly

22  my experiences and my anguish."

23          The defendant then called the victim twice.  Those are

24  the recordings.  And in those recordings, he gaslit her and he

25  attempted to convince her that she had willingly engaged in sex

O9IHComC

1    acts with him, but she pushed back.  She told him she felt

2    manipulated and clarified that what his description of events

3    was, was "not how she saw things."

4          Throughout these recorded calls, the defendant

5    repeatedly talks about how he was not supposed to be speaking

6    on the phone and not supposed to be using the phone, and he

7    instructs the victim not to text him.  These statements clearly

8    show his state of mind.  They show that he was on notice that

9    there could be an investigation into the claims raised in the

10   lawsuit that had been filed three days earlier.

11         And at the end of that second call, the defendant

12   ensured the victim that if she continued to support him, she

13   ain't got anything to worry about, which is a thinly veiled

14   reference to his continuing his financial support.  And

15   subsequent text messages make explicitly clear that that's what

16   he was talking about because two days later he texts a

17   coconspirator in reference to the financial support that he

18   provides to this victim and said:  "Make sure that" —— and he

19   uses a name here.  The name is an individual who is his

20   financial adviser —— "is not doing anything dumb, like not

21   having that rent paid on time."  The defendant made sure that

22   that financial coercion continued, clearly, to keep the victim

23   close and in his control.

24         The defendant's long history of obstruction and

25   violence demonstrates that he simply cannot overcome the

O9IHComC

1    presumption that no condition or combination of conditions can

2    ensure the safety of the community or the integrity of this

3    proceeding.  Courts have denied bail in similar situations.

4    We've cited some cases in our letter.  Of particular interest,

5    I think, is *United States v. Lafontaine*.  And this is a

6    slightly different posture because it's a revocation, but the

7    facts of that case are that the defendant contacted a potential

8    witness and attempted to feed that witness a false narrative

9    with the hope that the witness would adopt it as that person's

10   testimony, and that's exactly what's going on here.

11        In the government's request for detention is

12   consistent with other cases of this kind in this district and

13   in this circuit.  These cases stand for the proposition that

14   sex trafficking defendants, regardless of the age of their

15   victims, are routinely detained pretrial, particularly when

16   they have engaged in repeated obstruction.  I went over some of

17   these cases yesterday.  I'll touch on them lightly again.

18        THE COURT:  That's not necessary.  I'm familiar with

19   those cases.

20        MS. JOHNSON:  OK.

21        THE COURT:  Let me ask you this:  In the record, the

22   government had previously indicated that there was another

23   potential witness that the defendant contacted between

24   September 10 and September 14 some 58 times.  Can you give me a

25   little further elucidation on that?

O9IHComC

1          MS. JOHNSON:  Oh, sure.  So that requires a little

2     explanation of a recent civil suit.

3          So on September 10, so last week, an individual named

4     Dawn Richard filed a civil suit against the defendant and other

5     individuals and entities.  Ms. Richard was formerly in a band

6     with the defendant and a third individual named Kalenna Harper.

7     The allegations in Ms. Richard's lawsuit focus on some of the

8     time period of the charged conspiracy.  They focus on

9     particular events starting in 2009 and for some time period

10    thereafter.  Among other things, Ms. Richard alleges witnessing

11    violence by the defendant towards a victim, including assaults

12    and the like.

13         So that lawsuit is filed on September 10.  On

14    September 13, the other member of the band, Ms. Harper,

15    released a statement where she, in sum and substance, sort of

16    says what Ms. Richard's experience wasn't what I experienced.

17    But between those two dates, between September 10 and

18    September 14, the defendant and Ms. Harper had 128 total phone

19    contacts.  He called or texted Ms. Harper 58 separate times in

20    four days.  There has been no contact since September 14.

21    Granted, that's only been a few days.  But I think what's

22    highlighted about that incident is that it makes clear that the

23    defendant has an ongoing ability to keep witnesses, even

24    witnesses to very distant abuse and very distant things, in his

25    pocket and at his disposal.

O9IHComC

1          One other —— your Honor, we had discussed some cases

2     yesterday.  We didn't discuss *Lawrence Ray*, which I think is

3     another case that does support our argument here.  I don't

4     think we've touched on that, so I'll just briefly ——

5          THE COURT:  The case dealing with the official

6     proceeding requirement?

7          MS. JOHNSON:  No.  *Lawrence Ray* is a racketeering and

8     sex trafficking case in this district, and Magistrate Judge Fox

9     ordered detention based on risk of flight and dangerousness.

10    And I think one thing that's similar about the *Lawrence Ray*

11    case to this case is that, in the bail argument, there's

12    allegations by the defense that the sex trafficking case was

13    weak because there was only one victim, and Magistrate Judge

14    Fox again detained on the basis that the victims were

15    corroborated not only by other witnesses but also by

16    documentary evidence.

17         THE COURT:  Anything else from the government?

18         MS. JOHNSON:  Just a few additional things, your

19    Honor, briefly.

20         THE COURT:  How many more additional things?  We've

21    gone about 45 minutes.  Give me a sense of what else you need

22    to touch upon.

23         MS. JOHNSON:  I can finish this in under five minutes;

24    maybe even three.

25         THE COURT:  OK.  Go ahead.

O9IHComC

1          MS. JOHNSON:  OK.  I will just touch briefly on risk

2     of flight.  The circumstances are different than when Mr. Combs

3     flew here to sit in New York, which defense counsel has made a

4     lot of hay about.  And with respect to his offer to surrender,

5     there are extremely valid law enforcement reasons why the

6     government did not take him up on this offer, including the

7     risk of evidence destruction and allowing for further

8     obstruction.  So to the extent that this surrender and travel

9     argument has any force at all, it really only applies to risk

10    of flight.  It does not, does not, grapple with dangerousness

11    and obstruction.  Surrender has nothing to do with those two

12    things.  And the defendant really does not grapple with those

13    two things.  He doesn't talk about his ongoing danger and his

14    ongoing obstruction.  So coming to this jurisdiction and

15    offering to surrender simply does not vitiate those concerns.

16          The Court expressed concerns with the bail package.

17    The government has significant concerns with the bail package.

18    Again, I'm here seeking detention, so I'm not going to get into

19    those, but I note for the record that we do think that even the

20    supplemented bail package does not have enough conditions that

21    focus on obstruction, and we don't think there are conditions

22    that can really keep the defendant from doing the types of

23    things he's been doing, particularly because he's been

24    involving other people in them.

25          You'll hear later today about how much evidence we

O9IHComC

| | |
|---|---|
| 1 | have, and it was in the record yesterday.  There's a massive |
| 2 | amount of evidence.  There's a massive amount of witnesses, a |
| 3 | massive amount of electronic evidence.  There's a massive |
| 4 | amount of physical evidence that we seized.  We have witnesses |
| 5 | saying things, and these witnesses are powerfully corroborated |
| 6 | by communications, by photographs, by videos, by |
| 7 | contemporaneous documentary records, by text messages, and the |
| 8 | like.  And this is the evidence that we will use to prove the |
| 9 | charges in the indictment.  This is the same evidence, some of |
| 10 | which, just a little bit of which I've highlighted today, |
| 11 | confirms that the defendant is a danger to the community and |
| 12 | poses a serious risk to the integrity of these proceedings |
| 13 | through his efforts at obstruction. |
| 14 |          So for all the reasons I've stated here and in our |
| 15 | letters, the defendant should be detained pending trial. |
| 16 |          THE COURT:  Thank you. |
| 17 |          Defense counsel, again, you can stand there, you can |
| 18 | stand at the lectern, or you can be seated — whatever you feel |
| 19 | comfortable doing. |
| 20 |          MR. AGNIFILO:  I'll come to the lectern, Judge.  Thank |
| 21 | you. |
| 22 |          THE COURT:  OK. |
| 23 |          MR. AGNIFILO:  Your Honor, I'm going to address one |
| 24 | thing that my colleague said, and then I hope to address your |
| 25 | Honor's opening remarks directly. |

O9IHComC

1          The situation that my colleague just discussed with

2     Dawn Richard and Kalenna Harper I can shed some light on.  At

3     one point I myself got a phone call from Kalenna Harper and her

4     lawyer.  Without going too much down this rabbit hole, Kalenna

5     Harper said:  I would like to make a statement on behalf of

6     your client.  Her lawyer was on the phone saying:  I'm worried

7     that my client, Kalenna, is going to embroil herself in this

8     big mess that has public elements to it and all that.  And I'm

9     prepared to give the lawyer's name to the government and I'm

10    prepared to give, to the extent they don't have Kalenna

11    Harper's phone number, to the government, and they can follow

12    up on this.  And what I said to Ms. Harper and the lawyer is

13    you should do whatever you want.  You should feel free, if you

14    want to make a statement, to make a statement; and you should

15    feel free, if you don't want to make a statement, to not make a

16    statement.  I don't remember offhand what day it was.  It was

17    between the 10th and the 13th.  And then at one point I found

18    out she made a statement.

19          THE COURT:  The acoustics aren't great.

20          MR. AGNIFILO:  I'm sorry, Judge.

21          THE COURT:  You don't remember what?

22          MR. AGNIFILO:  I don't remember the exact —— it was

23    either the 11th or the 12th of September that I spoke to the

24    lawyer and Ms. Harper.  And at the end of that conversation, it

25    was not clear whether Ms. Harper wanted to make a statement or

O9IHComC

 1    not.  Sometime later —— and I think it was the next day or it

 2    could have been two days later —— I saw in press reporting that

 3    she had made a statement.

 4          So the reason I bring this to your Honor's attention

 5    is there's a lawyer in the mix.  Ms. Harper has a lawyer.  I

 6    spoke to the lawyer.  I will make the lawyer available to the

 7    government if the government wants to speak to the lawyer.  So

 8    to the extent that the government raises this because there's

 9    some suggestion that because Mr. Combs contacted Ms. Harper ——

10    and I would note that they were in the same band for a period

11    of time —— but these contacts were around the time of the

12    statement.  She seemed to be pained about whether she wanted to

13    make a statement.  She told me she wanted to make a statement

14    because she believed Dawn Richard's statements were not

15    accurate.  And she wanted to say something, yet she didn't want

16    to get overly involved.

17          THE COURT:  When she told you that, that was either

18    September the 11th or the 12th?

19          MR. AGNIFILO:  I believe that's right.

20          THE COURT:  Which is after the 10th, after the

21    defendant first reached out to her?

22          MR. AGNIFILO:  I don't know about the defendant's

23    contacts with her.  I don't know.  I just know when her and her

24    lawyer called me, it was the 11th.

25          (Counsel conferred)

O9IHComC

1          MR. AGNIFILO:  I'm told by the keeper of the facts

2     that it was the 11th.  So I think it was probably September 11.

3          But let me address —— so I wanted to point that out

4     just because that was the last thing that my colleague said.

5          THE COURT:  Let me ask you, why does that matter?

6          MR. AGNIFILO:  Because the government brought it up,

7     and the government brought it up, I think, to suggest that

8     somehow Mr. Combs coerced or forced or pressured Kalenna Harper

9     into —— let me take a step back, because I don't think —— the

10    entire context might not be clear.

11          I don't know what role Dawn Richards plays in this

12    case.  I don't.  She filed a civil complaint, so this is all

13    about a civil complaint.  When the civil complaint hit the

14    news, Kalenna Harper, who was in the same band as Dawn

15    Richards, obviously, said to herself:  I was in the same band

16    as Dawn Richards.  I don't think —— I didn't see any of those

17    things.

18          THE COURT:  Let me just ask you something.

19          MR. AGNIFILO:  Yeah, sure.

20          THE COURT:  Hypothetically speaking, if your client

21    reached out to this person on September 10, hypothetically

22    speaking ——

23          MR. AGNIFILO:  Right.

24          THE COURT:  —— said, I want you to say this.  Again,

25    very hypothetically saying —— let's say he said, I want you to

O9IHComC

1    lie about what happened.  I want you to tell this story, and

2    gives that information to her on the 10th.  And then on the

3    11th, you get a call from her lawyer saying that she's

4    interested in maybe making a statement, but he's not clear if

5    she could make a statement.

6          If that hypothetical situation happened, wouldn't that

7    still be evidence of an obstructive mind, mindset, of a

8    willingness to tamper with a potential witness?  I'm sure that

9    you're going to say that that person is not necessarily a

10   witness in this proceeding, and therefore I shouldn't consider

11   that.  But wouldn't that be evidence of a mindset that's

12   willing to tamper with witnesses or obstruct justice.  Because

13   I'm sure you would agree, you don't have to coerce someone in

14   order to obstruct justice, correct?

15         MR. AGNIFILO:  I agree with you.  I agree with your

16   Honor.  And I think if your —— your hypothetical is a

17   hypothetical, and I accept your hypothetical as that.

18         Yes, you might be right.  I wouldn't necessarily know.

19   But what I —— the reason I wanted to speak to her —— and

20   Ms. Geragos remind me that we spoke to her on the 10th as well.

21   And she's coming with her computer.  We're going to get some

22   accurate facts, probably more specific than I'm saying.

23         MS. GERAGOS:  Your Honor, I just want to say we did

24   speak to her.  I spoke to her, I'll say, for 30 minutes on the

25   early morning of the 11th so that she could recount her facts

O9IHComC

1    to us as to her —— she's mentioned in the lawsuit about 34

2    times, so she felt that her name was also being besmirched in

3    terms of she had witnessed violent acts by Mr. Combs against

4    the Victim-1 of Count Two.  And so I believe the contact with

5    this potential witness was also a potential defense witness for

6    us to speak to because she was mentioning violent acts with

7    respect to the person who is now Victim-1 of Count Two.  So we

8    did speak to her that night because we thought it was important

9    in terms of our defense investigation.

10             That's all I have to say.  I'll let ——

11             THE COURT:  I'm sorry.

12             MS. GERAGOS:  I'll let Mr. Agnifilo ——

13             THE COURT:  Go ahead and continue.  I didn't mean to

14   cut you off.

15             MS. GERAGOS:  No, I'll let Mr. Agnifilo continue.  He

16   wasn't on that call, so I just wanted to make that

17   representation.

18             THE COURT:  That was on the 11th?

19             MS. GERAGOS:  That was, I think, maybe even 2:00 in

20   the morning on the 11th.

21             THE COURT:  OK.  But after speaking to defense counsel

22   on the 11th, what would be the reason for her and Mr. Combs to

23   keep in contact?  I saw in the record here defense counsel was

24   making a statement that Mr. Combs was reaching out to witnesses

25   just to line witnesses up.  If this witness has already spoken

O9IHComC

1   to defense counsel, what would be the purpose of Mr. Combs

2   continuing to speak to that witness after September 11?

3           MS. GERAGOS:  After —— after ——

4           THE COURT:  After your conversation with the witness,

5   why would he need to reach out to her?

6           MS. GERAGOS:  Your Honor, I can't speculate only to

7   say that I think that this witness was really upset by the fact

8   that she kept getting publicized in many different articles

9   about incidents that she was supposedly present at that she

10  just was not —— that she stated, at least to us, that she was

11  not present for.  And that's my speculation.  I don't know

12  if ——

13          MR. AGNIFILO:  No, I understand your Honor's question,

14  and I don't know that all of these things resulted in

15  conversations.  I don't have access to the government's

16  evidence on this point, so I don't know that all these things

17  resulted in conversations.  Obviously, she wanted to speak to

18  Mr. Combs because her name was in this civil suit, and she

19  didn't want the name in the civil suit.  And she also wanted to

20  say I didn't see any of these things happen.

21          To the point that Ms. Geragos raised, in addition to

22  being named in the civil suit, she also may be an important

23  defense witness for conduct that may or may not be charged as

24  part of the indictment because it relates to the person who's

25  in Count Two.  So this is an important defense witness.  It's

O9IHComC

1    someone we will speak to.

2            But I want to allay the Court's larger concerns, and

3    then we can come back to this.  Because I am hearing the Court

4    loud and clear, and I have actual proposals that I think will

5    assist in showing the Court that we are taking the Court's

6    concerns very seriously.

7            I have brought to court today, in the fourth row, the

8    handsome man who lost his hair at some point is there.  His

9    name is Herman Weisberg.  Herman Weisberg owns SAGE

10   Intelligence.  He's a former New York Police Department

11   detective.  He worked in the DA squad, and he's had SAGE

12   Intelligence for, I think, about 15 years.  And here's what we

13   are proposing, in addition to all of the other conditions that

14   we have in our bail proposal:

15           That SAGE, personnel from SAGE Intelligence — all of

16   whom will be former law enforcement officials, either federal

17   law enforcement officials or state law enforcement officials —

18   will be monitoring the residence of Mr. Combs 24 hours a day;

19   24 hours a day, seven days a week.  Here's what this will

20   involve.

21           They will have at least one, and probably two, SAGE

22   employees there at all times.  They will basically have full

23   control of who enters and who doesn't enter.  There will be a

24   visitor's log that is kept and that we could have it shared

25   with Pretrial Services every week or every day or whatever we

O9IHComC

1    would like to do in those regards.

2           Mr. Combs will not have access to a cell phone.  Since

3    there will be a SAGE personnel on-site, if we want to reach

4    him, we can reach him that way.  He won't have access to the

5    Internet.  So what I am trying to fashion is a situation where

6    any witness intimidation, if that is the Court's concern, and I

7    see that it is, would be completely nullified.  It would be

8    virtually impossible.  And SAGE would monitor these things —

9    make sure he doesn't have a cell phone, make sure that anybody

10   who comes to the house is on the preapproved list of visitors,

11   would keep track of all the visitors.  And we can make that

12   list of visitors and provide it to the government, to pretrial,

13   and the Court.

14          SAGE would establish communications with local law

15   enforcement in Florida, if need be.  If there is some emergent

16   matter, SAGE would contact local law enforcement.  And what we

17   could do, Judge, and what we're willing to do is put together a

18   protocol so that the Court is absolutely satisfied and

19   comfortable that there is quite literally no way that Mr. Combs

20   would be able to conduct any kind of contact, have any — do

21   anything with a witness of any nature.

22          One thing that I want to make clear, in light of the

23   government's proffer today — and I'm not going to go through

24   all of the things that I said yesterday.  Your Honor read the

25   transcript, and I don't need to go through them all again — is

O9IHComC

1    we believe we have very significant defenses to everything that

2    the government has said, and we have been conducting, on the

3    defense side, a very significant investigation for six months.

4    And I anticipate that is only going to increase as we get

5    closer and closer to a trial.

6         So we will conduct the investigation, meaning the

7    lawyers and the investigators.  Obviously, Mr. Combs will have

8    no role in that.  Mr. Combs will not contact anybody who is not

9    on the preapproved list.  We will ensure that that's the case.

10   And if he fails to do that in any way, shape, or form, we would

11   explain to Mr. Combs that that would be a violation of his

12   release conditions, and he should expect to be incarcerated.

13   And that is an obviously real concern because, getting ready

14   for this —— Mr. Combs would be in the special housing unit if

15   he was incarcerated in the MDC.  That presents tremendous

16   challenges to us.  Given the amount of electronic evidence,

17   it's a very difficult place to be as an inmate, and it's a very

18   difficult place to get ready for any trial, much less a trial

19   with a tremendous amount of discovery, as this case has.

20        So he knows the stakes.  I will put something in place

21   that would give the Court and Pretrial Services and the

22   government assurance that nobody will be contacted unless that

23   person is on the preapproved list.  That would be monitored by

24   the people at SAGE.  And we are at risk of Mr. Combs being

25   incarcerated if anybody falls down on the job.  If Mr. Combs

O9IHComC

1    does something he's not supposed to do, if SAGE somehow misses

2    Mr. Combs doing something he's not supposed to do, if his

3    lawyers miss Mr. Combs doing something he's not supposed to do,

4    we know what the consequences would be.

5           So I'm listening to your Honor loud and clear.  And

6    I'm going to address risk of flight in a second because the

7    government's still moving on that theory, but I do want to

8    assure the Court that we are prepared to put in strenuous and

9    maybe unusual conditions to meet the Court's concern when it

10    comes to these important matters.

11           Now, that is not to say that I agree with the

12    government's assessment of whether these things are obstruction

13    or not obstruction.  That's an issue for another day, and I'll

14    take it up on the other day.  What I'm here to do today is to

15    address your Honor's concern.  When your Honor came out on the

16    bench, your Honor shared your Honor's thoughts with us, and I

17    listened loud and clear.  And I want to address those thoughts,

18    and I want to address those concerns directly.  And through

19    having SAGE Intelligence, their former law enforcement

20    officers, on-site 24 hours a day —— and we'll do whatever needs

21    to be done.  If we need two of them, we'll have two of them.

22    If we need three of them, we'll have three of them.  And we'll

23    put everything in place that we need in terms of visitors

24    coming in, visitors who aren't on the list and who can't come

25    in, that will all be done.  That will all be monitored, and we

O9IHComC

1    will all know what's being done in that regard.  So that is how

2    I intend to deal with that.

3         Mr. Combs, like I said, would not have a cell phone.

4    He would not have any ability to use the Internet.  And that

5    would, I think, come a long way to giving the Court greater

6    comfort in this regard.

7         I do want to address another issue, because I don't

8    believe that the actions that Mr. Combs has taken in regard to

9    surrendering his passport and coming to New York are only in

10   regard to risk of flight.  I disagree with my colleague's

11   assessment in that regard.  Because I think what it shows is

12   that he is deeply respectful of the Court's authority.  He is

13   willing to show that he is responsible, that he can follow

14   these directions, and that he is mindful and has been mindful

15   — and this is important — he is mindful and has been mindful

16   for a very long time that this is a significant investigation

17   and that the charges could be significant; not significant

18   because they're true, but significant just because they're

19   weighty charges.  And with the sex trafficking count, at a

20   minimum, it has a rebuttable presumption of detention, so I

21   want to put these in somewhat of a different light.  And I

22   won't belabor it because I know your Honor read this already.

23        When we told the government on April 1, all those

24   months ago, that we had Mr. Combs' passport, we were giving the

25   government an assurance:  He was not going to travel

O9IHComC

1    internationally, which he hasn't, and that the government would

2    know where he is.  Mr. Combs was willing to do that because he

3    understood that this was a significant investigation.

4         Now what I want to point out in this regard is this:

5    Back on April 1, when we sent the email to the government and

6    said that we have Mr. Combs' passport, we specifically went

7    through the charges that we believed they were looking into,

8    and we specifically mentioned racketeering conspiracy, we

9    specifically mentioned sex trafficking, and we specifically

10   mentioned violation of the Mann Act.  We mentioned all three

11   counts that ended up being in the indictment.

12        So back on April 1, we knew exactly the nature of this

13   investigation, and it turns out we were right.  But the

14   significance isn't that we're right.  The significance is that

15   we knew it was substantial, and even in the face of a

16   substantial investigation, Mr. Combs surrendered his passport.

17   Now, but that wasn't all.

18        THE COURT:  Just to be clear, when you're saying "we,"

19   you're including your client, Mr. Combs, in that; that he was

20   aware of that at least by April 1?

21        MR. AGNIFILO:  100 percent.  Just to make it clear,

22   Ms. Geragos and I flew to Florida.  We sat with Mr. Combs in

23   his house in Florida, and we said:  You are being investigated

24   by the Southern District of New York for a number of serious

25   charges.  Let me tell you what they are.  It's racketeering

O9IHComC

1   conspiracy.  It's sex trafficking.  It's obstruction of

2   justice.  It's prostitution, Mann Act-type prostitution.  I

3   mean, we were right because we knew what they were looking

4   into.  We also knew it because there was a search warrant, and

5   the search warrant had crimes in it.  So he knew.  He knew on

6   April 1 exactly what they were looking into.

7          Now, the government in their letter to your Honor

8   today somehow makes an argument that this is like defense

9   lawyer —— I think they call it defense lawyer theater, but it's

10  not theater at all.  It's actually a person showing tremendous

11  respect for the process and showing the Court that he can be

12  trusted because what he also —— what we went also on to do is

13  we took the passports of five of his family members.  And

14  members of his family and friends are here today in the second

15  row.  They love him.  They support him.  And many of them gave

16  us their passports over the last several months.

17          We also made efforts to sell his airplane, which is in

18  the process.  We have a letter of intent to sell the airplane.

19  Because I was concerned that, if he had access to an airplane,

20  that would give your Honor concern; that would give the

21  government concern.  I credit the government for not raising it

22  as a concern, and I think it's not a concern because we're

23  selling it.  But the significant thing is we had the foresight

24  to try to sell it.  Apparently, selling an airplane is not an

25  easy thing to do.  We've had three different buyers who didn't

O9IHComC

```
 1   work out.  We're on, I think, the fourth buyer, but, hopefully,

 2   we'll actually sell it this time.  In the meantime, we will

 3   make sure that Mr. Combs is not —— so let me just back up for a

 4   second.

 5          Because he is not using the plane, no plan on using

 6   the plane anytime in the near future, it gets chartered,

 7   because the plane has to keep flying or the plane apparently

 8   starts to fall apart.  So it gets chartered, and it's being

 9   chartered.  It's being chartered by other people in sort of a

10   public way.

11          THE COURT:  Can you just get to the point where you

12   said that this doesn't relate simply to risk of flight.

13          MR. AGNIFILO:  Yeah.

14          THE COURT:  Can you tell me what this relates to

15   otherwise.

16          MR. AGNIFILO:  It shows respect for the Court.  It

17   shows that he's trustworthy.  It shows that he is showing that

18   this is a serious process to him.  Your Honor must have seen

19   defendants who thumb their nose at the court and say:  Come

20   find me.  I'm not going to show the court the due respect that

21   it deserves.  I'm not going to do the things to show the Court

22   that I'm trustworthy.  Some defendants flee outright.  In some

23   of the cases that are distinguishable and your Honor's read,

24   like *Maxwell* and *Epstein* ——

25          THE COURT:  How does that relate to dangerousness
```

1    generally or danger of obstruction?  Because it seems to me

2    that it may —— what you've said relates to danger of

3    obstruction, but not in a good way for you.  If he's aware of

4    this April 1, 2024, then, again, why is he contacting witnesses

5    in June and July of 2024?

6         MR. AGNIFILO:  So I have an answer.  A witness

7    contacted him.  I think I know what they're talking about.  And

8    a person contacted my client on Signal, so it doesn't show up,

9    and wanted to talk to him, and he spoke to her.  And the

10   witness —— I'll tell you exactly what happened.  And the

11   witness told him I'm a grand jury witness.  He told us that,

12   Ms. Geragos and I, and we said:  Don't talk to her anymore.

13   And he didn't talk to her anymore, and that was that.

14        She contacted him, if it's the thing that I'm thinking

15   about, and I think I'm right.  So that is not him reaching out

16   to a witness.  He did not reach out to grand jury witnesses.  I

17   dispute that wholeheartedly.  He didn't do it and he wouldn't

18   do it.  And he wouldn't do it because he has the sense not to

19   do it, and he wouldn't do it because we wouldn't let him do it,

20   you know.  So as much as we ——

21        THE COURT:  OK.  Let's get back to, again, this point

22   that you're making.  This all seems to be that this is just

23   related —— this is again cabined to risk of flight.  So tell me

24   again why surrendering of the passports and everything has

25   something to do with danger.  You're saying it shows respect

O9IHComC

1    for the court, respect for the proceedings.  That seems

2    quintessentially like risk of flight.

3         MR. AGNIFILO:  Because I think part of ⸺ defendants

4    who are dangers, once the court process starts, are people who

5    have disregard for the court.  It's contemptuous of the court.

6    They are doing things, they're engaging in conduct that they

7    know is contemptuous of the court.  And everything that

8    Mr. Combs has done has shown he is not and has never been

9    contemptuous of the court.  In fact, his whole life has been

10   the exact opposite.

11        And it's important that I bring this up to your Honor

12   because I think it's a serious consideration.  It's not on his

13   rap sheet because he was acquitted, but it's well known that

14   between 1999 and 2001, he had a very significant criminal case

15   in Manhattan.  He went to trial, and he was acquitted.  And

16   during that over one-year period, he went to court every time

17   he was supposed to.  During that over one-year period, there

18   were no issues with witnesses.  There were no issues with

19   danger.  And he abided by the process.  He showed respect for

20   the court.  He came to court every day.  He went to trial, and

21   a jury of 12 New Yorkers found him not guilty.

22        So this is someone who actually has shown that, when

23   the chips are down, when the pressure is on, he doesn't do

24   anything that he's not supposed to do.  He shows up on time.

25   He shows up every day.  He didn't do anything with witnesses.

O9IHComC

| | |
|---|---|
| 1 | He didn't do anything dangerous.  And that is a track record. |
| 2 | That happened.  That's not just his lawyer making an argument. |
| 3 | That's the truth, and that's in the record.  That happened. |
| 4 | There is no issues with him for that over one-year period, and |
| 5 | he went to trial and was acquitted.  And he's going to show the |
| 6 | exact same respect for this Court. |
| 7 | So the reason it relates to danger and the reason it |
| 8 | relates to the government's concerns of witness intimidation is |
| 9 | because he hears the Court loud and clear.  There's a case now, |
| 10 | and he is going to do everything right from this point forward. |
| 11 | And I'm not asking your Honor just to trust him.  I am asking |
| 12 | your Honor to trust him, I am, but not that alone.  I'm saying |
| 13 | that if we put in place the different measures that I have in |
| 14 | the bail package and the letter that we submitted to the Court, |
| 15 | along with SAGE Intelligence — which we didn't name them, so I |
| 16 | understand why the government thought that we were going to use |
| 17 | the same security service that's been in place all this time, |
| 18 | but that was never the plan.  The plan was always to use a |
| 19 | company like SAGE Intelligence, and that's the plan now — |
| 20 | that, in addition to the fact that he's shown that he is |
| 21 | trustworthy — and I believe he has because I believe the |
| 22 | incidents that the government's talking about do not amount to |
| 23 | witness intimidation in the slightest — that we have in place |
| 24 | a foolproof system that will give the Court what it needs.  He |
| 25 | is not going to contact anybody.  He is not going to reach out |

O9IHComC

1    to anyone, and he's going to let his lawyers do the defense

2    investigation, as we should.

3        THE COURT:  But tell me more about this allegedly

4    foolproof system that you're proposing.  Under the system,

5    would Mr. Combs still have employees?

6        MR. AGNIFILO:  He will have employees.  He has

7    employees.  He has, you know, people who manage his finances.

8    They're not necessarily in the same house.  They're located in

9    California.  But he does have employees.

10        THE COURT:  Would it be necessary for him to speak

11    with these employees or have someone on his behalf speak with

12    these employees?

13        MR. AGNIFILO:  We could work that out.  There's going

14    to have to be some way of communicating with the employees,

15    some form or fashion of doing that.  I mean —

16        THE COURT:  And under your proposal, would Mr. Combs

17    be able to leave the residence?

18        MR. AGNIFILO:  No, I don't anticipate that he will.

19        THE COURT:  Would your proposal be the security

20    company — you said they'd be there.

21        MR. AGNIFILO:  Yes.

22        THE COURT:  What does "there" mean?

23        MR. AGNIFILO:  So there is — his home in Florida is

24    the one that we're looking to secure the bond.  It is in Miami.

25    He would live there and the security personnel would live there

O9IHComC

1  as well.  I mean, they would probably do it in shifts.  I don't

2  exactly know how, but they'll probably do it in eight-hour

3  shifts and rotate in and out.  But there will be ——

4         THE COURT:  But the proposal is that they would just

5  be in the house, not sitting there looking at him the whole

6  time, correct?

7         MR. AGNIFILO:  I don't know that they would need to

8  sit there and look at him.  I think what we could do is we

9  could put cameras.  We could put cameras at the entrances that

10 are filming 24 hours a day, and they would be in the house and

11 aware of the goings-on.  If there were requirements that he

12 don't have a cell phone, we could find ways of doing

13 spot-checks to make sure that he's not on a cell phone.  If the

14 requirement is that he doesn't use the Internet, we can do

15 spot-checks that he doesn't use the Internet.  But we can make

16 it as secure as we need to make it.

17        And let me just add, there are already —— and the

18 government knows this because I think they took a lot of the

19 footage back on March 25 —— there are cameras in different

20 parts of the house, so all we would need to do is kind of keep

21 those cameras rolling.  I'm happy to share the footage with

22 anybody who wants it.  But what we would do is we would monitor

23 those cameras, in addition to physically monitoring the

24 situation with the officers on-site.

25        THE COURT:  Who would be living in the home with him?

O9IHComC

1          MR. AGNIFILO:  One second.

2          (Counsel conferred with defendant)

3          MR. AGNIFILO:  I think we can arrange things so he's

4     the only one living there and that SAGE would be working there,

5     doing security, and he'd be the only one actually residing at

6     the house.

7          THE COURT:  But there would be visits from family

8     members and employees and friends and the like, correct?

9          MR. AGNIFILO:  Assuming that those people are —— we

10    will put a list together, we will share it with everybody who

11    wants to see it, and those would be the people who visit.  And

12    nobody else would visit because SAGE won't let them in.

13         THE COURT:  Go ahead.  Is there anything else?  You

14    want to address the violence and danger more generally?

15         MR. AGNIFILO:  Sure.  Yes, Judge.

16         THE COURT:  I know you made some statements before

17    regarding the 2016 video incident.

18         MR. AGNIFILO:  Yes, Judge.

19         THE COURT:  Again, that video is quite disturbing.

20    And it was eight years ago, but he's still 46, 47 years old at

21    the time this is taking place.

22         MR. AGNIFILO:  He was.

23         THE COURT:  And this was after his acquittal on the

24    state court charges.

25         MR. AGNIFILO:  It was.  So let me shed some light.

O9IHComC

 1    Your Honor asks a good question.  I think there's an answer to

 2    it.

 3              In the weeks and months after the video, Mr. Combs

 4    realized he has a problem with drug addiction and he has a

 5    problem with anger, and he went and —— he went into a rehab

 6    program for a period of time.  I don't want to get too much

 7    into this, but it's significant.  The person —— the woman in

 8    the video also went into rehab around the same time.

 9              The point is this was a ten-year relationship that was

10    very loving at times.  These people loved each other, and I

11    don't think there's any other view of the relationship than

12    that because they're just —— the written messages are —— it's

13    heartbreaking.  It's sort of a heartbreaking relationship in

14    many ways because they really did love each other.  And I think

15    what the government is doing —— and I'm not saying this in a

16    bad way —— but I think the dynamic of the case that I object to

17    most, most respectfully, is this:  The sex and the violence

18    were totally separate and motivated by totally different

19    things.  The way that this couple chose to be intimate was the

20    way that is —— they would bring a third party into their

21    intimacy.  That was their thing.  That is how these two adults

22    chose to be intimate.  And the written communications, Judge,

23    are overwhelming, overwhelming, that this is so.  Not only that

24    it was with consent, it was —— it was a sought-after, special

25    part of their relationship.  And in some ways ——

O9IHComC

1          THE COURT:  What does this have to do with him

2    punching her, throwing a vase at her, kicking her?  What's love

3    got to do with that?

4          MR. AGNIFILO:  It's a good question, and the answer is

5    it has nothing to do with because that's not what motivated

6    that stuff.  The intimacy is over here, OK?  All of the

7    problems are not related to the intimacy.  The problems are

8    related to jealousy from infidelity.  That is where the

9    problems come.  You have jealousy from infidelity.  You have

10   arguments.  You have fights.  You have things like you saw on

11   the video because of jealousy due to infidelity in both

12   directions, in both ── on the part of both participants,

13   Mr. Combs and this other person.  It's mutual.  And the

14   violence is from that 100 percent, and the written

15   communications make that clear.

16         THE COURT:  Let me just make sure I understand your

17   point on this.

18         MR. AGNIFILO:  Yes, your Honor.

19         THE COURT:  What is your point on this?  You're saying

20   that that's the reason that he ── because of jealousy, that's

21   the reason, because they had an argument, that that's the

22   reason that he punched her, threw a vase at her, and kicked

23   her?

24         MR. AGNIFILO:  I'm saying it's not sex trafficking.

25   The government is linking the two, and in the linkage they find

O9IHComC

1    sex trafficking.

2            THE COURT:  The government's also talking more

3    generally about violence against women and violence against

4    this particular woman who the government claims was sex

5    trafficked.

6            And let me ask you this thing:  If you're talking

7    about —— to the extent that you claim that this sort of

8    behavior was —— that inviting another person into the

9    relationship was somehow consensual, if that person is a sex

10   worker or prostitute and travels across state lines, isn't that

11   a problem regarding Count Three of the indictment?

12           MR. AGNIFILO:  It may or may not be.  I have spoken to

13   the people from this agency, and what they uniformly say is we

14   are not paid to have sex.  We are paid for our time.  And if we

15   meet somebody and it goes in that direction and everybody wants

16   to do this and there is sexual contact, then that sometimes

17   happens.

18           And, listen, at the end of the day, the one-time

19   governor of New York was investigated by the Southern District

20   of New York because he was sleeping with $5,000-an-hour

21   prostitutes while he was the governor, and they didn't

22   prosecute him.  They are prosecuting Mr. Combs for the exact

23   same type of conduct.

24           So, yes, let's assume for a second —— let's assume for

25   a second your Honor's question is right.  OK?  That is —— it's

O9IHComC

1    not sex trafficking.  It's not sex trafficking, that's my

2    point.  The reason we're really here and ——

3           THE COURT:  That would be a crime.  That would be a

4    federal offense.

5           MR. AGNIFILO:  No, I don't think that's true because I

6    don't know that, if you read the Mann Act, the consumer of the

7    intimacy is within the purview of the Mann Act.  My read of the

8    Mann Act is that it's about the business of sex, and there is

9    no argument that Mr. Combs was involved in the business of sex.

10   That's not the argument.

11          THE COURT:  Let's get back to that video and the

12   physical beating.

13          MR. AGNIFILO:  Yes.

14          THE COURT:  Why isn't that relevant to a consideration

15   as to danger to the community more generally and acts of

16   violence against women and what the government has alleged

17   here?

18          MR. AGNIFILO:  Judge, I think it's relevant.  I think

19   it is relevant.  I haven't said it wasn't relevant.  I'm saying

20   it's not part of the sex trafficking.  That's my theory, that

21   it's not part of the sex trafficking.  Is it relevant?  Your

22   Honor's going to look at the video the way everybody looked at

23   the video, the way Mr. Combs looked at the video.  Mr. Combs

24   issued an apology after the video, and I'm not going to undo

25   his apology.  It's a hard video to watch.  It's an upsetting

O9IHComC

1    video to watch.  It was an upsetting video to watch for

2    everyone, but that doesn't mean he should be incarcerated.

3          It's eight and a half years ago.  He went into rehab

4    since then.  He has done tremendous things to try to change as

5    a person since then, and he's not the same person he was then.

6    He was in a relationship that was a toxic relationship.  And

7    probably the best single thing, both for him and the woman

8    involved, is that they broke up and they both went their

9    separate ways seven years ago at this point —— six years ago.

10   Six years ago they broke up at this point, and sometimes that

11   happens in life.

12         You know, Mr. Combs has the unfortunate reality that

13   one of the worst things he's ever done was on videotape.  I'm

14   glad that didn't happen to me.  None of us should be that

15   unlucky.  But one of the worst things he ever did happens to be

16   on videotape, and it will one day be played at his federal

17   trial, and we'll deal with it when it is.  So I'm not asking

18   your Honor to ignore it.  I'm not ignoring it.  But I don't

19   think it's dispositive, and I don't think, in and of itself, it

20   means that he should be detained pretrial.

21         We have defenses to the charges.  That's the point.

22   We have defenses to the charges, real defenses.  This is going

23   to be a trial one day, 100 percent.  He's not going to plead

24   guilty to racketeering and sex trafficking and those things.

25   He's not.  So this is going to be a trial.  And I am asking

O9IHComC

```
 1    you, because it's so critically important, we have proffered,
 2    your Honor, a very substantial bail package.  And him coming to
 3    New York, Judge, I think, also is not just important in terms
 4    of risk of flight; I think it's important for every aspect of
 5    what we consider when we think about bail.
 6              I mean, this is a man — we had a meeting with the
 7    government.  Ms. Geragos and I met with my colleagues to my
 8    right here, I think it was, September 3.  It was a day after
 9    Labor Day, the Tuesday after Labor Day.  And Ms. Geragos and I
10    left that meeting, and I realized they were going to return an
11    indictment soon.  I didn't know if soon was a week.  I didn't
12    know if soon was a month.  I didn't know if soon was three
13    months.  I got on the phone with Mr. Combs the next day, and I
14    said you should consider coming to New York because I think
15    they're going to charge you soon.
16              He got on a plane on September 5 and came to New York,
17    and he came to New York to turn himself in.  He came to
18    New York to surrender.  And I told my colleagues, he's here.
19    He wants to surrender.  Just give him a time, and he'll be
20    there.  I understand that they don't have to do it, and they
21    didn't do it.  They told me they would get back to me, and then
22    he got arrested.  And that's OK.  That's OK.  But the fact that
23    he got on an airplane to come to New York when so many
24    defendants, Judge, get on an airplane or a bus or a train, or
25    whatever, and run as far away from the place of danger as
```

1    possible.  The fact that he did the exact opposite is a weighty

2    consideration of him in general.  And so when I say to the

3    Court that I want the Court to trust him, he has earned the

4    Court's trust.

5         And even if the Court doesn't fully trust him, trust

6    the package as a whole that I'm proposing with a $50 million

7    bond, which is a tremendous bond, secured by about $50 million

8    in equity with the cosigners that we've proposed; with the

9    passport surrendered that we've proposed, including his own

10   passport; with electronic monitoring; he stays in the house;

11   SAGE Intelligence supervises the house; we have a list of

12   permitted visitors; he doesn't have a cell phone; he doesn't

13   have any Internet access.  And I believe that will do two very

14   important things:  (1) It will give the Court comfort that he's

15   not a flight risk due to the conditions, he's not a danger,

16   he's not a danger of any witness obstruction with these

17   conditions, and it allows him to prepare for his trial in a

18   fair way.

19        And everything that we have been doing, we have known

20   this was coming.  If he was going to run, if he was going to do

21   something reckless and stupid, he would have done it in March,

22   and he didn't.  Instead, he gave us his passport, and we told

23   the government we had it.

24        This is someone who has worked hard his whole life.

25   We haven't gotten too much into his personal characteristics,

O9IHComC

1    but I think it's actually somewhat important.

2            He has — first of all, he has one misdemeanor

3    conviction from 29 years ago.  That's it.  He's 53 years old.

4    One misdemeanor conviction from 29 years ago.  He was an actual

5    altar boy growing up.  He's a very religious man.

6            THE COURT:  How far back are you going now?

7            MR. AGNIFILO:  The man has — I'm going back and I'm

8    talking about him as a person because it's all one continuum.

9            THE COURT:  OK.

10           MR. AGNIFILO:  He watches a sermon every day.  He's

11   religious.  He comes from a religious family.  His father,

12   unfortunately, was killed when he was two years old.  He was

13   raised by his mother, who did a wonderful job with him.  And he

14   has worked hard, and he has earned everything that he's ever

15   gotten in his life.

16           And the one thing that I'm asking your Honor for is to

17   see that he has done everything to earn the Court's trust.  He

18   has done a great deal to earn the Court's trust.  And I am

19   submitting that this very, very substantial package, both

20   what's in the written letter supplemented by what I said today,

21   and supplemented still further by SAGE Intelligence being

22   on-site — and we can have any protocol that your Honor sees

23   fit.  We'll certainly suggest one, but if your Honor wants

24   something more or different, we can do whatever your Honor

25   thinks is necessary — that that, in combination, that

O9IHComC

1    substantial package means that he should be released to work on

2    his case, to meet with his lawyers.  If we need to speak to him

3    by flying to Florida, we'll do that.  He'll stay in his house

4    in Florida, and he'll do nothing but prepare for his trial.

5          So I'm asking you to release him on these very, very

6    strenuous conditions, Judge.  Thank you.

7          THE COURT:  Thank you.

8          All right.  I've heard from the parties.  I've

9    reviewed everything.  I find that the government has proven

10   that the defendant is a danger regarding obstruction of justice

11   and witness tampering by clear and convincing evidence.

12         I also find that the government has proven that the

13   defendant is a danger to the safety of others in the community

14   more generally by clear and convincing evidence.

15         I need not reach the issue of risk of flight.  Again,

16   I find that the government has carried its burden of persuasion

17   by clear and convincing evidence on dangerousness both for

18   obstruction and witness tampering, as well as danger more

19   generally, even if the defense has rebutted the presumption by

20   coming forward with their burden of production.

21         Regarding the bail package that has been proposed by

22   defense counsel in terms of risk of flight, I think it's

23   insufficient.

24         In terms of overcoming what the government has proven,

25   again, I'll say it this way:  Again, the government has proven

O9IHComC

```
 1   by clear and convincing evidence that there is no condition or

 2   combination of conditions that will reasonably assure the

 3   safety of a person in the community, as well that he will not

 4   obstruct justice or tamper with witnesses.

 5        There are issues also with what the defense has

 6   suggested in terms of this SAGE Intelligence.  Certainly, the

 7   defendant would still have access to employees and other

 8   individuals.  And given what the government has proffered, he

 9   could certainly obstruct justice and intimidate witnesses

10   through those folks, through even coded messages if necessary.

11        So I am denying bail, and I am granting the

12   government's motion.

13        We are scheduled to have an initial conference on the

14   24th.  Since we're here, I don't know if we need to do that.

15   Perhaps we can just find out how counsel wish to proceed.  I

16   know that Mr. Combs was already arraigned on the indictment.

17   So how do counsel wish to proceed?  Let me hear from the

18   government first.

19        MS. SMYSER:  Thank you, your Honor.  Happy to give the

20   Court an overview of the discovery in the case and also the

21   government's proposed schedule.

22        So, first, I think it's important to note that your

23   Honor probably has seen this from the record so far, but there

24   is going to be a huge amount of discovery in the case.  It's

25   going to consist of dozens of terabytes of data.  Then I want
```

O9IHComC

1  to cover some of those categories of the Rule 16 discovery that

2  we'll be disclosing to the defense.

3          First, it will include grand jury subpoena returns.

4  For some context as to the volume of those returns, we have

5  served over 300 grand jury subpoenas in the case and gotten

6  returns from over 100 individuals and entities, including phone

7  companies, tech companies, social media companies, hotels,

8  airlines, some companies related to Mr. Combs himself.

9          Second, the Rule 16 discovery will also include search

10  warrants.  We've obtained over 20 search warrants in the case,

11  including warrants for electronic devices and iCloud accounts,

12  including warrants for his historical and prospective cell

13  phone information and for a variety of persons, as well as for

14  Mr. Combs' residences.

15          Third, the discovery will include photographs of

16  physical evidence, including evidence that was collected from

17  his residences in March 2024, as well as from his hotel room a

18  few days ago, which includes freak-off supplies, narcotics,

19  firearms, and ammunition.

20          The discovery will also include a variety of law

21  enforcement reports and records, including from local law

22  enforcement.

23          And finally, there are a large number of electronic

24  devices in the case.  Specifically, over the course of the

25  investigation, including in the past few days, the government

O9IHComC

1   has been collecting electronic devices and, in total, has

2   seized over 100 phones, laptops, tablets, and iCloud accounts,

3   as well as over 30 other kinds of devices.  And here, I'm

4   talking about things like hard drives, flash drives, cameras,

5   DVRs.  These devices are often large, sometimes hundreds of

6   gigabytes, sometimes terabytes, especially in relation to the

7   iCloud accounts.

8        Already the government has extracted approximately

9   half of those phones, laptops, tablets, and iCloud accounts.

10  And these devices are in the process of a privilege review,

11  varying stages of it, and they will then be reviewed for

12  identified data and —— review, and we will produce that

13  identified data on a rolling basis to defense counsel as it

14  becomes available.

15       So although this is a large amount of discovery, we

16  have a plan for producing it to defense counsel.

17       First, before producing any discovery, as your Honor

18  might anticipate, we will need a signed protective order given

19  that the discovery will contain sensitive victim and witness

20  information, and we have, as we've discussed, real concerns

21  about witness tampering as well as with the sensitivity of the

22  victim information and statements that have been given to the

23  media so far.  So we will start engaging in those discussions

24  with defense counsel today about negotiating the protective

25  order, and we'll let your Honor know if there are any issues

O9IHComC

1    with that process.

2            Second, soon after getting the protective order

3    signed, we plan to produce the affidavits related to the search

4    warrants that we've obtained in the case.  As I said, there are

5    over 20 of them.  Many of them have lengthy affidavits which

6    lay out large portions of the case and will assist the defense

7    in assessing whether there are motions that we would like to

8    make.

9            Third, within approximately 30 days of having a

10   protective order, the government would intend to make a large

11   production of discovery to the defense consisting of a variety

12   of things, including grand jury subpoena returns.  But,

13   importantly, we are prepared to produce many of Mr. Combs' own

14   devices and accounts.  We have approximately 35 full

15   extractions ready to produce to the defense.  We anticipate

16   that the copying of those devices, given their size, will take

17   some time, but we will engage in that process as soon as we

18   can.

19           And, finally, our plan would be, after this initial

20   large production, to continue to make productions on a rolling

21   basis.  And I just want to note for the Court that our

22   investigation in this case is very much ongoing, and we will

23   continue to produce the information that is in our possession.

24   And as we get more related to the new investigation, we will

25   also review that in accordance with our discovery obligations

O9IHComC

1    to produce to the defense.

2          We think it makes sense, in order to give defense

3    counsel sufficient time to review this discovery, to have a

4    status conference in approximately 90 days.

5          THE COURT:  OK.  Defense counsel, let me hear from

6    you.

7          MR. AGNIFILO:  Yes, your Honor.  I am —— without

8    speaking to Mr. Combs in greater detail, in light of the fact

9    that he's going to be in the SHU of the MDC, I'm not in a place

10   where I'm prepared to consent to a speedy trial.  I'm not

11   saying that I won't in the future, but this is a serious

12   conversation we have to have.  And the fact that he is going to

13   be incarcerated is a significant factor.  So I don't know that

14   I can consent to a 90-day adjournment for a status conference.

15   I think we want to reserve the right of moving much quicker

16   than that.  The government arrested him, the government wants

17   him detained, and we're going to have to do everything possible

18   to move this along.

19          So where I am today is I'd like some time to speak

20   with him, and more than just a few minutes here.  We need to go

21   through this in real detail.  I also need to see what's going

22   to be possible in the SHU, and I don't know that I exactly know

23   that now in terms of what computer facilities are going to be

24   possible.  And so at this point I'm not prepared to waive

25   speedy trial.

O9IHComC

1    THE COURT:  So what do you want to do at this point?

2  Do you want to set a trial date?  Do you want to, because I

3  would —— well, I don't know.

4    Do you want time to review the discovery that's going

5  to be produced, do you want to come back in 45 days, or do you

6  want me to set a trial date?  I can set a trial date if you

7  want me to set a trial date ——

8    MR. AGNIFILO:  I understand.

9    THE COURT:  —— whenever you want it.  And if I can't

10 try it, I'll find a colleague who can if you want to set a

11 trial date.

12    MR. AGNIFILO:  Can I just talk to the government for a

13 second?  I just have a question.

14    THE COURT:  Yes.

15    (Counsel conferred)

16    MR. AGNIFILO:  I have a proposal.  Would your Honor be

17 amenable to a status conference in somewhere between 14 and 20

18 days?  And in the interim, what I think we'll have a better

19 handle on is how Mr. Combs would be able to look at the

20 discovery, what discovery will be available when, and what,

21 from a technical perspective, he'll be able to look at and with

22 what level of difficulty.

23    So my ask of the Court is that we have a shorter

24 turnaround time for a status conference, and whatever's good

25 for the Court in that general period of time of two to three

O9IHComC

 1    weeks.

 2              THE COURT:  OK.  We can do that.

 3              What's your position on speedy trial time between now

 4    and that two- to three-week period?

 5              MR. AGNIFILO:  Without a much more in-depth

 6    conversation with my client, I'm not prepared to waive it.

 7              THE COURT:  OK.  What's the government's position on

 8    whether or not I should exclude ── well, let's get the date,

 9    first of all.

10              How about October the 9th?  Are counsel available

11    then?

12              MR. AGNIFILO:  One second, Judge.

13              THE COURT:  Let's say 2 o'clock.

14              MR. AGNIFILO:  That's fine, Judge.  Thank you.

15              THE COURT:  Does that work for the government?

16              MS. SMYSER:  Yes, your Honor.

17              THE COURT:  OK.  Let's set this down for October 9 at

18    2 o'clock.

19              I know the defendant says you don't want to waive

20    speedy trial time.  Fine.  What is the government's position on

21    whether or not time should be excluded, and what's defense

22    counsel's position on that?

23              MS. SMYSER:  Your Honor, the government would move to

24    exclude time under the Speedy Trial Act.  The ends of justice

25    outweigh the interests of the public and the defendant in a

O9IHComC

1    speedy trial here given the complexity of the case, given the

2    need for the government to produce discovery to the defendant,

3    and for the defendant and his counsel to begin to review that

4    discovery.

5        THE COURT:  All right.  So, defense counsel, I

6    understand your position.  You don't want to waive speedy trial

7    time.  I get that.  But would you be prepared to try this case

8    on October the 9th?

9        MR. AGNIFILO:  No, no, I'm not saying that I am.  What

10   I'm saying is I need more information to come to the Court with

11   an intelligent position on this, and the things that we don't

12   know is what his ability to look at the stuff will be where he

13   is.  I don't know where he will be in the MDC.  Where they

14   designate him is significant to that.  I think the government

15   is — it might help in the process of trying to make sure that

16   he gets what he needs, and I think by October 9 we'll have a

17   better idea of what they can produce and when.

18       So, no, I'm not looking to try the case on October 9.

19   That would be irresponsible.  I'm not asking to do that.  But

20   what I am asking is — the government's going to move with all,

21   you know, urgency to get me everything, and then October 9, I

22   think we'll have our arms around the situation a little bit

23   better.

24       THE COURT:  OK.  I will exclude time under the Speedy

25   Trial Act from today's date until October 9 so the defense

O9IHComC

1    counsel gets an opportunity to consult with his client, gets an

2    opportunity to start reviewing the discovery, gets an

3    opportunity to decide how they want to proceed with this case,

4    and also to be better prepared for trial in this case.  I find

5    that the interests of Mr. Combs and the interests of justice

6    support exclusion of time under the Speedy Trial Act from

7    today's date until October 9.  I further find that the

8    interests of Mr. Combs and the interests of justice outweigh

9    the public's interest in a speedy trial.  I will enter an order

10   to that effect.

11          Let me also just share something with counsel.  We

12   received a couple of calls in chambers today from people who

13   claimed to have information relevant to the prosecution of this

14   case.  We did not engage with those individuals other than my

15   staff instructed them to reach out to the U.S. Attorney's

16   Office.  I just wanted to let counsel know that.

17          The other thing is that, in their most recent

18   submission, the government made an allusion to Local Criminal

19   Rule 23.1.  Is there anything that anybody wants me to do about

20   that now, counsel for the government?  Again, that relates to

21   statements allegedly made by defense counsel on some news

22   channel recently.

23          MS. JOHNSON:  We're not asking the Court to do

24   anything right now, your Honor.  We just wanted to put a marker

25   down that we thought some of the comments got a little bit

O9IHComC

1    close to the line under the local rule, particularly with

2    respect to issues regarding the victim and potentially

3    inadmissible evidence.  So we just wanted to flag that for the

4    Court.

5            THE COURT:  OK.  Anything else from defense counsel on

6    that?

7            MR. AGNIFILO:  I'm not sure that this is something

8    that the Court ——

9            THE COURT:  They're not asking me to do anything.  You

10   don't have to say anything.

11           MR. AGNIFILO:  No, no, it's not about that.

12           THE COURT:  Go ahead.

13           MR. AGNIFILO:  I believe —— and I know that courts

14   sometimes do this in terms of sentencing.  I've never actually

15   asked a court to do it on a pre-sentencing posture.  I think

16   Essex County would be preferable to the MDC, and I know that

17   they do house certain defendants, even in Southern District and

18   the Eastern District cases, in Essex County.

19           I don't know what your Honor can do to help in that

20   regard.  I've never made this request of a court at a pretrial

21   setting.  But I don't —— if your Honor would say you don't have

22   any objection to it, if that was consistent with the protocols

23   that existed, that might even be helpful, and then I'll take

24   the weight on myself to try to make that happen if I can.  So

25   any little thing could help me.

O9IHComC

1          THE COURT:  OK.  Government, what's your view on this?

2          MS. JOHNSON:  I don't have the cite off the top of my

3  head, but I know that in the regulations there's —— that the

4  designation authority is entirely within —— given to the BOP.

5  I think this gets a little complicated, and I think —— I don't

6  know that there's anything that the Court can do to put the

7  thumb on the scale of where he's placed.  I think that's

8  ultimately a decision of the Bureau of Prisons.

9          THE COURT:  My sense is that what defense counsel is

10  asking is it's akin to, at sentencing, even though the Court

11  has no authority to dictate where someone is held, basically

12  akin to the Court making a recommendation that someone be

13  housed at a particular facility.  Again, I'm not aware of that

14  being done pretrial, so perhaps what we should do is have

15  counsel file a joint status report regarding this issue,

16  regarding what, if anything, the Court can do in that regard.

17  Certainly, defense counsel, you can look into this on your own.

18  Let's get that by Monday, September 23.

19          Does that work for the defense?

20          MR. AGNIFILO:  Yes, your Honor.  Thank you.

21          THE COURT:  Does that work for the government?

22          MS. JOHNSON:  It does, your Honor.

23          THE COURT:  That will be a joint submission.

24          Is there anything else today from the government?

25          MS. JOHNSON:  No, your Honor.  Thank you.

O9IHComC

| | |
|---|---|
| 1 | THE COURT:  Is there anything else today from the |
| 2 | defense? |
| 3 | MR. AGNIFILO:  No, thank you. |
| 4 | THE COURT:  Let me just —— I will say this:  We have a |
| 5 | status conference date for October the 9th, and I'll be around, |
| 6 | and we can certainly do that.  I know that the —— being placed |
| 7 | in the MDC will be difficult, and often when prisoners are |
| 8 | taken to court, they're often woken up at 3:00 or 4:00 in the |
| 9 | morning and taken to court.  If counsel have discussed matters |
| 10 | with themselves and come to some agreement as to how we should |
| 11 | move forward, I will not object to counsel submitting a joint |
| 12 | report a couple of days ahead of time, because there's no |
| 13 | reason to have a court appearance just to simply adjourn it for |
| 14 | another day. |
| 15 | Anything from the government on that? |
| 16 | MS. JOHNSON:  Understood, your Honor.  We'll speak |
| 17 | with counsel and see if we can reach any resolutions prior to |
| 18 | October 9. |
| 19 | THE COURT:  Anything from the defense on that? |
| 20 | MR. AGNIFILO:  I understand the Court's position. |
| 21 | THE COURT:  All right.  We're adjourned.  Thank you. |
| 22 | (Adjourned) |
| 23 | |
| 24 | |
| 25 | |

ECF,INTAPP

# U.S. District Court
## Southern District of New York (Foley Square)
## CRIMINAL DOCKET FOR CASE #: 1:24−cr−00542−ALC All Defendants

Case title: USA v. COMBS                                     Date Filed: 09/12/2024

Assigned to: Judge Andrew L.
Carter, Jr

**Defendant (1)**

**Sean Combs**                          represented by   **Marc Antony Agnifilo**
*also known as*                                          Agnifilo Intrater LLP
Sealed Defendant 1                                       445 Park Avenue
                                                         Ste 7th Floor
                                                         New York, NY 10022
                                                         646−205−4350
                                                         Email: marc@agilawgroup.com
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Teny Rose Geragos**
                                                         Agnifilo Intrater LLP
                                                         445 Park Avenue
                                                         Ste 7th Floor
                                                         New York, NY 10022
                                                         646−205−4350
                                                         Email: teny@agilawgroup.com
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Anthony L. Ricco**
                                                         Law Office of Anthony L. Ricco
                                                         20 Vesey Street
                                                         New York, NY 10007
                                                         (212)−791−3919
                                                         Fax: (212) 791−3940
                                                         Email: tonyricco@aol.com
                                                         *ATTORNEY TO BE NOTICED*

**Pending Counts**                                       **Disposition**

18:1962−7480.F
RACKETEERING CONSPIRACY
(1)

18:1591.F SEX TRAFFICKING
OF CHILDREN OR BY FORCE,
FRAUD OR COERCION
(2)

TRANSPORTING FOR
PROSTITUTION
(3)

**Highest Offense Level (Opening)**

Felony

**Terminated Counts**                                    **Disposition**

None

**Highest Offense Level**
**(Terminated)**

None

**Complaints**                                                    **Disposition**

None

**Plaintiff**

USA                                       represented by   **Emily Anne Johnson**
                                                          DOJ–USAO
                                                          US Attorney's Office, SDNY
                                                          1 St. Andrew's Plaza
                                                          New York, NY 10007
                                                          212–637–2409
                                                          Email: emily.johnson@usdoj.gov
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*
                                                          *Designation: Assistant US Attorney*

                                                          **Madison Reddick Smyser**
                                                          DOJ–USAO
                                                          U.S. Attorney's Office, SDNY
                                                          One Saint Andrew's Plaza
                                                          New York, NY 10007
                                                          212–637–2381
                                                          Email: madison.smyser@usdoj.gov
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*
                                                          *Designation: Assistant US Attorney*

                                                          **Mary Christine Slavik**
                                                          DOJ–USAO
                                                          One St. Andrew's Plaza
                                                          New York, NY 10007
                                                          212–637–1113
                                                          Email: mary.slavik@usdoj.gov
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*
                                                          *Designation: Assistant US Attorney*

                                                          **Meredith Foster**
                                                          DOJ–USAO
                                                          Southern District of New York
                                                          26 Federal Plaza
                                                          New York
                                                          New York, NY 10278
                                                          212–637–2310
                                                          Email: meredith.foster@usdoj.gov
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*
                                                          *Designation: Assistant US Attorney*

                                                          **Mitzi Steiner**
                                                          DOJ–USAO
                                                          1 St. Andrew's Plaza
                                                          New York, NY 10007
                                                          212–637–2284
                                                          Email: mitzi.steiner@usdoj.gov
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

*Designation: Assistant US Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/12/2024 | 1 | UNREDACTED INDICTMENT FILED as to Sealed Defendant 1. (jm) **(Not for Public view pursuant to Standing Order of the court, 24–mc–184.)** (Entered: 09/17/2024) |
| 09/12/2024 | 2 | SEALED REDACTED INDICTMENT as to Sealed Defendant 1 (1) count(s) 1, 2, 3. (jm) (Entered: 09/17/2024) |
| 09/17/2024 | 3 | Order to Unseal Indictment as to Sealed Defendant 1. (Signed by Magistrate Judge Robyn F. Tarnofsky on 9/17/24)(jm) (Entered: 09/17/2024) |
| 09/17/2024 | | INDICTMENT UNSEALED as to Sean Combs. (jm) (Entered: 09/17/2024) |
| 09/17/2024 | | Case as to Sean Combs ASSIGNED to Judge Andrew L. Carter, Jr. Judge Unassigned no longer assigned to the case.. (jm) (Entered: 09/17/2024) |
| 09/17/2024 | | Case Designated ECF as to Sean Combs. (jm) (Entered: 09/17/2024) |
| 09/17/2024 | | Attorney update in case as to Sean Combs. Attorney Emily Anne Johnson,Mary Christine Slavik,Madison Reddick Smyser,Mitzi Steiner for USA added. (jm) (Entered: 09/17/2024) |
| 09/17/2024 | 5 | LETTER by USA as to Sean Combs addressed to Judge Andrew L. Carter, Jr. from USA dated September 17, 2024 re: Govt Request for Detention Document filed by USA. (Johnson, Emily) (Entered: 09/17/2024) |
| 09/17/2024 | 6 | NOTICE OF ATTORNEY APPEARANCE: Marc Antony Agnifilo appearing for Sean Combs. Appearance Type: Retained. (Agnifilo, Marc) (Entered: 09/17/2024) |
| 09/17/2024 | 7 | NOTICE OF ATTORNEY APPEARANCE: Teny Rose Geragos appearing for Sean Combs. Appearance Type: Retained. (Geragos, Teny) (Entered: 09/17/2024) |
| 09/17/2024 | | Attorney update in case as to Sean Combs. Attorney Meredith Foster for USA added. (jm) (Entered: 09/17/2024) |
| 09/17/2024 | 9 | MOTION for Bond *Updated ECF 8* . Document filed by Sean Combs. (Agnifilo, Marc) (Entered: 09/17/2024) |
| 09/17/2024 | | Arrest of Sean Combs (Arrest date of 9/16/2024). (job) (Entered: 09/17/2024) |
| 09/17/2024 | 10 | Minute Entry for proceedings held before Magistrate Judge Robyn F. Tarnofsky: Initial Appearance as to Sean Combs held on 9/17/2024. Detention Hearing as to Sean Combs held on 9/17/2024. Arraignment as to Sean Combs (1) Count 1,2,3 held on 9/17/2024. Plea entered by Sean Combs (1) Count 1,2,3 Not Guilty. AUSA Emily Johnson present for the Government. Defendant present with attorney's, Marc Agnifilo and Teny Geragos. BAIL DISPOSITION: Detention: Risk of Flight/Danger. –Speedy Trial time excluded until 9/24/2024. (Status Conference set for 9/24/2024 at 10:00 AM before Judge Andrew L. Carter Jr..) (job) (Entered: 09/17/2024) |
| 09/18/2024 | 11 | ORDER as to Sean Combs. A Bail Appeal Hearing is set for September 18, 2024 at 2:00 p.m. (Bail Appeal Hearing set for 9/18/2024 at 02:00 PM before Judge Andrew L. Carter Jr) (Signed by Judge Andrew L. Carter, Jr on 9/17/2024)(jw) (Entered: 09/18/2024) |
| 09/18/2024 | 12 | AMENDED ORDER as to Sean Combs. A Bail Appeal Hearing is set for September 18, 2024 at 3:30pm (Bail Appeal Hearing set for 9/18/2024 at 03:30 PM before Judge Andrew L. Carter Jr..) (Signed by Judge Andrew L. Carter, Jr on 9/17/24)(jw) (Entered: 09/18/2024) |
| 09/18/2024 | 13 | LETTER MOTION addressed to Judge Andrew L. Carter, Jr. from Marc Agnifilo, Esq. dated 9/18/2024 re: Mr. Combs' Release from Custody . Document filed by Sean Combs. Return Date set for 9/18/2024 at 03:30 PM. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9)(Agnifilo, Marc) (Entered: 09/18/2024) |

| 09/18/2024 | 14 | Brady ORDER as to Sean Combs. (Signed by Magistrate Judge Robyn F. Tarnofsky on 9/18/24)(jm) (Entered: 09/18/2024) |
| 09/18/2024 | 15 | LETTER RESPONSE in Opposition by USA as to Sean Combs addressed to Judge Andrew L. Carter, Jr. dated 09/18/2024 re: 13 LETTER MOTION addressed to Judge Andrew L. Carter, Jr. from Marc Agnifilo, Esq. dated 9/18/2024 re: Mr. Combs' Release from Custody .. (Smyser, Madison) (Entered: 09/18/2024) |
| 09/18/2024 |  | Minute Entry for proceedings held before Judge Andrew L. Carter, Jr: Bond Hearing as to Sean Combs held on 9/18/2024. AUSAs Emily Johnson, Madison Smyser, Mary Slavik, Meredith Foster and Mitzi Steiner for the Government. Defendant appears with attorneys, Marc Agnifilo and Teny Geragos. Bail DENIED. Joint Status Report due 9/23/24. The 9/24/24 status conference is canceled. Status Conference set for 10/9/24 at 2:00 p.m. Time excluded from 9/18/24 to 10/9/24 in the interest of justice. Defendant remains in custody. Court Reporter: Raquel Robles. See transcript for complete details. (Status Report due by 9/23/2024. Status Conference set for 10/9/2024 at 02:00 PM before Judge Andrew L. Carter Jr.) (jbo) (Entered: 09/19/2024) |
| 09/23/2024 | 16 | LETTER by Sean Combs addressed to Judge Andrew L. Carter, Jr. from Marc Agnifilo, Esq. dated 9/23/24 re: Status Report (Agnifilo, Marc) (Entered: 09/23/2024) |
| 09/30/2024 | 17 | TRANSCRIPT of Proceedings as to Sean Combs re: Conference held on 9/17/24 before Magistrate Judge Robyn F. Tarnofsky. Court Reporter/Transcriber: Lisa O'Brien, (212) 805–0320, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/21/2024. Redacted Transcript Deadline set for 10/31/2024. Release of Transcript Restriction set for 12/30/2024. (Moya, Goretti) (Entered: 09/30/2024) |
| 09/30/2024 | 18 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Sean Combs. Notice is hereby given that an official transcript of a Conference proceeding held on 9/17/24 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 09/30/2024) |
| 09/30/2024 | 19 | TRANSCRIPT of Proceedings as to Sean Combs re: Conference held on 9/18/24 before Judge Andrew L. Carter, Jr. Court Reporter/Transcriber: Raquel Robles, (212) 805–0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/21/2024. Redacted Transcript Deadline set for 10/31/2024. Release of Transcript Restriction set for 12/30/2024. (Moya, Goretti); Modified on 9/30/2024 (bw). (Entered: 09/30/2024) |
| 09/30/2024 | 20 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Sean Combs. Notice is hereby given that an official transcript of a Conference proceeding held on 9/18/24 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 09/30/2024) |
| 09/30/2024 | 21 | NOTICE OF APPEAL by Sean Combs from 19 Transcript. Filing fee $ 605.00, receipt number 33291. (tp) (Entered: 09/30/2024) |
| 09/30/2024 |  | Transmission of Notice of Appeal and Certified Copy of Docket Sheet as to Sean Combs to US Court of Appeals re: 21 Notice of Appeal. (tp) (Entered: 09/30/2024) |
| 09/30/2024 |  | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files as to Sean Combs re: 21 Notice of Appeal were transmitted to the U.S. Court of Appeals. (tp) (Entered: 09/30/2024) |
| 09/30/2024 | 22 | NOTICE OF ATTORNEY APPEARANCE: Anthony L. Ricco appearing for Sean Combs. Appearance Type: Retained. (Ricco, Anthony) (Entered: 09/30/2024) |

O9IHComC

| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| | SOUTHERN DISTRICT OF NEW YORK |
| 2 | ------------------------------x |
| 3 | UNITED STATES OF AMERICA, |
| 4 | v.                    24 Cr. 542 (ALC) |
| 5 | SEAN COMBS, |
| 6 | a/k/a "Puff Daddy," |
| | a/k/a "P. Diddy," |
| 7 | a/k/a "Diddy," |
| | a/k/a "PD," |
| 8 | a/k/a "Love," |
| 9 | Defendant. |
| | Bond Appeal |
| 10 | ------------------------------x |
| 11 | New York, N.Y. |
| | September 18, 2024 |
| 12 | 3:30 p.m. |
| 13 | Before: |
| 14 | HON. ANDREW L. CARTER, JR. |
| 15 | District Judge |
| 16 | APPEARANCES |
| 17 | DAMIAN WILLIAMS |
| | United States Attorney for the |
| 18 | Southern District of New York |
| | BY:  EMILY JOHNSON |
| 19 | CHRISTINE SLAVIK |
| | MADISON SMYSER |
| 20 | MITZI STEINER |
| | MEREDITH FOSTER |
| 21 | Assistant United States Attorneys |
| 22 | AGNIFILO INTRATER LLP |
| | Attorneys for Defendant |
| 23 | BY:  MARC AGNIFILO |
| | TENY R. GERAGOS |
| 24 | |
| | Also Present:  Francesca Tessier, Pretrial Services Officer |
| 25 | Joshua Rothman, Pretrial Services Officer |

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O9IHComC

```
 1              THE DEPUTY CLERK:  Criminal cause for a bail appeal
 2    hearing in case No. 24 Cr. 542, United States v. Sean Combs.
 3              Counsel, please state your appearances for the
 4    government.
 5              MS. JOHNSON:  Good afternoon, your Honor.  Emily
 6    Johnson, Madison Smyser, Christy Slavik, Mitzi Steiner, and
 7    Meredith Foster, for the government.  Behind us, from Pretrial
 8    Services, are Officers Francesca Tessier and Joshua Rothman.
 9              THE COURT:  And for the defendant.
10              MR. AGNIFILO:  Yes.  Good afternoon, your Honor.  Marc
11    Agnifilo with Teny Geragos and Mr. Sean "Love" Combs is with us
12    today as well.
13              THE COURT:  OK.  All right.  Good afternoon.
14              I've seen the submissions.  I reviewed the previous
15    submissions that the parties made to Magistrate Judge
16    Tarnofsky.  I've looked at the transcript from the bail hearing
17    yesterday.  Let me just share with you my initial thoughts to
18    help counsel perhaps cabin your comments appropriately.
19              The government primarily seeks detention based on a
20    risk of flight and the danger of obstruction of justice or
21    witness tampering.  Regarding those two bases, first, my lesser
22    concern here is risk of flight, although that is a concern.
23    Certainly, Mr. Combs is a risk of flight.  Defense counsel has
24    submitted evidence regarding the efforts that he and his client
25    have made to try to show the Court and the government that he
```

O9IHComC

1    is not a risk of flight.  The government has again attempted to

2    prove that he is a risk of flight, and the government has to do

3    more than just simply prove he's a risk of flight.  They must

4    prove that he is a risk of flight such that no condition or

5    combination of conditions will reasonably assure his return to

6    court.

7          The package that's been submitted by Mr. Combs, I

8    think, does not give the Court a reasonable assurance that he

9    would return to court.  Regarding the issue of whether or not

10   the government has proven risk such that no condition or

11   combination of conditions would reasonably assure his return to

12   court remains a bit of an open question in my mind, but

13   certainly, the package that's been submitted is not sufficient

14   to reasonably assure his return to court given his wealth.

15         My bigger concern deals with the danger of obstruction

16   of justice and the danger of witness tampering.  That is a real

17   concern that I have here.  And I've seen the parties'

18   submissions, but I just wanted to give counsel my thoughts as

19   to what I am primarily concerned about.

20         Having said that, I'll now hear from the parties,

21   starting with the government, since the government has the

22   ultimate burden here.

23         MS. JOHNSON:  Thank you, your Honor.  Would it be

24   acceptable if I spoke from the lectern?

25         THE COURT:  You can speak from the lectern.  You can

4

O9IHComC

```
 1   stand there.  You can sit there.  Wherever you're comfortable
 2   is fine with me.
 3            MS. JOHNSON:  Thank you, Judge.
 4            Your Honor, this case is about Sean Combs' physical
 5   and sexual violence against women and others.  This physical
 6   and sexual violence has gone on for decades.  It's also about
 7   the vast efforts he undertook, using his extensive resources,
 8   to cover up his crimes.  In other words, the very conduct he's
 9   charged with shows his dangerousness, his resources, and his
10   willingness to lie and obstruct.
11            Yesterday, Judge Tarnofsky recognized this when she
12   found that there were no conditions or combination of
13   conditions that could assure the safety of the community or the
14   defendant's appearance in court, and she detained the
15   defendant.  The government respectfully submits that your Honor
16   should reach the same conclusion today.
17            As the Court just said, you have, obviously, read our
18   papers in detail and the transcript from yesterday.  I want to
19   be clear that we are seeking detention on, in addition to risk
20   of flight and risk of obstruction of justice, but also just on
21   dangerousness generally.  All of those factors to be considered
22   in ordering detention weigh in our favor here.
23            As I know the Court knows, in this case detention is
24   presumed under the Bail Reform Act because the defendant is
25   charged with sex trafficking, which is an offense under Chapter
```

O9IHComC

| | |
|---|---|
| 1 | 77 of Title 18.  It's the defendant's burden to rebut that |
| 2 | presumption, and the magistrate court already found that he did |
| 3 | not do so. |
| 4 | So I want to start with dangerousness and obstruction, |
| 5 | and I'd like to talk about the seriousness of the offenses |
| 6 | first, which reflects both the defendant's dangerousness and |
| 7 | the risks of obstruction if released.  Many of the facts are |
| 8 | set forth in our submission and were on the record yesterday, |
| 9 | so I only want to briefly review a few with your Honor before I |
| 10 | dive in. |
| 11 | The defendant used force, threats of force, and |
| 12 | coercion to cause female victims to engage in sexual activity |
| 13 | with male commercial sex workers that he referred to as "freak |
| 14 | offs."  These were elaborate sexual performances that he |
| 15 | arranged, directed, masturbated during, and often |
| 16 | electronically recorded.  These began in and around 2009, at |
| 17 | least, and lasted until at least this year and often took place |
| 18 | over multiple days and frequently with more than one escort. |
| 19 | These freak offs were arranged with the assistance of members |
| 20 | of his enterprise who set up the rooms, stocked the rooms with |
| 21 | supplies, arranged the travel, delivered the cash to pay the |
| 22 | escorts, among other tasks. |
| 23 | The defendant used narcotics so that female victims |
| 24 | could continue to participate in freak offs despite exhaustion |
| 25 | and fatigue that they began to experience as these were |

O9IHComC

1    sometimes multiday events.  These narcotics included ketamine,

2    ecstasy, GHB, and others.  And victims themselves, in

3    communications that the government has seized, described

4    themselves as being "drugged" during these freak offs.

5         I mentioned that the defendant electronically recorded

6    the freak offs, and he did that at least in part so he could

7    keep the recordings and use them as blackmail against his

8    victims, so I want to pause on that for a moment.  In addition

9    to witnesses who would testify to this fact, it's also in black

10   and white in communications that the government has seized.

11   For example, in December of 2015, a victim texted the defendant

12   and makes explicit reference to this type of extortion.  This

13   is the quote:

14        "You know what sick and disgusting shit I was reminded

15   of the other day?  You forcing me to" — do something else,

16   which I'm not going to mention on the public record — "or you

17   were going to leak some FO shit."  FO standing for freak off.

18        The defendant recorded these women engaged in freak

19   offs.  He threatened them with those very videos to get them to

20   engage in even more.  And the defendant makes a lot of claims

21   yesterday and in his papers about the victims' motives in

22   speaking up now, but that message is from nine years ago.  And

23   I suspect that we'll hear that we should ignore these types of

24   things because they're old, but this isn't the only time

25   there's communications that explicitly reference this kind of

7

O9IHComC

```
1    blackmail.  In fact, the same thing happened much more recently

2    several years later, after 2015, when a different victim said,

3    and here's a quote:  "He just threatened me about my sex tapes

4    that he has of me on two phones.  He said he would expose me,

5    mind you these sex tapes where I am heavily drugged and doing

6    things he asked of me for the past three years."

7              That's just two examples of the defendant's egregious

8    conduct in extorting and blackmailing victims that happened

9    years apart, and so it's rich when the defense submission filed

10   today accuses the victim of extorting the defendant.  Let me be

11   clear.  The only person who is engaged in extortion in this

12   case repeatedly is the defendant.

13             At least a dozen witnesses will confirm that they

14   personally observed the defendant's violence towards women or

15   the injuries that were sustained as a result.  And in addition

16   to that physical violence towards women, there's also evidence

17   of other violent acts, including physical assaults on other

18   individuals, including employees and witnesses to violence,

19   kidnapping, and arson.

20             The defendant surrounded himself with and used

21   firearms, including three defaced AR-15s and a high-capacity

22   magazine loaded with 59 rounds of ammunition that was seized

23   from his LA and Miami residences this year.  Yesterday, defense

24   counsel argued that these were the same guns used by the

25   defendant's professional security team, but what we hadn't told
```

O9IHComC

| | |
|---|---|
| 1 | the Court yet was that we did seize the guns used by his |
| 2 | professional security team.  We took six of them.  They were |
| 3 | licensed guns that were registered to the security team.  They |
| 4 | were stored in the defendant's homes, and he had access to |
| 5 | them.  But, for obvious reasons, we're much more concerned |
| 6 | about the defaced firearms hidden in his personal closet, and |
| 7 | that was our focus.  But it's worth noting that the defaced |
| 8 | guns have nothing to do with security and have everything to do |
| 9 | with dangerousness.  And even beyond that, when we consider the |
| 10 | additional guns that his security team has, he has even greater |
| 11 | access to firearms. |
| 12 | One more point on this is that the security team is |
| 13 | now the same team that he suggests be allowed to monitor him |
| 14 | while he's on bail.  His head of security was served yesterday |
| 15 | with a search warrant for his devices because of what our |
| 16 | investigation has revealed about his own personal involvement |
| 17 | in the offense conduct and in offenses under investigation by |
| 18 | the government. |
| 19 | As the Court knows from the transcript of yesterday's |
| 20 | proceeding, I spoke then about an incident that occurred on |
| 21 | March 5, 2016, at the InterContinental Hotel in Los Angeles, |
| 22 | and yesterday the government attached publicly released |
| 23 | surveillance footage to our submission as an exhibit.  And as I |
| 24 | said yesterday, this is a critical incident to assessing both |
| 25 | danger and obstruction.  I'm going to talk about it a little |

O9IHComC

1   bit more today with some additional detail.

2       Contrary to defense counsel's argument yesterday,

3   which attempted to inaccurately recast this incident as just a

4   fight in a relationship, the events of March 5, 2016, are

5   powerful evidence of trafficking, a recorded example of

6   defendant's use of force in connection with a freak off.  So

7   I'm going to summarize the evidence again with some additional

8   details that I did not mention yesterday.

9       In short, the evidence shows that the defendant had a

10   freak off at the InterContinental Hotel in Los Angeles on

11   March 5, 2016.  The defendant contends that this incident only

12   involves the defendant and the victim, but this is wrong.  We

13   have multiple sources of evidence that demonstrate there was at

14   least one commercial sex worker who was with the defendant and

15   the victim in the hotel room prior to the assault that's

16   recorded on camera and remained in the room while the assault

17   was being captured.

18       Following the freak off, the defendant violently

19   assaulted a victim who was sneaking out of the room to leave

20   the hotel.  You can see in the hallway surveillance video that

21   she isn't even wearing shoes as she is leaving.  She's leaving

22   as fast as she can because she's trying to get out of there.

23   She's in danger.  In the video, the defendant storms out of the

24   room in nothing but a towel.  He comes up to her, he punches

25   her, he throws her to the ground, he kicks her, he attempts to

O9IHComC

1    drag her back to the hotel room, and then he throws a vase at

2    her.

3            Text messages in the hours and days that follow

4    confirm the injuries caused by the incident.  These are quotes:

5            "I have a black eye and a fat lip.  You are sick for

6    thinking it's OK to do what you've done."

7            "I still have crazy bruising."

8            This is clear evidence of the dangerousness of the

9    defendant, and it's evidence that he has to try to minimize it.

10   He casts it as a misdemeanor assault arising out of a lover's

11   quarrel based on the fact that he wanted to get his clothes

12   back, but that's not what happened here.  The evidence shows

13   that the victim tried to escape the hotel room where the

14   defendant and an escort were without even putting on her shoes.

15   The defendant then violently beat her and tried to drag her

16   back to the hotel room.  It was only when hotel security staff

17   intervened that the victim was able to leave the hotel.

18           So this is just one example of violence being used in

19   connection with a freak off, but this incident is also

20   important because of everything that happened after the

21   assaults, because that's when the cover-ups started.

22           First, the defendant tried to bribe a hotel security

23   officer with a handful of cash in exchange for that officer's

24   silence.  The security guard refused to be bought.  Then the

25   defendant's staff got involved, contacting hotel security to

O9IHComC

1    get the footage of the incident and keep it from being seen by

2    anyone.  And by March 8, three days later, the surveillance

3    video somehow disappeared from the hotel server.

4           The defense has argued that there was no criminal

5    investigation, so there couldn't have possibly been

6    obstruction, and the defendant was just trying to prevent

7    something embarrassing from becoming public.  But that's not

8    what the evidence shows.  In fact, what the defendant himself

9    was saying immediately after the assault on March 5, here's a

10   few messages he sent right after that timestamp on the

11   surveillance video recording:

12           "Call me.  The cops are here."

13           "I got six kids."

14           "Yo, please call.  I'm surrounded."

15           "You gonna abandon me all alone?"

16           While we don't have evidence that the police were

17   actually there, the point is that the defendant knew he had

18   done something that could elicit a law enforcement response,

19   and he had to cover it up.  And critically, his staff knew that

20   police had responded to the victim's apartment.  They have

21   photographs of the responding officer's Los Angeles Police

22   Department business card in their text messages, and those

23   staff members remained in contact with the victim to ensure

24   that she would not talk to the police.

25           So these communications, the video disappearing, none

O9IHComC

| | |
|---|---|
| 1 | of this is a coincidence.  It's a result of defendant's |
| 2 | employees trying to cover up his crimes, all at his direction. |
| 3 | And the cover-up continued until last year, after the civil |
| 4 | suit was filed in November that, among other allegations, |
| 5 | detailed this assault at the InterContinental.  The defendant |
| 6 | responded, and I quote:  "I did not do any of the awful things |
| 7 | alleged." |
| 8 |         There is no other way to read this but as an |
| 9 | unequivocal denial of his participation in this incident.  It's |
| 10 | also yet another way that he continued obstructing and covering |
| 11 | up what he did.  In this year, after CNN released the |
| 12 | surveillance video, the defendant ultimately admitted that he |
| 13 | was actually the person on that video, but only after it was |
| 14 | leaked to the media and only after there was indisputable proof |
| 15 | of his identity on tape and his violence on tape. |
| 16 |         But yesterday we got more to the story.  That |
| 17 | apparently this assault was precipitated by the defendant being |
| 18 | hit in the head, while he was sleeping, by a cell phone and his |
| 19 | clothes being taken in a small overnight bag that you can see |
| 20 | the victim walking down the hall with in addition to her purse. |
| 21 | This is apparently why he runs out of the hotel in nothing but |
| 22 | a towel.  But our evidence will show that's just not what |
| 23 | happened.  Assuming, for the sake of argument, that it did, |
| 24 | which it didn't, but assuming that, punching, kicking, and |
| 25 | dragging someone in and of itself is a crime, and covering that |

O9IHComC

1    up is an act of obstruction.  And if it's about the clothes and

2    wanting to get the clothes back, which again it's not, why drag

3    the victim back down the hall to the room?  And you can see

4    that on the tape.  That's what he does.  This explanation is

5    just another cover-up.  It's just more lies, and it's just more

6    obstruction.

7              This sequence of events and all the indisputable

8    evidence —— from the videos to the text messages to the

9    photographs that are in communications —— makes clear that you

10   cannot take the defendant at his word when he denies his

11   criminal conduct.  But make no mistake, March 5, 2016, is far

12   from the defendant's lone act of violence and obstruction, so

13   let's talk a little bit more about that.

14             Freak-off activity is the core of this case, and freak

15   offs are inherently dangerous.  They use force, coercion, and

16   drugs to coerce the victims into doing the freak offs.  The

17   defendant controlled aspects of their lives, used significant

18   physical force against them, and all to compel them to engage

19   in these lengthy sex acts.

20             Yesterday, the defense said they interviewed about

21   half a dozen escorts who would dispute the government's account

22   of what happened during the freak offs.  Our investigation is

23   ongoing, and so I can't say too much about this, but I will

24   note that half a dozen escorts is just the tip of the iceberg

25   of the number of escorts who have participated in freak offs.

O9IHComC

1          And yesterday, the defense also spent a lot of time

2     talking about how these freak offs were between consenting

3     adults and how the government was not claiming sex without

4     consent.  Abuse occurred in the context of at least one

5     long-term relationship, which we acknowledge, but the

6     government's theory does involve a lack of consent.  This case

7     is charged, at least in part, in Count Two as sex trafficking

8     by force, fraud, and coercion.  When a woman is being beaten

9     and coerced in order to get her to engage in commercial sex

10    activity, those sex acts are not consensual.

11         And as I said yesterday, it is really important to

12    note that long-term relationships and abusive relationships are

13    not mutually exclusive.  The government expects to introduce

14    the testimony of expert witnesses regarding the dynamics that

15    appear in almost all sex trafficking and sex abuse cases.

16    Similar testimony has been introduced in several cases in this

17    district.  A few examples are *United States v. Hadden*, *United

18    States v. Ray, United States v. Maxwell*, and *United

19    States v. Rivera*.

20         We expect that these expert witnesses will explain

21    issues of apparent consent and how abusers control their

22    victims, even in the context of long-term relationships in

23    which the victims express love for their abusers and continue

24    to go back to them.  We further expect that these expert

25    witnesses will discuss various forms of coercion, including

O9IHComC

1    isolation, intimidation, violence, manipulation, surveillance,

2    narcotics, grooming behaviors, and others, and generally why

3    victims do not leave their abusers and immediately report their

4    crimes.

5              The focus of today's proceeding, however, is not and

6    should not be on the dynamics of abusive relationships.

7    Today's proceeding is squarely focused on the defendant alone

8    and whether the defendant presents a danger to the community,

9    whether the defendant threatens the integrity of these

10   proceedings, and whether the defendant presents a risk of

11   flight, all of which he does.

12             Defense counsel has made much yesterday and today in

13   his letter about his misinformed view that there was not a sex

14   crime here, and therefore, the nature of this offense doesn't

15   weigh in favor of detention.  He's argued, in essence, that

16   anyone who was participating in a freak off wanted to be there.

17   That flies in the face of the evidence in this case, much of

18   which we've laid out to the Court, but it also shows a

19   misunderstanding of the law.

20             When participants in commercial sex activity are

21   threatened with the release of collateral videos, like those

22   two text messages I read, when they are threatened with the

23   loss of their livelihood and housing —— we'll get to that in a

24   minute —— and when they're beaten both during and outside freak

25   offs —— you saw video of that —— they cannot consent.  That is

O9IHComC

 1   trafficking.  This view was especially evident when counsel

 2   spent time minimizing and horrifically understating the

 3   defendant's violence.  The video from March 5, 2016, is far

 4   more than a misdemeanor assault, as he claims.  When force or

 5   coercion is used in connection with commercial sex, as it is

 6   here, again, that's trafficking.

 7        The defendant's decades-long history of violent

 8   conduct makes clear that even the most stringent bail

 9   conditions will not suffice to ensure the safety of the

10   community.  The inquiry in this context is focused on the

11   danger to any real person, and the evidence shows that there is

12   a risk of physical danger towards victims, employees, and other

13   individuals.

14        The investigation has revealed evidence of numerous

15   assaults against female victims and other individuals.  These

16   assaults involved choking, hitting, kicking, dragging victims

17   sometimes by their hair.  They sometimes occurred in cars where

18   victims heads were slammed against the car window or on the

19   floor of a car.  And again, independent evidence like text

20   messages confirms this type of violence.  Without attributing

21   any of these messages, I'm going to read four that make my

22   point:

23        "I turn my head for a second, and you get fucked up,

24   and you drag me down the hall by my hair."

25        "I have bleeding cuts."

O9IHComC

1              "You hit me in the head two good times."

2              "When you get fucked up the wrong way, you always want

3    to show me that you have the power and you knock me around.

4    I'm not a rag doll.  I'm someone's child."

5              And we don't just have the texts.  We also have

6    witnesses who can confirm, because they witnessed this violence

7    and they witnessed the injuries.  And this conduct took place

8    behind closed doors —— in houses, in hotel rooms, in cars, in

9    settings that are not easily monitored by even the most

10   stringent conditions of release.  And I note that Judge

11   Tarnofsky was particularly concerned about this point and also

12   about the next one: that the defendant's violence was

13   premeditated and spontaneous.  And I think the text messages I

14   just read highlight that.  And the defendant's violence, the

15   spontaneity exacerbate the difficulty of crafting conditions of

16   release to ensure the safety of any person.  How do you craft

17   bail conditions that can address the defendant's tendency to

18   become violent at the slightest provocation and to become

19   violent, as the text messages say, when he "gets fucked up the

20   wrong way"?

21             In fact, Judge Tarnofsky found that she did not

22   believe defense counsel had the ability to control the

23   defendant, given his substance abuse and anger issues.  There

24   is a long-standing pattern of abuse here, a pattern that has

25   been entirely undeterred by threat of public exposure or law

O9IHComC

1    enforcement intervention, and it's probative of whether the

2    defendant will continue to engage in that pattern.

3            I note we cite this case in our paupers, but the

4    *Mercedes* case in the Second Circuit, 254 F.3d 433 (2d Cir.

5    2001), talks about the danger of releasing defendants with a

6    history of domestic violence, noting that a domestic violence

7    history is probative of a dangerousness determination because a

8    willingness to strike a loved one is evidence of a tendency to

9    be violent and dangerous towards others.  And in that case, the

10   circuit reversed the district court's order of release for a

11   defendant with a history of domestic violence but no criminal

12   history.

13           So let's turn to obstruction now, and I know that your

14   Honor is particularly interested in this point.

15           So the risk of obstruction in this case is heightened

16   because of the defendant's power.  It gives him a unique

17   ability to influence people and to intimidate witnesses and

18   victims.  Witnesses have universally, one for one, expressed to

19   us their extreme fear of the defendant, extreme.  His influence

20   makes it so difficult to convince witnesses to share their

21   experiences and to trust that the government can keep them safe

22   from him.

23           I talked about some of it before with the March 5

24   incident, but we have evidence that further indicates that the

25   defendant and his coconspirators will deflect, minimize, and

O9IHComC

1    lie about his conduct.  Defense counsel spent time trying to

2    recast his, what I submit to the Court are obvious, obstructive

3    efforts as just maintaining contact with people.  So before we

4    dive in, I want to be clear about a few principles of

5    obstruction based on the statutes that have been charged in

6    this case.

7              There need not be an existing investigation or

8    official proceeding, and the defendant need not know about it.

9    What we will also show that the defendant knew about this

10   investigation at least as of January 2024, and he certainly

11   suspected the possibility of an investigation after November of

12   2023 when civil lawsuits were filed alleging, among other

13   offenses, sex trafficking.

14             So following that November civil suit, when the

15   defendant certainly had reason to suspect the possibility of an

16   investigation, he and his coconspirators continued their

17   efforts to reach out to potential victims or witnesses.  This

18   outreach has included directly contacting at least one victim

19   in November of 2023, constant contact with witnesses to the

20   charged conduct, and with contacting of witnesses, including

21   those who received grand jury subpoenas, prior to dates of

22   testimony or government meetings.  And this contact is as

23   recent as July of 2024, so well after the government has

24   definitive proof that the defendant knew about this

25   investigation.

O9IHComC

1          So two of those examples are there were communications

2    between the defendant and a witness who received a grand jury

3    subpoena.  These communications are both prior to and following

4    the witness' meeting with the government, and the government

5    has evidence that the defendant knew that this witness had

6    received a grand jury subpoena.  And both between —— before the

7    meeting with the government and after the meeting with the

8    government, there were 14 total contacts between the two of

9    those people.

10          In another case, a witness was served with a grand

11    jury ——

12          THE COURT:  Hold on just a second.  Go back for a

13    second.  You said there were 13 contacts between two of those

14    people.  You mean two witnesses or just between the defendant

15    and the witness?

16          MS. JOHNSON:  I'm sorry for not being precise, your

17    Honor.  There were 14 total contacts between the defendant and

18    the witness.

19          THE COURT:  OK.

20          MS. JOHNSON:  And my second example, a witness was

21    served with a grand jury subpoena in June of 2024; thereafter

22    was contacted multiple times by the defendant by phone and text

23    in June and July of 2024, despite the fact that the two had not

24    spoken in several years.  They were suddenly back in contact

25    leading up to the defendant's —— sorry, in the aftermath of the

O9IHComC

1    witness receiving a grand jury subpoena.

2            And these efforts by the defendant were also crafted

3    to avoid detection.  He used intermediaries to reach out to

4    people.  And in an instance I'll describe in detail, he

5    recorded conversations with a victim on the device of a

6    coconspirator.  These kinds of efforts, these kinds of means,

7    make obstruction even more difficult to detect when it's being

8    done through other people and on other devices.

9            We know from the evidence we've collected that the

10   purpose of these calls was to spread false narratives.  So

11   here's an example.  The instance that I mentioned where the

12   defendant directly contacted a victim in November 2023, he

13   placed two calls to the victim, both of which are recorded on

14   the coconspirator's phone.  And as background that will help

15   explain some of the things that are discussed in the call, the

16   defendant provides financial support to this person.  So early

17   on November 19, which is three days after the filing of the

18   civil lawsuit by another victim, the defendant received a text

19   from this other person in response.  It reads:

20           "I feel like I'm reading my own sexual trauma.  It

21   makes me sick how three solid pages, word for word, is exactly

22   my experiences and my anguish."

23           The defendant then called the victim twice.  Those are

24   the recordings.  And in those recordings, he gaslit her and he

25   attempted to convince her that she had willingly engaged in sex

O9IHComC

1   acts with him, but she pushed back.  She told him she felt

2   manipulated and clarified that what his description of events

3   was, was "not how she saw things."

4          Throughout these recorded calls, the defendant

5   repeatedly talks about how he was not supposed to be speaking

6   on the phone and not supposed to be using the phone, and he

7   instructs the victim not to text him.  These statements clearly

8   show his state of mind.  They show that he was on notice that

9   there could be an investigation into the claims raised in the

10  lawsuit that had been filed three days earlier.

11         And at the end of that second call, the defendant

12  ensured the victim that if she continued to support him, she

13  ain't got anything to worry about, which is a thinly veiled

14  reference to his continuing his financial support.  And

15  subsequent text messages make explicitly clear that that's what

16  he was talking about because two days later he texts a

17  coconspirator in reference to the financial support that he

18  provides to this victim and said:  "Make sure that" ⎯ and he

19  uses a name here.  The name is an individual who is his

20  financial adviser ⎯ "is not doing anything dumb, like not

21  having that rent paid on time."  The defendant made sure that

22  that financial coercion continued, clearly, to keep the victim

23  close and in his control.

24         The defendant's long history of obstruction and

25  violence demonstrates that he simply cannot overcome the

1    presumption that no condition or combination of conditions can

2    ensure the safety of the community or the integrity of this

3    proceeding.  Courts have denied bail in similar situations.

4    We've cited some cases in our letter.  Of particular interest,

5    I think, is *United States v. Lafontaine*.  And this is a

6    slightly different posture because it's a revocation, but the

7    facts of that case are that the defendant contacted a potential

8    witness and attempted to feed that witness a false narrative

9    with the hope that the witness would adopt it as that person's

10   testimony, and that's exactly what's going on here.

11            In the government's request for detention is

12   consistent with other cases of this kind in this district and

13   in this circuit.  These cases stand for the proposition that

14   sex trafficking defendants, regardless of the age of their

15   victims, are routinely detained pretrial, particularly when

16   they have engaged in repeated obstruction.  I went over some of

17   these cases yesterday.  I'll touch on them lightly again.

18            THE COURT:  That's not necessary.  I'm familiar with

19   those cases.

20            MS. JOHNSON:  OK.

21            THE COURT:  Let me ask you this:  In the record, the

22   government had previously indicated that there was another

23   potential witness that the defendant contacted between

24   September 10 and September 14 some 58 times.  Can you give me a

25   little further elucidation on that?

O9IHComC

1          MS. JOHNSON:  Oh, sure.  So that requires a little

2     explanation of a recent civil suit.

3          So on September 10, so last week, an individual named

4     Dawn Richard filed a civil suit against the defendant and other

5     individuals and entities.  Ms. Richard was formerly in a band

6     with the defendant and a third individual named Kalenna Harper.

7     The allegations in Ms. Richard's lawsuit focus on some of the

8     time period of the charged conspiracy.  They focus on

9     particular events starting in 2009 and for some time period

10    thereafter.  Among other things, Ms. Richard alleges witnessing

11    violence by the defendant towards a victim, including assaults

12    and the like.

13         So that lawsuit is filed on September 10.  On

14    September 13, the other member of the band, Ms. Harper,

15    released a statement where she, in sum and substance, sort of

16    says what Ms. Richard's experience wasn't what I experienced.

17    But between those two dates, between September 10 and

18    September 14, the defendant and Ms. Harper had 128 total phone

19    contacts.  He called or texted Ms. Harper 58 separate times in

20    four days.  There has been no contact since September 14.

21    Granted, that's only been a few days.  But I think what's

22    highlighted about that incident is that it makes clear that the

23    defendant has an ongoing ability to keep witnesses, even

24    witnesses to very distant abuse and very distant things, in his

25    pocket and at his disposal.

O9IHComC

1          One other —— your Honor, we had discussed some cases

2     yesterday.  We didn't discuss *Lawrence Ray*, which I think is

3     another case that does support our argument here.  I don't

4     think we've touched on that, so I'll just briefly ——

5          THE COURT:  The case dealing with the official

6     proceeding requirement?

7          MS. JOHNSON:  No.  *Lawrence Ray* is a racketeering and

8     sex trafficking case in this district, and Magistrate Judge Fox

9     ordered detention based on risk of flight and dangerousness.

10    And I think one thing that's similar about the *Lawrence Ray*

11    case to this case is that, in the bail argument, there's

12    allegations by the defense that the sex trafficking case was

13    weak because there was only one victim, and Magistrate Judge

14    Fox again detained on the basis that the victims were

15    corroborated not only by other witnesses but also by

16    documentary evidence.

17         THE COURT:  Anything else from the government?

18         MS. JOHNSON:  Just a few additional things, your

19    Honor, briefly.

20         THE COURT:  How many more additional things?  We've

21    gone about 45 minutes.  Give me a sense of what else you need

22    to touch upon.

23         MS. JOHNSON:  I can finish this in under five minutes;

24    maybe even three.

25         THE COURT:  OK.  Go ahead.

O9IHComC

1          MS. JOHNSON:  OK.  I will just touch briefly on risk

2    of flight.  The circumstances are different than when Mr. Combs

3    flew here to sit in New York, which defense counsel has made a

4    lot of hay about.  And with respect to his offer to surrender,

5    there are extremely valid law enforcement reasons why the

6    government did not take him up on this offer, including the

7    risk of evidence destruction and allowing for further

8    obstruction.  So to the extent that this surrender and travel

9    argument has any force at all, it really only applies to risk

10   of flight.  It does not, does not, grapple with dangerousness

11   and obstruction.  Surrender has nothing to do with those two

12   things.  And the defendant really does not grapple with those

13   two things.  He doesn't talk about his ongoing danger and his

14   ongoing obstruction.  So coming to this jurisdiction and

15   offering to surrender simply does not vitiate those concerns.

16          The Court expressed concerns with the bail package.

17   The government has significant concerns with the bail package.

18   Again, I'm here seeking detention, so I'm not going to get into

19   those, but I note for the record that we do think that even the

20   supplemented bail package does not have enough conditions that

21   focus on obstruction, and we don't think there are conditions

22   that can really keep the defendant from doing the types of

23   things he's been doing, particularly because he's been

24   involving other people in them.

25          You'll hear later today about how much evidence we

O9IHComC

```
 1    have, and it was in the record yesterday.  There's a massive
 2    amount of evidence.  There's a massive amount of witnesses, a
 3    massive amount of electronic evidence.  There's a massive
 4    amount of physical evidence that we seized.  We have witnesses
 5    saying things, and these witnesses are powerfully corroborated
 6    by communications, by photographs, by videos, by
 7    contemporaneous documentary records, by text messages, and the
 8    like.  And this is the evidence that we will use to prove the
 9    charges in the indictment.  This is the same evidence, some of
10    which, just a little bit of which I've highlighted today,
11    confirms that the defendant is a danger to the community and
12    poses a serious risk to the integrity of these proceedings
13    through his efforts at obstruction.
14            So for all the reasons I've stated here and in our
15    letters, the defendant should be detained pending trial.
16            THE COURT:  Thank you.
17            Defense counsel, again, you can stand there, you can
18    stand at the lectern, or you can be seated — whatever you feel
19    comfortable doing.
20            MR. AGNIFILO:  I'll come to the lectern, Judge.  Thank
21    you.
22            THE COURT:  OK.
23            MR. AGNIFILO:  Your Honor, I'm going to address one
24    thing that my colleague said, and then I hope to address your
25    Honor's opening remarks directly.
```

O9IHComC

1          The situation that my colleague just discussed with

2     Dawn Richard and Kalenna Harper I can shed some light on.  At

3     one point I myself got a phone call from Kalenna Harper and her

4     lawyer.  Without going too much down this rabbit hole, Kalenna

5     Harper said:  I would like to make a statement on behalf of

6     your client.  Her lawyer was on the phone saying:  I'm worried

7     that my client, Kalenna, is going to embroil herself in this

8     big mess that has public elements to it and all that.  And I'm

9     prepared to give the lawyer's name to the government and I'm

10    prepared to give, to the extent they don't have Kalenna

11    Harper's phone number, to the government, and they can follow

12    up on this.  And what I said to Ms. Harper and the lawyer is

13    you should do whatever you want.  You should feel free, if you

14    want to make a statement, to make a statement; and you should

15    feel free, if you don't want to make a statement, to not make a

16    statement.  I don't remember offhand what day it was.  It was

17    between the 10th and the 13th.  And then at one point I found

18    out she made a statement.

19          THE COURT:  The acoustics aren't great.

20          MR. AGNIFILO:  I'm sorry, Judge.

21          THE COURT:  You don't remember what?

22          MR. AGNIFILO:  I don't remember the exact —— it was

23    either the 11th or the 12th of September that I spoke to the

24    lawyer and Ms. Harper.  And at the end of that conversation, it

25    was not clear whether Ms. Harper wanted to make a statement or

O9IHComC

```
 1   not.  Sometime later —— and I think it was the next day or it

 2   could have been two days later —— I saw in press reporting that

 3   she had made a statement.

 4          So the reason I bring this to your Honor's attention

 5   is there's a lawyer in the mix.  Ms. Harper has a lawyer.  I

 6   spoke to the lawyer.  I will make the lawyer available to the

 7   government if the government wants to speak to the lawyer.  So

 8   to the extent that the government raises this because there's

 9   some suggestion that because Mr. Combs contacted Ms. Harper ——

10   and I would note that they were in the same band for a period

11   of time —— but these contacts were around the time of the

12   statement.  She seemed to be pained about whether she wanted to

13   make a statement.  She told me she wanted to make a statement

14   because she believed Dawn Richard's statements were not

15   accurate.  And she wanted to say something, yet she didn't want

16   to get overly involved.

17          THE COURT:  When she told you that, that was either

18   September the 11th or the 12th?

19          MR. AGNIFILO:  I believe that's right.

20          THE COURT:  Which is after the 10th, after the

21   defendant first reached out to her?

22          MR. AGNIFILO:  I don't know about the defendant's

23   contacts with her.  I don't know.  I just know when her and her

24   lawyer called me, it was the 11th.

25          (Counsel conferred)
```

O9IHComC

| | |
|---|---|
| 1 | MR. AGNIFILO:  I'm told by the keeper of the facts |
| 2 | that it was the 11th.  So I think it was probably September 11. |
| 3 | But let me address — so I wanted to point that out |
| 4 | just because that was the last thing that my colleague said. |
| 5 | THE COURT:  Let me ask you, why does that matter? |
| 6 | MR. AGNIFILO:  Because the government brought it up, |
| 7 | and the government brought it up, I think, to suggest that |
| 8 | somehow Mr. Combs coerced or forced or pressured Kalenna Harper |
| 9 | into — let me take a step back, because I don't think — the |
| 10 | entire context might not be clear. |
| 11 | I don't know what role Dawn Richards plays in this |
| 12 | case.  I don't.  She filed a civil complaint, so this is all |
| 13 | about a civil complaint.  When the civil complaint hit the |
| 14 | news, Kalenna Harper, who was in the same band as Dawn |
| 15 | Richards, obviously, said to herself:  I was in the same band |
| 16 | as Dawn Richards.  I don't think — I didn't see any of those |
| 17 | things. |
| 18 | THE COURT:  Let me just ask you something. |
| 19 | MR. AGNIFILO:  Yeah, sure. |
| 20 | THE COURT:  Hypothetically speaking, if your client |
| 21 | reached out to this person on September 10, hypothetically |
| 22 | speaking — |
| 23 | MR. AGNIFILO:  Right. |
| 24 | THE COURT:  — said, I want you to say this.  Again, |
| 25 | very hypothetically saying — let's say he said, I want you to |

O9IHComC

| | |
|---|---|
| 1 | lie about what happened.  I want you to tell this story, and |
| 2 | gives that information to her on the 10th.  And then on the |
| 3 | 11th, you get a call from her lawyer saying that she's |
| 4 | interested in maybe making a statement, but he's not clear if |
| 5 | she could make a statement. |
| 6 | If that hypothetical situation happened, wouldn't that |
| 7 | still be evidence of an obstructive mind, mindset, of a |
| 8 | willingness to tamper with a potential witness?  I'm sure that |
| 9 | you're going to say that that person is not necessarily a |
| 10 | witness in this proceeding, and therefore I shouldn't consider |
| 11 | that.  But wouldn't that be evidence of a mindset that's |
| 12 | willing to tamper with witnesses or obstruct justice.  Because |
| 13 | I'm sure you would agree, you don't have to coerce someone in |
| 14 | order to obstruct justice, correct? |
| 15 | MR. AGNIFILO:  I agree with you.  I agree with your |
| 16 | Honor.  And I think if your —— your hypothetical is a |
| 17 | hypothetical, and I accept your hypothetical as that. |
| 18 | Yes, you might be right.  I wouldn't necessarily know. |
| 19 | But what I —— the reason I wanted to speak to her —— and |
| 20 | Ms. Geragos remind me that we spoke to her on the 10th as well. |
| 21 | And she's coming with her computer.  We're going to get some |
| 22 | accurate facts, probably more specific than I'm saying. |
| 23 | MS. GERAGOS:  Your Honor, I just want to say we did |
| 24 | speak to her.  I spoke to her, I'll say, for 30 minutes on the |
| 25 | early morning of the 11th so that she could recount her facts |

O9IHComC

```
 1    to us as to her —— she's mentioned in the lawsuit about 34
 2    times, so she felt that her name was also being besmirched in
 3    terms of she had witnessed violent acts by Mr. Combs against
 4    the Victim-1 of Count Two.  And so I believe the contact with
 5    this potential witness was also a potential defense witness for
 6    us to speak to because she was mentioning violent acts with
 7    respect to the person who is now Victim-1 of Count Two.  So we
 8    did speak to her that night because we thought it was important
 9    in terms of our defense investigation.
10            That's all I have to say.  I'll let ——
11            THE COURT:  I'm sorry.
12            MS. GERAGOS:  I'll let Mr. Agnifilo ——
13            THE COURT:  Go ahead and continue.  I didn't mean to
14    cut you off.
15            MS. GERAGOS:  No, I'll let Mr. Agnifilo continue.  He
16    wasn't on that call, so I just wanted to make that
17    representation.
18            THE COURT:  That was on the 11th?
19            MS. GERAGOS:  That was, I think, maybe even 2:00 in
20    the morning on the 11th.
21            THE COURT:  OK.  But after speaking to defense counsel
22    on the 11th, what would be the reason for her and Mr. Combs to
23    keep in contact?  I saw in the record here defense counsel was
24    making a statement that Mr. Combs was reaching out to witnesses
25    just to line witnesses up.  If this witness has already spoken
```

O9IHComC

```
 1    to defense counsel, what would be the purpose of Mr. Combs

 2    continuing to speak to that witness after September 11?

 3               MS. GERAGOS:  After —— after ——

 4               THE COURT:  After your conversation with the witness,

 5    why would he need to reach out to her?

 6               MS. GERAGOS:  Your Honor, I can't speculate only to

 7    say that I think that this witness was really upset by the fact

 8    that she kept getting publicized in many different articles

 9    about incidents that she was supposedly present at that she

10    just was not —— that she stated, at least to us, that she was

11    not present for.  And that's my speculation.  I don't know

12    if ——

13               MR. AGNIFILO:  No, I understand your Honor's question,

14    and I don't know that all of these things resulted in

15    conversations.  I don't have access to the government's

16    evidence on this point, so I don't know that all these things

17    resulted in conversations.  Obviously, she wanted to speak to

18    Mr. Combs because her name was in this civil suit, and she

19    didn't want the name in the civil suit.  And she also wanted to

20    say I didn't see any of these things happen.

21               To the point that Ms. Geragos raised, in addition to

22    being named in the civil suit, she also may be an important

23    defense witness for conduct that may or may not be charged as

24    part of the indictment because it relates to the person who's

25    in Count Two.  So this is an important defense witness.  It's
```

O9IHComC

1          someone we will speak to.

2                  But I want to allay the Court's larger concerns, and

3          then we can come back to this.  Because I am hearing the Court

4          loud and clear, and I have actual proposals that I think will

5          assist in showing the Court that we are taking the Court's

6          concerns very seriously.

7                  I have brought to court today, in the fourth row, the

8          handsome man who lost his hair at some point is there.  His

9          name is Herman Weisberg.  Herman Weisberg owns SAGE

10         Intelligence.  He's a former New York Police Department

11         detective.  He worked in the DA squad, and he's had SAGE

12         Intelligence for, I think, about 15 years.  And here's what we

13         are proposing, in addition to all of the other conditions that

14         we have in our bail proposal:

15                 That SAGE, personnel from SAGE Intelligence —— all of

16         whom will be former law enforcement officials, either federal

17         law enforcement officials or state law enforcement officials ——

18         will be monitoring the residence of Mr. Combs 24 hours a day;

19         24 hours a day, seven days a week.  Here's what this will

20         involve.

21                 They will have at least one, and probably two, SAGE

22         employees there at all times.  They will basically have full

23         control of who enters and who doesn't enter.  There will be a

24         visitor's log that is kept and that we could have it shared

25         with Pretrial Services every week or every day or whatever we

O9IHComC

1      would like to do in those regards.

2              Mr. Combs will not have access to a cell phone.  Since

3      there will be a SAGE personnel on-site, if we want to reach

4      him, we can reach him that way.  He won't have access to the

5      Internet.  So what I am trying to fashion is a situation where

6      any witness intimidation, if that is the Court's concern, and I

7      see that it is, would be completely nullified.  It would be

8      virtually impossible.  And SAGE would monitor these things —

9      make sure he doesn't have a cell phone, make sure that anybody

10     who comes to the house is on the preapproved list of visitors,

11     would keep track of all the visitors.  And we can make that

12     list of visitors and provide it to the government, to pretrial,

13     and the Court.

14             SAGE would establish communications with local law

15     enforcement in Florida, if need be.  If there is some emergent

16     matter, SAGE would contact local law enforcement.  And what we

17     could do, Judge, and what we're willing to do is put together a

18     protocol so that the Court is absolutely satisfied and

19     comfortable that there is quite literally no way that Mr. Combs

20     would be able to conduct any kind of contact, have any — do

21     anything with a witness of any nature.

22             One thing that I want to make clear, in light of the

23     government's proffer today — and I'm not going to go through

24     all of the things that I said yesterday.  Your Honor read the

25     transcript, and I don't need to go through them all again — is

O9IHComC

```
 1    we believe we have very significant defenses to everything that
 2    the government has said, and we have been conducting, on the
 3    defense side, a very significant investigation for six months.
 4    And I anticipate that is only going to increase as we get
 5    closer and closer to a trial.
 6              So we will conduct the investigation, meaning the
 7    lawyers and the investigators.  Obviously, Mr. Combs will have
 8    no role in that.  Mr. Combs will not contact anybody who is not
 9    on the preapproved list.  We will ensure that that's the case.
10    And if he fails to do that in any way, shape, or form, we would
11    explain to Mr. Combs that that would be a violation of his
12    release conditions, and he should expect to be incarcerated.
13    And that is an obviously real concern because, getting ready
14    for this — Mr. Combs would be in the special housing unit if
15    he was incarcerated in the MDC.  That presents tremendous
16    challenges to us.  Given the amount of electronic evidence,
17    it's a very difficult place to be as an inmate, and it's a very
18    difficult place to get ready for any trial, much less a trial
19    with a tremendous amount of discovery, as this case has.
20              So he knows the stakes.  I will put something in place
21    that would give the Court and Pretrial Services and the
22    government assurance that nobody will be contacted unless that
23    person is on the preapproved list.  That would be monitored by
24    the people at SAGE.  And we are at risk of Mr. Combs being
25    incarcerated if anybody falls down on the job.  If Mr. Combs
```

O9IHComC

1    does something he's not supposed to do, if SAGE somehow misses

2    Mr. Combs doing something he's not supposed to do, if his

3    lawyers miss Mr. Combs doing something he's not supposed to do,

4    we know what the consequences would be.

5            So I'm listening to your Honor loud and clear.  And

6    I'm going to address risk of flight in a second because the

7    government's still moving on that theory, but I do want to

8    assure the Court that we are prepared to put in strenuous and

9    maybe unusual conditions to meet the Court's concern when it

10   comes to these important matters.

11           Now, that is not to say that I agree with the

12   government's assessment of whether these things are obstruction

13   or not obstruction.  That's an issue for another day, and I'll

14   take it up on the other day.  What I'm here to do today is to

15   address your Honor's concern.  When your Honor came out on the

16   bench, your Honor shared your Honor's thoughts with us, and I

17   listened loud and clear.  And I want to address those thoughts,

18   and I want to address those concerns directly.  And through

19   having SAGE Intelligence, their former law enforcement

20   officers, on-site 24 hours a day — and we'll do whatever needs

21   to be done.  If we need two of them, we'll have two of them.

22   If we need three of them, we'll have three of them.  And we'll

23   put everything in place that we need in terms of visitors

24   coming in, visitors who aren't on the list and who can't come

25   in, that will all be done.  That will all be monitored, and we

O9IHComC

```
 1    will all know what's being done in that regard.  So that is how
 2    I intend to deal with that.
 3             Mr. Combs, like I said, would not have a cell phone.
 4    He would not have any ability to use the Internet.  And that
 5    would, I think, come a long way to giving the Court greater
 6    comfort in this regard.
 7             I do want to address another issue, because I don't
 8    believe that the actions that Mr. Combs has taken in regard to
 9    surrendering his passport and coming to New York are only in
10    regard to risk of flight.  I disagree with my colleague's
11    assessment in that regard.  Because I think what it shows is
12    that he is deeply respectful of the Court's authority.  He is
13    willing to show that he is responsible, that he can follow
14    these directions, and that he is mindful and has been mindful
15    — and this is important — he is mindful and has been mindful
16    for a very long time that this is a significant investigation
17    and that the charges could be significant; not significant
18    because they're true, but significant just because they're
19    weighty charges.  And with the sex trafficking count, at a
20    minimum, it has a rebuttable presumption of detention, so I
21    want to put these in somewhat of a different light.  And I
22    won't belabor it because I know your Honor read this already.
23             When we told the government on April 1, all those
24    months ago, that we had Mr. Combs' passport, we were giving the
25    government an assurance:  He was not going to travel
```

O9IHComC

1   internationally, which he hasn't, and that the government would

2   know where he is.  Mr. Combs was willing to do that because he

3   understood that this was a significant investigation.

4        Now what I want to point out in this regard is this:

5   Back on April 1, when we sent the email to the government and

6   said that we have Mr. Combs' passport, we specifically went

7   through the charges that we believed they were looking into,

8   and we specifically mentioned racketeering conspiracy, we

9   specifically mentioned sex trafficking, and we specifically

10  mentioned violation of the Mann Act.  We mentioned all three

11  counts that ended up being in the indictment.

12       So back on April 1, we knew exactly the nature of this

13  investigation, and it turns out we were right.  But the

14  significance isn't that we're right.  The significance is that

15  we knew it was substantial, and even in the face of a

16  substantial investigation, Mr. Combs surrendered his passport.

17  Now, but that wasn't all.

18       THE COURT:  Just to be clear, when you're saying "we,"

19  you're including your client, Mr. Combs, in that; that he was

20  aware of that at least by April 1?

21       MR. AGNIFILO:  100 percent.  Just to make it clear,

22  Ms. Geragos and I flew to Florida.  We sat with Mr. Combs in

23  his house in Florida, and we said:  You are being investigated

24  by the Southern District of New York for a number of serious

25  charges.  Let me tell you what they are.  It's racketeering

O9IHComC

```
 1    conspiracy.  It's sex trafficking.  It's obstruction of

 2    justice.  It's prostitution, Mann Act-type prostitution.  I

 3    mean, we were right because we knew what they were looking

 4    into.  We also knew it because there was a search warrant, and

 5    the search warrant had crimes in it.  So he knew.  He knew on

 6    April 1 exactly what they were looking into.

 7           Now, the government in their letter to your Honor

 8    today somehow makes an argument that this is like defense

 9    lawyer —— I think they call it defense lawyer theater, but it's

10    not theater at all.  It's actually a person showing tremendous

11    respect for the process and showing the Court that he can be

12    trusted because what he also —— what we went also on to do is

13    we took the passports of five of his family members.  And

14    members of his family and friends are here today in the second

15    row.  They love him.  They support him.  And many of them gave

16    us their passports over the last several months.

17           We also made efforts to sell his airplane, which is in

18    the process.  We have a letter of intent to sell the airplane.

19    Because I was concerned that, if he had access to an airplane,

20    that would give your Honor concern; that would give the

21    government concern.  I credit the government for not raising it

22    as a concern, and I think it's not a concern because we're

23    selling it.  But the significant thing is we had the foresight

24    to try to sell it.  Apparently, selling an airplane is not an

25    easy thing to do.  We've had three different buyers who didn't
```

O9IHComC

| | |
|---|---|
| 1 | work out.  We're on, I think, the fourth buyer, but, hopefully, |
| 2 | we'll actually sell it this time.  In the meantime, we will |
| 3 | make sure that Mr. Combs is not —— so let me just back up for a |
| 4 | second. |
| 5 | Because he is not using the plane, no plan on using |
| 6 | the plane anytime in the near future, it gets chartered, |
| 7 | because the plane has to keep flying or the plane apparently |
| 8 | starts to fall apart.  So it gets chartered, and it's being |
| 9 | chartered.  It's being chartered by other people in sort of a |
| 10 | public way. |
| 11 | THE COURT:  Can you just get to the point where you |
| 12 | said that this doesn't relate simply to risk of flight. |
| 13 | MR. AGNIFILO:  Yeah. |
| 14 | THE COURT:  Can you tell me what this relates to |
| 15 | otherwise. |
| 16 | MR. AGNIFILO:  It shows respect for the Court.  It |
| 17 | shows that he's trustworthy.  It shows that he is showing that |
| 18 | this is a serious process to him.  Your Honor must have seen |
| 19 | defendants who thumb their nose at the court and say:  Come |
| 20 | find me.  I'm not going to show the court the due respect that |
| 21 | it deserves.  I'm not going to do the things to show the Court |
| 22 | that I'm trustworthy.  Some defendants flee outright.  In some |
| 23 | of the cases that are distinguishable and your Honor's read, |
| 24 | like *Maxwell* and *Epstein* —— |
| 25 | THE COURT:  How does that relate to dangerousness |

O9IHComC

1   generally or danger of obstruction?  Because it seems to me

2   that it may —— what you've said relates to danger of

3   obstruction, but not in a good way for you.  If he's aware of

4   this April 1, 2024, then, again, why is he contacting witnesses

5   in June and July of 2024?

6        MR. AGNIFILO:  So I have an answer.  A witness

7   contacted him.  I think I know what they're talking about.  And

8   a person contacted my client on Signal, so it doesn't show up,

9   and wanted to talk to him, and he spoke to her.  And the

10  witness —— I'll tell you exactly what happened.  And the

11  witness told him I'm a grand jury witness.  He told us that,

12  Ms. Geragos and I, and we said:  Don't talk to her anymore.

13  And he didn't talk to her anymore, and that was that.

14       She contacted him, if it's the thing that I'm thinking

15  about, and I think I'm right.  So that is not him reaching out

16  to a witness.  He did not reach out to grand jury witnesses.  I

17  dispute that wholeheartedly.  He didn't do it and he wouldn't

18  do it.  And he wouldn't do it because he has the sense not to

19  do it, and he wouldn't do it because we wouldn't let him do it,

20  you know.  So as much as we ——

21       THE COURT:  OK.  Let's get back to, again, this point

22  that you're making.  This all seems to be that this is just

23  related —— this is again cabined to risk of flight.  So tell me

24  again why surrendering of the passports and everything has

25  something to do with danger.  You're saying it shows respect

O9IHComC

1   for the court, respect for the proceedings.  That seems

2   quintessentially like risk of flight.

3        MR. AGNIFILO:  Because I think part of —— defendants

4   who are dangers, once the court process starts, are people who

5   have disregard for the court.  It's contemptuous of the court.

6   They are doing things, they're engaging in conduct that they

7   know is contemptuous of the court.  And everything that

8   Mr. Combs has done has shown he is not and has never been

9   contemptuous of the court.  In fact, his whole life has been

10  the exact opposite.

11       And it's important that I bring this up to your Honor

12  because I think it's a serious consideration.  It's not on his

13  rap sheet because he was acquitted, but it's well known that

14  between 1999 and 2001, he had a very significant criminal case

15  in Manhattan.  He went to trial, and he was acquitted.  And

16  during that over one-year period, he went to court every time

17  he was supposed to.  During that over one-year period, there

18  were no issues with witnesses.  There were no issues with

19  danger.  And he abided by the process.  He showed respect for

20  the court.  He came to court every day.  He went to trial, and

21  a jury of 12 New Yorkers found him not guilty.

22       So this is someone who actually has shown that, when

23  the chips are down, when the pressure is on, he doesn't do

24  anything that he's not supposed to do.  He shows up on time.

25  He shows up every day.  He didn't do anything with witnesses.

O9IHComC

|    |                                                              |
|----|--------------------------------------------------------------|
| 1  | He didn't do anything dangerous.  And that is a track record. |
| 2  | That happened.  That's not just his lawyer making an argument. |
| 3  | That's the truth, and that's in the record.  That happened.  |
| 4  | There is no issues with him for that over one-year period, and |
| 5  | he went to trial and was acquitted.  And he's going to show the |
| 6  | exact same respect for this Court.                           |
| 7  | So the reason it relates to danger and the reason it         |
| 8  | relates to the government's concerns of witness intimidation is |
| 9  | because he hears the Court loud and clear.  There's a case now, |
| 10 | and he is going to do everything right from this point forward. |
| 11 | And I'm not asking your Honor just to trust him.  I am asking |
| 12 | your Honor to trust him, I am, but not that alone.  I'm saying |
| 13 | that if we put in place the different measures that I have in |
| 14 | the bail package and the letter that we submitted to the Court, |
| 15 | along with SAGE Intelligence — which we didn't name them, so I |
| 16 | understand why the government thought that we were going to use |
| 17 | the same security service that's been in place all this time, |
| 18 | but that was never the plan.  The plan was always to use a    |
| 19 | company like SAGE Intelligence, and that's the plan now —     |
| 20 | that, in addition to the fact that he's shown that he is      |
| 21 | trustworthy — and I believe he has because I believe the     |
| 22 | incidents that the government's talking about do not amount to |
| 23 | witness intimidation in the slightest — that we have in place |
| 24 | a foolproof system that will give the Court what it needs.  He |
| 25 | is not going to contact anybody.  He is not going to reach out |

O9IHComC

1    to anyone, and he's going to let his lawyers do the defense

2    investigation, as we should.

3            THE COURT:  But tell me more about this allegedly

4    foolproof system that you're proposing.  Under the system,

5    would Mr. Combs still have employees?

6            MR. AGNIFILO:  He will have employees.  He has

7    employees.  He has, you know, people who manage his finances.

8    They're not necessarily in the same house.  They're located in

9    California.  But he does have employees.

10           THE COURT:  Would it be necessary for him to speak

11   with these employees or have someone on his behalf speak with

12   these employees?

13           MR. AGNIFILO:  We could work that out.  There's going

14   to have to be some way of communicating with the employees,

15   some form or fashion of doing that.  I mean ——

16           THE COURT:  And under your proposal, would Mr. Combs

17   be able to leave the residence?

18           MR. AGNIFILO:  No, I don't anticipate that he will.

19           THE COURT:  Would your proposal be the security

20   company —— you said they'd be there.

21           MR. AGNIFILO:  Yes.

22           THE COURT:  What does "there" mean?

23           MR. AGNIFILO:  So there is —— his home in Florida is

24   the one that we're looking to secure the bond.  It is in Miami.

25   He would live there and the security personnel would live there

O9IHComC

```
1    as well.  I mean, they would probably do it in shifts.  I don't

2    exactly know how, but they'll probably do it in eight-hour

3    shifts and rotate in and out.  But there will be ——

4         THE COURT:  But the proposal is that they would just

5    be in the house, not sitting there looking at him the whole

6    time, correct?

7         MR. AGNIFILO:  I don't know that they would need to

8    sit there and look at him.  I think what we could do is we

9    could put cameras.  We could put cameras at the entrances that

10   are filming 24 hours a day, and they would be in the house and

11   aware of the goings-on.  If there were requirements that he

12   don't have a cell phone, we could find ways of doing

13   spot-checks to make sure that he's not on a cell phone.  If the

14   requirement is that he doesn't use the Internet, we can do

15   spot-checks that he doesn't use the Internet.  But we can make

16   it as secure as we need to make it.

17        And let me just add, there are already —— and the

18   government knows this because I think they took a lot of the

19   footage back on March 25 —— there are cameras in different

20   parts of the house, so all we would need to do is kind of keep

21   those cameras rolling.  I'm happy to share the footage with

22   anybody who wants it.  But what we would do is we would monitor

23   those cameras, in addition to physically monitoring the

24   situation with the officers on-site.

25        THE COURT:  Who would be living in the home with him?
```

O9IHComC

1          MR. AGNIFILO:  One second.

2          (Counsel conferred with defendant)

3          MR. AGNIFILO:  I think we can arrange things so he's

4    the only one living there and that SAGE would be working there,

5    doing security, and he'd be the only one actually residing at

6    the house.

7          THE COURT:  But there would be visits from family

8    members and employees and friends and the like, correct?

9          MR. AGNIFILO:  Assuming that those people are —— we

10   will put a list together, we will share it with everybody who

11   wants to see it, and those would be the people who visit.  And

12   nobody else would visit because SAGE won't let them in.

13         THE COURT:  Go ahead.  Is there anything else?  You

14   want to address the violence and danger more generally?

15         MR. AGNIFILO:  Sure.  Yes, Judge.

16         THE COURT:  I know you made some statements before

17   regarding the 2016 video incident.

18         MR. AGNIFILO:  Yes, Judge.

19         THE COURT:  Again, that video is quite disturbing.

20   And it was eight years ago, but he's still 46, 47 years old at

21   the time this is taking place.

22         MR. AGNIFILO:  He was.

23         THE COURT:  And this was after his acquittal on the

24   state court charges.

25         MR. AGNIFILO:  It was.  So let me shed some light.

O9IHComC

1    Your Honor asks a good question.  I think there's an answer to

2    it.

3           In the weeks and months after the video, Mr. Combs

4    realized he has a problem with drug addiction and he has a

5    problem with anger, and he went and —— he went into a rehab

6    program for a period of time.  I don't want to get too much

7    into this, but it's significant.  The person —— the woman in

8    the video also went into rehab around the same time.

9           The point is this was a ten-year relationship that was

10   very loving at times.  These people loved each other, and I

11   don't think there's any other view of the relationship than

12   that because they're just —— the written messages are —— it's

13   heartbreaking.  It's sort of a heartbreaking relationship in

14   many ways because they really did love each other.  And I think

15   what the government is doing —— and I'm not saying this in a

16   bad way —— but I think the dynamic of the case that I object to

17   most, most respectfully, is this:  The sex and the violence

18   were totally separate and motivated by totally different

19   things.  The way that this couple chose to be intimate was the

20   way that is —— they would bring a third party into their

21   intimacy.  That was their thing.  That is how these two adults

22   chose to be intimate.  And the written communications, Judge,

23   are overwhelming, overwhelming, that this is so.  Not only that

24   it was with consent, it was —— it was a sought-after, special

25   part of their relationship.  And in some ways ——

O9IHComC

```
1          THE COURT:  What does this have to do with him

2    punching her, throwing a vase at her, kicking her?  What's love

3    got to do with that?

4          MR. AGNIFILO:  It's a good question, and the answer is

5    it has nothing to do with because that's not what motivated

6    that stuff.  The intimacy is over here, OK?  All of the

7    problems are not related to the intimacy.  The problems are

8    related to jealousy from infidelity.  That is where the

9    problems come.  You have jealousy from infidelity.  You have

10   arguments.  You have fights.  You have things like you saw on

11   the video because of jealousy due to infidelity in both

12   directions, in both —— on the part of both participants,

13   Mr. Combs and this other person.  It's mutual.  And the

14   violence is from that 100 percent, and the written

15   communications make that clear.

16         THE COURT:  Let me just make sure I understand your

17   point on this.

18         MR. AGNIFILO:  Yes, your Honor.

19         THE COURT:  What is your point on this?  You're saying

20   that that's the reason that he —— because of jealousy, that's

21   the reason, because they had an argument, that that's the

22   reason that he punched her, threw a vase at her, and kicked

23   her?

24         MR. AGNIFILO:  I'm saying it's not sex trafficking.

25   The government is linking the two, and in the linkage they find
```

O9IHComC

1    sex trafficking.

2              THE COURT:  The government's also talking more

3    generally about violence against women and violence against

4    this particular woman who the government claims was sex

5    trafficked.

6              And let me ask you this thing:  If you're talking

7    about —— to the extent that you claim that this sort of

8    behavior was —— that inviting another person into the

9    relationship was somehow consensual, if that person is a sex

10   worker or prostitute and travels across state lines, isn't that

11   a problem regarding Count Three of the indictment?

12             MR. AGNIFILO:  It may or may not be.  I have spoken to

13   the people from this agency, and what they uniformly say is we

14   are not paid to have sex.  We are paid for our time.  And if we

15   meet somebody and it goes in that direction and everybody wants

16   to do this and there is sexual contact, then that sometimes

17   happens.

18             And, listen, at the end of the day, the one-time

19   governor of New York was investigated by the Southern District

20   of New York because he was sleeping with $5,000-an-hour

21   prostitutes while he was the governor, and they didn't

22   prosecute him.  They are prosecuting Mr. Combs for the exact

23   same type of conduct.

24             So, yes, let's assume for a second —— let's assume for

25   a second your Honor's question is right.  OK?  That is —— it's

O9IHComC

| 1 | not sex trafficking.  It's not sex trafficking, that's my |
| 2 | point.  The reason we're really here and —— |
| 3 |         THE COURT:  That would be a crime.  That would be a |
| 4 | federal offense. |
| 5 |         MR. AGNIFILO:  No, I don't think that's true because I |
| 6 | don't know that, if you read the Mann Act, the consumer of the |
| 7 | intimacy is within the purview of the Mann Act.  My read of the |
| 8 | Mann Act is that it's about the business of sex, and there is |
| 9 | no argument that Mr. Combs was involved in the business of sex. |
| 10 | That's not the argument. |
| 11 |         THE COURT:  Let's get back to that video and the |
| 12 | physical beating. |
| 13 |         MR. AGNIFILO:  Yes. |
| 14 |         THE COURT:  Why isn't that relevant to a consideration |
| 15 | as to danger to the community more generally and acts of |
| 16 | violence against women and what the government has alleged |
| 17 | here? |
| 18 |         MR. AGNIFILO:  Judge, I think it's relevant.  I think |
| 19 | it is relevant.  I haven't said it wasn't relevant.  I'm saying |
| 20 | it's not part of the sex trafficking.  That's my theory, that |
| 21 | it's not part of the sex trafficking.  Is it relevant?  Your |
| 22 | Honor's going to look at the video the way everybody looked at |
| 23 | the video, the way Mr. Combs looked at the video.  Mr. Combs |
| 24 | issued an apology after the video, and I'm not going to undo |
| 25 | his apology.  It's a hard video to watch.  It's an upsetting |

O9IHComC

1    video to watch.  It was an upsetting video to watch for

2    everyone, but that doesn't mean he should be incarcerated.

3              It's eight and a half years ago.  He went into rehab

4    since then.  He has done tremendous things to try to change as

5    a person since then, and he's not the same person he was then.

6    He was in a relationship that was a toxic relationship.  And

7    probably the best single thing, both for him and the woman

8    involved, is that they broke up and they both went their

9    separate ways seven years ago at this point — six years ago.

10   Six years ago they broke up at this point, and sometimes that

11   happens in life.

12             You know, Mr. Combs has the unfortunate reality that

13   one of the worst things he's ever done was on videotape.  I'm

14   glad that didn't happen to me.  None of us should be that

15   unlucky.  But one of the worst things he ever did happens to be

16   on videotape, and it will one day be played at his federal

17   trial, and we'll deal with it when it is.  So I'm not asking

18   your Honor to ignore it.  I'm not ignoring it.  But I don't

19   think it's dispositive, and I don't think, in and of itself, it

20   means that he should be detained pretrial.

21             We have defenses to the charges.  That's the point.

22   We have defenses to the charges, real defenses.  This is going

23   to be a trial one day, 100 percent.  He's not going to plead

24   guilty to racketeering and sex trafficking and those things.

25   He's not.  So this is going to be a trial.  And I am asking

O9IHComC

 1   you, because it's so critically important, we have proffered,

 2   your Honor, a very substantial bail package.  And him coming to

 3   New York, Judge, I think, also is not just important in terms

 4   of risk of flight; I think it's important for every aspect of

 5   what we consider when we think about bail.

 6           I mean, this is a man —— we had a meeting with the

 7   government.  Ms. Geragos and I met with my colleagues to my

 8   right here, I think it was, September 3.  It was a day after

 9   Labor Day, the Tuesday after Labor Day.  And Ms. Geragos and I

10   left that meeting, and I realized they were going to return an

11   indictment soon.  I didn't know if soon was a week.  I didn't

12   know if soon was a month.  I didn't know if soon was three

13   months.  I got on the phone with Mr. Combs the next day, and I

14   said you should consider coming to New York because I think

15   they're going to charge you soon.

16           He got on a plane on September 5 and came to New York,

17   and he came to New York to turn himself in.  He came to

18   New York to surrender.  And I told my colleagues, he's here.

19   He wants to surrender.  Just give him a time, and he'll be

20   there.  I understand that they don't have to do it, and they

21   didn't do it.  They told me they would get back to me, and then

22   he got arrested.  And that's OK.  That's OK.  But the fact that

23   he got on an airplane to come to New York when so many

24   defendants, Judge, get on an airplane or a bus or a train, or

25   whatever, and run as far away from the place of danger as

1    possible.  The fact that he did the exact opposite is a weighty

2    consideration of him in general.  And so when I say to the

3    Court that I want the Court to trust him, he has earned the

4    Court's trust.

5         And even if the Court doesn't fully trust him, trust

6    the package as a whole that I'm proposing with a $50 million

7    bond, which is a tremendous bond, secured by about $50 million

8    in equity with the cosigners that we've proposed; with the

9    passport surrendered that we've proposed, including his own

10   passport; with electronic monitoring; he stays in the house;

11   SAGE Intelligence supervises the house; we have a list of

12   permitted visitors; he doesn't have a cell phone; he doesn't

13   have any Internet access.  And I believe that will do two very

14   important things:  (1) It will give the Court comfort that he's

15   not a flight risk due to the conditions, he's not a danger,

16   he's not a danger of any witness obstruction with these

17   conditions, and it allows him to prepare for his trial in a

18   fair way.

19        And everything that we have been doing, we have known

20   this was coming.  If he was going to run, if he was going to do

21   something reckless and stupid, he would have done it in March,

22   and he didn't.  Instead, he gave us his passport, and we told

23   the government we had it.

24        This is someone who has worked hard his whole life.

25   We haven't gotten too much into his personal characteristics,

O9IHComC

1    but I think it's actually somewhat important.

2            He has —— first of all, he has one misdemeanor

3    conviction from 29 years ago.  That's it.  He's 53 years old.

4    One misdemeanor conviction from 29 years ago.  He was an actual

5    altar boy growing up.  He's a very religious man.

6            THE COURT:  How far back are you going now?

7            MR. AGNIFILO:  The man has —— I'm going back and I'm

8    talking about him as a person because it's all one continuum.

9            THE COURT:  OK.

10           MR. AGNIFILO:  He watches a sermon every day.  He's

11   religious.  He comes from a religious family.  His father,

12   unfortunately, was killed when he was two years old.  He was

13   raised by his mother, who did a wonderful job with him.  And he

14   has worked hard, and he has earned everything that he's ever

15   gotten in his life.

16           And the one thing that I'm asking your Honor for is to

17   see that he has done everything to earn the Court's trust.  He

18   has done a great deal to earn the Court's trust.  And I am

19   submitting that this very, very substantial package, both

20   what's in the written letter supplemented by what I said today,

21   and supplemented still further by SAGE Intelligence being

22   on-site —— and we can have any protocol that your Honor sees

23   fit.  We'll certainly suggest one, but if your Honor wants

24   something more or different, we can do whatever your Honor

25   thinks is necessary —— that that, in combination, that

O9IHComC

1   substantial package means that he should be released to work on

2   his case, to meet with his lawyers.  If we need to speak to him

3   by flying to Florida, we'll do that.  He'll stay in his house

4   in Florida, and he'll do nothing but prepare for his trial.

5          So I'm asking you to release him on these very, very

6   strenuous conditions, Judge.  Thank you.

7          THE COURT:  Thank you.

8          All right.  I've heard from the parties.  I've

9   reviewed everything.  I find that the government has proven

10  that the defendant is a danger regarding obstruction of justice

11  and witness tampering by clear and convincing evidence.

12         I also find that the government has proven that the

13  defendant is a danger to the safety of others in the community

14  more generally by clear and convincing evidence.

15         I need not reach the issue of risk of flight.  Again,

16  I find that the government has carried its burden of persuasion

17  by clear and convincing evidence on dangerousness both for

18  obstruction and witness tampering, as well as danger more

19  generally, even if the defense has rebutted the presumption by

20  coming forward with their burden of production.

21         Regarding the bail package that has been proposed by

22  defense counsel in terms of risk of flight, I think it's

23  insufficient.

24         In terms of overcoming what the government has proven,

25  again, I'll say it this way:  Again, the government has proven

O9IHComC

1    by clear and convincing evidence that there is no condition or

2    combination of conditions that will reasonably assure the

3    safety of a person in the community, as well that he will not

4    obstruct justice or tamper with witnesses.

5         There are issues also with what the defense has

6    suggested in terms of this SAGE Intelligence.  Certainly, the

7    defendant would still have access to employees and other

8    individuals.  And given what the government has proffered, he

9    could certainly obstruct justice and intimidate witnesses

10   through those folks, through even coded messages if necessary.

11        So I am denying bail, and I am granting the

12   government's motion.

13        We are scheduled to have an initial conference on the

14   24th.  Since we're here, I don't know if we need to do that.

15   Perhaps we can just find out how counsel wish to proceed.  I

16   know that Mr. Combs was already arraigned on the indictment.

17   So how do counsel wish to proceed?  Let me hear from the

18   government first.

19        MS. SMYSER:  Thank you, your Honor.  Happy to give the

20   Court an overview of the discovery in the case and also the

21   government's proposed schedule.

22        So, first, I think it's important to note that your

23   Honor probably has seen this from the record so far, but there

24   is going to be a huge amount of discovery in the case.  It's

25   going to consist of dozens of terabytes of data.  Then I want

O9IHComC

1    to cover some of those categories of the Rule 16 discovery that

2    we'll be disclosing to the defense.

3            First, it will include grand jury subpoena returns.

4    For some context as to the volume of those returns, we have

5    served over 300 grand jury subpoenas in the case and gotten

6    returns from over 100 individuals and entities, including phone

7    companies, tech companies, social media companies, hotels,

8    airlines, some companies related to Mr. Combs himself.

9            Second, the Rule 16 discovery will also include search

10   warrants.  We've obtained over 20 search warrants in the case,

11   including warrants for electronic devices and iCloud accounts,

12   including warrants for his historical and prospective cell

13   phone information and for a variety of persons, as well as for

14   Mr. Combs' residences.

15           Third, the discovery will include photographs of

16   physical evidence, including evidence that was collected from

17   his residences in March 2024, as well as from his hotel room a

18   few days ago, which includes freak-off supplies, narcotics,

19   firearms, and ammunition.

20           The discovery will also include a variety of law

21   enforcement reports and records, including from local law

22   enforcement.

23           And finally, there are a large number of electronic

24   devices in the case.  Specifically, over the course of the

25   investigation, including in the past few days, the government

O9IHComC

1    has been collecting electronic devices and, in total, has

2    seized over 100 phones, laptops, tablets, and iCloud accounts,

3    as well as over 30 other kinds of devices.  And here, I'm

4    talking about things like hard drives, flash drives, cameras,

5    DVRs.  These devices are often large, sometimes hundreds of

6    gigabytes, sometimes terabytes, especially in relation to the

7    iCloud accounts.

8         Already the government has extracted approximately

9    half of those phones, laptops, tablets, and iCloud accounts.

10   And these devices are in the process of a privilege review,

11   varying stages of it, and they will then be reviewed for

12   identified data and —— review, and we will produce that

13   identified data on a rolling basis to defense counsel as it

14   becomes available.

15        So although this is a large amount of discovery, we

16   have a plan for producing it to defense counsel.

17        First, before producing any discovery, as your Honor

18   might anticipate, we will need a signed protective order given

19   that the discovery will contain sensitive victim and witness

20   information, and we have, as we've discussed, real concerns

21   about witness tampering as well as with the sensitivity of the

22   victim information and statements that have been given to the

23   media so far.  So we will start engaging in those discussions

24   with defense counsel today about negotiating the protective

25   order, and we'll let your Honor know if there are any issues

O9IHComC

1    with that process.

2          Second, soon after getting the protective order

3    signed, we plan to produce the affidavits related to the search

4    warrants that we've obtained in the case.  As I said, there are

5    over 20 of them.  Many of them have lengthy affidavits which

6    lay out large portions of the case and will assist the defense

7    in assessing whether there are motions that we would like to

8    make.

9          Third, within approximately 30 days of having a

10   protective order, the government would intend to make a large

11   production of discovery to the defense consisting of a variety

12   of things, including grand jury subpoena returns.  But,

13   importantly, we are prepared to produce many of Mr. Combs' own

14   devices and accounts.  We have approximately 35 full

15   extractions ready to produce to the defense.  We anticipate

16   that the copying of those devices, given their size, will take

17   some time, but we will engage in that process as soon as we

18   can.

19         And, finally, our plan would be, after this initial

20   large production, to continue to make productions on a rolling

21   basis.  And I just want to note for the Court that our

22   investigation in this case is very much ongoing, and we will

23   continue to produce the information that is in our possession.

24   And as we get more related to the new investigation, we will

25   also review that in accordance with our discovery obligations

O9IHComC

```
 1    to produce to the defense.

 2              We think it makes sense, in order to give defense

 3    counsel sufficient time to review this discovery, to have a

 4    status conference in approximately 90 days.

 5              THE COURT:  OK.  Defense counsel, let me hear from

 6    you.

 7              MR. AGNIFILO:  Yes, your Honor.  I am —— without

 8    speaking to Mr. Combs in greater detail, in light of the fact

 9    that he's going to be in the SHU of the MDC, I'm not in a place

10    where I'm prepared to consent to a speedy trial.  I'm not

11    saying that I won't in the future, but this is a serious

12    conversation we have to have.  And the fact that he is going to

13    be incarcerated is a significant factor.  So I don't know that

14    I can consent to a 90-day adjournment for a status conference.

15    I think we want to reserve the right of moving much quicker

16    than that.  The government arrested him, the government wants

17    him detained, and we're going to have to do everything possible

18    to move this along.

19              So where I am today is I'd like some time to speak

20    with him, and more than just a few minutes here.  We need to go

21    through this in real detail.  I also need to see what's going

22    to be possible in the SHU, and I don't know that I exactly know

23    that now in terms of what computer facilities are going to be

24    possible.  And so at this point I'm not prepared to waive

25    speedy trial.
```

O9IHComC

```
 1              THE COURT:  So what do you want to do at this point?

 2     Do you want to set a trial date?  Do you want to, because I

 3     would —— well, I don't know.

 4              Do you want time to review the discovery that's going

 5     to be produced, do you want to come back in 45 days, or do you

 6     want me to set a trial date?  I can set a trial date if you

 7     want me to set a trial date ——

 8              MR. AGNIFILO:  I understand.

 9              THE COURT:  —— whenever you want it.  And if I can't

10     try it, I'll find a colleague who can if you want to set a

11     trial date.

12              MR. AGNIFILO:  Can I just talk to the government for a

13     second?  I just have a question.

14              THE COURT:  Yes.

15              (Counsel conferred)

16              MR. AGNIFILO:  I have a proposal.  Would your Honor be

17     amenable to a status conference in somewhere between 14 and 20

18     days?  And in the interim, what I think we'll have a better

19     handle on is how Mr. Combs would be able to look at the

20     discovery, what discovery will be available when, and what,

21     from a technical perspective, he'll be able to look at and with

22     what level of difficulty.

23              So my ask of the Court is that we have a shorter

24     turnaround time for a status conference, and whatever's good

25     for the Court in that general period of time of two to three
```

O9IHComC

1   weeks.

2            THE COURT:  OK.  We can do that.

3            What's your position on speedy trial time between now

4   and that two- to three-week period?

5            MR. AGNIFILO:  Without a much more in-depth

6   conversation with my client, I'm not prepared to waive it.

7            THE COURT:  OK.  What's the government's position on

8   whether or not I should exclude —— well, let's get the date,

9   first of all.

10           How about October the 9th?  Are counsel available

11  then?

12           MR. AGNIFILO:  One second, Judge.

13           THE COURT:  Let's say 2 o'clock.

14           MR. AGNIFILO:  That's fine, Judge.  Thank you.

15           THE COURT:  Does that work for the government?

16           MS. SMYSER:  Yes, your Honor.

17           THE COURT:  OK.  Let's set this down for October 9 at

18  2 o'clock.

19           I know the defendant says you don't want to waive

20  speedy trial time.  Fine.  What is the government's position on

21  whether or not time should be excluded, and what's defense

22  counsel's position on that?

23           MS. SMYSER:  Your Honor, the government would move to

24  exclude time under the Speedy Trial Act.  The ends of justice

25  outweigh the interests of the public and the defendant in a

O9IHComC

```
 1   speedy trial here given the complexity of the case, given the

 2   need for the government to produce discovery to the defendant,

 3   and for the defendant and his counsel to begin to review that

 4   discovery.

 5        THE COURT:  All right.  So, defense counsel, I

 6   understand your position.  You don't want to waive speedy trial

 7   time.  I get that.  But would you be prepared to try this case

 8   on October the 9th?

 9        MR. AGNIFILO:  No, no, I'm not saying that I am.  What

10   I'm saying is I need more information to come to the Court with

11   an intelligent position on this, and the things that we don't

12   know is what his ability to look at the stuff will be where he

13   is.  I don't know where he will be in the MDC.  Where they

14   designate him is significant to that.  I think the government

15   is —— it might help in the process of trying to make sure that

16   he gets what he needs, and I think by October 9 we'll have a

17   better idea of what they can produce and when.

18        So, no, I'm not looking to try the case on October 9.

19   That would be irresponsible.  I'm not asking to do that.  But

20   what I am asking is —— the government's going to move with all,

21   you know, urgency to get me everything, and then October 9, I

22   think we'll have our arms around the situation a little bit

23   better.

24        THE COURT:  OK.  I will exclude time under the Speedy

25   Trial Act from today's date until October 9 so the defense
```

O9IHComC

1    counsel gets an opportunity to consult with his client, gets an

2    opportunity to start reviewing the discovery, gets an

3    opportunity to decide how they want to proceed with this case,

4    and also to be better prepared for trial in this case.  I find

5    that the interests of Mr. Combs and the interests of justice

6    support exclusion of time under the Speedy Trial Act from

7    today's date until October 9.  I further find that the

8    interests of Mr. Combs and the interests of justice outweigh

9    the public's interest in a speedy trial.  I will enter an order

10   to that effect.

11        Let me also just share something with counsel.  We

12   received a couple of calls in chambers today from people who

13   claimed to have information relevant to the prosecution of this

14   case.  We did not engage with those individuals other than my

15   staff instructed them to reach out to the U.S. Attorney's

16   Office.  I just wanted to let counsel know that.

17        The other thing is that, in their most recent

18   submission, the government made an allusion to Local Criminal

19   Rule 23.1.  Is there anything that anybody wants me to do about

20   that now, counsel for the government?  Again, that relates to

21   statements allegedly made by defense counsel on some news

22   channel recently.

23        MS. JOHNSON:  We're not asking the Court to do

24   anything right now, your Honor.  We just wanted to put a marker

25   down that we thought some of the comments got a little bit

O9IHComC

1    close to the line under the local rule, particularly with

2    respect to issues regarding the victim and potentially

3    inadmissible evidence.  So we just wanted to flag that for the

4    Court.

5              THE COURT:  OK.  Anything else from defense counsel on

6    that?

7              MR. AGNIFILO:  I'm not sure that this is something

8    that the Court ——

9              THE COURT:  They're not asking me to do anything.  You

10   don't have to say anything.

11             MR. AGNIFILO:  No, no, it's not about that.

12             THE COURT:  Go ahead.

13             MR. AGNIFILO:  I believe —— and I know that courts

14   sometimes do this in terms of sentencing.  I've never actually

15   asked a court to do it on a pre-sentencing posture.  I think

16   Essex County would be preferable to the MDC, and I know that

17   they do house certain defendants, even in Southern District and

18   the Eastern District cases, in Essex County.

19             I don't know what your Honor can do to help in that

20   regard.  I've never made this request of a court at a pretrial

21   setting.  But I don't —— if your Honor would say you don't have

22   any objection to it, if that was consistent with the protocols

23   that existed, that might even be helpful, and then I'll take

24   the weight on myself to try to make that happen if I can.  So

25   any little thing could help me.

O9IHComC

1          THE COURT:  OK.  Government, what's your view on this?

2          MS. JOHNSON:  I don't have the cite off the top of my

3    head, but I know that in the regulations there's —— that the

4    designation authority is entirely within —— given to the BOP.

5    I think this gets a little complicated, and I think —— I don't

6    know that there's anything that the Court can do to put the

7    thumb on the scale of where he's placed.  I think that's

8    ultimately a decision of the Bureau of Prisons.

9          THE COURT:  My sense is that what defense counsel is

10   asking is it's akin to, at sentencing, even though the Court

11   has no authority to dictate where someone is held, basically

12   akin to the Court making a recommendation that someone be

13   housed at a particular facility.  Again, I'm not aware of that

14   being done pretrial, so perhaps what we should do is have

15   counsel file a joint status report regarding this issue,

16   regarding what, if anything, the Court can do in that regard.

17   Certainly, defense counsel, you can look into this on your own.

18   Let's get that by Monday, September 23.

19          Does that work for the defense?

20          MR. AGNIFILO:  Yes, your Honor.  Thank you.

21          THE COURT:  Does that work for the government?

22          MS. JOHNSON:  It does, your Honor.

23          THE COURT:  That will be a joint submission.

24          Is there anything else today from the government?

25          MS. JOHNSON:  No, your Honor.  Thank you.

O9IHComC

1          THE COURT:  Is there anything else today from the

2     defense?

3          MR. AGNIFILO:  No, thank you.

4          THE COURT:  Let me just —— I will say this:  We have a

5     status conference date for October the 9th, and I'll be around,

6     and we can certainly do that.  I know that the —— being placed

7     in the MDC will be difficult, and often when prisoners are

8     taken to court, they're often woken up at 3:00 or 4:00 in the

9     morning and taken to court.  If counsel have discussed matters

10    with themselves and come to some agreement as to how we should

11    move forward, I will not object to counsel submitting a joint

12    report a couple of days ahead of time, because there's no

13    reason to have a court appearance just to simply adjourn it for

14    another day.

15          Anything from the government on that?

16          MS. JOHNSON:  Understood, your Honor.  We'll speak

17    with counsel and see if we can reach any resolutions prior to

18    October 9.

19          THE COURT:  Anything from the defense on that?

20          MR. AGNIFILO:  I understand the Court's position.

21          THE COURT:  All right.  We're adjourned.  Thank you.

22          (Adjourned)

23

24

25

Generated: Sep 30, 2024 2:17PM                                              Page 1/1

# U.S. District Court

## New York Southern - Manhattan

Receipt Date: Sep 30, 2024 2:17PM

SEAN COMBS

Rcpt. No: 33291                    Trans. Date: Sep 30, 2024 2:17PM                    Cashier ID: #JE

| CD | Purpose | Case/Party/Defendant | Qty | Price | Amt |
|----|---------|---------------------|-----|-------|-----|
| 203 | Notice of Appeal/Docketing Fee | | 1 | 605.00 | 605.00 |

| CD | Tender | | | | Amt |
|----|--------|--|--|--|-----|
| CC | Credit Card | | | | $605.00 |

Total Due Prior to Payment: $605.00

Total Tendered: $605.00

Total Cash Received: $0.00

Cash Change Amount: $0.00

**Comments**: 24CR00542 ALC

Only when the bank clears the check, money order, or verifies credit of funds, is the fee or debt officially paid or discharged. A $53 fee will be charged for a returned check.

**United States Court of Appeals for the Second Circuit**
**Thurgood Marshall U.S. Courthouse**
**40 Foley Square**
**New York, NY 10007**

**DEBRA ANN LIVINGSTON**
CHIEF JUDGE

**CATHERINE O'HAGAN WOLFE**
CLERK OF COURT

Date: September 30, 2024
Docket #: 24-2606
Short Title: United States of America v. Combs

DC Docket #: 1:24-cr-542-1
DC Court: SDNY (NEW YORK CITY)
Trial Judge - Andrew L. Carter

## NOTICE OF RECORD ON APPEAL FILED

In the above referenced case the document indicated below has been filed in the Court.

\_\_\_\_ Record on Appeal - Certified List

\_\_\_\_ Record on Appeal - CD ROM

\_\_\_\_ Record on Appeal - Paper Documents

\_X\_\_ Record on Appeal - Electronic Index

\_\_\_\_ Record on Appeal - Paper Index

Inquiries regarding this case may be directed to 212-857-8512.

| From: | NYSD_ECF_Pool@nysd.uscourts.gov |
|---|---|
| To: | NYSD CourtMail |
| Subject: | Activity in Case 1:24-cr-00542-ALC USA v. COMBS Appeal Record Sent to USCA - Electronic File |
| Date: | Monday, September 30, 2024 3:52:05 PM |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### U.S. District Court

### Southern District of New York

### Notice of Electronic Filing

The following transaction was entered on 9/30/2024 at 3:51 PM EDT and filed on 9/30/2024
**Case Name:** USA v. COMBS
**Case Number:** 1:24-cr-00542-ALC
**Filer:**
**Document Number:** No document attached

**Docket Text:**
**Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files as to Sean Combs re: [21] Notice of Appeal were transmitted to the U.S. Court of Appeals. (tp)**

**1:24-cr-00542-ALC-1 Notice has been electronically mailed to:**

Marc Antony Agnifilo    marc@agilawgroup.com, ecf@agilawgroup.com

Emily Anne Johnson     emily.johnson@usdoj.gov, caseview.ecf@usdoj.gov, usanys.ecf@usdoj.gov

Mary Christine Slavik    mary.slavik@usdoj.gov, CaseView.ECF@usdoj.gov, usanys.ecf@usdoj.gov

Teny Rose Geragos    teny@agilawgroup.com, ecf@agilawgroup.com

Mitzi Steiner    mitzi.steiner@usdoj.gov, caseview.ecf@usdoj.gov, usanys.ecf@usdoj.gov

Madison Reddick Smyser    madison.smyser@usdoj.gov

Meredith Foster    meredith.foster@usdoj.gov

**1:24-cr-00542-ALC-1 Notice has been delivered by other means to:**

ECF,INTAPP

# U.S. District Court
## Southern District of New York (Foley Square)
## CRIMINAL DOCKET FOR CASE #: 1:24−cr−00542−ALC All Defendants

Case title: USA v. COMBS                    Date Filed: 09/12/2024

Assigned to: Judge Andrew L.
Carter, Jr

**Defendant (1)**

| | |
|---|---|
| **Sean Combs** <br> *also known as* <br> Sealed Defendant 1 | represented by **Marc Antony Agnifilo** <br> Agnifilo Intrater LLP <br> 445 Park Avenue <br> Ste 7th Floor <br> New York, NY 10022 <br> 646−205−4350 <br> Email: marc@agilawgroup.com <br> *LEAD ATTORNEY* <br> *ATTORNEY TO BE NOTICED* <br><br> **Teny Rose Geragos** <br> Agnifilo Intrater LLP <br> 445 Park Avenue <br> Ste 7th Floor <br> New York, NY 10022 <br> 646−205−4350 <br> Email: teny@agilawgroup.com <br> *LEAD ATTORNEY* <br> *ATTORNEY TO BE NOTICED* <br><br> **Anthony L. Ricco** <br> Law Office of Anthony L. Ricco <br> 20 Vesey Street <br> New York, NY 10007 <br> (212)−791−3919 <br> Fax: (212) 791−3940 <br> Email: tonyricco@aol.com <br> *ATTORNEY TO BE NOTICED* |

| **Pending Counts** | **Disposition** |
|---|---|
| 18:1962−7480.F <br> RACKETEERING CONSPIRACY <br> (1) | |
| 18:1591.F SEX TRAFFICKING <br> OF CHILDREN OR BY FORCE, <br> FRAUD OR COERCION <br> (2) | |
| TRANSPORTING FOR <br> PROSTITUTION <br> (3) | |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level
(Terminated)**

None

| **Complaints** | **Disposition** |
| --- | --- |
| None | |

**Plaintiff**

| | | |
| --- | --- | --- |
| USA | represented by | **Emily Anne Johnson** |

**Emily Anne Johnson**
DOJ–USAO
US Attorney's Office, SDNY
1 St. Andrew's Plaza
New York, NY 10007
212–637–2409
Email: emily.johnson@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Madison Reddick Smyser**
DOJ–USAO
U.S. Attorney's Office, SDNY
One Saint Andrew's Plaza
New York, NY 10007
212–637–2381
Email: madison.smyser@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Mary Christine Slavik**
DOJ–USAO
One St. Andrew's Plaza
New York, NY 10007
212–637–1113
Email: mary.slavik@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Meredith Foster**
DOJ–USAO
Southern District of New York
26 Federal Plaza
New York
New York, NY 10278
212–637–2310
Email: meredith.foster@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Mitzi Steiner**
DOJ–USAO
1 St. Andrew's Plaza
New York, NY 10007
212–637–2284
Email: mitzi.steiner@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

*Designation: Assistant US Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/12/2024 | 1 | UNREDACTED INDICTMENT FILED as to Sealed Defendant 1. (jm) **(Not for Public view pursuant to Standing Order of the court, 24–mc–184.)** (Entered: 09/17/2024) |
| 09/12/2024 | 2 | SEALED REDACTED INDICTMENT as to Sealed Defendant 1 (1) count(s) 1, 2, 3. (jm) (Entered: 09/17/2024) |
| 09/17/2024 | 3 | Order to Unseal Indictment as to Sealed Defendant 1. (Signed by Magistrate Judge Robyn F. Tarnofsky on 9/17/24)(jm) (Entered: 09/17/2024) |
| 09/17/2024 | | INDICTMENT UNSEALED as to Sean Combs. (jm) (Entered: 09/17/2024) |
| 09/17/2024 | | Case as to Sean Combs ASSIGNED to Judge Andrew L. Carter, Jr. Judge Unassigned no longer assigned to the case.. (jm) (Entered: 09/17/2024) |
| 09/17/2024 | | Case Designated ECF as to Sean Combs. (jm) (Entered: 09/17/2024) |
| 09/17/2024 | | Attorney update in case as to Sean Combs. Attorney Emily Anne Johnson,Mary Christine Slavik,Madison Reddick Smyser,Mitzi Steiner for USA added. (jm) (Entered: 09/17/2024) |
| 09/17/2024 | 5 | LETTER by USA as to Sean Combs addressed to Judge Andrew L. Carter, Jr. from USA dated September 17, 2024 re: Govt Request for Detention Document filed by USA. (Johnson, Emily) (Entered: 09/17/2024) |
| 09/17/2024 | 6 | NOTICE OF ATTORNEY APPEARANCE: Marc Antony Agnifilo appearing for Sean Combs. Appearance Type: Retained. (Agnifilo, Marc) (Entered: 09/17/2024) |
| 09/17/2024 | 7 | NOTICE OF ATTORNEY APPEARANCE: Teny Rose Geragos appearing for Sean Combs. Appearance Type: Retained. (Geragos, Teny) (Entered: 09/17/2024) |
| 09/17/2024 | | Attorney update in case as to Sean Combs. Attorney Meredith Foster for USA added. (jm) (Entered: 09/17/2024) |
| 09/17/2024 | 9 | MOTION for Bond *Updated ECF 8* . Document filed by Sean Combs. (Agnifilo, Marc) (Entered: 09/17/2024) |
| 09/17/2024 | | Arrest of Sean Combs (Arrest date of 9/16/2024). (job) (Entered: 09/17/2024) |
| 09/17/2024 | 10 | Minute Entry for proceedings held before Magistrate Judge Robyn F. Tarnofsky: Initial Appearance as to Sean Combs held on 9/17/2024. Detention Hearing as to Sean Combs held on 9/17/2024. Arraignment as to Sean Combs (1) Count 1,2,3 held on 9/17/2024. Plea entered by Sean Combs (1) Count 1,2,3 Not Guilty. AUSA Emily Johnson present for the Government. Defendant present with attorney's, Marc Agnifilo and Teny Geragos. BAIL DISPOSITION: Detention: Risk of Flight/Danger. –Speedy Trial time excluded until 9/24/2024. (Status Conference set for 9/24/2024 at 10:00 AM before Judge Andrew L. Carter Jr..) (job) (Entered: 09/17/2024) |
| 09/18/2024 | 11 | ORDER as to Sean Combs. A Bail Appeal Hearing is set for September 18, 2024 at 2:00 p.m. (Bail Appeal Hearing set for 9/18/2024 at 02:00 PM before Judge Andrew L. Carter Jr) (Signed by Judge Andrew L. Carter, Jr on 9/17/2024)(jw) (Entered: 09/18/2024) |
| 09/18/2024 | 12 | AMENDED ORDER as to Sean Combs. A Bail Appeal Hearing is set for September 18, 2024 at 3:30pm (Bail Appeal Hearing set for 9/18/2024 at 03:30 PM before Judge Andrew L. Carter Jr..) (Signed by Judge Andrew L. Carter, Jr on 9/17/24)(jw) (Entered: 09/18/2024) |
| 09/18/2024 | 13 | LETTER MOTION addressed to Judge Andrew L. Carter, Jr. from Marc Agnifilo, Esq. dated 9/18/2024 re: Mr. Combs' Release from Custody . Document filed by Sean Combs. Return Date set for 9/18/2024 at 03:30 PM. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9)(Agnifilo, Marc) (Entered: 09/18/2024) |

| 09/18/2024 | 14 | Brady ORDER as to Sean Combs. (Signed by Magistrate Judge Robyn F. Tarnofsky on 9/18/24)(jm) (Entered: 09/18/2024) |
|---|---|---|
| 09/18/2024 | 15 | LETTER RESPONSE in Opposition by USA as to Sean Combs addressed to Judge Andrew L. Carter, Jr. dated 09/18/2024 re: 13 LETTER MOTION addressed to Judge Andrew L. Carter, Jr. from Marc Agnifilo, Esq. dated 9/18/2024 re: Mr. Combs' Release from Custody .. (Smyser, Madison) (Entered: 09/18/2024) |
| 09/18/2024 |  | Minute Entry for proceedings held before Judge Andrew L. Carter, Jr: Bond Hearing as to Sean Combs held on 9/18/2024. AUSAs Emily Johnson, Madison Smyser, Mary Slavik, Meredith Foster and Mitzi Steiner for the Government. Defendant appears with attorneys, Marc Agnifilo and Teny Geragos. Bail DENIED. Joint Status Report due 9/23/24. The 9/24/24 status conference is canceled. Status Conference set for 10/9/24 at 2:00 p.m. Time excluded from 9/18/24 to 10/9/24 in the interest of justice. Defendant remains in custody. Court Reporter: Raquel Robles. See transcript for complete details. (Status Report due by 9/23/2024. Status Conference set for 10/9/2024 at 02:00 PM before Judge Andrew L. Carter Jr.) (jbo) (Entered: 09/19/2024) |
| 09/23/2024 | 16 | LETTER by Sean Combs addressed to Judge Andrew L. Carter, Jr. from Marc Agnifilo, Esq. dated 9/23/24 re: Status Report (Agnifilo, Marc) (Entered: 09/23/2024) |
| 09/30/2024 | 17 | TRANSCRIPT of Proceedings as to Sean Combs re: Conference held on 9/17/24 before Magistrate Judge Robyn F. Tarnofsky. Court Reporter/Transcriber: Lisa O'Brien, (212) 805−0320, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/21/2024. Redacted Transcript Deadline set for 10/31/2024. Release of Transcript Restriction set for 12/30/2024. (Moya, Goretti) (Entered: 09/30/2024) |
| 09/30/2024 | 18 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Sean Combs. Notice is hereby given that an official transcript of a Conference proceeding held on 9/17/24 has been filed by the court reporter/transcriber in the above−captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 09/30/2024) |
| 09/30/2024 | 19 | TRANSCRIPT of Proceedings as to Sean Combs re: Conference held on 9/18/24 before Judge Andrew L. Carter, Jr. Court Reporter/Transcriber: Raquel Robles, (212) 805−0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/21/2024. Redacted Transcript Deadline set for 10/31/2024. Release of Transcript Restriction set for 12/30/2024. (Moya, Goretti); Modified on 9/30/2024 (bw). (Entered: 09/30/2024) |
| 09/30/2024 | 20 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Sean Combs. Notice is hereby given that an official transcript of a Conference proceeding held on 9/18/24 has been filed by the court reporter/transcriber in the above−captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 09/30/2024) |
| 09/30/2024 | 21 | NOTICE OF APPEAL by Sean Combs from 19 Transcript. Filing fee $ 605.00, receipt number 33291. (tp) (Entered: 09/30/2024) |
| 09/30/2024 |  | Transmission of Notice of Appeal and Certified Copy of Docket Sheet as to Sean Combs to US Court of Appeals re: 21 Notice of Appeal. (tp) (Entered: 09/30/2024) |
| 09/30/2024 |  | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files as to Sean Combs re: 21 Notice of Appeal were transmitted to the U.S. Court of Appeals. (tp) (Entered: 09/30/2024) |
| 09/30/2024 | 22 | NOTICE OF ATTORNEY APPEARANCE: Anthony L. Ricco appearing for Sean Combs. Appearance Type: Retained. (Ricco, Anthony) (Entered: 09/30/2024) |

**United States Court of Appeals for the Second Circuit**
**Thurgood Marshall U.S. Courthouse**
**40 Foley Square**
**New York, NY 10007**

**DEBRA ANN LIVINGSTON**
CHIEF JUDGE

**CATHERINE O'HAGAN WOLFE**
CLERK OF COURT

Date: September 30, 2024
Docket #: 24-2606
Short Title: United States of America v. Combs

DC Docket #: 1:24-cr-542-1
DC Court: SDNY (NEW YORK CITY)
Trial Judge - Andrew L. Carter

## DOCKETING NOTICE

An appeal in the above-referenced case has been docketed under number: 24-2606. This number must appear on all documents related to this case that are filed in this Court. Appellate counsel of record either represented the appellant before the district court, filed the notice of appeal, or acted as counsel for appellee in the district court. For pro se parties the docket sheet with the caption page, and an Acknowledgment and Notice of Appearance Form are enclosed. In counseled cases the docket sheet is available on PACER. Counsel must access the Acknowledgment and Notice of Appearance Form from this Court's website http://www.ca2.uscourts.gov.

The form must be completed and returned within 14 days of the date of this notice. The form requires the following information:

YOUR CORRECT CONTACT INFORMATION: Review the party information on the docket sheet and note any incorrect information in writing on the Acknowledgment and Notice of Appearance Form.

The Court will contact one counsel per party or group of collectively represented parties when serving notice or issuing our order. Counsel must designate on the Acknowledgment and Notice of Appearance a lead attorney to accept all notices from this Court who, in turn will, be responsible for notifying any associated counsel.

CHANGE IN CONTACT INFORMATION: An attorney or pro se party who does not immediately notify the Court when contact information changes will not receive notices, documents and orders filed in the case.

An attorney and any pro se party who is permitted to file documents electronically in ACMS must notify the Court of a change to the user's mailing address, business address, telephone number, or e-mail. To update contact information, a Filing User must access PACER's Manage

My Appellate Filer Account, https://www.pacer.gov/psco/cgi-bin/cmecf/ea-login.pl. The Court's records will be updated within 1 business day of a user entering the change in PACER.

A pro se party who is not permitted to file documents electronically must notify the Court of a change in mailing address or telephone number by filing a letter with the Clerk of Court.

CAPTION:  In an appeal, the Court uses the district court caption pursuant to FRAP 12(a), 32(a). For a petition for review or original proceeding the Court uses a caption pursuant to FRAP 15(a) or 21(a), respectively. Please review the caption carefully and promptly advise this Court of any improper or inaccurate designations in writing on the Acknowledgment and Notice of Appearance form. If a party has been terminated from the case the caption may reflect that change only if the district court judge ordered that the caption be amended.

APPELLATE DESIGNATIONS: Please review whether petitioner is listed correctly on the party listing page of the docket sheet and in the caption. If there is an error, please note on the Acknowledgment and Notice of Appearance Form. Timely submission of the Acknowledgment and Notice of Appearance Form will constitute compliance with the requirement to file a Representation Statement required by FRAP 12(b).

For additional information consult the Court's instructions posted on the website.

Inquiries regarding this case may be directed to 212-857-8551.

**Criminal Notice of Appeal - Form A**

## NOTICE OF APPEAL

**United States District Court**

Southern _____ District of New York _____

Caption:
United States of America ₓ.

Sean Combs

Docket No.: 1:24-cr-542

Andrew L. Carter, Jr.

(District Court Judge)

Notice is hereby given that Sean Combs _____ appeals to the United States Court of

Appeals for the Second Circuit from the judgment ____ |, other | ✓ Order denying release on conditions

entered in this action on September 18, 2024 .
(date)
(specify)

This appeal concerns: Conviction only |___| Sentence only |___| Conviction & Sentence |____ Other | ✓

Defendant found guilty by plea | | trial | | N/A | ✓ .

Offense occurred after November 1, 1987? Yes | | No [___ N/A | ✓

Date of sentence: _____ N/A | ✓ |

Bail/Jail Disposition: Committed | ✓ Not committed | | N/A |

Appellant is represented by counsel? Yes ✓ | No | | If yes, provide the following information:

| | |
|---|---|
| Defendant's Counsel: | Alexandra A.E. Shapiro |
| Counsel's Address: | Shapiro Arato Bach LLP |
| | 1140 Avenue of the Americas 17th Floor, New York, NY 10036 |
| Counsel's Phone: | (212) 258-4881 |
| Assistant U.S. Attorney: | Emily Johnson |
| AUSA's Address: | US Attorney's Office, SDNY |
| | 1 St. Andrew's Plaza, New York, NY 10007 |
| AUSA's Phone: | (212) 637-2409 |

Signature

Generated: Sep 30, 2024 2:17PM                                                                    Page 1/1

# U.S. District Court

## New York Southern - Manhattan

Receipt Date: Sep 30, 2024 2:17PM

SEAN COMBS

Rcpt. No: 33291                        Trans. Date: Sep 30, 2024 2:17PM                    Cashier ID: #JE

| CD | Purpose | Case/Party/Defendant | Qty | Price | Amt |
|----|---------|---------------------|-----|-------|-----|
| 203 | Notice of Appeal/Docketing Fee | | 1 | 605.00 | 605.00 |

| CD | Tender | Amt |
|----|--------|-----|
| CC | Credit Card | $605.00 |
| | Total Due Prior to Payment: | $605.00 |
| | Total Tendered: | $605.00 |
| | Total Cash Received: | $0.00 |
| | Cash Change Amount: | $0.00 |

**Comments**: 24CR00542 ALC

Only when the bank clears the check, money order, or verifies credit of funds, is the fee or debt officially paid or discharged. A $53 fee will be charged for a returned check.

O9IHComC

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    UNITED STATES OF AMERICA,

 4                    v.                    24 Cr. 542 (ALC)

 5    SEAN COMBS,

 6       a/k/a "Puff Daddy,"
         a/k/a "P. Diddy,"
 7       a/k/a "Diddy,"
         a/k/a "PD,"
 8       a/k/a "Love,"

 9                  Defendant.
                                           Bond Appeal
10    ------------------------------x

11                                         New York, N.Y.
                                           September 18, 2024
12                                         3:30 p.m.

13    Before:

14                      HON. ANDREW L. CARTER, JR.

15                                         District Judge

16                            APPEARANCES

17    DAMIAN WILLIAMS
           United States Attorney for the
18         Southern District of New York
      BY:  EMILY JOHNSON
19         CHRISTINE SLAVIK
           MADISON SMYSER
20         MITZI STEINER
           MEREDITH FOSTER
21         Assistant United States Attorneys

22    AGNIFILO INTRATER LLP
           Attorneys for Defendant
23    BY:  MARC AGNIFILO
           TENY R. GERAGOS
24
25    Also Present:  Francesca Tessier, Pretrial Services Officer
                     Joshua Rothman, Pretrial Services Officer
```

O9IHComC

```
1         THE DEPUTY CLERK:  Criminal cause for a bail appeal
2    hearing in case No. 24 Cr. 542, United States v. Sean Combs.
3         Counsel, please state your appearances for the
4    government.
5         MS. JOHNSON:  Good afternoon, your Honor.  Emily
6    Johnson, Madison Smyser, Christy Slavik, Mitzi Steiner, and
7    Meredith Foster, for the government.  Behind us, from Pretrial
8    Services, are Officers Francesca Tessier and Joshua Rothman.
9         THE COURT:  And for the defendant.
10         MR. AGNIFILO:  Yes.  Good afternoon, your Honor.  Marc
11    Agnifilo with Teny Geragos and Mr. Sean "Love" Combs is with us
12    today as well.
13         THE COURT:  OK.  All right.  Good afternoon.
14         I've seen the submissions.  I reviewed the previous
15    submissions that the parties made to Magistrate Judge
16    Tarnofsky.  I've looked at the transcript from the bail hearing
17    yesterday.  Let me just share with you my initial thoughts to
18    help counsel perhaps cabin your comments appropriately.
19         The government primarily seeks detention based on a
20    risk of flight and the danger of obstruction of justice or
21    witness tampering.  Regarding those two bases, first, my lesser
22    concern here is risk of flight, although that is a concern.
23    Certainly, Mr. Combs is a risk of flight.  Defense counsel has
24    submitted evidence regarding the efforts that he and his client
25    have made to try to show the Court and the government that he
```

O9IHComC

1    is not a risk of flight.  The government has again attempted to

2    prove that he is a risk of flight, and the government has to do

3    more than just simply prove he's a risk of flight.  They must

4    prove that he is a risk of flight such that no condition or

5    combination of conditions will reasonably assure his return to

6    court.

7           The package that's been submitted by Mr. Combs, I

8    think, does not give the Court a reasonable assurance that he

9    would return to court.  Regarding the issue of whether or not

10   the government has proven risk such that no condition or

11   combination of conditions would reasonably assure his return to

12   court remains a bit of an open question in my mind, but

13   certainly, the package that's been submitted is not sufficient

14   to reasonably assure his return to court given his wealth.

15          My bigger concern deals with the danger of obstruction

16   of justice and the danger of witness tampering.  That is a real

17   concern that I have here.  And I've seen the parties'

18   submissions, but I just wanted to give counsel my thoughts as

19   to what I am primarily concerned about.

20          Having said that, I'll now hear from the parties,

21   starting with the government, since the government has the

22   ultimate burden here.

23          MS. JOHNSON:  Thank you, your Honor.  Would it be

24   acceptable if I spoke from the lectern?

25          THE COURT:  You can speak from the lectern.  You can

O9IHComC

1    stand there.  You can sit there.  Wherever you're comfortable

2    is fine with me.

3                 MS. JOHNSON:  Thank you, Judge.

4                 Your Honor, this case is about Sean Combs' physical

5    and sexual violence against women and others.  This physical

6    and sexual violence has gone on for decades.  It's also about

7    the vast efforts he undertook, using his extensive resources,

8    to cover up his crimes.  In other words, the very conduct he's

9    charged with shows his dangerousness, his resources, and his

10   willingness to lie and obstruct.

11                Yesterday, Judge Tarnofsky recognized this when she

12   found that there were no conditions or combination of

13   conditions that could assure the safety of the community or the

14   defendant's appearance in court, and she detained the

15   defendant.  The government respectfully submits that your Honor

16   should reach the same conclusion today.

17                As the Court just said, you have, obviously, read our

18   papers in detail and the transcript from yesterday.  I want to

19   be clear that we are seeking detention on, in addition to risk

20   of flight and risk of obstruction of justice, but also just on

21   dangerousness generally.  All of those factors to be considered

22   in ordering detention weigh in our favor here.

23                As I know the Court knows, in this case detention is

24   presumed under the Bail Reform Act because the defendant is

25   charged with sex trafficking, which is an offense under Chapter

O9IHComC

1    77 of Title 18.  It's the defendant's burden to rebut that

2    presumption, and the magistrate court already found that he did

3    not do so.

4         So I want to start with dangerousness and obstruction,

5    and I'd like to talk about the seriousness of the offenses

6    first, which reflects both the defendant's dangerousness and

7    the risks of obstruction if released.  Many of the facts are

8    set forth in our submission and were on the record yesterday,

9    so I only want to briefly review a few with your Honor before I

10   dive in.

11        The defendant used force, threats of force, and

12   coercion to cause female victims to engage in sexual activity

13   with male commercial sex workers that he referred to as "freak

14   offs."  These were elaborate sexual performances that he

15   arranged, directed, masturbated during, and often

16   electronically recorded.  These began in and around 2009, at

17   least, and lasted until at least this year and often took place

18   over multiple days and frequently with more than one escort.

19   These freak offs were arranged with the assistance of members

20   of his enterprise who set up the rooms, stocked the rooms with

21   supplies, arranged the travel, delivered the cash to pay the

22   escorts, among other tasks.

23        The defendant used narcotics so that female victims

24   could continue to participate in freak offs despite exhaustion

25   and fatigue that they began to experience as these were

O9IHComC

1    sometimes multiday events.  These narcotics included ketamine,

2    ecstasy, GHB, and others.  And victims themselves, in

3    communications that the government has seized, described

4    themselves as being "drugged" during these freak offs.

5         I mentioned that the defendant electronically recorded

6    the freak offs, and he did that at least in part so he could

7    keep the recordings and use them as blackmail against his

8    victims, so I want to pause on that for a moment.  In addition

9    to witnesses who would testify to this fact, it's also in black

10   and white in communications that the government has seized.

11   For example, in December of 2015, a victim texted the defendant

12   and makes explicit reference to this type of extortion.  This

13   is the quote:

14        "You know what sick and disgusting shit I was reminded

15   of the other day?  You forcing me to" — do something else,

16   which I'm not going to mention on the public record — "or you

17   were going to leak some FO shit."  FO standing for freak off.

18        The defendant recorded these women engaged in freak

19   offs.  He threatened them with those very videos to get them to

20   engage in even more.  And the defendant makes a lot of claims

21   yesterday and in his papers about the victims' motives in

22   speaking up now, but that message is from nine years ago.  And

23   I suspect that we'll hear that we should ignore these types of

24   things because they're old, but this isn't the only time

25   there's communications that explicitly reference this kind of

O9IHComC

```
 1    blackmail.  In fact, the same thing happened much more recently

 2    several years later, after 2015, when a different victim said,

 3    and here's a quote:  "He just threatened me about my sex tapes

 4    that he has of me on two phones.  He said he would expose me,

 5    mind you these sex tapes where I am heavily drugged and doing

 6    things he asked of me for the past three years."

 7               That's just two examples of the defendant's egregious

 8    conduct in extorting and blackmailing victims that happened

 9    years apart, and so it's rich when the defense submission filed

10    today accuses the victim of extorting the defendant.  Let me be

11    clear.  The only person who is engaged in extortion in this

12    case repeatedly is the defendant.

13               At least a dozen witnesses will confirm that they

14    personally observed the defendant's violence towards women or

15    the injuries that were sustained as a result.  And in addition

16    to that physical violence towards women, there's also evidence

17    of other violent acts, including physical assaults on other

18    individuals, including employees and witnesses to violence,

19    kidnapping, and arson.

20               The defendant surrounded himself with and used

21    firearms, including three defaced AR-15s and a high-capacity

22    magazine loaded with 59 rounds of ammunition that was seized

23    from his LA and Miami residences this year.  Yesterday, defense

24    counsel argued that these were the same guns used by the

25    defendant's professional security team, but what we hadn't told
```

O9IHComC

1    the Court yet was that we did seize the guns used by his

2    professional security team.  We took six of them.  They were

3    licensed guns that were registered to the security team.  They

4    were stored in the defendant's homes, and he had access to

5    them.  But, for obvious reasons, we're much more concerned

6    about the defaced firearms hidden in his personal closet, and

7    that was our focus.  But it's worth noting that the defaced

8    guns have nothing to do with security and have everything to do

9    with dangerousness.  And even beyond that, when we consider the

10   additional guns that his security team has, he has even greater

11   access to firearms.

12          One more point on this is that the security team is

13   now the same team that he suggests be allowed to monitor him

14   while he's on bail.  His head of security was served yesterday

15   with a search warrant for his devices because of what our

16   investigation has revealed about his own personal involvement

17   in the offense conduct and in offenses under investigation by

18   the government.

19          As the Court knows from the transcript of yesterday's

20   proceeding, I spoke then about an incident that occurred on

21   March 5, 2016, at the InterContinental Hotel in Los Angeles,

22   and yesterday the government attached publicly released

23   surveillance footage to our submission as an exhibit.  And as I

24   said yesterday, this is a critical incident to assessing both

25   danger and obstruction.  I'm going to talk about it a little

O9IHComC

1    bit more today with some additional detail.

2           Contrary to defense counsel's argument yesterday,

3    which attempted to inaccurately recast this incident as just a

4    fight in a relationship, the events of March 5, 2016, are

5    powerful evidence of trafficking, a recorded example of

6    defendant's use of force in connection with a freak off.  So

7    I'm going to summarize the evidence again with some additional

8    details that I did not mention yesterday.

9           In short, the evidence shows that the defendant had a

10   freak off at the InterContinental Hotel in Los Angeles on

11   March 5, 2016.  The defendant contends that this incident only

12   involves the defendant and the victim, but this is wrong.  We

13   have multiple sources of evidence that demonstrate there was at

14   least one commercial sex worker who was with the defendant and

15   the victim in the hotel room prior to the assault that's

16   recorded on camera and remained in the room while the assault

17   was being captured.

18          Following the freak off, the defendant violently

19   assaulted a victim who was sneaking out of the room to leave

20   the hotel.  You can see in the hallway surveillance video that

21   she isn't even wearing shoes as she is leaving.  She's leaving

22   as fast as she can because she's trying to get out of there.

23   She's in danger.  In the video, the defendant storms out of the

24   room in nothing but a towel.  He comes up to her, he punches

25   her, he throws her to the ground, he kicks her, he attempts to

O9IHComC

1    drag her back to the hotel room, and then he throws a vase at

2    her.

3              Text messages in the hours and days that follow

4    confirm the injuries caused by the incident.  These are quotes:

5              "I have a black eye and a fat lip.  You are sick for

6    thinking it's OK to do what you've done."

7              "I still have crazy bruising."

8              This is clear evidence of the dangerousness of the

9    defendant, and it's evidence that he has to try to minimize it.

10   He casts it as a misdemeanor assault arising out of a lover's

11   quarrel based on the fact that he wanted to get his clothes

12   back, but that's not what happened here.  The evidence shows

13   that the victim tried to escape the hotel room where the

14   defendant and an escort were without even putting on her shoes.

15   The defendant then violently beat her and tried to drag her

16   back to the hotel room.  It was only when hotel security staff

17   intervened that the victim was able to leave the hotel.

18             So this is just one example of violence being used in

19   connection with a freak off, but this incident is also

20   important because of everything that happened after the

21   assaults, because that's when the cover-ups started.

22             First, the defendant tried to bribe a hotel security

23   officer with a handful of cash in exchange for that officer's

24   silence.  The security guard refused to be bought.  Then the

25   defendant's staff got involved, contacting hotel security to

O9IHComC

1   get the footage of the incident and keep it from being seen by

2   anyone.  And by March 8, three days later, the surveillance

3   video somehow disappeared from the hotel server.

4           The defense has argued that there was no criminal

5   investigation, so there couldn't have possibly been

6   obstruction, and the defendant was just trying to prevent

7   something embarrassing from becoming public.  But that's not

8   what the evidence shows.  In fact, what the defendant himself

9   was saying immediately after the assault on March 5, here's a

10  few messages he sent right after that timestamp on the

11  surveillance video recording:

12          "Call me.  The cops are here."

13          "I got six kids."

14          "Yo, please call.  I'm surrounded."

15          "You gonna abandon me all alone?"

16          While we don't have evidence that the police were

17  actually there, the point is that the defendant knew he had

18  done something that could elicit a law enforcement response,

19  and he had to cover it up.  And critically, his staff knew that

20  police had responded to the victim's apartment.  They have

21  photographs of the responding officer's Los Angeles Police

22  Department business card in their text messages, and those

23  staff members remained in contact with the victim to ensure

24  that she would not talk to the police.

25          So these communications, the video disappearing, none

O9IHComC

1    of this is a coincidence.  It's a result of defendant's

2    employees trying to cover up his crimes, all at his direction.

3    And the cover-up continued until last year, after the civil

4    suit was filed in November that, among other allegations,

5    detailed this assault at the InterContinental.  The defendant

6    responded, and I quote:  "I did not do any of the awful things

7    alleged."

8            There is no other way to read this but as an

9    unequivocal denial of his participation in this incident.  It's

10   also yet another way that he continued obstructing and covering

11   up what he did.  In this year, after CNN released the

12   surveillance video, the defendant ultimately admitted that he

13   was actually the person on that video, but only after it was

14   leaked to the media and only after there was indisputable proof

15   of his identity on tape and his violence on tape.

16           But yesterday we got more to the story.  That

17   apparently this assault was precipitated by the defendant being

18   hit in the head, while he was sleeping, by a cell phone and his

19   clothes being taken in a small overnight bag that you can see

20   the victim walking down the hall with in addition to her purse.

21   This is apparently why he runs out of the hotel in nothing but

22   a towel.  But our evidence will show that's just not what

23   happened.  Assuming, for the sake of argument, that it did,

24   which it didn't, but assuming that, punching, kicking, and

25   dragging someone in and of itself is a crime, and covering that

O9IHComC

| | |
|---|---|
| 1 | up is an act of obstruction.  And if it's about the clothes and |
| 2 | wanting to get the clothes back, which again it's not, why drag |
| 3 | the victim back down the hall to the room?  And you can see |
| 4 | that on the tape.  That's what he does.  This explanation is |
| 5 | just another cover-up.  It's just more lies, and it's just more |
| 6 | obstruction. |
| 7 |        This sequence of events and all the indisputable |
| 8 | evidence —— from the videos to the text messages to the |
| 9 | photographs that are in communications —— makes clear that you |
| 10 | cannot take the defendant at his word when he denies his |
| 11 | criminal conduct.  But make no mistake, March 5, 2016, is far |
| 12 | from the defendant's lone act of violence and obstruction, so |
| 13 | let's talk a little bit more about that. |
| 14 |        Freak-off activity is the core of this case, and freak |
| 15 | offs are inherently dangerous.  They use force, coercion, and |
| 16 | drugs to coerce the victims into doing the freak offs.  The |
| 17 | defendant controlled aspects of their lives, used significant |
| 18 | physical force against them, and all to compel them to engage |
| 19 | in these lengthy sex acts. |
| 20 |        Yesterday, the defense said they interviewed about |
| 21 | half a dozen escorts who would dispute the government's account |
| 22 | of what happened during the freak offs.  Our investigation is |
| 23 | ongoing, and so I can't say too much about this, but I will |
| 24 | note that half a dozen escorts is just the tip of the iceberg |
| 25 | of the number of escorts who have participated in freak offs. |

O9IHComC

1            And yesterday, the defense also spent a lot of time

2   talking about how these freak offs were between consenting

3   adults and how the government was not claiming sex without

4   consent.  Abuse occurred in the context of at least one

5   long-term relationship, which we acknowledge, but the

6   government's theory does involve a lack of consent.  This case

7   is charged, at least in part, in Count Two as sex trafficking

8   by force, fraud, and coercion.  When a woman is being beaten

9   and coerced in order to get her to engage in commercial sex

10  activity, those sex acts are not consensual.

11           And as I said yesterday, it is really important to

12  note that long-term relationships and abusive relationships are

13  not mutually exclusive.  The government expects to introduce

14  the testimony of expert witnesses regarding the dynamics that

15  appear in almost all sex trafficking and sex abuse cases.

16  Similar testimony has been introduced in several cases in this

17  district.  A few examples are *United States v. Hadden*, *United*

18  *States v. Ray, United States v. Maxwell*, and *United*

19  *States v. Rivera*.

20           We expect that these expert witnesses will explain

21  issues of apparent consent and how abusers control their

22  victims, even in the context of long-term relationships in

23  which the victims express love for their abusers and continue

24  to go back to them.  We further expect that these expert

25  witnesses will discuss various forms of coercion, including

1    isolation, intimidation, violence, manipulation, surveillance,

2    narcotics, grooming behaviors, and others, and generally why

3    victims do not leave their abusers and immediately report their

4    crimes.

5            The focus of today's proceeding, however, is not and

6    should not be on the dynamics of abusive relationships.

7    Today's proceeding is squarely focused on the defendant alone

8    and whether the defendant presents a danger to the community,

9    whether the defendant threatens the integrity of these

10    proceedings, and whether the defendant presents a risk of

11    flight, all of which he does.

12            Defense counsel has made much yesterday and today in

13    his letter about his misinformed view that there was not a sex

14    crime here, and therefore, the nature of this offense doesn't

15    weigh in favor of detention.  He's argued, in essence, that

16    anyone who was participating in a freak off wanted to be there.

17    That flies in the face of the evidence in this case, much of

18    which we've laid out to the Court, but it also shows a

19    misunderstanding of the law.

20            When participants in commercial sex activity are

21    threatened with the release of collateral videos, like those

22    two text messages I read, when they are threatened with the

23    loss of their livelihood and housing —— we'll get to that in a

24    minute —— and when they're beaten both during and outside freak

25    offs —— you saw video of that —— they cannot consent.  That is

O9IHComC

```
 1    trafficking.  This view was especially evident when counsel

 2    spent time minimizing and horrifically understating the

 3    defendant's violence.  The video from March 5, 2016, is far

 4    more than a misdemeanor assault, as he claims.  When force or

 5    coercion is used in connection with commercial sex, as it is

 6    here, again, that's trafficking.

 7         The defendant's decades-long history of violent

 8    conduct makes clear that even the most stringent bail

 9    conditions will not suffice to ensure the safety of the

10    community.  The inquiry in this context is focused on the

11    danger to any real person, and the evidence shows that there is

12    a risk of physical danger towards victims, employees, and other

13    individuals.

14         The investigation has revealed evidence of numerous

15    assaults against female victims and other individuals.  These

16    assaults involved choking, hitting, kicking, dragging victims

17    sometimes by their hair.  They sometimes occurred in cars where

18    victims heads were slammed against the car window or on the

19    floor of a car.  And again, independent evidence like text

20    messages confirms this type of violence.  Without attributing

21    any of these messages, I'm going to read four that make my

22    point:

23              "I turn my head for a second, and you get fucked up,

24    and you drag me down the hall by my hair."

25              "I have bleeding cuts."
```

O9IHComC

<pre>
 1                "You hit me in the head two good times."
 2                "When you get fucked up the wrong way, you always want
 3      to show me that you have the power and you knock me around.
 4      I'm not a rag doll.  I'm someone's child."
 5                And we don't just have the texts.  We also have
 6      witnesses who can confirm, because they witnessed this violence
 7      and they witnessed the injuries.  And this conduct took place
 8      behind closed doors —— in houses, in hotel rooms, in cars, in
 9      settings that are not easily monitored by even the most
10      stringent conditions of release.  And I note that Judge
11      Tarnofsky was particularly concerned about this point and also
12      about the next one: that the defendant's violence was
13      premeditated and spontaneous.  And I think the text messages I
14      just read highlight that.  And the defendant's violence, the
15      spontaneity exacerbate the difficulty of crafting conditions of
16      release to ensure the safety of any person.  How do you craft
17      bail conditions that can address the defendant's tendency to
18      become violent at the slightest provocation and to become
19      violent, as the text messages say, when he "gets fucked up the
20      wrong way"?
21                In fact, Judge Tarnofsky found that she did not
22      believe defense counsel had the ability to control the
23      defendant, given his substance abuse and anger issues.  There
24      is a long-standing pattern of abuse here, a pattern that has
25      been entirely undeterred by threat of public exposure or law
</pre>

O9IHComC

1    enforcement intervention, and it's probative of whether the

2    defendant will continue to engage in that pattern.

3           I note we cite this case in our paupers, but the

4    *Mercedes* case in the Second Circuit, 254 F.3d 433 (2d Cir.

5    2001), talks about the danger of releasing defendants with a

6    history of domestic violence, noting that a domestic violence

7    history is probative of a dangerousness determination because a

8    willingness to strike a loved one is evidence of a tendency to

9    be violent and dangerous towards others.  And in that case, the

10   circuit reversed the district court's order of release for a

11   defendant with a history of domestic violence but no criminal

12   history.

13          So let's turn to obstruction now, and I know that your

14   Honor is particularly interested in this point.

15          So the risk of obstruction in this case is heightened

16   because of the defendant's power.  It gives him a unique

17   ability to influence people and to intimidate witnesses and

18   victims.  Witnesses have universally, one for one, expressed to

19   us their extreme fear of the defendant, extreme.  His influence

20   makes it so difficult to convince witnesses to share their

21   experiences and to trust that the government can keep them safe

22   from him.

23          I talked about some of it before with the March 5

24   incident, but we have evidence that further indicates that the

25   defendant and his coconspirators will deflect, minimize, and

O9IHComC

1    lie about his conduct.  Defense counsel spent time trying to

2    recast his, what I submit to the Court are obvious, obstructive

3    efforts as just maintaining contact with people.  So before we

4    dive in, I want to be clear about a few principles of

5    obstruction based on the statutes that have been charged in

6    this case.

7         There need not be an existing investigation or

8    official proceeding, and the defendant need not know about it.

9    What we will also show that the defendant knew about this

10    investigation at least as of January 2024, and he certainly

11    suspected the possibility of an investigation after November of

12    2023 when civil lawsuits were filed alleging, among other

13    offenses, sex trafficking.

14         So following that November civil suit, when the

15    defendant certainly had reason to suspect the possibility of an

16    investigation, he and his coconspirators continued their

17    efforts to reach out to potential victims or witnesses.  This

18    outreach has included directly contacting at least one victim

19    in November of 2023, constant contact with witnesses to the

20    charged conduct, and with contacting of witnesses, including

21    those who received grand jury subpoenas, prior to dates of

22    testimony or government meetings.  And this contact is as

23    recent as July of 2024, so well after the government has

24    definitive proof that the defendant knew about this

25    investigation.

O9IHComC

1             So two of those examples are there were communications

2      between the defendant and a witness who received a grand jury

3      subpoena.  These communications are both prior to and following

4      the witness' meeting with the government, and the government

5      has evidence that the defendant knew that this witness had

6      received a grand jury subpoena.  And both between —— before the

7      meeting with the government and after the meeting with the

8      government, there were 14 total contacts between the two of

9      those people.

10            In another case, a witness was served with a grand

11     jury ——

12            THE COURT:  Hold on just a second.  Go back for a

13     second.  You said there were 13 contacts between two of those

14     people.  You mean two witnesses or just between the defendant

15     and the witness?

16            MS. JOHNSON:  I'm sorry for not being precise, your

17     Honor.  There were 14 total contacts between the defendant and

18     the witness.

19            THE COURT:  OK.

20            MS. JOHNSON:  And my second example, a witness was

21     served with a grand jury subpoena in June of 2024; thereafter

22     was contacted multiple times by the defendant by phone and text

23     in June and July of 2024, despite the fact that the two had not

24     spoken in several years.  They were suddenly back in contact

25     leading up to the defendant's —— sorry, in the aftermath of the

O9IHComC

```
1   witness receiving a grand jury subpoena.

2              And these efforts by the defendant were also crafted

3   to avoid detection.  He used intermediaries to reach out to

4   people.  And in an instance I'll describe in detail, he

5   recorded conversations with a victim on the device of a

6   coconspirator.  These kinds of efforts, these kinds of means,

7   make obstruction even more difficult to detect when it's being

8   done through other people and on other devices.

9              We know from the evidence we've collected that the

10  purpose of these calls was to spread false narratives.  So

11  here's an example.  The instance that I mentioned where the

12  defendant directly contacted a victim in November 2023, he

13  placed two calls to the victim, both of which are recorded on

14  the coconspirator's phone.  And as background that will help

15  explain some of the things that are discussed in the call, the

16  defendant provides financial support to this person.  So early

17  on November 19, which is three days after the filing of the

18  civil lawsuit by another victim, the defendant received a text

19  from this other person in response.  It reads:

20              "I feel like I'm reading my own sexual trauma.  It

21  makes me sick how three solid pages, word for word, is exactly

22  my experiences and my anguish."

23              The defendant then called the victim twice.  Those are

24  the recordings.  And in those recordings, he gaslit her and he

25  attempted to convince her that she had willingly engaged in sex
```

O9IHComC

```
1    acts with him, but she pushed back.  She told him she felt

2    manipulated and clarified that what his description of events

3    was, was "not how she saw things."

4           Throughout these recorded calls, the defendant

5    repeatedly talks about how he was not supposed to be speaking

6    on the phone and not supposed to be using the phone, and he

7    instructs the victim not to text him.  These statements clearly

8    show his state of mind.  They show that he was on notice that

9    there could be an investigation into the claims raised in the

10   lawsuit that had been filed three days earlier.

11          And at the end of that second call, the defendant

12   ensured the victim that if she continued to support him, she

13   ain't got anything to worry about, which is a thinly veiled

14   reference to his continuing his financial support.  And

15   subsequent text messages make explicitly clear that that's what

16   he was talking about because two days later he texts a

17   coconspirator in reference to the financial support that he

18   provides to this victim and said:  "Make sure that" — and he

19   uses a name here.  The name is an individual who is his

20   financial adviser — "is not doing anything dumb, like not

21   having that rent paid on time."  The defendant made sure that

22   that financial coercion continued, clearly, to keep the victim

23   close and in his control.

24          The defendant's long history of obstruction and

25   violence demonstrates that he simply cannot overcome the
```

O9IHComC

1    presumption that no condition or combination of conditions can

2    ensure the safety of the community or the integrity of this

3    proceeding.  Courts have denied bail in similar situations.

4    We've cited some cases in our letter.  Of particular interest,

5    I think, is *United States v. Lafontaine*.  And this is a

6    slightly different posture because it's a revocation, but the

7    facts of that case are that the defendant contacted a potential

8    witness and attempted to feed that witness a false narrative

9    with the hope that the witness would adopt it as that person's

10   testimony, and that's exactly what's going on here.

11        In the government's request for detention is

12   consistent with other cases of this kind in this district and

13   in this circuit.  These cases stand for the proposition that

14   sex trafficking defendants, regardless of the age of their

15   victims, are routinely detained pretrial, particularly when

16   they have engaged in repeated obstruction.  I went over some of

17   these cases yesterday.  I'll touch on them lightly again.

18        THE COURT:  That's not necessary.  I'm familiar with

19   those cases.

20        MS. JOHNSON:  OK.

21        THE COURT:  Let me ask you this:  In the record, the

22   government had previously indicated that there was another

23   potential witness that the defendant contacted between

24   September 10 and September 14 some 58 times.  Can you give me a

25   little further elucidation on that?

O9IHComC

1          MS. JOHNSON:  Oh, sure.  So that requires a little

2     explanation of a recent civil suit.

3          So on September 10, so last week, an individual named

4     Dawn Richard filed a civil suit against the defendant and other

5     individuals and entities.  Ms. Richard was formerly in a band

6     with the defendant and a third individual named Kalenna Harper.

7     The allegations in Ms. Richard's lawsuit focus on some of the

8     time period of the charged conspiracy.  They focus on

9     particular events starting in 2009 and for some time period

10    thereafter.  Among other things, Ms. Richard alleges witnessing

11    violence by the defendant towards a victim, including assaults

12    and the like.

13          So that lawsuit is filed on September 10.  On

14    September 13, the other member of the band, Ms. Harper,

15    released a statement where she, in sum and substance, sort of

16    says what Ms. Richard's experience wasn't what I experienced.

17    But between those two dates, between September 10 and

18    September 14, the defendant and Ms. Harper had 128 total phone

19    contacts.  He called or texted Ms. Harper 58 separate times in

20    four days.  There has been no contact since September 14.

21    Granted, that's only been a few days.  But I think what's

22    highlighted about that incident is that it makes clear that the

23    defendant has an ongoing ability to keep witnesses, even

24    witnesses to very distant abuse and very distant things, in his

25    pocket and at his disposal.

O9IHComC

1          One other —— your Honor, we had discussed some cases

2     yesterday.  We didn't discuss *Lawrence Ray*, which I think is

3     another case that does support our argument here.  I don't

4     think we've touched on that, so I'll just briefly ——

5          THE COURT:  The case dealing with the official

6     proceeding requirement?

7          MS. JOHNSON:  No.  *Lawrence Ray* is a racketeering and

8     sex trafficking case in this district, and Magistrate Judge Fox

9     ordered detention based on risk of flight and dangerousness.

10    And I think one thing that's similar about the *Lawrence Ray*

11    case to this case is that, in the bail argument, there's

12    allegations by the defense that the sex trafficking case was

13    weak because there was only one victim, and Magistrate Judge

14    Fox again detained on the basis that the victims were

15    corroborated not only by other witnesses but also by

16    documentary evidence.

17         THE COURT:  Anything else from the government?

18         MS. JOHNSON:  Just a few additional things, your

19    Honor, briefly.

20         THE COURT:  How many more additional things?  We've

21    gone about 45 minutes.  Give me a sense of what else you need

22    to touch upon.

23         MS. JOHNSON:  I can finish this in under five minutes;

24    maybe even three.

25         THE COURT:  OK.  Go ahead.

O9IHComC

1          MS. JOHNSON:  OK.  I will just touch briefly on risk

2     of flight.  The circumstances are different than when Mr. Combs

3     flew here to sit in New York, which defense counsel has made a

4     lot of hay about.  And with respect to his offer to surrender,

5     there are extremely valid law enforcement reasons why the

6     government did not take him up on this offer, including the

7     risk of evidence destruction and allowing for further

8     obstruction.  So to the extent that this surrender and travel

9     argument has any force at all, it really only applies to risk

10     of flight.  It does not, does not, grapple with dangerousness

11     and obstruction.  Surrender has nothing to do with those two

12     things.  And the defendant really does not grapple with those

13     two things.  He doesn't talk about his ongoing danger and his

14     ongoing obstruction.  So coming to this jurisdiction and

15     offering to surrender simply does not vitiate those concerns.

16          The Court expressed concerns with the bail package.

17     The government has significant concerns with the bail package.

18     Again, I'm here seeking detention, so I'm not going to get into

19     those, but I note for the record that we do think that even the

20     supplemented bail package does not have enough conditions that

21     focus on obstruction, and we don't think there are conditions

22     that can really keep the defendant from doing the types of

23     things he's been doing, particularly because he's been

24     involving other people in them.

25          You'll hear later today about how much evidence we

O9IHComC

 1    have, and it was in the record yesterday.  There's a massive

 2    amount of evidence.  There's a massive amount of witnesses, a

 3    massive amount of electronic evidence.  There's a massive

 4    amount of physical evidence that we seized.  We have witnesses

 5    saying things, and these witnesses are powerfully corroborated

 6    by communications, by photographs, by videos, by

 7    contemporaneous documentary records, by text messages, and the

 8    like.  And this is the evidence that we will use to prove the

 9    charges in the indictment.  This is the same evidence, some of

10    which, just a little bit of which I've highlighted today,

11    confirms that the defendant is a danger to the community and

12    poses a serious risk to the integrity of these proceedings

13    through his efforts at obstruction.

14            So for all the reasons I've stated here and in our

15    letters, the defendant should be detained pending trial.

16            THE COURT:  Thank you.

17            Defense counsel, again, you can stand there, you can

18    stand at the lectern, or you can be seated — whatever you feel

19    comfortable doing.

20            MR. AGNIFILO:  I'll come to the lectern, Judge.  Thank

21    you.

22            THE COURT:  OK.

23            MR. AGNIFILO:  Your Honor, I'm going to address one

24    thing that my colleague said, and then I hope to address your

25    Honor's opening remarks directly.

O9IHComC

1          The situation that my colleague just discussed with
2    Dawn Richard and Kalenna Harper I can shed some light on.  At
3    one point I myself got a phone call from Kalenna Harper and her
4    lawyer.  Without going too much down this rabbit hole, Kalenna
5    Harper said:  I would like to make a statement on behalf of
6    your client.  Her lawyer was on the phone saying:  I'm worried
7    that my client, Kalenna, is going to embroil herself in this
8    big mess that has public elements to it and all that.  And I'm
9    prepared to give the lawyer's name to the government and I'm
10   prepared to give, to the extent they don't have Kalenna
11   Harper's phone number, to the government, and they can follow
12   up on this.  And what I said to Ms. Harper and the lawyer is
13   you should do whatever you want.  You should feel free, if you
14   want to make a statement, to make a statement; and you should
15   feel free, if you don't want to make a statement, to not make a
16   statement.  I don't remember offhand what day it was.  It was
17   between the 10th and the 13th.  And then at one point I found
18   out she made a statement.
19          THE COURT:  The acoustics aren't great.
20          MR. AGNIFILO:  I'm sorry, Judge.
21          THE COURT:  You don't remember what?
22          MR. AGNIFILO:  I don't remember the exact —— it was
23   either the 11th or the 12th of September that I spoke to the
24   lawyer and Ms. Harper.  And at the end of that conversation, it
25   was not clear whether Ms. Harper wanted to make a statement or

O9IHComC

 1    not.  Sometime later —— and I think it was the next day or it

 2    could have been two days later —— I saw in press reporting that

 3    she had made a statement.

 4            So the reason I bring this to your Honor's attention

 5    is there's a lawyer in the mix.  Ms. Harper has a lawyer.  I

 6    spoke to the lawyer.  I will make the lawyer available to the

 7    government if the government wants to speak to the lawyer.  So

 8    to the extent that the government raises this because there's

 9    some suggestion that because Mr. Combs contacted Ms. Harper ——

10    and I would note that they were in the same band for a period

11    of time —— but these contacts were around the time of the

12    statement.  She seemed to be pained about whether she wanted to

13    make a statement.  She told me she wanted to make a statement

14    because she believed Dawn Richard's statements were not

15    accurate.  And she wanted to say something, yet she didn't want

16    to get overly involved.

17            THE COURT:  When she told you that, that was either

18    September the 11th or the 12th?

19            MR. AGNIFILO:  I believe that's right.

20            THE COURT:  Which is after the 10th, after the

21    defendant first reached out to her?

22            MR. AGNIFILO:  I don't know about the defendant's

23    contacts with her.  I don't know.  I just know when her and her

24    lawyer called me, it was the 11th.

25            (Counsel conferred)

O9IHComC

1          MR. AGNIFILO:  I'm told by the keeper of the facts

2      that it was the 11th.  So I think it was probably September 11.

3          But let me address — so I wanted to point that out

4      just because that was the last thing that my colleague said.

5          THE COURT:  Let me ask you, why does that matter?

6          MR. AGNIFILO:  Because the government brought it up,

7      and the government brought it up, I think, to suggest that

8      somehow Mr. Combs coerced or forced or pressured Kalenna Harper

9      into — let me take a step back, because I don't think — the

10     entire context might not be clear.

11         I don't know what role Dawn Richards plays in this

12     case.  I don't.  She filed a civil complaint, so this is all

13     about a civil complaint.  When the civil complaint hit the

14     news, Kalenna Harper, who was in the same band as Dawn

15     Richards, obviously, said to herself:  I was in the same band

16     as Dawn Richards.  I don't think — I didn't see any of those

17     things.

18         THE COURT:  Let me just ask you something.

19         MR. AGNIFILO:  Yeah, sure.

20         THE COURT:  Hypothetically speaking, if your client

21     reached out to this person on September 10, hypothetically

22     speaking —

23         MR. AGNIFILO:  Right.

24         THE COURT:  — said, I want you to say this.  Again,

25     very hypothetically saying — let's say he said, I want you to

O9IHComC

1    lie about what happened.  I want you to tell this story, and

2    gives that information to her on the 10th.  And then on the

3    11th, you get a call from her lawyer saying that she's

4    interested in maybe making a statement, but he's not clear if

5    she could make a statement.

6           If that hypothetical situation happened, wouldn't that

7    still be evidence of an obstructive mind, mindset, of a

8    willingness to tamper with a potential witness?  I'm sure that

9    you're going to say that that person is not necessarily a

10   witness in this proceeding, and therefore I shouldn't consider

11   that.  But wouldn't that be evidence of a mindset that's

12   willing to tamper with witnesses or obstruct justice.  Because

13   I'm sure you would agree, you don't have to coerce someone in

14   order to obstruct justice, correct?

15           MR. AGNIFILO:  I agree with you.  I agree with your

16   Honor.  And I think if your — your hypothetical is a

17   hypothetical, and I accept your hypothetical as that.

18           Yes, you might be right.  I wouldn't necessarily know.

19   But what I — the reason I wanted to speak to her — and

20   Ms. Geragos remind me that we spoke to her on the 10th as well.

21   And she's coming with her computer.  We're going to get some

22   accurate facts, probably more specific than I'm saying.

23           MS. GERAGOS:  Your Honor, I just want to say we did

24   speak to her.  I spoke to her, I'll say, for 30 minutes on the

25   early morning of the 11th so that she could recount her facts

O9IHComC

```
 1    to us as to her —— she's mentioned in the lawsuit about 34

 2    times, so she felt that her name was also being besmirched in

 3    terms of she had witnessed violent acts by Mr. Combs against

 4    the Victim-1 of Count Two.  And so I believe the contact with

 5    this potential witness was also a potential defense witness for

 6    us to speak to because she was mentioning violent acts with

 7    respect to the person who is now Victim-1 of Count Two.  So we

 8    did speak to her that night because we thought it was important

 9    in terms of our defense investigation.

10            That's all I have to say.  I'll let ——

11            THE COURT:  I'm sorry.

12            MS. GERAGOS:  I'll let Mr. Agnifilo ——

13            THE COURT:  Go ahead and continue.  I didn't mean to

14    cut you off.

15            MS. GERAGOS:  No, I'll let Mr. Agnifilo continue.  He

16    wasn't on that call, so I just wanted to make that

17    representation.

18            THE COURT:  That was on the 11th?

19            MS. GERAGOS:  That was, I think, maybe even 2:00 in

20    the morning on the 11th.

21            THE COURT:  OK.  But after speaking to defense counsel

22    on the 11th, what would be the reason for her and Mr. Combs to

23    keep in contact?  I saw in the record here defense counsel was

24    making a statement that Mr. Combs was reaching out to witnesses

25    just to line witnesses up.  If this witness has already spoken
```

O9IHComC

1    to defense counsel, what would be the purpose of Mr. Combs

2    continuing to speak to that witness after September 11?

3              MS. GERAGOS:  After —— after ——

4              THE COURT:  After your conversation with the witness,

5    why would he need to reach out to her?

6              MS. GERAGOS:  Your Honor, I can't speculate only to

7    say that I think that this witness was really upset by the fact

8    that she kept getting publicized in many different articles

9    about incidents that she was supposedly present at that she

10   just was not —— that she stated, at least to us, that she was

11   not present for.  And that's my speculation.  I don't know

12   if ——

13             MR. AGNIFILO:  No, I understand your Honor's question,

14   and I don't know that all of these things resulted in

15   conversations.  I don't have access to the government's

16   evidence on this point, so I don't know that all these things

17   resulted in conversations.  Obviously, she wanted to speak to

18   Mr. Combs because her name was in this civil suit, and she

19   didn't want the name in the civil suit.  And she also wanted to

20   say I didn't see any of these things happen.

21             To the point that Ms. Geragos raised, in addition to

22   being named in the civil suit, she also may be an important

23   defense witness for conduct that may or may not be charged as

24   part of the indictment because it relates to the person who's

25   in Count Two.  So this is an important defense witness.  It's

O9IHComC

1    someone we will speak to.

2           But I want to allay the Court's larger concerns, and

3    then we can come back to this.  Because I am hearing the Court

4    loud and clear, and I have actual proposals that I think will

5    assist in showing the Court that we are taking the Court's

6    concerns very seriously.

7           I have brought to court today, in the fourth row, the

8    handsome man who lost his hair at some point is there.  His

9    name is Herman Weisberg.  Herman Weisberg owns SAGE

10   Intelligence.  He's a former New York Police Department

11   detective.  He worked in the DA squad, and he's had SAGE

12   Intelligence for, I think, about 15 years.  And here's what we

13   are proposing, in addition to all of the other conditions that

14   we have in our bail proposal:

15          That SAGE, personnel from SAGE Intelligence — all of

16   whom will be former law enforcement officials, either federal

17   law enforcement officials or state law enforcement officials —

18   will be monitoring the residence of Mr. Combs 24 hours a day;

19   24 hours a day, seven days a week.  Here's what this will

20   involve.

21          They will have at least one, and probably two, SAGE

22   employees there at all times.  They will basically have full

23   control of who enters and who doesn't enter.  There will be a

24   visitor's log that is kept and that we could have it shared

25   with Pretrial Services every week or every day or whatever we

1    would like to do in those regards.

2            Mr. Combs will not have access to a cell phone.  Since

3    there will be a SAGE personnel on-site, if we want to reach

4    him, we can reach him that way.  He won't have access to the

5    Internet.  So what I am trying to fashion is a situation where

6    any witness intimidation, if that is the Court's concern, and I

7    see that it is, would be completely nullified.  It would be

8    virtually impossible.  And SAGE would monitor these things ——

9    make sure he doesn't have a cell phone, make sure that anybody

10   who comes to the house is on the preapproved list of visitors,

11   would keep track of all the visitors.  And we can make that

12   list of visitors and provide it to the government, to pretrial,

13   and the Court.

14           SAGE would establish communications with local law

15   enforcement in Florida, if need be.  If there is some emergent

16   matter, SAGE would contact local law enforcement.  And what we

17   could do, Judge, and what we're willing to do is put together a

18   protocol so that the Court is absolutely satisfied and

19   comfortable that there is quite literally no way that Mr. Combs

20   would be able to conduct any kind of contact, have any —— do

21   anything with a witness of any nature.

22           One thing that I want to make clear, in light of the

23   government's proffer today —— and I'm not going to go through

24   all of the things that I said yesterday.  Your Honor read the

25   transcript, and I don't need to go through them all again —— is

O9IHComC

1    we believe we have very significant defenses to everything that

2    the government has said, and we have been conducting, on the

3    defense side, a very significant investigation for six months.

4    And I anticipate that is only going to increase as we get

5    closer and closer to a trial.

6          So we will conduct the investigation, meaning the

7    lawyers and the investigators.  Obviously, Mr. Combs will have

8    no role in that.  Mr. Combs will not contact anybody who is not

9    on the preapproved list.  We will ensure that that's the case.

10   And if he fails to do that in any way, shape, or form, we would

11   explain to Mr. Combs that that would be a violation of his

12   release conditions, and he should expect to be incarcerated.

13   And that is an obviously real concern because, getting ready

14   for this –– Mr. Combs would be in the special housing unit if

15   he was incarcerated in the MDC.  That presents tremendous

16   challenges to us.  Given the amount of electronic evidence,

17   it's a very difficult place to be as an inmate, and it's a very

18   difficult place to get ready for any trial, much less a trial

19   with a tremendous amount of discovery, as this case has.

20         So he knows the stakes.  I will put something in place

21   that would give the Court and Pretrial Services and the

22   government assurance that nobody will be contacted unless that

23   person is on the preapproved list.  That would be monitored by

24   the people at SAGE.  And we are at risk of Mr. Combs being

25   incarcerated if anybody falls down on the job.  If Mr. Combs

O9IHComC

```
1    does something he's not supposed to do, if SAGE somehow misses

2    Mr. Combs doing something he's not supposed to do, if his

3    lawyers miss Mr. Combs doing something he's not supposed to do,

4    we know what the consequences would be.

5            So I'm listening to your Honor loud and clear.  And

6    I'm going to address risk of flight in a second because the

7    government's still moving on that theory, but I do want to

8    assure the Court that we are prepared to put in strenuous and

9    maybe unusual conditions to meet the Court's concern when it

10   comes to these important matters.

11           Now, that is not to say that I agree with the

12   government's assessment of whether these things are obstruction

13   or not obstruction.  That's an issue for another day, and I'll

14   take it up on the other day.  What I'm here to do today is to

15   address your Honor's concern.  When your Honor came out on the

16   bench, your Honor shared your Honor's thoughts with us, and I

17   listened loud and clear.  And I want to address those thoughts,

18   and I want to address those concerns directly.  And through

19   having SAGE Intelligence, their former law enforcement

20   officers, on-site 24 hours a day —— and we'll do whatever needs

21   to be done.  If we need two of them, we'll have two of them.

22   If we need three of them, we'll have three of them.  And we'll

23   put everything in place that we need in terms of visitors

24   coming in, visitors who aren't on the list and who can't come

25   in, that will all be done.  That will all be monitored, and we
```

O9IHComC

1    will all know what's being done in that regard.  So that is how
2    I intend to deal with that.

3        Mr. Combs, like I said, would not have a cell phone.
4    He would not have any ability to use the Internet.  And that
5    would, I think, come a long way to giving the Court greater
6    comfort in this regard.

7        I do want to address another issue, because I don't
8    believe that the actions that Mr. Combs has taken in regard to
9    surrendering his passport and coming to New York are only in
10   regard to risk of flight.  I disagree with my colleague's
11   assessment in that regard.  Because I think what it shows is
12   that he is deeply respectful of the Court's authority.  He is
13   willing to show that he is responsible, that he can follow
14   these directions, and that he is mindful and has been mindful
15   — and this is important — he is mindful and has been mindful
16   for a very long time that this is a significant investigation
17   and that the charges could be significant; not significant
18   because they're true, but significant just because they're
19   weighty charges.  And with the sex trafficking count, at a
20   minimum, it has a rebuttable presumption of detention, so I
21   want to put these in somewhat of a different light.  And I
22   won't belabor it because I know your Honor read this already.

23       When we told the government on April 1, all those
24   months ago, that we had Mr. Combs' passport, we were giving the
25   government an assurance:  He was not going to travel

1    internationally, which he hasn't, and that the government would

2    know where he is.  Mr. Combs was willing to do that because he

3    understood that this was a significant investigation.

4           Now what I want to point out in this regard is this:

5    Back on April 1, when we sent the email to the government and

6    said that we have Mr. Combs' passport, we specifically went

7    through the charges that we believed they were looking into,

8    and we specifically mentioned racketeering conspiracy, we

9    specifically mentioned sex trafficking, and we specifically

10   mentioned violation of the Mann Act.  We mentioned all three

11   counts that ended up being in the indictment.

12          So back on April 1, we knew exactly the nature of this

13   investigation, and it turns out we were right.  But the

14   significance isn't that we're right.  The significance is that

15   we knew it was substantial, and even in the face of a

16   substantial investigation, Mr. Combs surrendered his passport.

17   Now, but that wasn't all.

18          THE COURT:  Just to be clear, when you're saying "we,"

19   you're including your client, Mr. Combs, in that; that he was

20   aware of that at least by April 1?

21          MR. AGNIFILO:  100 percent.  Just to make it clear,

22   Ms. Geragos and I flew to Florida.  We sat with Mr. Combs in

23   his house in Florida, and we said:  You are being investigated

24   by the Southern District of New York for a number of serious

25   charges.  Let me tell you what they are.  It's racketeering

O9IHComC

 1   conspiracy.  It's sex trafficking.  It's obstruction of

 2   justice.  It's prostitution, Mann Act-type prostitution.  I

 3   mean, we were right because we knew what they were looking

 4   into.  We also knew it because there was a search warrant, and

 5   the search warrant had crimes in it.  So he knew.  He knew on

 6   April 1 exactly what they were looking into.

 7          Now, the government in their letter to your Honor

 8   today somehow makes an argument that this is like defense

 9   lawyer —— I think they call it defense lawyer theater, but it's

10   not theater at all.  It's actually a person showing tremendous

11   respect for the process and showing the Court that he can be

12   trusted because what he also —— what we went also on to do is

13   we took the passports of five of his family members.  And

14   members of his family and friends are here today in the second

15   row.  They love him.  They support him.  And many of them gave

16   us their passports over the last several months.

17          We also made efforts to sell his airplane, which is in

18   the process.  We have a letter of intent to sell the airplane.

19   Because I was concerned that, if he had access to an airplane,

20   that would give your Honor concern; that would give the

21   government concern.  I credit the government for not raising it

22   as a concern, and I think it's not a concern because we're

23   selling it.  But the significant thing is we had the foresight

24   to try to sell it.  Apparently, selling an airplane is not an

25   easy thing to do.  We've had three different buyers who didn't

O9IHComC

```
 1   work out.  We're on, I think, the fourth buyer, but, hopefully,

 2   we'll actually sell it this time.  In the meantime, we will

 3   make sure that Mr. Combs is not ── so let me just back up for a

 4   second.

 5          Because he is not using the plane, no plan on using

 6   the plane anytime in the near future, it gets chartered,

 7   because the plane has to keep flying or the plane apparently

 8   starts to fall apart.  So it gets chartered, and it's being

 9   chartered.  It's being chartered by other people in sort of a

10   public way.

11          THE COURT:  Can you just get to the point where you

12   said that this doesn't relate simply to risk of flight.

13          MR. AGNIFILO:  Yeah.

14          THE COURT:  Can you tell me what this relates to

15   otherwise.

16          MR. AGNIFILO:  It shows respect for the Court.  It

17   shows that he's trustworthy.  It shows that he is showing that

18   this is a serious process to him.  Your Honor must have seen

19   defendants who thumb their nose at the court and say:  Come

20   find me.  I'm not going to show the court the due respect that

21   it deserves.  I'm not going to do the things to show the Court

22   that I'm trustworthy.  Some defendants flee outright.  In some

23   of the cases that are distinguishable and your Honor's read,

24   like *Maxwell* and *Epstein* ──

25          THE COURT:  How does that relate to dangerousness
```

O9IHComC

1    generally or danger of obstruction?  Because it seems to me

2    that it may —— what you've said relates to danger of

3    obstruction, but not in a good way for you.  If he's aware of

4    this April 1, 2024, then, again, why is he contacting witnesses

5    in June and July of 2024?

6         MR. AGNIFILO:  So I have an answer.  A witness

7    contacted him.  I think I know what they're talking about.  And

8    a person contacted my client on Signal, so it doesn't show up,

9    and wanted to talk to him, and he spoke to her.  And the

10   witness —— I'll tell you exactly what happened.  And the

11   witness told him I'm a grand jury witness.  He told us that,

12   Ms. Geragos and I, and we said:  Don't talk to her anymore.

13   And he didn't talk to her anymore, and that was that.

14        She contacted him, if it's the thing that I'm thinking

15   about, and I think I'm right.  So that is not him reaching out

16   to a witness.  He did not reach out to grand jury witnesses.  I

17   dispute that wholeheartedly.  He didn't do it and he wouldn't

18   do it.  And he wouldn't do it because he has the sense not to

19   do it, and he wouldn't do it because we wouldn't let him do it,

20   you know.  So as much as we ——

21        THE COURT:  OK.  Let's get back to, again, this point

22   that you're making.  This all seems to be that this is just

23   related —— this is again cabined to risk of flight.  So tell me

24   again why surrendering of the passports and everything has

25   something to do with danger.  You're saying it shows respect

O9IHComC

1    for the court, respect for the proceedings.  That seems

2    quintessentially like risk of flight.

3              MR. AGNIFILO:  Because I think part of —— defendants

4    who are dangers, once the court process starts, are people who

5    have disregard for the court.  It's contemptuous of the court.

6    They are doing things, they're engaging in conduct that they

7    know is contemptuous of the court.  And everything that

8    Mr. Combs has done has shown he is not and has never been

9    contemptuous of the court.  In fact, his whole life has been

10   the exact opposite.

11             And it's important that I bring this up to your Honor

12   because I think it's a serious consideration.  It's not on his

13   rap sheet because he was acquitted, but it's well known that

14   between 1999 and 2001, he had a very significant criminal case

15   in Manhattan.  He went to trial, and he was acquitted.  And

16   during that over one-year period, he went to court every time

17   he was supposed to.  During that over one-year period, there

18   were no issues with witnesses.  There were no issues with

19   danger.  And he abided by the process.  He showed respect for

20   the court.  He came to court every day.  He went to trial, and

21   a jury of 12 New Yorkers found him not guilty.

22             So this is someone who actually has shown that, when

23   the chips are down, when the pressure is on, he doesn't do

24   anything that he's not supposed to do.  He shows up on time.

25   He shows up every day.  He didn't do anything with witnesses.

O9IHComC

1    He didn't do anything dangerous.  And that is a track record.

2    That happened.  That's not just his lawyer making an argument.

3    That's the truth, and that's in the record.  That happened.

4    There is no issues with him for that over one-year period, and

5    he went to trial and was acquitted.  And he's going to show the

6    exact same respect for this Court.

7           So the reason it relates to danger and the reason it

8    relates to the government's concerns of witness intimidation is

9    because he hears the Court loud and clear.  There's a case now,

10   and he is going to do everything right from this point forward.

11   And I'm not asking your Honor just to trust him.  I am asking

12   your Honor to trust him, I am, but not that alone.  I'm saying

13   that if we put in place the different measures that I have in

14   the bail package and the letter that we submitted to the Court,

15   along with SAGE Intelligence — which we didn't name them, so I

16   understand why the government thought that we were going to use

17   the same security service that's been in place all this time,

18   but that was never the plan.  The plan was always to use a

19   company like SAGE Intelligence, and that's the plan now —

20   that, in addition to the fact that he's shown that he is

21   trustworthy — and I believe he has because I believe the

22   incidents that the government's talking about do not amount to

23   witness intimidation in the slightest — that we have in place

24   a foolproof system that will give the Court what it needs.  He

25   is not going to contact anybody.  He is not going to reach out

O9IHComC

1    to anyone, and he's going to let his lawyers do the defense

2    investigation, as we should.

3              THE COURT:  But tell me more about this allegedly

4    foolproof system that you're proposing.  Under the system,

5    would Mr. Combs still have employees?

6              MR. AGNIFILO:  He will have employees.  He has

7    employees.  He has, you know, people who manage his finances.

8    They're not necessarily in the same house.  They're located in

9    California.  But he does have employees.

10             THE COURT:  Would it be necessary for him to speak

11   with these employees or have someone on his behalf speak with

12   these employees?

13             MR. AGNIFILO:  We could work that out.  There's going

14   to have to be some way of communicating with the employees,

15   some form or fashion of doing that.  I mean —

16             THE COURT:  And under your proposal, would Mr. Combs

17   be able to leave the residence?

18             MR. AGNIFILO:  No, I don't anticipate that he will.

19             THE COURT:  Would your proposal be the security

20   company — you said they'd be there.

21             MR. AGNIFILO:  Yes.

22             THE COURT:  What does "there" mean?

23             MR. AGNIFILO:  So there is — his home in Florida is

24   the one that we're looking to secure the bond.  It is in Miami.

25   He would live there and the security personnel would live there

O9IHComC

1   as well.  I mean, they would probably do it in shifts.  I don't

2   exactly know how, but they'll probably do it in eight-hour

3   shifts and rotate in and out.  But there will be ——

4           THE COURT:  But the proposal is that they would just

5   be in the house, not sitting there looking at him the whole

6   time, correct?

7           MR. AGNIFILO:  I don't know that they would need to

8   sit there and look at him.  I think what we could do is we

9   could put cameras.  We could put cameras at the entrances that

10  are filming 24 hours a day, and they would be in the house and

11  aware of the goings-on.  If there were requirements that he

12  don't have a cell phone, we could find ways of doing

13  spot-checks to make sure that he's not on a cell phone.  If the

14  requirement is that he doesn't use the Internet, we can do

15  spot-checks that he doesn't use the Internet.  But we can make

16  it as secure as we need to make it.

17          And let me just add, there are already —— and the

18  government knows this because I think they took a lot of the

19  footage back on March 25 —— there are cameras in different

20  parts of the house, so all we would need to do is kind of keep

21  those cameras rolling.  I'm happy to share the footage with

22  anybody who wants it.  But what we would do is we would monitor

23  those cameras, in addition to physically monitoring the

24  situation with the officers on-site.

25          THE COURT:  Who would be living in the home with him?

O9IHComC

1              MR. AGNIFILO:  One second.

2              (Counsel conferred with defendant)

3              MR. AGNIFILO:  I think we can arrange things so he's

4    the only one living there and that SAGE would be working there,

5    doing security, and he'd be the only one actually residing at

6    the house.

7              THE COURT:  But there would be visits from family

8    members and employees and friends and the like, correct?

9              MR. AGNIFILO:  Assuming that those people are —— we

10   will put a list together, we will share it with everybody who

11   wants to see it, and those would be the people who visit.  And

12   nobody else would visit because SAGE won't let them in.

13             THE COURT:  Go ahead.  Is there anything else?  You

14   want to address the violence and danger more generally?

15             MR. AGNIFILO:  Sure.  Yes, Judge.

16             THE COURT:  I know you made some statements before

17   regarding the 2016 video incident.

18             MR. AGNIFILO:  Yes, Judge.

19             THE COURT:  Again, that video is quite disturbing.

20   And it was eight years ago, but he's still 46, 47 years old at

21   the time this is taking place.

22             MR. AGNIFILO:  He was.

23             THE COURT:  And this was after his acquittal on the

24   state court charges.

25             MR. AGNIFILO:  It was.  So let me shed some light.

O9IHComC

1    Your Honor asks a good question.  I think there's an answer to

2    it.

3            In the weeks and months after the video, Mr. Combs

4    realized he has a problem with drug addiction and he has a

5    problem with anger, and he went and —— he went into a rehab

6    program for a period of time.  I don't want to get too much

7    into this, but it's significant.  The person —— the woman in

8    the video also went into rehab around the same time.

9            The point is this was a ten-year relationship that was

10   very loving at times.  These people loved each other, and I

11   don't think there's any other view of the relationship than

12   that because they're just —— the written messages are —— it's

13   heartbreaking.  It's sort of a heartbreaking relationship in

14   many ways because they really did love each other.  And I think

15   what the government is doing —— and I'm not saying this in a

16   bad way —— but I think the dynamic of the case that I object to

17   most, most respectfully, is this:  The sex and the violence

18   were totally separate and motivated by totally different

19   things.  The way that this couple chose to be intimate was the

20   way that is —— they would bring a third party into their

21   intimacy.  That was their thing.  That is how these two adults

22   chose to be intimate.  And the written communications, Judge,

23   are overwhelming, overwhelming, that this is so.  Not only that

24   it was with consent, it was —— it was a sought-after, special

25   part of their relationship.  And in some ways ——

O9IHComC

1          THE COURT:  What does this have to do with him

2    punching her, throwing a vase at her, kicking her?  What's love

3    got to do with that?

4          MR. AGNIFILO:  It's a good question, and the answer is

5    it has nothing to do with because that's not what motivated

6    that stuff.  The intimacy is over here, OK?  All of the

7    problems are not related to the intimacy.  The problems are

8    related to jealousy from infidelity.  That is where the

9    problems come.  You have jealousy from infidelity.  You have

10   arguments.  You have fights.  You have things like you saw on

11   the video because of jealousy due to infidelity in both

12   directions, in both —— on the part of both participants,

13   Mr. Combs and this other person.  It's mutual.  And the

14   violence is from that 100 percent, and the written

15   communications make that clear.

16         THE COURT:  Let me just make sure I understand your

17   point on this.

18         MR. AGNIFILO:  Yes, your Honor.

19         THE COURT:  What is your point on this?  You're saying

20   that that's the reason that he —— because of jealousy, that's

21   the reason, because they had an argument, that that's the

22   reason that he punched her, threw a vase at her, and kicked

23   her?

24         MR. AGNIFILO:  I'm saying it's not sex trafficking.

25   The government is linking the two, and in the linkage they find

O9IHComC

1    sex trafficking.

2             THE COURT:  The government's also talking more

3    generally about violence against women and violence against

4    this particular woman who the government claims was sex

5    trafficked.

6             And let me ask you this thing:  If you're talking

7    about — to the extent that you claim that this sort of

8    behavior was — that inviting another person into the

9    relationship was somehow consensual, if that person is a sex

10   worker or prostitute and travels across state lines, isn't that

11   a problem regarding Count Three of the indictment?

12            MR. AGNIFILO:  It may or may not be.  I have spoken to

13   the people from this agency, and what they uniformly say is we

14   are not paid to have sex.  We are paid for our time.  And if we

15   meet somebody and it goes in that direction and everybody wants

16   to do this and there is sexual contact, then that sometimes

17   happens.

18            And, listen, at the end of the day, the one-time

19   governor of New York was investigated by the Southern District

20   of New York because he was sleeping with $5,000-an-hour

21   prostitutes while he was the governor, and they didn't

22   prosecute him.  They are prosecuting Mr. Combs for the exact

23   same type of conduct.

24            So, yes, let's assume for a second — let's assume for

25   a second your Honor's question is right.  OK?  That is — it's

O9IHComC

```
 1    not sex trafficking.  It's not sex trafficking, that's my
 2    point.  The reason we're really here and ——
 3              THE COURT:  That would be a crime.  That would be a
 4    federal offense.
 5              MR. AGNIFILO:  No, I don't think that's true because I
 6    don't know that, if you read the Mann Act, the consumer of the
 7    intimacy is within the purview of the Mann Act.  My read of the
 8    Mann Act is that it's about the business of sex, and there is
 9    no argument that Mr. Combs was involved in the business of sex.
10    That's not the argument.
11              THE COURT:  Let's get back to that video and the
12    physical beating.
13              MR. AGNIFILO:  Yes.
14              THE COURT:  Why isn't that relevant to a consideration
15    as to danger to the community more generally and acts of
16    violence against women and what the government has alleged
17    here?
18              MR. AGNIFILO:  Judge, I think it's relevant.  I think
19    it is relevant.  I haven't said it wasn't relevant.  I'm saying
20    it's not part of the sex trafficking.  That's my theory, that
21    it's not part of the sex trafficking.  Is it relevant?  Your
22    Honor's going to look at the video the way everybody looked at
23    the video, the way Mr. Combs looked at the video.  Mr. Combs
24    issued an apology after the video, and I'm not going to undo
25    his apology.  It's a hard video to watch.  It's an upsetting
```

O9IHComC

<pre>
 1    video to watch.  It was an upsetting video to watch for
 2    everyone, but that doesn't mean he should be incarcerated.
 3              It's eight and a half years ago.  He went into rehab
 4    since then.  He has done tremendous things to try to change as
 5    a person since then, and he's not the same person he was then.
 6    He was in a relationship that was a toxic relationship.  And
 7    probably the best single thing, both for him and the woman
 8    involved, is that they broke up and they both went their
 9    separate ways seven years ago at this point —— six years ago.
10    Six years ago they broke up at this point, and sometimes that
11    happens in life.
12              You know, Mr. Combs has the unfortunate reality that
13    one of the worst things he's ever done was on videotape.  I'm
14    glad that didn't happen to me.  None of us should be that
15    unlucky.  But one of the worst things he ever did happens to be
16    on videotape, and it will one day be played at his federal
17    trial, and we'll deal with it when it is.  So I'm not asking
18    your Honor to ignore it.  I'm not ignoring it.  But I don't
19    think it's dispositive, and I don't think, in and of itself, it
20    means that he should be detained pretrial.
21              We have defenses to the charges.  That's the point.
22    We have defenses to the charges, real defenses.  This is going
23    to be a trial one day, 100 percent.  He's not going to plead
24    guilty to racketeering and sex trafficking and those things.
25    He's not.  So this is going to be a trial.  And I am asking
</pre>

O9IHComC

1    you, because it's so critically important, we have proffered,

2    your Honor, a very substantial bail package.  And him coming to

3    New York, Judge, I think, also is not just important in terms

4    of risk of flight; I think it's important for every aspect of

5    what we consider when we think about bail.

6          I mean, this is a man — we had a meeting with the

7    government.  Ms. Geragos and I met with my colleagues to my

8    right here, I think it was, September 3.  It was a day after

9    Labor Day, the Tuesday after Labor Day.  And Ms. Geragos and I

10   left that meeting, and I realized they were going to return an

11   indictment soon.  I didn't know if soon was a week.  I didn't

12   know if soon was a month.  I didn't know if soon was three

13   months.  I got on the phone with Mr. Combs the next day, and I

14   said you should consider coming to New York because I think

15   they're going to charge you soon.

16         He got on a plane on September 5 and came to New York,

17   and he came to New York to turn himself in.  He came to

18   New York to surrender.  And I told my colleagues, he's here.

19   He wants to surrender.  Just give him a time, and he'll be

20   there.  I understand that they don't have to do it, and they

21   didn't do it.  They told me they would get back to me, and then

22   he got arrested.  And that's OK.  That's OK.  But the fact that

23   he got on an airplane to come to New York when so many

24   defendants, Judge, get on an airplane or a bus or a train, or

25   whatever, and run as far away from the place of danger as

O9IHComC

```
 1    possible.  The fact that he did the exact opposite is a weighty
 2    consideration of him in general.  And so when I say to the
 3    Court that I want the Court to trust him, he has earned the
 4    Court's trust.
 5              And even if the Court doesn't fully trust him, trust
 6    the package as a whole that I'm proposing with a $50 million
 7    bond, which is a tremendous bond, secured by about $50 million
 8    in equity with the cosigners that we've proposed; with the
 9    passport surrendered that we've proposed, including his own
10    passport; with electronic monitoring; he stays in the house;
11    SAGE Intelligence supervises the house; we have a list of
12    permitted visitors; he doesn't have a cell phone; he doesn't
13    have any Internet access.  And I believe that will do two very
14    important things:  (1) It will give the Court comfort that he's
15    not a flight risk due to the conditions, he's not a danger,
16    he's not a danger of any witness obstruction with these
17    conditions, and it allows him to prepare for his trial in a
18    fair way.
19              And everything that we have been doing, we have known
20    this was coming.  If he was going to run, if he was going to do
21    something reckless and stupid, he would have done it in March,
22    and he didn't.  Instead, he gave us his passport, and we told
23    the government we had it.
24              This is someone who has worked hard his whole life.
25    We haven't gotten too much into his personal characteristics,
```

O9IHComC

1    but I think it's actually somewhat important.

2          He has —— first of all, he has one misdemeanor

3    conviction from 29 years ago.  That's it.  He's 53 years old.

4    One misdemeanor conviction from 29 years ago.  He was an actual

5    altar boy growing up.  He's a very religious man.

6          THE COURT:  How far back are you going now?

7          MR. AGNIFILO:  The man has —— I'm going back and I'm

8    talking about him as a person because it's all one continuum.

9          THE COURT:  OK.

10         MR. AGNIFILO:  He watches a sermon every day.  He's

11   religious.  He comes from a religious family.  His father,

12   unfortunately, was killed when he was two years old.  He was

13   raised by his mother, who did a wonderful job with him.  And he

14   has worked hard, and he has earned everything that he's ever

15   gotten in his life.

16         And the one thing that I'm asking your Honor for is to

17   see that he has done everything to earn the Court's trust.  He

18   has done a great deal to earn the Court's trust.  And I am

19   submitting that this very, very substantial package, both

20   what's in the written letter supplemented by what I said today,

21   and supplemented still further by SAGE Intelligence being

22   on-site —— and we can have any protocol that your Honor sees

23   fit.  We'll certainly suggest one, but if your Honor wants

24   something more or different, we can do whatever your Honor

25   thinks is necessary —— that that, in combination, that

O9IHComC

1    substantial package means that he should be released to work on

2    his case, to meet with his lawyers.  If we need to speak to him

3    by flying to Florida, we'll do that.  He'll stay in his house

4    in Florida, and he'll do nothing but prepare for his trial.

5           So I'm asking you to release him on these very, very

6    strenuous conditions, Judge.  Thank you.

7           THE COURT:  Thank you.

8           All right.  I've heard from the parties.  I've

9    reviewed everything.  I find that the government has proven

10   that the defendant is a danger regarding obstruction of justice

11   and witness tampering by clear and convincing evidence.

12          I also find that the government has proven that the

13   defendant is a danger to the safety of others in the community

14   more generally by clear and convincing evidence.

15          I need not reach the issue of risk of flight.  Again,

16   I find that the government has carried its burden of persuasion

17   by clear and convincing evidence on dangerousness both for

18   obstruction and witness tampering, as well as danger more

19   generally, even if the defense has rebutted the presumption by

20   coming forward with their burden of production.

21          Regarding the bail package that has been proposed by

22   defense counsel in terms of risk of flight, I think it's

23   insufficient.

24          In terms of overcoming what the government has proven,

25   again, I'll say it this way:  Again, the government has proven

O9IHComC

 1   by clear and convincing evidence that there is no condition or

 2   combination of conditions that will reasonably assure the

 3   safety of a person in the community, as well that he will not

 4   obstruct justice or tamper with witnesses.

 5           There are issues also with what the defense has

 6   suggested in terms of this SAGE Intelligence.  Certainly, the

 7   defendant would still have access to employees and other

 8   individuals.  And given what the government has proffered, he

 9   could certainly obstruct justice and intimidate witnesses

10   through those folks, through even coded messages if necessary.

11           So I am denying bail, and I am granting the

12   government's motion.

13           We are scheduled to have an initial conference on the

14   24th.  Since we're here, I don't know if we need to do that.

15   Perhaps we can just find out how counsel wish to proceed.  I

16   know that Mr. Combs was already arraigned on the indictment.

17   So how do counsel wish to proceed?  Let me hear from the

18   government first.

19           MS. SMYSER:  Thank you, your Honor.  Happy to give the

20   Court an overview of the discovery in the case and also the

21   government's proposed schedule.

22           So, first, I think it's important to note that your

23   Honor probably has seen this from the record so far, but there

24   is going to be a huge amount of discovery in the case.  It's

25   going to consist of dozens of terabytes of data.  Then I want

O9IHComC

```
 1     to cover some of those categories of the Rule 16 discovery that
 2     we'll be disclosing to the defense.
 3            First, it will include grand jury subpoena returns.
 4     For some context as to the volume of those returns, we have
 5     served over 300 grand jury subpoenas in the case and gotten
 6     returns from over 100 individuals and entities, including phone
 7     companies, tech companies, social media companies, hotels,
 8     airlines, some companies related to Mr. Combs himself.
 9            Second, the Rule 16 discovery will also include search
10     warrants.  We've obtained over 20 search warrants in the case,
11     including warrants for electronic devices and iCloud accounts,
12     including warrants for his historical and prospective cell
13     phone information and for a variety of persons, as well as for
14     Mr. Combs' residences.
15            Third, the discovery will include photographs of
16     physical evidence, including evidence that was collected from
17     his residences in March 2024, as well as from his hotel room a
18     few days ago, which includes freak-off supplies, narcotics,
19     firearms, and ammunition.
20            The discovery will also include a variety of law
21     enforcement reports and records, including from local law
22     enforcement.
23            And finally, there are a large number of electronic
24     devices in the case.  Specifically, over the course of the
25     investigation, including in the past few days, the government
```

O9IHComC

1   has been collecting electronic devices and, in total, has

2   seized over 100 phones, laptops, tablets, and iCloud accounts,

3   as well as over 30 other kinds of devices.  And here, I'm

4   talking about things like hard drives, flash drives, cameras,

5   DVRs.  These devices are often large, sometimes hundreds of

6   gigabytes, sometimes terabytes, especially in relation to the

7   iCloud accounts.

8         Already the government has extracted approximately

9   half of those phones, laptops, tablets, and iCloud accounts.

10  And these devices are in the process of a privilege review,

11  varying stages of it, and they will then be reviewed for

12  identified data and —— review, and we will produce that

13  identified data on a rolling basis to defense counsel as it

14  becomes available.

15        So although this is a large amount of discovery, we

16  have a plan for producing it to defense counsel.

17        First, before producing any discovery, as your Honor

18  might anticipate, we will need a signed protective order given

19  that the discovery will contain sensitive victim and witness

20  information, and we have, as we've discussed, real concerns

21  about witness tampering as well as with the sensitivity of the

22  victim information and statements that have been given to the

23  media so far.  So we will start engaging in those discussions

24  with defense counsel today about negotiating the protective

25  order, and we'll let your Honor know if there are any issues

O9IHComC

 1   with that process.

 2        Second, soon after getting the protective order

 3   signed, we plan to produce the affidavits related to the search

 4   warrants that we've obtained in the case.  As I said, there are

 5   over 20 of them.  Many of them have lengthy affidavits which

 6   lay out large portions of the case and will assist the defense

 7   in assessing whether there are motions that we would like to

 8   make.

 9        Third, within approximately 30 days of having a

10   protective order, the government would intend to make a large

11   production of discovery to the defense consisting of a variety

12   of things, including grand jury subpoena returns.  But,

13   importantly, we are prepared to produce many of Mr. Combs' own

14   devices and accounts.  We have approximately 35 full

15   extractions ready to produce to the defense.  We anticipate

16   that the copying of those devices, given their size, will take

17   some time, but we will engage in that process as soon as we

18   can.

19        And, finally, our plan would be, after this initial

20   large production, to continue to make productions on a rolling

21   basis.  And I just want to note for the Court that our

22   investigation in this case is very much ongoing, and we will

23   continue to produce the information that is in our possession.

24   And as we get more related to the new investigation, we will

25   also review that in accordance with our discovery obligations

O9IHComC

1    to produce to the defense.

2            We think it makes sense, in order to give defense

3    counsel sufficient time to review this discovery, to have a

4    status conference in approximately 90 days.

5            THE COURT:  OK.  Defense counsel, let me hear from

6    you.

7            MR. AGNIFILO:  Yes, your Honor.  I am —— without

8    speaking to Mr. Combs in greater detail, in light of the fact

9    that he's going to be in the SHU of the MDC, I'm not in a place

10   where I'm prepared to consent to a speedy trial.  I'm not

11   saying that I won't in the future, but this is a serious

12   conversation we have to have.  And the fact that he is going to

13   be incarcerated is a significant factor.  So I don't know that

14   I can consent to a 90-day adjournment for a status conference.

15   I think we want to reserve the right of moving much quicker

16   than that.  The government arrested him, the government wants

17   him detained, and we're going to have to do everything possible

18   to move this along.

19           So where I am today is I'd like some time to speak

20   with him, and more than just a few minutes here.  We need to go

21   through this in real detail.  I also need to see what's going

22   to be possible in the SHU, and I don't know that I exactly know

23   that now in terms of what computer facilities are going to be

24   possible.  And so at this point I'm not prepared to waive

25   speedy trial.

O9IHComC

```
 1              THE COURT:  So what do you want to do at this point?
 2     Do you want to set a trial date?  Do you want to, because I
 3     would ── well, I don't know.
 4              Do you want time to review the discovery that's going
 5     to be produced, do you want to come back in 45 days, or do you
 6     want me to set a trial date?  I can set a trial date if you
 7     want me to set a trial date ──
 8              MR. AGNIFILO:  I understand.
 9              THE COURT:  ── whenever you want it.  And if I can't
10     try it, I'll find a colleague who can if you want to set a
11     trial date.
12              MR. AGNIFILO:  Can I just talk to the government for a
13     second?  I just have a question.
14              THE COURT:  Yes.
15              (Counsel conferred)
16              MR. AGNIFILO:  I have a proposal.  Would your Honor be
17     amenable to a status conference in somewhere between 14 and 20
18     days?  And in the interim, what I think we'll have a better
19     handle on is how Mr. Combs would be able to look at the
20     discovery, what discovery will be available when, and what,
21     from a technical perspective, he'll be able to look at and with
22     what level of difficulty.
23              So my ask of the Court is that we have a shorter
24     turnaround time for a status conference, and whatever's good
25     for the Court in that general period of time of two to three
```

O9IHComC

1    weeks.

2              THE COURT:  OK.  We can do that.

3              What's your position on speedy trial time between now

4    and that two- to three-week period?

5              MR. AGNIFILO:  Without a much more in-depth

6    conversation with my client, I'm not prepared to waive it.

7              THE COURT:  OK.  What's the government's position on

8    whether or not I should exclude —— well, let's get the date,

9    first of all.

10             How about October the 9th?  Are counsel available

11   then?

12             MR. AGNIFILO:  One second, Judge.

13             THE COURT:  Let's say 2 o'clock.

14             MR. AGNIFILO:  That's fine, Judge.  Thank you.

15             THE COURT:  Does that work for the government?

16             MS. SMYSER:  Yes, your Honor.

17             THE COURT:  OK.  Let's set this down for October 9 at

18   2 o'clock.

19             I know the defendant says you don't want to waive

20   speedy trial time.  Fine.  What is the government's position on

21   whether or not time should be excluded, and what's defense

22   counsel's position on that?

23             MS. SMYSER:  Your Honor, the government would move to

24   exclude time under the Speedy Trial Act.  The ends of justice

25   outweigh the interests of the public and the defendant in a

O9IHComC

```
1   speedy trial here given the complexity of the case, given the

2   need for the government to produce discovery to the defendant,

3   and for the defendant and his counsel to begin to review that

4   discovery.

5           THE COURT:  All right.  So, defense counsel, I

6   understand your position.  You don't want to waive speedy trial

7   time.  I get that.  But would you be prepared to try this case

8   on October the 9th?

9           MR. AGNIFILO:  No, no, I'm not saying that I am.  What

10  I'm saying is I need more information to come to the Court with

11  an intelligent position on this, and the things that we don't

12  know is what his ability to look at the stuff will be where he

13  is.  I don't know where he will be in the MDC.  Where they

14  designate him is significant to that.  I think the government

15  is —— it might help in the process of trying to make sure that

16  he gets what he needs, and I think by October 9 we'll have a

17  better idea of what they can produce and when.

18          So, no, I'm not looking to try the case on October 9.

19  That would be irresponsible.  I'm not asking to do that.  But

20  what I am asking is —— the government's going to move with all,

21  you know, urgency to get me everything, and then October 9, I

22  think we'll have our arms around the situation a little bit

23  better.

24          THE COURT:  OK.  I will exclude time under the Speedy

25  Trial Act from today's date until October 9 so the defense
```

O9IHComC

1    counsel gets an opportunity to consult with his client, gets an

2    opportunity to start reviewing the discovery, gets an

3    opportunity to decide how they want to proceed with this case,

4    and also to be better prepared for trial in this case.  I find

5    that the interests of Mr. Combs and the interests of justice

6    support exclusion of time under the Speedy Trial Act from

7    today's date until October 9.  I further find that the

8    interests of Mr. Combs and the interests of justice outweigh

9    the public's interest in a speedy trial.  I will enter an order

10   to that effect.

11        Let me also just share something with counsel.  We

12   received a couple of calls in chambers today from people who

13   claimed to have information relevant to the prosecution of this

14   case.  We did not engage with those individuals other than my

15   staff instructed them to reach out to the U.S. Attorney's

16   Office.  I just wanted to let counsel know that.

17        The other thing is that, in their most recent

18   submission, the government made an allusion to Local Criminal

19   Rule 23.1.  Is there anything that anybody wants me to do about

20   that now, counsel for the government?  Again, that relates to

21   statements allegedly made by defense counsel on some news

22   channel recently.

23        MS. JOHNSON:  We're not asking the Court to do

24   anything right now, your Honor.  We just wanted to put a marker

25   down that we thought some of the comments got a little bit

O9IHComC

| | |
|---|---|
| 1 | close to the line under the local rule, particularly with |
| 2 | respect to issues regarding the victim and potentially |
| 3 | inadmissible evidence.  So we just wanted to flag that for the |
| 4 | Court. |
| 5 | THE COURT:  OK.  Anything else from defense counsel on |
| 6 | that? |
| 7 | MR. AGNIFILO:  I'm not sure that this is something |
| 8 | that the Court —— |
| 9 | THE COURT:  They're not asking me to do anything.  You |
| 10 | don't have to say anything. |
| 11 | MR. AGNIFILO:  No, no, it's not about that. |
| 12 | THE COURT:  Go ahead. |
| 13 | MR. AGNIFILO:  I believe —— and I know that courts |
| 14 | sometimes do this in terms of sentencing.  I've never actually |
| 15 | asked a court to do it on a pre-sentencing posture.  I think |
| 16 | Essex County would be preferable to the MDC, and I know that |
| 17 | they do house certain defendants, even in Southern District and |
| 18 | the Eastern District cases, in Essex County. |
| 19 | I don't know what your Honor can do to help in that |
| 20 | regard.  I've never made this request of a court at a pretrial |
| 21 | setting.  But I don't —— if your Honor would say you don't have |
| 22 | any objection to it, if that was consistent with the protocols |
| 23 | that existed, that might even be helpful, and then I'll take |
| 24 | the weight on myself to try to make that happen if I can.  So |
| 25 | any little thing could help me. |

O9IHComC

1              THE COURT:  OK.  Government, what's your view on this?

2              MS. JOHNSON:  I don't have the cite off the top of my

3     head, but I know that in the regulations there's —— that the

4     designation authority is entirely within —— given to the BOP.

5     I think this gets a little complicated, and I think —— I don't

6     know that there's anything that the Court can do to put the

7     thumb on the scale of where he's placed.  I think that's

8     ultimately a decision of the Bureau of Prisons.

9              THE COURT:  My sense is that what defense counsel is

10    asking is it's akin to, at sentencing, even though the Court

11    has no authority to dictate where someone is held, basically

12    akin to the Court making a recommendation that someone be

13    housed at a particular facility.  Again, I'm not aware of that

14    being done pretrial, so perhaps what we should do is have

15    counsel file a joint status report regarding this issue,

16    regarding what, if anything, the Court can do in that regard.

17    Certainly, defense counsel, you can look into this on your own.

18    Let's get that by Monday, September 23.

19              Does that work for the defense?

20              MR. AGNIFILO:  Yes, your Honor.  Thank you.

21              THE COURT:  Does that work for the government?

22              MS. JOHNSON:  It does, your Honor.

23              THE COURT:  That will be a joint submission.

24              Is there anything else today from the government?

25              MS. JOHNSON:  No, your Honor.  Thank you.

O9IHComC

1          THE COURT:  Is there anything else today from the

2    defense?

3          MR. AGNIFILO:  No, thank you.

4          THE COURT:  Let me just ⸺ I will say this:  We have a

5    status conference date for October the 9th, and I'll be around,

6    and we can certainly do that.  I know that the ⸺ being placed

7    in the MDC will be difficult, and often when prisoners are

8    taken to court, they're often woken up at 3:00 or 4:00 in the

9    morning and taken to court.  If counsel have discussed matters

10   with themselves and come to some agreement as to how we should

11   move forward, I will not object to counsel submitting a joint

12   report a couple of days ahead of time, because there's no

13   reason to have a court appearance just to simply adjourn it for

14   another day.

15          Anything from the government on that?

16          MS. JOHNSON:  Understood, your Honor.  We'll speak

17   with counsel and see if we can reach any resolutions prior to

18   October 9.

19          THE COURT:  Anything from the defense on that?

20          MR. AGNIFILO:  I understand the Court's position.

21          THE COURT:  All right.  We're adjourned.  Thank you.

22          (Adjourned)

23

24

25

ECF,INTAPP

# U.S. District Court
## Southern District of New York (Foley Square)
### CRIMINAL DOCKET FOR CASE #: 1:24−cr−00542−ALC All Defendants

Case title: USA v. COMBS

Date Filed: 09/12/2024

Assigned to: Judge Andrew L. Carter, Jr

**Defendant (1)**

**Sean Combs**
*also known as*
Sealed Defendant 1

represented by **Marc Antony Agnifilo**
Agnifilo Intrater LLP
445 Park Avenue
Ste 7th Floor
New York, NY 10022
646−205−4350
Email: marc@agilawgroup.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Teny Rose Geragos**
Agnifilo Intrater LLP
445 Park Avenue
Ste 7th Floor
New York, NY 10022
646−205−4350
Email: teny@agilawgroup.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Anthony L. Ricco**
Law Office of Anthony L. Ricco
20 Vesey Street
New York, NY 10007
(212)−791−3919
Fax: (212) 791−3940
Email: tonyricco@aol.com
*ATTORNEY TO BE NOTICED*

**Pending Counts**

18:1962−7480.F
RACKETEERING CONSPIRACY
(1)

18:1591.F SEX TRAFFICKING
OF CHILDREN OR BY FORCE,
FRAUD OR COERCION
(2)

TRANSPORTING FOR
PROSTITUTION
(3)

**Disposition**

**Highest Offense Level (Opening)**

Felony

**Terminated Counts**

None

**Disposition**

**Highest Offense Level
(Terminated)**

None

**Complaints**                                    **Disposition**

None

**Plaintiff**

USA                              represented by  **Emily Anne Johnson**
                                                DOJ–USAO
                                                US Attorney's Office, SDNY
                                                1 St. Andrew's Plaza
                                                New York, NY 10007
                                                212–637–2409
                                                Email: emily.johnson@usdoj.gov
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*
                                                *Designation: Assistant US Attorney*

                                                **Madison Reddick Smyser**
                                                DOJ–USAO
                                                U.S. Attorney's Office, SDNY
                                                One Saint Andrew's Plaza
                                                New York, NY 10007
                                                212–637–2381
                                                Email: madison.smyser@usdoj.gov
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*
                                                *Designation: Assistant US Attorney*

                                                **Mary Christine Slavik**
                                                DOJ–USAO
                                                One St. Andrew's Plaza
                                                New York, NY 10007
                                                212–637–1113
                                                Email: mary.slavik@usdoj.gov
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*
                                                *Designation: Assistant US Attorney*

                                                **Meredith Foster**
                                                DOJ–USAO
                                                Southern District of New York
                                                26 Federal Plaza
                                                New York
                                                New York, NY 10278
                                                212–637–2310
                                                Email: meredith.foster@usdoj.gov
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*
                                                *Designation: Assistant US Attorney*

                                                **Mitzi Steiner**
                                                DOJ–USAO
                                                1 St. Andrew's Plaza
                                                New York, NY 10007
                                                212–637–2284
                                                Email: mitzi.steiner@usdoj.gov
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*

*Designation: Assistant US Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/12/2024 | 1 | UNREDACTED INDICTMENT FILED as to Sealed Defendant 1. (jm) **(Not for Public view pursuant to Standing Order of the court, 24–mc–184.)** (Entered: 09/17/2024) |
| 09/12/2024 | 2 | SEALED REDACTED INDICTMENT as to Sealed Defendant 1 (1) count(s) 1, 2, 3. (jm) (Entered: 09/17/2024) |
| 09/17/2024 | 3 | Order to Unseal Indictment as to Sealed Defendant 1. (Signed by Magistrate Judge Robyn F. Tarnofsky on 9/17/24)(jm) (Entered: 09/17/2024) |
| 09/17/2024 | | INDICTMENT UNSEALED as to Sean Combs. (jm) (Entered: 09/17/2024) |
| 09/17/2024 | | Case as to Sean Combs ASSIGNED to Judge Andrew L. Carter, Jr. Judge Unassigned no longer assigned to the case.. (jm) (Entered: 09/17/2024) |
| 09/17/2024 | | Case Designated ECF as to Sean Combs. (jm) (Entered: 09/17/2024) |
| 09/17/2024 | | Attorney update in case as to Sean Combs. Attorney Emily Anne Johnson,Mary Christine Slavik,Madison Reddick Smyser,Mitzi Steiner for USA added. (jm) (Entered: 09/17/2024) |
| 09/17/2024 | 5 | LETTER by USA as to Sean Combs addressed to Judge Andrew L. Carter, Jr. from USA dated September 17, 2024 re: Govt Request for Detention Document filed by USA. (Johnson, Emily) (Entered: 09/17/2024) |
| 09/17/2024 | 6 | NOTICE OF ATTORNEY APPEARANCE: Marc Antony Agnifilo appearing for Sean Combs. Appearance Type: Retained. (Agnifilo, Marc) (Entered: 09/17/2024) |
| 09/17/2024 | 7 | NOTICE OF ATTORNEY APPEARANCE: Teny Rose Geragos appearing for Sean Combs. Appearance Type: Retained. (Geragos, Teny) (Entered: 09/17/2024) |
| 09/17/2024 | | Attorney update in case as to Sean Combs. Attorney Meredith Foster for USA added. (jm) (Entered: 09/17/2024) |
| 09/17/2024 | 9 | MOTION for Bond *Updated ECF 8* . Document filed by Sean Combs. (Agnifilo, Marc) (Entered: 09/17/2024) |
| 09/17/2024 | | Arrest of Sean Combs (Arrest date of 9/16/2024). (job) (Entered: 09/17/2024) |
| 09/17/2024 | 10 | Minute Entry for proceedings held before Magistrate Judge Robyn F. Tarnofsky: Initial Appearance as to Sean Combs held on 9/17/2024. Detention Hearing as to Sean Combs held on 9/17/2024. Arraignment as to Sean Combs (1) Count 1,2,3 held on 9/17/2024. Plea entered by Sean Combs (1) Count 1,2,3 Not Guilty. AUSA Emily Johnson present for the Government. Defendant present with attorney's, Marc Agnifilo and Teny Geragos. BAIL DISPOSITION: Detention: Risk of Flight/Danger. –Speedy Trial time excluded until 9/24/2024. (Status Conference set for 9/24/2024 at 10:00 AM before Judge Andrew L. Carter Jr..) (job) (Entered: 09/17/2024) |
| 09/18/2024 | 11 | ORDER as to Sean Combs. A Bail Appeal Hearing is set for September 18, 2024 at 2:00 p.m. (Bail Appeal Hearing set for 9/18/2024 at 02:00 PM before Judge Andrew L. Carter Jr) (Signed by Judge Andrew L. Carter, Jr on 9/17/2024)(jw) (Entered: 09/18/2024) |
| 09/18/2024 | 12 | AMENDED ORDER as to Sean Combs. A Bail Appeal Hearing is set for September 18, 2024 at 3:30pm (Bail Appeal Hearing set for 9/18/2024 at 03:30 PM before Judge Andrew L. Carter Jr..) (Signed by Judge Andrew L. Carter, Jr on 9/17/24)(jw) (Entered: 09/18/2024) |
| 09/18/2024 | 13 | LETTER MOTION addressed to Judge Andrew L. Carter, Jr. from Marc Agnifilo, Esq. dated 9/18/2024 re: Mr. Combs' Release from Custody . Document filed by Sean Combs. Return Date set for 9/18/2024 at 03:30 PM. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9)(Agnifilo, Marc) (Entered: 09/18/2024) |

| 09/18/2024 | 14 | Brady ORDER as to Sean Combs. (Signed by Magistrate Judge Robyn F. Tarnofsky on 9/18/24)(jm) (Entered: 09/18/2024) |
| 09/18/2024 | 15 | LETTER RESPONSE in Opposition by USA as to Sean Combs addressed to Judge Andrew L. Carter, Jr. dated 09/18/2024 re: 13 LETTER MOTION addressed to Judge Andrew L. Carter, Jr. from Marc Agnifilo, Esq. dated 9/18/2024 re: Mr. Combs' Release from Custody .. (Smyser, Madison) (Entered: 09/18/2024) |
| 09/18/2024 | | Minute Entry for proceedings held before Judge Andrew L. Carter, Jr: Bond Hearing as to Sean Combs held on 9/18/2024. AUSAs Emily Johnson, Madison Smyser, Mary Slavik, Meredith Foster and Mitzi Steiner for the Government. Defendant appears with attorneys, Marc Agnifilo and Teny Geragos. Bail DENIED. Joint Status Report due 9/23/24. The 9/24/24 status conference is canceled. Status Conference set for 10/9/24 at 2:00 p.m. Time excluded from 9/18/24 to 10/9/24 in the interest of justice. Defendant remains in custody. Court Reporter: Raquel Robles. See transcript for complete details. (Status Report due by 9/23/2024. Status Conference set for 10/9/2024 at 02:00 PM before Judge Andrew L. Carter Jr.) (jbo) (Entered: 09/19/2024) |
| 09/23/2024 | 16 | LETTER by Sean Combs addressed to Judge Andrew L. Carter, Jr. from Marc Agnifilo, Esq. dated 9/23/24 re: Status Report (Agnifilo, Marc) (Entered: 09/23/2024) |
| 09/30/2024 | 17 | TRANSCRIPT of Proceedings as to Sean Combs re: Conference held on 9/17/24 before Magistrate Judge Robyn F. Tarnofsky. Court Reporter/Transcriber: Lisa O'Brien, (212) 805−0320, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/21/2024. Redacted Transcript Deadline set for 10/31/2024. Release of Transcript Restriction set for 12/30/2024. (Moya, Goretti) (Entered: 09/30/2024) |
| 09/30/2024 | 18 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Sean Combs. Notice is hereby given that an official transcript of a Conference proceeding held on 9/17/24 has been filed by the court reporter/transcriber in the above−captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 09/30/2024) |
| 09/30/2024 | 19 | TRANSCRIPT of Proceedings as to Sean Combs re: Conference held on 9/18/24 before Judge Andrew L. Carter, Jr. Court Reporter/Transcriber: Raquel Robles, (212) 805−0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/21/2024. Redacted Transcript Deadline set for 10/31/2024. Release of Transcript Restriction set for 12/30/2024. (Moya, Goretti); Modified on 9/30/2024 (bw). (Entered: 09/30/2024) |
| 09/30/2024 | 20 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Sean Combs. Notice is hereby given that an official transcript of a Conference proceeding held on 9/18/24 has been filed by the court reporter/transcriber in the above−captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 09/30/2024) |
| 09/30/2024 | 21 | NOTICE OF APPEAL by Sean Combs from 19 Transcript. Filing fee $ 605.00, receipt number 33291. (tp) (Entered: 09/30/2024) |
| 09/30/2024 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet as to Sean Combs to US Court of Appeals re: 21 Notice of Appeal. (tp) (Entered: 09/30/2024) |
| 09/30/2024 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files as to Sean Combs re: 21 Notice of Appeal were transmitted to the U.S. Court of Appeals. (tp) (Entered: 09/30/2024) |
| 09/30/2024 | 22 | NOTICE OF ATTORNEY APPEARANCE: Anthony L. Ricco appearing for Sean Combs. Appearance Type: Retained. (Ricco, Anthony) (Entered: 09/30/2024) |

## NOTICE OF APPEARANCE FOR SUBSTITUTE, ADDITIONAL, OR AMICUS COUNSEL

Short Title: United States of America v. Sean Combs     Docket No.: 24-2606

**Substitute, Additional, or Amicus Counsel's Contact Information** is as follows:

Name: Christy Slavik

Firm: United States Attorney's Office for the Southern District of New York

Address: 26 Federal Plaza, New York, NY 10278

Telephone: (212) 637-1113     Fax: (212) 637-

E-mail: mary.slavik@usdoj.gov

**Appearance for:** United States of America/Appellee
(party/designation)

**Select One:**

☐ Substitute counsel (replacing lead counsel: _____ )
(name/firm)

☐ Substitute counsel (replacing other counsel: _____ )
(name/firm)

☑ Additional counsel (co-counsel with: Danielle Renee Sassoon/U.S. Attorney's Office for the Southern District of New York )
(name/firm)

☐ Amicus (in support of : _____ )
(party/designation)

## CERTIFICATION

I certify that:

☑ I am admitted to practice in this Court and, if required by Interim Local Rule 46.1(a)(2), have renewed

my admission on _____ OR

☐ I applied for admission on _____ .

Signature of Counsel: /s/ Christy Slavik

Type or Print Name: _____

## NOTICE OF APPEARANCE FOR SUBSTITUTE, ADDITIONAL, OR AMICUS COUNSEL

Short Title: United States of America v. Sean Combs

Docket No.: 24-2606

**Substitute, Additional, or Amicus Counsel's Contact Information** is as follows:

Name: Mitzi Steiner

Firm: United States Attorney's Office for the Southern District of New York

Address: 26 Federal Plaza, New York, NY 10278

Telephone: (212) 637-2284          Fax: (212) 637-0097

E-mail: mitzi.steiner@usdoj.gov

**Appearance for:** United States of America/Appellee

(party/designation)

**Select One:**

☐ Substitute counsel (replacing lead counsel: _____ )

(name/firm)

☐ Substitute counsel (replacing other counsel: _____ )

(name/firm)

☑ Additional counsel (co-counsel with: Danielle Renee Sassoon/U.S. Attorney's Office for the Southern District of New York )

(name/firm)

☐ Amicus (in support of : _____ )

(party/designation)

## CERTIFICATION

I certify that:

☑ I am admitted to practice in this Court and, if required by Interim Local Rule 46.1(a)(2), have renewed

my admission on _____ OR

☐ I applied for admission on _____ .

Signature of Counsel: /s/

Type or Print Name: Mitzi Steiner

## ACKNOWLEDGMENT AND NOTICE OF APPEARANCE

Short Title: United States of America v. Combs          Docket No.: 24-2606

Lead Counsel of Record (name/firm) or Pro se Party (name): Alexandra A.E. Shapiro / Shapiro Arato Bach LLP

Appearance for (party/designation): Sean Combs / Defendant-Appellant

## DOCKET SHEET ACKNOWLEDGMENT/AMENDMENTS

**Caption** as indicated is:
[✓] Correct
[ ] Incorrect.    See attached caption page with corrections.

**Appellate Designation** is:
[✓] Correct
[ ] Incorrect.    The following parties do not wish to participate in this appeal:
Parties: _____
[ ] Incorrect.    Please change the following parties' designations:
        Party                              Correct Designation

**Contact Information** for Lead Counsel/Pro Se Party is:
[✓] Correct
[ ] Incorrect or Incomplete.    As an e-filer, I have updated my contact information in the PACER "Manage My Account" screen.

Name: _____
Firm: _____
Address: _____
Telephone: _____    Fax: _____
Email: _____

## RELATED CASES

[✓] This case has not been before this Court previously.
[ ] This case has been before this Court previously.    The short title, docket number, and citation are: _____

[ ] Matters related to this appeal or involving the same issue have been or presently are before this Court.    The short titles, docket numbers, and citations are: _____

## CERTIFICATION

I certify that [✓] I am admitted to practice in this Court and, if required by LR 46.1(a)(2), have renewed my admission on
April 30, 2024 _____OR that [ ] I applied for admission on_____or renewal on
_____.    If the Court has not yet admitted me or approved my renewal, I have completed Addendum A.
Signature of Lead Counsel of Record: /s/ Alexandra A.E. Shapiro
Type or Print Name: Alexandra A.E. Shapiro
                OR
Signature of pro se litigant: _____
Type or Print Name: _____
[ ] I am a pro se litigant who is not an attorney.
[ ] I am an incarcerated pro se litigant.

## NOTICE OF APPEARANCE FOR SUBSTITUTE, ADDITIONAL, OR AMICUS COUNSEL

Short Title: United States of America v. Combs                    Docket No.: 24-2606

**Substitute, Additional, or Amicus Counsel's Contact Information is as follows:**

Name: Jason A. Driscoll

Firm: Shapiro Arato Bach LLP

Address: 1140 Avenue of the Americas, 17th Fl. New York, NY 10036

Telephone: 212-257-4898                    Fax: N/A

E-mail: jdriscoll@shapiroarato.com

**Appearance for:** Sean Combs / Defendant-Appellant
(party/designation)

**Select One:**

☐ Substitute counsel (replacing lead counsel: _____ )
(name/firm)

☐ Substitute counsel (replacing other counsel: _____ )
(name/firm)

☑ Additional counsel (co-counsel with: Alexandra A.E. Shapiro / Shapiro Arato Bach LLP )
(name/firm)

☐ Amicus (in support of: _____ )
(party/designation)

### CERTIFICATION

I certify that:

☑ I am admitted to practice in this Court and, if required by Interim Local Rule 46.1(a)(2), have renewed

my admission on August 29, 2023                                        OR

☐ I applied for admission on _____ .

Signature of Counsel: /s/ Jason A. Driscoll

Type or Print Name: Jason A. Driscoll

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**
**CRIMINAL APPEAL TRANSCRIPT INFORMATION - FORM B**

**TO BE COMPLETED BY ATTORNEY:**

**CASE NAME:** United States of America _____ v.

Combs _____

**DOCKET NUMBER:** 24-2606 _____

**COUNSEL'S NAME:** Alexandra A.E. Shapiro _____

**COUNSEL'S ADDRESS:** 1140 Avenue of the Americas _____

New York, NY 10036 _____

**COUNSEL'S PHONE:** (212) 257-4881 _____

### QUESTIONNAIRE

☐ I am ordering a transcript.

☑ I am not ordering a transcript.  Reason: ☑ Daily copy available  ☐ U.S. Atty. placed order
☐ Other (attach explanation)

### TRANSCRIPT ORDER

Prepare transcript of

☐ Pre-trial proceedings:_____
(Description & Dates)

☐ Trial:_____
(Description & Dates)

☐ Sentencing:_____
(Description & Dates)

☐ Post-trial proceedings:_____
(Description & Dates)

I,_____, hereby certify that I will make satisfactory arrangements with
(counsel's name)

the court reporter for payment of the costs of the transcript in accordance with  FRAP 10(b).

Method of payment:  ☐ Funds  ☐ CJA Form 24

/s/ Alexandra A.E. Shapiro _____  October 1, 2024 _____
Counsel's Signature                                                              Date

**TO BE COMPLETED BY COURT REPORTER AND FORWARDED TO COURT OF APPEALS:**

### ACKNOWLEDGMENT

Date order received: _____      Estimated Number of Pages: _____

Estimated completion date: _____

_____      _____
Court Reporter's Signature                                    Date

**Attorney(s):** Send completed form to the U.S. District Court as that court may require and send copies to the Court of Appeals, U.S. Attorney's Office, and Court Reporter.
**Court Reporter(s):** Send completed acknowledgment to the Court of Appeals Clerk.