**24-2606**

United States Court of Appeals
*for the*
Second Circuit

▶▶◀◀

UNITED STATES OF AMERICA,

*Appellee,*

— v. —

SEAN COMBS,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK, 24-CR-542 (AS)

**APPELLANT'S APPENDIX TO THE MOTION FOR
PRETRIAL RELEASE**

ALEXANDRA A.E. SHAPIRO
JASON A. DRISCOLL
SHAPIRO ARATO BACH LLP
1140 Avenue of the Americas,
17th Floor
New York, New York 10036
(212) 257-4880

*Attorneys for Defendant-Appellant*

## **APPENDIX**

Dkt. 2        Indictment.................................................................................. A-1

Dkt. 5        Government's Letter Requesting Detention ....................................... A-15

Dkt. 8        Sean Combs's Letter Requesting Pretrial Release............................. A-31

Dkt. 13       Sean Combs's Letter Requesting Release ......................................... A-41

Dkt. 13-1     Exhibit 1. Written Appraisal of Home.............................................. A-56

Dkt. 13-2     Exhibit 2. Satisfaction of Mortgage ................................................ A-87

Dkt. 13-3     Exhibit 3. Letter to Government dated April 1, 2024........................ A-91

Dkt. 13-4     Exhibit 4. Email Correspondence .................................................... A-93

Dkt. 13-5     Exhibit 5. Email Correspondence .................................................... A-95

Dkt. 13-6     Exhibit 6. Email Correspondence .................................................... A-99

Dkt. 13-7     Exhibit 7. Letter to Government dated May 22, 2024..................... A-104

Dkt. 13-8     Exhibit 8. Letter to Government dated June 13, 2024..................... A-106

Dkt. 15       Government's Opposition To Dkt. 13 .............................................. A-108

---           Transcript from September 17, 2024 Arraignment .......................... A-114

---           Transcript from September 18, 2024 Bail Hearing .......................... A-170

**A-001**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | **SEALED INDICTMENT** |
| v. | 24 Cr. |
| SEAN COMBS,<br>a/k/a "Puff Daddy,"<br>a/k/a "P. Diddy,"<br>a/k/a "Diddy,"<br>a/k/a "PD,"<br>a/k/a "Love," | **24 CRIM 542** |
| Defendant. | |

**COUNT ONE**
**(Racketeering Conspiracy)**

The Grand Jury charges:

Overview

1.      For decades, SEAN COMBS, a/k/a "Puff Daddy," a/k/a "P. Diddy," a/k/a "Diddy,"

a/k/a "PD," a/k/a "Love," the defendant, abused, threatened, and coerced women and others around

him to fulfill his sexual desires, protect his reputation, and conceal his conduct.  To do so, COMBS

relied on the employees, resources, and influence of the multi-faceted business empire that he led

and controlled—creating a criminal enterprise whose members and associates engaged in, and

attempted to engage in, among other crimes, sex trafficking, forced labor, kidnapping, arson,

bribery, and obstruction of justice.

2.      SEAN COMBS, a/k/a "Puff Daddy," a/k/a "P. Diddy," a/k/a "Diddy," a/k/a "PD,"

a/k/a "Love," the defendant, operated his business, headquartered at various times in Manhattan

and Los Angeles, under a variety of United States-based corporate entities, including Bad Boy

A-002

Entertainment, Combs Enterprises, and Combs Global (collectively, the "Combs Business"). Corporate entities in the Combs Business included, among other things, record labels, a recording studio, an apparel line, an alcoholic spirits business, a marketing agency, and a television network and media company.

3.      At all times relevant to this Indictment, SEAN COMBS, a/k/a "Puff Daddy," a/k/a "P. Diddy," a/k/a "Diddy," a/k/a "PD," a/k/a "Love," the defendant, engaged in a persistent and pervasive pattern of abuse toward women and other individuals. This abuse was, at times, verbal, emotional, physical, and sexual. As part of his pattern of abuse, COMBS manipulated women to participate in highly orchestrated performances of sexual activity with male commercial sex workers. At times, COMBS, and others acting at his direction, made arrangements for women and commercial sex workers to fly to COMBS' location. COMBS ensured participation from the women by, among other things, obtaining and distributing narcotics to them, controlling their careers, leveraging his financial support and threatening to cut off the same, and using intimidation and violence.

4.      Physical abuse by SEAN COMBS, a/k/a "Puff Daddy," a/k/a "P. Diddy," a/k/a "Diddy," a/k/a "PD," a/k/a "Love," the defendant, was recurrent and widely known. On numerous occasions from at least in or about 2009 and continuing for years, COMBS assaulted women by, among other things, striking, punching, dragging, throwing objects at, and kicking them. These assaults were, at times, witnessed by others and included one instance at a Los Angeles hotel in or about March 2016, which was captured on video and later publicly reported, where COMBS kicked, dragged, and threw a vase at a woman as she was attempting to leave. When a member of the hotel security staff intervened, COMBS attempted to bribe the staff member to ensure silence.

**A-003**

COMBS' violence was also not limited to these women. It extended to his employees, witnesses to his abuse, and others.

5.    SEAN COMBS, a/k/a "Puff Daddy," a/k/a "P. Diddy," a/k/a "Diddy," a/k/a "PD," a/k/a "Love," the defendant, used the Combs Business, including certain employees, to carry out, facilitate, and cover up his abuse and commercial sex. Those employees—including security staff, household staff, personal assistants, and high-ranking supervisors—and other close associates acted as COMBS' intermediaries, and their conduct was facilitated and assisted by COMBS' control of the Combs Business.

<u>The Combs Enterprise</u>

6.    From at least in or about 2008, through on or about the date of the filing of this Indictment, SEAN COMBS, a/k/a "Puff Daddy," a/k/a "P. Diddy," a/k/a "Diddy," a/k/a "PD," a/k/a "Love," the defendant, and others known and unknown, were members and associates of a criminal organization (the "Combs Enterprise" or the "Enterprise"). Members and associates of the Combs Enterprise engaged in, and attempted to engage in, among other activities, sex trafficking, forced labor, interstate transportation for purposes of prostitution, coercion and enticement to engage in prostitution, narcotics offenses, kidnapping, arson, bribery, and obstruction of justice.

7.    The Combs Enterprise, including its leadership, its members, and its associates, constituted an "enterprise," as defined by Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact, although not a legal entity. The Combs Enterprise consisted of: (i) SEAN COMBS, a/k/a "Puff Daddy," a/k/a "P. Diddy," a/k/a "Diddy," a/k/a "PD," a/k/a "Love," the defendant; (ii) entities within the Combs Business, including but not limited to Bad

**A-004**

Boy Entertainment, Combs Enterprises, and Combs Global; (iii) individuals employed by and associated with the Combs Business; and (iv) others known and unknown.

8.    The Combs Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the Combs Enterprise. The Combs Enterprise was engaged in, and its activities affected, interstate and foreign commerce. The Combs Enterprise operated in the Southern District of New York and elsewhere.

9.    At all times relevant to this Indictment, SEAN COMBS, a/k/a "Puff Daddy," a/k/a "P. Diddy," a/k/a "Diddy," a/k/a "PD," a/k/a "Love," the defendant, was the leader of the Combs Enterprise.

10.    SEAN COMBS, a/k/a "Puff Daddy," a/k/a "P. Diddy," a/k/a "Diddy," a/k/a "PD," a/k/a "Love," the defendant, and others known and unknown, participated in unlawful and other activities related to the conduct of the Combs Enterprise's affairs. These individuals included certain Combs Business employees, such as members of COMBS' security staff, household staff, personal assistants, and high-ranking supervisors, as well as other close associates of COMBS.

<u>Purposes of the Combs Enterprise</u>

11.    The purposes of the Combs Enterprise included the following:

a.    Operating a global business in the media, entertainment, and lifestyle industries, including, among other things, record labels, a recording studio, an apparel line, an alcoholic spirits business, a marketing agency, and a television network and media company;

b.    Preserving, protecting, promoting, and enhancing the power, reputation, and brand of SEAN COMBS, a/k/a "Puff Daddy," a/k/a "P. Diddy," a/k/a "Diddy," a/k/a "PD," a/k/a "Love," the defendant, as a musician, entrepreneur, and figure in the entertainment industry;

4

**A-005**

c.      Enriching members and associates of the Enterprise, including its leader, COMBS, and in particular those who demonstrated loyalty to COMBS and willingness to conceal his crimes;

d.      Preserving, protecting, promoting, and enhancing the power of the Combs Enterprise, including the power of its leader, COMBS, through violence, use of firearms, threats of violence, coercion, and verbal, emotional, physical, and sexual abuse;

e.      Fulfilling the personal desires of COMBS, particularly those related to COMBS' sexual gratification, including through the exploitation of women and the use of commercial sex workers;

f.      Enabling COMBS and other members and associates of the Combs Enterprise to engage in unlawful acts of violence, including sexual violence; sex trafficking; forced labor; interstate transportation for purposes of prostitution; coercion and enticement to engage in prostitution; narcotics distribution; and other crimes, and concealing the commission of such acts;

g.      Securing absolute loyalty from members of the Combs Enterprise, including through acts of violence and threats; and

h.      Protecting the Combs Enterprise and its members and associates, including COMBS, from detection and prosecution by law enforcement authorities through acts of intimidation, manipulation, bribery, and threats of retaliation against individuals who witnessed the crimes committed by members and associates of the Enterprise.

<u>Means and Methods of the Enterprise</u>

12.      Among the means and methods by which SEAN COMBS, a/k/a "Puff Daddy," a/k/a "P. Diddy," a/k/a "Diddy," a/k/a "PD," a/k/a "Love," the defendant, and other members and

5

**A-006**

associates of the Combs Enterprise conducted and participated in the conduct of the affairs of the Combs Enterprise included the following:

a.       COMBS, and other members and associates of the Combs Enterprise, wielded the power and prestige of COMBS' role at the Combs Business to intimidate, threaten, and lure female victims into COMBS' orbit, often under the pretense of a romantic relationship. COMBS then used force, threats of force, and coercion, to cause victims to engage in extended sex acts with male commercial sex workers that COMBS referred to as, among other things, "Freak Offs." Freak Offs were elaborate and produced sex performances that COMBS arranged, directed, masturbated during, and often electronically recorded. In arranging these Freak Offs, COMBS, with the assistance of members and associates of the Combs Enterprise, transported, and caused to be transported, commercial sex workers across state lines and internationally. Freak Offs occurred regularly, sometimes lasted multiple days, and often involved multiple commercial sex workers. During Freak Offs, COMBS distributed a variety of controlled substances to victims, in part to keep the victims obedient and compliant. Sometimes unbeknownst to the victims, COMBS kept videos he filmed of victims engaging in sex acts with commercial sex workers. After Freak Offs, COMBS and the victims typically received IV fluids to recover from the physical exertion and drug use.

b.       Members and associates of the Combs Enterprise, including high-ranking supervisors, security staff, household staff, personal assistants, and other Combs Business employees, facilitated the Freak Offs by, among other things, booking hotel rooms for the Freak Offs; stocking the hotel rooms in advance with the required Freak Off supplies, including controlled substances, baby oil, lubricant, extra linens, and lighting; cleaning the hotel rooms after the Freak Offs to try to mitigate room damage; arranging for travel for victims, commercial sex

6

**A-007**

workers, and COMBS to and from Freak Offs; resupplying COMBS with requested supplies; delivering large sums of cash to COMBS to pay the commercial sex workers; and scheduling the delivery of IV fluids. In or about March 2024, during searches of COMBS' residences in Miami, Florida and Los Angeles, California, law enforcement seized various Freak Off supplies, including narcotics and more than 1,000 bottles of baby oil and lubricant.

        c.     COMBS subjected victims to physical, emotional, and verbal abuse to cause the victims to engage in Freak Offs. COMBS maintained control over his victims through, among other things, physical violence, promises of career opportunities, granting and threatening to withhold financial support, and by other coercive means, including tracking their whereabouts, dictating the victims' appearance, monitoring their medical records, controlling their housing, and supplying them with controlled substances. During and separate from Freak Offs, COMBS, among other things, hit, kicked, threw objects at, and dragged victims, at times, by their hair. These assaults often resulted in injuries that took days or weeks to heal. COMBS also threatened victims' careers and livelihoods, including if they resisted participating in Freak Offs. Victims believed they could not refuse COMBS' demands without risking their financial or job security or without repercussions in the form of physical or emotional abuse. COMBS also used the sensitive, embarrassing, and incriminating recordings that he made during Freak Offs as collateral to ensure the continued obedience and silence of the victims.

        d.     Members and associates of the Combs Enterprise, including COMBS' security personnel, at times carried firearms. On more than one occasion, COMBS himself carried or brandished firearms to intimidate and threaten others, including victims of and witnesses to his abuse. In or about March 2024, during searches of COMBS' residences in Miami, Florida and

7

Los Angeles, California, law enforcement seized firearms and ammunition, including three AR-15s with defaced serial numbers, as well as a drum magazine.

e.    Members and associates of the Combs Enterprise enabled COMBS' control over victims by following his directions regarding financial payments to victims, advancing or suppressing the victims' career opportunities, and acquiring the controlled substances COMBS used to keep the victims compliant. Members and associates of the Combs Enterprise at times witnessed COMBS' violence toward the victims, or the victims' injuries caused by Combs, without intervening. Instead, members and associates of the Combs Enterprise helped conceal the violence and abuse by, among other things, assisting COMBS in monitoring and preventing victims from leaving locations, such as hotels or COMBS' residences. These occasions included instances in which a victim was required to remain in hiding—sometimes for several days at a time—to recover from injuries COMBS inflicted, without being publicly observed. Members and associates of the Combs Enterprise also assisted COMBS in locating and contacting victims who attempted to flee his abuse.

f.    When employees, witnesses to his abuse, or others threatened COMBS' authority or reputation, COMBS and members and associates of the Enterprise engaged in acts of violence, threats of violence, threats of financial and reputational harm, and verbal abuse. These acts of violence included kidnapping and arson. In addition, on multiple occasions, COMBS threw both objects and people, as well as hit, dragged, choked, and shoved others.

g.    When COMBS' authority or reputation was threatened by the possibility of negative publicity or legal or law enforcement action against him, including in or about late 2023 following public allegations of COMBS' crimes, COMBS and members and associates of the Enterprise pressured witnesses and victims, including through attempted bribery, to stay silent and

**A-009**

not report what they experienced or knew to law enforcement. On phone calls, COMBS and other members and associates of the Enterprise, among other things, provided these victims and witnesses with a false narrative of events in an effort to conceal COMBS' crimes. COMBS caused these calls to be recorded on at least two occasions.

The Racketeering Conspiracy

13.    From at least in or about 2008, through on or about the date of the filing of this Indictment, in the Southern District of New York and elsewhere, SEAN COMBS, a/k/a "Puff Daddy," a/k/a "P. Diddy," a/k/a "Diddy," a/k/a "PD," a/k/a "Love," the defendant, and others known and unknown, being persons employed by and associated with the Combs Enterprise described in paragraphs 6 through 12 of this Indictment, an enterprise engaged in, and the activities of which affected, interstate and foreign commerce, knowingly combined, conspired, confederated, and agreed together and with each other to violate the racketeering laws of the United States, to wit, Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Combs Enterprise through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and 1961(5), consisting of:

a.    multiple acts involving kidnapping, chargeable under the following provisions of state law: California Penal Code § 207 (kidnapping), California Penal Code §§ 21(a), 664 (attempt), California Penal Code § 31 (aiding and abetting), and California Penal Code § 182 (conspiracy);

b.    multiple acts involving arson, chargeable under the following provisions of state law: California Penal Code § 451 (arson), California Penal Code §§ 21(a), 664 (attempt), California Penal Code § 31 (aiding and abetting), and California Penal Code § 182 (conspiracy);

9

**A-010**

c.      multiple acts involving bribery, chargeable under the following provisions of state law:  California Penal Code § 137(a) (bribery of a witness), California Penal Code §§ 21(a), 664 (attempt),  California Penal Code § 31 (aiding and abetting), and California Penal Code § 182 (conspiracy);

d.      multiple acts indictable under Title 18, United States Code, Section 1512 (relating to tampering with a witness, victim, or an informant);

e.      multiple acts indictable under Title 18, United States Code, Sections 1589 and 2 (relating to forced labor);

f.      multiple acts indictable under Title 18, United States Code, Sections 1591 and 2 (relating to sex trafficking);

g.      multiple acts indictable under Title 18, United States Code, Sections 2421, 2422, and 2 (relating to transportation and inducement to travel for purposes of prostitution and other illegal sexual activities); and

h.      multiple offenses involving the possession with intent to distribute, or distribution of narcotics and controlled substances, including cocaine, oxycodone, alprazolam, 3,4-Methylenedioxymethamphetamine,       4-Bromo-2,5-dimethoxyphenethylamine,       gamma hydroxybutyric acid, and ketamine, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C), (b)(1)(E), (b)(2), and 846 (distribution and possession with intent to distribute and conspiracy to do the same), and Title 18, United States Code, Section 2 (aiding, abetting, and willfully causing).

14.     It was a part of the conspiracy that SEAN COMBS, a/k/a "Puff Daddy," a/k/a "P. Diddy," a/k/a "Diddy," a/k/a "PD," a/k/a "Love," the defendant, agreed that a conspirator would

commit at least two acts of racketeering activity in the conduct of the affairs of the Combs Enterprise.

### Notice of Special Sentencing Factor

15.    From at least in or about 2009, up to and including in or about 2018, in the Southern District of New York and elsewhere, as part of his agreement to conduct and participate in the conduct of the affairs of the Combs Enterprise through a pattern of racketeering activity, SEAN COMBS, a/k/a "Puff Daddy," a/k/a "P. Diddy," a/k/a "Diddy," a/k/a "PD," a/k/a "Love," the defendant, agreed to, in and affecting interstate and foreign commerce, knowingly recruit, entice, harbor, transport, provide, obtain, advertise, maintain, patronize, and solicit by any means a person, knowing and in reckless disregard of the fact that means of force, threats of force, fraud, and coercion, as described in Title 18, United States Code, Section 1591(e)(2), and any combination of such means, would be used to cause the person to engage in a commercial sex act, in violation of Title 18, United States Code, Section 1591(a)(1) and (b)(1).

(Title 18, United States Code, Section 1962(d).)

### COUNT TWO
**(Sex Trafficking by Force, Fraud, or Coercion)**
**(Victim-1)**

The Grand Jury further charges:

16.    From at least in or about 2009, up to and including in or about 2018, in the Southern District of New York and elsewhere, SEAN COMBS, a/k/a "Puff Daddy," a/k/a "P. Diddy," a/k/a "Diddy," a/k/a "PD," a/k/a "Love," the defendant, in and affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and solicited by any means a person, knowing and in reckless disregard of the fact that means of force, threats of force, fraud, and coercion, as described in Title 18, United

11

**A-012**

States Code, Section 1591(e)(2), and any combination of such means, would be used to cause the person to engage in a commercial sex act, and attempted, aided and abetted, and willfully caused the same, to wit, COMBS recruited, enticed, harbored, transported, and maintained a person ("Victim-1"), and attempted, aided and abetted, and willfully caused Victim-1, to engage in commercial sex acts, knowing and in reckless disregard of the fact that Victim-1 was engaging in commercial sex acts as a result of force, fraud, and coercion.

(Title 18, United States Code, Sections 1591(a)(1), (b)(1), 1594(a), and 2.)

### COUNT THREE
**(Transportation to Engage in Prostitution)**

The Grand Jury further charges:

17.    From at least in or about 2009, up to and including in or about 2024, in the Southern District of New York and elsewhere, SEAN COMBS, a/k/a "Puff Daddy," a/k/a "P. Diddy," a/k/a "Diddy," a/k/a "PD," a/k/a "Love," the defendant, knowingly transported an individual in interstate and foreign commerce with intent that the individual engage in prostitution, and attempted, aided and abetted, and willfully caused the same, to wit, COMBS transported, aided and abetted, and willfully caused the transportation of female victims and commercial sex workers in interstate and foreign commerce on multiple occasions with the intent that they engage in prostitution.

(Title 18, United States Code, Sections 2421(a) and 2.)

### FORFEITURE ALLEGATIONS

18.    As a result of committing the offense alleged in Count One of this Indictment, SEAN COMBS, a/k/a "Puff Daddy," a/k/a "P. Diddy," a/k/a "Diddy," a/k/a "PD," a/k/a "Love," the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 1963, any and all interests the defendant acquired or maintained in violation of Title 18, United

12

States Code, Section 1962; any and all interests in, securities of, claims against, and property or contractual rights of any kind affording a source of influence over, the enterprise named and described herein which the defendant established, operated, controlled, conducted, and participated in the conduct of, in violation of Title 18, United States Code, Section 1962; and any and all property constituting and derived from proceeds obtained, directly and indirectly, said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense.

19.    As a result of committing the offense alleged in Count Two of this Indictment, SEAN COMBS, a/k/a "Puff Daddy," a/k/a "P. Diddy," a/k/a "Diddy," a/k/a "PD," a/k/a "Love," the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 1594, any and all property, real and personal, involved in, used, or intended to be used to commit or to facilitate the commission of said offense and any and all property traceable to such property; any and all property, real and personal, constituting or derived from proceeds obtained, directly or indirectly, as a result of said offense, including but not limited to a sum of money in United States currency representing the amount of property involved in said offense and proceeds traceable to the commission of said offense.

20.    As a result of committing the offense alleged in Count Three of this Indictment, SEAN COMBS, a/k/a "Puff Daddy," a/k/a "P. Diddy," a/k/a "Diddy," a/k/a "PD," a/k/a "Love," the defendant, shall forfeit to the United States, pursuant to (i) Title 18, United States Code, Section 2428, any and all property, real and personal, constituting or derived from proceeds obtained, directly or indirectly, as a result of said offense; and any and all property, real or personal, that was used or intended to be used to commit or facilitate the commission of said offense, and (ii) Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, any

A-014

and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense.

### Substitute Assets Provision

21.    If any of the above described forfeitable property, as a result of any act or omission of the defendant:

  a.    cannot be located upon the exercise of due diligence;

  b.    has been transferred or sold to, or deposited with, a third person;

  c.    has been placed beyond the jurisdiction of the Court;

  d.    has been substantially diminished in value; or

  e.    has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 1963(m), Title 21, United States Code, Section 853(p), and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of the above forfeitable property.

> (Title 18, United States Code, Section 981;
> Title 18, United States Code, Section 1594;
> Title 18, United States Code, Section 1963;
> Title 18, United States Code, Section 2428;
> Title 21, United States Code, Section 853;
> Title 28, United States Code, Section 2461.)



FOREPERSON

Damian Williams
DAMIAN WILLIAMS
United States Attorney

14

A-015



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

26 Federal Plaza, 37ᵗʰ Floor
New York, New York 10278

September 17, 2024

**BY EMAIL**
The Honorable Robyn F. Tarnofsky
United States Magistrate Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

Re:    *United States v. Sean Combs, a/k/a "Puff Daddy," a/k/a "P. Diddy," a/k/a "Diddy," a/k/a "PD," a/k/a "Love,"* 24 Cr. 542 (ALC)

Dear Judge Tarnofsky:

The defendant Sean Combs, a/k/a "Puff Daddy," a/k/a "P. Diddy," a/k/a "Diddy," a/k/a "PD," a/k/a "Love," was taken into custody this morning after a grand jury sitting in this District returned a three-count indictment charging him with crimes related to his decades-long pattern of physical and sexual violence against multiple victims, and his use of force, threats, and coercion to enact his will, protect his reputation, and fulfill his sexual desires.

The Government respectfully submits this letter in anticipation of the defendant's appearance before this Court later today and in support of the Government's request for the defendant's detention pending trial. As set forth below, there is no condition, or combination of conditions, that will reasonably assure the appearance of the defendant as required and the safety of others and the community, not to mention the integrity of the proceedings. As reflected by the gravity of the charges in the Indictment, the defendant is dangerous and poses an ongoing threat to the safety of the community. If released, he remains a serious risk of flight, despite the conditions offered by his counsel. Most glaringly, the defendant also poses a significant risk of obstructing justice. Indeed, and as set forth below, during the course of the charged conduct, the defendant has attempted to bribe security staff and threatened and interfered with witnesses to his criminal conduct. He has already tried to obstruct the Government's investigation of this case, repeatedly contacting victims and witnesses and feeding them false narratives of events, as described in detail below. There are simply no conditions that would ensure that the defendant's efforts to obstruct and tamper with witnesses will stop. The defendant therefore cannot overcome the statutory presumption in favor of detention, and the Court should order him detained. *See* 18 U.S.C. § 3142(e)(1).

### Background

On September 17, 2024, an indictment returned by a federal grand jury sitting in the Southern District of New York (the "Indictment") was unsealed, charging the defendant with racketeering conspiracy from in or about 2008 through on or about the date of the Indictment, in

# A-016

Page 2

violation of 18 U.S.C. § 1962(d) (Count One); sex trafficking from in or about 2009 through in or about 2018, in violation of 18 U.S.C. §§ 1591 and 2 (Count Two); and interstate transportation to engage in prostitution from in or about 2009 through in or about 2024, in violation of 18 U.S.C. §§ 2421(a) and 2 (Count Three).

**A. Combs' Use of Violence, Threats, and Coercion**

Since at least 2008, the defendant and other members and associates of the racketeering enterprise alleged in the Indictment (the "Enterprise"), which includes the defendant's multi-faceted business empire (the "Combs Business"), wielded the power and prestige of the defendant's reputation as a musician, entrepreneur, and figure in the entertainment industry to commit federal crimes, including racketeering, sex trafficking, and other offenses. As charged in the Indictment, many of those crimes involved the sexual abuse and exploitation of women, and other crimes of violence.

1. <u>Sex Trafficking and Abuse</u>

Using the power and prestige of the Enterprise, the defendant lured female victims into the defendant's orbit, often under the pretense of a romantic relationship. The defendant then used force, threats of force, and coercion to cause those female victims to engage in sexual activity, which included frequent sex acts with male commercial sex workers that the defendant referred to as "Freak Offs." Freak Offs were elaborate sex performances that the defendant arranged, directed, masturbated during, and often electronically recorded. Freak Offs occurred regularly from at least in or around 2009 through this year, sometimes lasted multiple days, and frequently involved multiple sex workers. The defendant arranged Freak Offs with the assistance of members and associates of the Enterprise, including employees of his business, and the hotel rooms where they were staged often sustained significant damages.[1]

The defendant ensured the victims would participate in Freak Offs through coercion and violence. For instance, the defendant provided controlled substances, including ketamine, ecstasy, and gamma hydroxybutyrate ("GHB"), to female victims so that they could and would continue to engage in Freak Offs, despite fatigue, physical and emotional exhaustion, and pain. Additionally, both during Freak Offs and separate from Freak Offs, the defendant subjected female victims to physical, emotional, and verbal abuse, in part to cause them to engage in Freak Offs. The defendant hit, kicked, threw objects at, and dragged female victims, sometimes by their hair. At least a dozen witnesses will confirm that they personally observed the defendant's violence towards women and/or the injuries sustained by women at the defendant's hand. One incident of physical abuse occurred when a female victim was attempting to leave the hotel following a March 2016 Freak Off. This abuse was captured on video surveillance and publicly reported in May 2024.[2] The defendant's assaults often resulted in serious injuries to the victims that took days or weeks to heal.

---

[1] For example, in approximately 2012 in Manhattan, the defendant paid over $46,000 to cover damages to a penthouse hotel room following a Freak Off.

[2] An excerpt of this video footage is attached hereto as Exhibit A.

The defendant also coerced victims into participating in Freak Offs by controlling their careers, finances, livelihood, and/or housing, among other aspects of their lives, or by threatening to disseminate recordings of Freak Offs. The defendant used his considerable wealth and influence to make victims rely on him financially, for example, by paying for their rent or their cars or by offering them career opportunities. Once he provided his support, the defendant repeatedly threatened to take it away to ensure the victims' compliance with his demands, including their participation in Freak Offs. Indeed, victims believed that they could not refuse the defendant's demands that they engage in Freak Offs without risking their financial security or career prospects or without repercussions in the form of physical or emotional abuse.

### 2. Other Violence

In addition to the defendant's physical, sexual, and emotional abuse of his romantic partners, the defendant repeatedly engaged in acts of violence directed towards his employees and others. As charged in the Indictment, the defendant, often assisted by members and associates of the Enterprise, engaged in kidnapping, arson, and physical violence, such as throwing objects at people, throwing people to the ground, and hitting, dragging, choking, and shoving others. Numerous witnesses, including the defendant's employees and others, observed or experienced violence from the defendant firsthand and sustained lasting trauma as a result.

For example, in the early morning hours of December 22, 2011, the defendant and a co-conspirator kidnapped an individual at gunpoint to facilitate breaking into and entering the residence of another ("Individual-1"). Multiple witnesses would testify at trial to the events surrounding the kidnapping and break-in, the latter of which is corroborated by police reports and other records.

Approximately two weeks later, the defendant's co-conspirators set fire to Individual-1's vehicle by slicing open the car's convertible top and dropping a Molotov cocktail inside the interior. Police and fire department reports extensively document the arson and conclude that the fire was intentionally set. Multiple witnesses would also testify to the defendant bragging about his role in destroying Individual-1's car.

More broadly, since at least 2008, allegations of the defendant's physical abuse of women and others have been publicly reported in the media, including in Hollywood blogs and on podcasts. Law enforcement reports corroborate that police responded to several instances of the defendant's violence, including assaults against victims and other individuals. More recently, there has been an outpouring of other public allegations against the defendant, including claims of threats and physical and sexual violence, dating as far back as the 1990s.[3] In short, the defendant's

---

[3] *See Joi Dickerson-Neal v. Combs*, No. 952341/2023 (N.Y. Sup. Ct.) (complaint filed on Nov. 23, 2023); *Liza Gardner v. Combs*, No. 24 Civ. 7729 (D.N.J.) (LMG-JRA) (complaint filed on Nov. 27, 2023, and removed to New Jersey federal court on July 12, 2024); *Doe v. Combs*, No. 23 Civ. 10628 (JGLC) (S.D.N.Y) (complaint filed on Dec. 6, 2023); *Crystal McKinney v. Combs*, No. 24 Civ. 3931 (NRB) (S.D.N.Y.) (complaint filed on May 21, 2024); and *Dawn Richard v. Combs*, No. 24 Civ. 6848 (KPF) (S.D.N.Y.) (complaint filed on Sept. 10, 2024).

**A-018**

Page 4

violent tendencies are widely known. However, at no point during the past few decades has the threat of public exposure or law enforcement intervention deterred the defendant from continuing his abuse.

### 3. Firearms

The defendant and members of the Enterprise, including the defendant's security personnel, at times carried firearms, and the defendant himself carried and brandished firearms to intimidate and threaten others. Indeed, some victims were aware of the defendant's access to firearms: on one occasion, the defendant forced a female victim to carry a firearm on his behalf and on another occasion, he pointed a firearm at a female victim.

The defendant continues to have access to guns, including illegal firearms. In March 2024, during searches of the defendant's residences in Miami, Florida and Los Angeles, California, law enforcement seized firearms and ammunition, including three AR-15s, each with defaced serial numbers, as well as a large capacity drum magazine. As pictured below in a close-up image, the serial number of one of the AR-15s is visibly bored through and obscured:



Two of the three defaced AR-15s were found in the defendant's Miami bedroom closet, stored broken down in parts, along with magazines that were loaded with ammunition, as depicted below. One of the AR-15s had a 10-round magazine loaded with 10 rounds of large caliber .223 ammunition, while the second AR-15 had a 30-round magazine loaded with 19 rounds of .223 ammunition.




Page 5



A large capacity drum magazine, loaded with 59 rounds of .223 ammunition, was seized from the defendant's Los Angeles residence, as depicted below:



In addition, six legally purchased guns with serial numbers, some of which were stored in gun safes, were recovered from the defendant's residences. Although these particular guns—both the legal and illegal firearms—were seized, their presence in the defendant's homes demonstrates that the defendant has access to, and surrounds himself with, both guns and ammunition. Likewise, even if the defendant were personally restrained by the Court from obtaining new firearms himself, he could retain access to them through others.[4]

In sum, the defendant's regular use of violence and threats of violence, as well as the coercion described above, against the victims and others, fostered a culture of fear in which these individuals believed they were unable to reject the defendant's demands without subjecting themselves to physical violence or other abuse.

---

[4] Certain of the firearms seized during the March 2024 searches were licensed to a current member of Combs' security staff. In addition to that individual, during the course of the charged conspiracy, Combs has employed other security staff members with significant criminal history, including violent crimes and firearms offenses.

**A-020**

Page 6

### B. Combs Bribed Witnesses and Obstructed Justice

Throughout the time period charged in the Indictment, when the defendant faced the possibility that his violent and criminal conduct could become public, the defendant and other members and associates of the Enterprise pressured witnesses and victims not to report what they saw or heard to law enforcement, or to otherwise conceal the criminal conduct.

For example, and as noted above, in March 2016, the defendant was captured on video surveillance striking, kicking, and dragging a woman in a public area of a hotel in an apparent attempt to prevent her from leaving a Freak Off. When a member of hotel security staff intervened, the defendant attempted to offer the hotel security officer a stack of cash to ensure his silence. After the security guard refused the defendant's bribe, and after coordination between the defendant and his employees, the defendant's staff contacted other members of hotel security. At the same time, staff members were in close communication with the victim of the assault as well—all in an effort to cover up the defendant's assault and to prevent the incident from being publicly disclosed. Within days of the incident, the surveillance video disappeared from the hotel's server.

Similarly, throughout the time period charged in the Indictment, members and associates of the Enterprise have reached out to multiple victims on behalf of the defendant to convince them not to report the defendant's abuse. Most recently, in late 2023, immediately following public allegations of certain of the defendant's crimes,[5] including his physical and sexual abuse of women, the defendant and other members of the Enterprise made repeated phone calls to victims and witnesses during which they provided victims and witnesses with false narratives of events, in an apparent effort to conceal the defendant's crimes. On at least two occasions, the defendant recorded those calls on a co-conspirator's cellphone, thereby attempting to obscure his involvement in the obstruction.

### C. The Government's Investigation Is Ongoing

While the Indictment against the defendant was unsealed today, the investigation into his and other co-conspirators' conduct is active and ongoing. As a result of that ongoing investigation, as well as the defendant's charged conduct outlined above—including obstruction of justice and witness tampering—the Government is limited in its ability to fully set forth all known details of the defendant's criminal conduct, including details of certain witness testimony. To the extent the Court has additional questions about the charged offense conduct or any other information set forth herein, the Government is prepared to proffer additional information on an *ex parte* basis.

### Argument

### I.  Applicable Law

Under the Bail Reform Act, 18 U.S.C. §§ 3141 *et seq.*, federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a

---

[5] *See Ventura v. Combs*, No. 23 Civ. 10098 (DLC) (S.D.N.Y.), Dkt. 1 (complaint filed November 16, 2023).

danger to the community or a risk of flight. 18 U.S.C. § 3142(e). A finding of risk of flight must be supported by a preponderance of the evidence. *See, e.g., United States v. Patriarca*, 948 F.2d 789, 793 (1st Cir. 1991); *United States v. Jackson*, 823 F.2d 4, 5 (2d Cir. 1987); *United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985). A finding of dangerousness must be supported by clear and convincing evidence. *See, e.g., United States v. Ferranti*, 66 F.3d 540, 542 (2d Cir. 1995); *Patriarca*, 948 F.2d at 792; *Chimurenga*, 760 F.2d at 405.

Obstruction of justice is another ground for pretrial detention by the courts. *See United States v. LaFontaine*, 210 F.3d 125, 134 (2d Cir. 2000). Courts in the Second Circuit have held that pretrial detention for obstruction of justice is appropriate as long as the Government can establish by "clear and convincing evidence" that "there exists a serious risk" the defendant would "threaten, injure, or intimidate, a prospective witness or juror." *United States v. Leon*, 766 F.2d 77, 82 (2d Cir. 1985); *see also United States v. Zherka*, 592 F. App'x 35, 35 (2d Cir. 2015) (summary order) ("A serious risk of obstruction of justice may qualify as . . . a danger to the community.").

The Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crimes charged, including whether the offense is a violation of section 1591; (2) the weight of the evidence against the person; (3) the history and characteristics of the defendant, including the person's "character, . . . past conduct, . . . [and] financial resources"; and (4) the "nature and seriousness of the danger to any person or the community that would be posed by the person's release." *See* 18 U.S.C. § 3142(g). The concept of "dangerousness" encompasses not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'" *United States v. Millan*, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history). A finding of dangerousness does not require that the defendant have criminal history, particularly if a defendant has a history of domestic violence. *See United States v. Mercedes*, 254 F.3d 433, 437-38 (2d Cir. 2001) (holding that "prior acts of domestic violence are relevant to a determination of dangerousness" because a "willingness to strike loved ones offers probative evidence of tendency to violence and dangerousness towards others").

Evidentiary rules do not apply at detention hearings, and the Government is entitled to present evidence by way of proffer, among other means. *See* 18 U.S.C. § 3142(f)(2); *see also LaFontaine*, 210 F.3d at 130-31 (Government entitled to proceed by proffer in detention hearings).

Where a judicial officer concludes after a hearing that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial." 18 U.S.C. § 3142(e)(1). Additionally, where, as here, a defendant is charged with sex trafficking in violation of 18 U.S.C. § 1951—in other words, an offense under chapter 77 of Title 18—it shall be presumed, subject to rebuttal, that no condition or combination of conditions will reasonably assure the appearance of the defendant as required and the safety of the community. 18 U.S.C. § 3142(e)(3)(D).

Page 8

## II.    Discussion

For the reasons set forth below, the defendant poses a significant danger to the community—both in terms of physical violence and obstructive conduct—as well as a risk of flight.  This is especially true given the nature of the criminal conduct and the strong weight of the evidence.  The defendant therefore cannot overcome the statutory presumption in favor of detention in this case.

### A.    Dangerousness

The defendant is charged with serious and violent crimes.  As charged in the Indictment, the defendant has physically and sexually abused women and others for the better part of two decades.  The sex trafficking charge based on the defendant's abusive conduct—Count Two— carries with it a presumption of detention.  *See* 18 U.S.C. § 3142(e)(3)(D).  And detention is particularly supported by the facts of this case.  Since at least 2008, the defendant has engaged in serious acts of violence, including forcing and coercing women to participate in sexual activity, including sex acts with commercial sex workers, by using physical force, financial pressure, emotional abuse, and narcotics.  These acts, described in detail above, were referred to as Freak Offs, among other names, and involved orchestrated sexual performances facilitated through drug use that sometimes lasted days at a time.

That is not all.  As set forth in the Indictment, the charges against the defendant capture significant additional violence, both spontaneous and premeditated.  On numerous occasions, the defendant assaulted women, employees, and others when he became enraged—by throwing objects at them, choking them, pushing them, kicking them, and slamming them against walls and on to the ground.  The defendant and other members and associates of the Enterprise were also capable of premeditated violence, resorting to kidnapping and arson when the defendant's power and control were threatened.  The defendant's violence—whether spontaneous or premeditated— had the effect of exerting his continued control over these individuals.  The defendant also carried firearms to intimidate and threaten others.  Multiple defaced semi-automatic rifles were recovered when law enforcement searched the defendant's residences in March 2024, including two defaced rifles that had been disassembled and hidden in the defendant's bedroom closet.  In short, the conduct with which the defendant is charged shows a pattern of violent and abusive conduct, underscoring his dangerousness.  *See* 18 U.S.C. § 3142(g)(1).

This disposition to violence cannot be reasonably prevented through bail conditions.  The violence alleged in the Indictment was not isolated or aberrational.  It was systematic and pervasive: the defendant abused women with whom he was in personal relationships, employees, witnesses to his crimes, and others.  As described above, the defendant has sexually, physically, and emotionally abused long-term romantic partners for decades, including by forcing them to engage in Freak Offs.  The defendant has abused countless others in his orbit—and in particular, women—without regard for consequences.  Indeed, the defendant's abuse of women long predates the conduct charged in the Indictment: to date, at least five women have publicly accused the defendant of violent sexual assaults dating back to the 1990s.

Page 9

Moreover, the defendant's violence and abuse often occurred behind closed doors, including in his homes, hotels where he was staying, and other private settings. He has assaulted victims, employees, and others—and even brandished a firearm at a victim—in his homes. The alleged sex trafficking similarly took place in private settings not easily monitored. Indeed, in addition to engaging in Freak Offs at hotels, the defendant has, at times, organized Freak Offs at his home or at the homes of his female victims. This is precisely the kind of violence that even strict conditions such as home incarceration cannot prevent.

In sum, the defendant's long history of violent conduct makes clear that even the most stringent bail conditions will not suffice to ensure the safety of the community. The defendant is a serial abuser who repeatedly assaults and coerces women to achieve his own sexual gratification, and uses his vast wealth and position of power in the entertainment industry to conceal his illegal conduct and prevent victims of, and witnesses to, his abuse from coming forward. *See* 18 U.S.C. § 3142(g)(3). The defendant's longstanding pattern of abuse is probative evidence of the likelihood that he will continue to abuse. Indeed, nothing—not even the threat of public exposure or law enforcement intervention—has stopped his abuse. The defendant has continued to physically assault and threaten those around him, including his romantic partners, his employees, and others who happened to be present when he succumbed to fits of rage. No bail conditions can address the defendant's tendency to become violent when angry or emotional: anyone in his presence is at risk of abuse or assault. And the defendant's physical assaults are serious, resulting at times in serious injury requiring medical intervention and long periods of recovery. Therefore, the "nature and seriousness of the danger to *any* person" is both real and specific. *See* 18 U.S.C. § 3142(g)(4) (emphasis added); *see also Mercedes*, 254 F.3d at 437 (reversing district court's release of defendant who had no criminal history but had a history of domestic violence).

## B.    Obstruction

As part of the charged racketeering conspiracy, the defendant engaged in obstruction of justice, including bribery and witness tampering. *See* 18 U.S.C. § 3142(g)(1). Given the defendant's history of engaging in obstructive conduct to conceal his criminal activity, both personally and through intermediaries, there is every reason to believe that the defendant will continue to engage in such obstruction if released. *See* 18 U.S.C. § 3142(g)(3); *see also United States v. Kelly*, No. 19 Cr. 286 (AMD) (E.D.N.Y.) (Aug. 2, 2019 Hear'g Tr.) (transcript of bail hearing in which defendant was denied bail due to risk of flight and obstructive conduct).

As detailed in the Indictment, following a Freak Off in March 2016, the defendant attempted to bribe hotel security staff to prevent hotel security from publicly disclosing and/or reporting to law enforcement his vicious attack on a woman attempting to leave a Freak Off. The defendant's efforts to disclaim responsibility for that attack continued until earlier this year. A civil lawsuit was filed on or about November 16, 2023 alleging years of sexual, emotional, verbal, and physical abuse by the defendant, including allegations describing the March 2016 incident. Following the filing of the lawsuit, the defendant stated, in no uncertain terms, "Let me be

absolutely clear: I did not do any of the awful things being alleged."[6]  Through counsel, the defendant "vehemently denie[d] these offensive and outrageous allegations," describing the complaint as "riddled with baseless and outrageous lies."[7]  It was not until the video surveillance footage of the defendant's attack was leaked to the media months later that the defendant was forced to admit that he had, in fact, perpetrated the "disgusting" attack.[8]  Clearly, the defendant is willing to deflect, minimize, and lie—and induce others to do so on his behalf—to avoid taking responsibility for his own actions.

More recently, the defendant has, directly and through intermediaries, engaged in obstructive conduct related to the matters under investigation in this case.  Specifically, following the November 2023 lawsuit, the defendant and intermediaries acting on his behalf reached out to potential victims and witnesses to the alleged conduct—including individuals he did not speak to regularly and had not spoken to in years, to attempt to feed those victims and witnesses false narratives about the defendant's criminal conduct.  With respect to at least two of these individuals, the defendant's co-conspirators assisted in efforts to protect the defendant.  For example, on or about November 19, 2023—just three days after the filing of the lawsuit described above—the defendant made multiple calls to another victim of his sexual abuse and recorded certain of those calls using the cellphone of a co-conspirator.  During the calls, the defendant repeatedly asked for the victim's support and "friendship," and attempted to convince the victim that she had willingly engaged in acts constituting sexual abuse.  The defendant also assured the victim that if she "needed" the defendant too, she "ain't got worry about nothing else"—a thinly veiled attempt to coerce the victim into adopting and supporting the defendant's false version of events to protect the defendant.  Even more concerning, since learning about the criminal investigation, including following the execution of the search warrants at his residences, Combs contacted other witnesses on multiple occasions, including other witnesses who had received grand jury subpoenas.

The defendant's recent conduct is similar to that in *United States v. LaFontaine*, in which the Second Circuit affirmed the district court's revocation of pretrial release after the defendant in that case engaged in witness tampering.  210 F.3d at 125.  Specifically, the defendant, who was charged with multiple counts of fraud in connection with providing false claims to medical insurers, called a witness to "remind" the witness that a particular patient had received surgeries that the patient had not, in fact, received.  *Id.* at 128.  The Second Circuit affirmed the district court's finding that there was no condition or combination of conditions that would assure the safety of the community given the defendant's witness tampering, despite the fact that the defendant's tampering did not include actual violence or threats of violence.  *Id.* at 134.  In

---

[6] *See, e.g.*, Billboard, "Diddy Denies Sexual Assault Claims: 'I Did Not Do Any of the Awful Things Being Alleged," *available at* https://ca.billboard.com/music/music-news/diddy-denies-sexual-assault-claims-1235543220/.

[7] *See, e.g.*, CNN, "A closer look at the sexual misconduct lawsuits against Sean 'Diddy' Combs" *available at* https://www.cnn.com/2024/03/31/entertainment/sean-diddy-combs-lawsuits/index.html.

[8] *See* https://www.youtube.com/watch?v=0ZC2hsZHE0M (AP link showing Instagram video from the defendant's account in which the defendant admits to the attack depicted on surveillance video, which was subsequently deleted from the defendant's Instagram account).

rejecting the defendant's arguments that the district court's finding of dangerousness was not justifiable, the Second Circuit noted that the defendant had "fed" the witness false testimony with the expectation that the witness would adopt it, and that even stringent electronic monitoring conditions could be circumvented. *Id.* at 134-35.

Here, the defendant's conduct goes beyond what the *LaFontaine* court found sufficient to revoke bail. Even before being charged with a crime, the defendant has taken numerous proactive steps to tamper with potential witnesses' testimony against him. The Government is aware, through electronic evidence, toll records, conversations with witnesses, and other evidence, that the defendant has contacted witnesses, including subpoenaed witnesses, prior to the dates on which the witnesses were required to appear before the grand jury. In addition, the defendant has recorded calls with at least one victim and provided, either directly or through intermediaries, false narratives of the events that transpired so that those witnesses would adopt that false testimony. Moreover, the defendant's obstructive conduct is made even more alarming by the manner in which he carried it out to evade detection: in some instances, by having intermediaries make calls on his behalf, and recording certain calls on another individual's device. These deliberate actions show that the defendant was aware that what he was doing was obstructive and that his aim was to evade detection. Even the most stringent conditions—including the monitoring of a court authorized electronic device—would fail to ensure that the defendant would not engage in this kind of obstruction from his home, including by acting through intermediaries and using others' devices.

Given the defendant's history of obstruction, as well as the violent nature of the charges against the defendant, the defendant cannot overcome the presumption that no condition or combination of conditions can assure the safety of the community.

### C.    Risk of Flight

Nor can the defendant overcome the presumption that he is a risk of flight. The crimes that the defendant is charged with carry significant penalties, including a mandatory minimum sentence of 15 years' imprisonment and a statutory maximum sentence of life imprisonment. *See* 18 U.S.C. § 3142(g)(1). The possibility of a substantial sentence is a significant factor in assessing the risk of flight. *See United States v. Green*, No. 20 Cr. 357 (VM), 2020 WL 5814191, at *2 (S.D.N.Y. Sept. 30, 2020) (noting that substantial sentence defendant may face weighed in favor of finding that defendant was a flight risk); *see also United States v. Moscaritolo*, No. 10 Cr. 4 (JL), 2010 WL 309679, at *2 (D.N.H. Jan 26, 2010) ("[T]he steeper the potential sentence, the more probable the flight risk is, especially considering the strong case of the government . . .") (citation omitted). Here, the defendant is facing *at least* 15 years' imprisonment if he is convicted. This fact alone would provide a compelling incentive for anyone to flee from prosecution, but the incentive to flee is especially strong for this defendant, who, at age 54, faces the very real prospect of spending a substantial portion of the rest of his life in prison.

As detailed below, the evidence in this case is incredibly powerful, as the facts set forth in the Indictment and herein make plain. *See* 18 U.S.C. § 3142(g)(2). Dozens of victims and witnesses have provided detailed, credible, and corroborated information against the defendant. These individuals include many who personally experienced and witnessed violence and other

crimes at the hand of the defendant. Moreover, their accounts are well corroborated by significant extrinsic evidence, including financial and billing records, travel records, electronic data, and communications, including extensive communications by and with the defendant himself. For example, victim testimony regarding Freak Offs is at times corroborated by other witness testimony, communications with the defendant and commercial sex workers, travel records, hotel records, videos of the Freak Offs, and records reflecting or indicating payment. Similarly, a victim's physical abuse may be corroborated by, among other things, videos of the abuse, photographs of injuries, reports made to law enforcement, communications with the defendant and others, and testimony from other witnesses who saw or heard about the abuse. The vast and varied sources of evidence, described in detail below, will be compelling evidence of guilt at any trial in this case. Thus, the serious risk of conviction provides further incentive for the defendant to flee prosecution.

Moreover, in this case, risk of flight is augmented by the nature of the evidence against the defendant. The evidence against the defendant, which would be made public at trial, includes substantial evidence that is highly sensitive and has the potential to significantly and negatively impact the defendant's reputation—for example, dozens of video recordings created by the defendant of Freak Offs with victims. For decades, the defendant has spent significant time and resources ensuring that his criminal conduct avoids public scrutiny. Given the potential penalties here, both incarceration and reputational harm, the defendant has every incentive to flee to avoid prosecution and a public trial. *See, e.g.*, *United States v. Madoff*, 316 F. App'x 58, 59 (2d Cir. 2009) ("[I]ncentive to flee . . . naturally bears upon and increases the risk of flight."); *United States v. Sammons*, No. 19 Cr. 107, 2020 WL 613930, at *5 (S.D. Ohio Feb. 10, 2020) ("The shame of the allegations that he is facing is also an immense incentive to flee.").

The defendant's incentive to flee, outlined above, coupled with the defendant's seemingly limitless resources create significant risk of non-appearance. The defendant's net worth is publicly estimated at being close to $1 billion.[9] Indeed, the investigation of this case has revealed that the defendant has access to vast funds and resources—including deep reserves of cash—which would facilitate his evasion of prosecution. At least as of December 2023, the defendant had access to dozens of bank accounts—some personal and many under corporate entities—which contain millions of dollars. Additionally, as of December 2023, the defendant had over $1 million in personal cash on hand. The defendant has traveled internationally several times per year since at least 2006, and since approximately 2019, has owned a personal plane on which he has traveled internationally.[10] The defendant maintains two primary residences in Los Angeles and Miami. In addition to his private plane, the defendant owns multiple vehicles in multiple locations. He has a

---

[9] *See* Fox Business, "Sean 'Diddy' Combs net worth is close to $1B here are some big ticket assets," *available at* https://www.foxbusiness.com/lifestyle/sean-diddy-combs-net-worth-close-1b-here-some-big-ticket-assets.

[10] Through conversations with defense counsel, the Government understands that defense counsel is currently in possession of the defendant's passport, as well as the passports of several of the defendant's family members, and that the defendant is in the process of attempting to sell his plane and Los Angeles residence. As explained above, however, the defendant's vast resources make him a flight risk even without a passport, private plane, or multiple residences.

personal staff, including assistants, security, chefs, trainers, and others, who perform tasks at his command, including transporting him, delivering him currency, securing narcotics for him, and other tasks. And he is extraordinarily well connected both within and outside the entertainment industry. In short, if the defendant wanted to flee, he has the money, manpower, and tools to do so quickly and without detection. The defendant's lack of access to his passport or private jet would not negate the fact that the defendant could easily buy his way out of facing justice.

As discussed below, the defendant's legal team has attempted to mitigate this substantial risk of flight by taking steps such as taking his family's passports, attempting to sell his plane, and reporting his whereabouts to the Government. These steps have been taken with the precise goal of crafting an argument for bail before the Court. While the defendant may have made the calculated decision in consultation with his attorneys not to flee before any charges were filed, that calculus inevitably changes today, when an Indictment charging the defendant with extremely serious offenses carrying enormous potential penalties was unsealed. He is now—for the first time in his life—facing a mandatory minimum term of imprisonment of 15 years and a maximum term of imprisonment of life, in which the Government is prepared to prove the charges against him by, among other things, the testimony of dozens of witnesses and victims to his serial abuse, and evidence from dozens of his own electronic devices and those of his co-conspirators. Given the serious nature of the charges, the strength of the evidence, and the defendant's access to vast amounts of resources, his risk of flight is more pronounced today than it has ever been.

### D.    Weight of the Evidence

In considering the danger and risk of flight presented by the defendant, the Court is also required to consider the weight of the evidence against the defendant. 18 U.S.C. § 3142(g)(2). The defendant faces a strong and powerful case here, only magnifying the danger he could present to others, especially victims and witnesses ready to testify against him, and the risk he flees. The evidence in this case consists of a vast amount of victim and witness testimony, electronic evidence, physical evidence, and subpoena returns and other voluntary productions, among other things.

As to witnesses, to date, the Government has conducted interviews with over 50 victims and witnesses, many of whom saw or experienced the defendant's abuse. Many of these witnesses corroborate one another, and their accounts are similarly consistent with the other types of evidence discussed below. The Government only expects that number to continue to grow, given that the investigation, which is now public, is ongoing.

The electronic evidence is similarly vast. The Government has sought and obtained numerous search warrants for such evidence, in addition to obtaining evidence voluntarily from certain victims and witnesses. Setting aside devices seized in connection with the defendant's arrest, the Government has obtained over 90 cellphones, laptops, and cloud storage accounts, as well as over 30 other electronic and storage devices, such as hard drives, thumb drives, cameras, and a surveillance system. This electronic data comes from the defendant himself, as well as co-conspirators, victims, and witnesses, and chronicles much of the defendant's criminal activity as it occurs.

The evidence also consists of physical evidence, which was seized pursuant to search warrants executed at the defendant's residences in Los Angeles and Miami, as well as on his person and the persons of certain co-conspirators. In addition to the firearms and electronics discussed above, the physical evidence also includes other evidence of Freak Offs, including over 1,000 bottles of baby oil and personal lubricant.

Finally, the evidence includes records obtained pursuant to over 300 grand jury subpoenas and other voluntary productions. These materials come from over 100 entities and individuals, including communications providers; tech companies; social media companies; banks and other financial institutions; airlines, hotels, car services, and other travel-related companies; escort services; and even the defendant's companies and wealth management firm.

Together, this evidence, as well as other evidence gathered, powerfully demonstrates the defendant's guilt, and counsels in favor of detention.

### E.    The Defendant's Proposed Bail Package Is Insufficient

For all the reasons set forth herein, there is no bail package that can reasonably assure the safety of others in this case, where the defendant has engaged in a decades-long pattern of violence against women and others, and has used his wealth and power to ensure that his criminal conduct goes unpunished through manipulative and obstructive conduct. In particular, the bail package proposed by defense counsel is insufficient because it fails to adequately protect others from the defendant's violence, impose measures to prevent and detect obstruction, or prevent the defendant from accessing his vast resources—including millions of dollars in cash—to evade prosecution, or dissipating those assets to avoid financial penalties for his crimes.

Defense counsel has proposed certain bail conditions, including home detention with electronic monitoring and a $50 million bond secured by the defendant's Miami property. These conditions are plainly insufficient to address the legitimate concerns set out above. In particular, given the defendant's history of engaging in obstructive conduct, the Court must reject the insufficient conditions proposed by defense counsel, which do nothing to prevent and detect such conduct. For example, in *United States v. Ferranti*, 66 F.3d at 543-44, a case in which the defendant was charged with witness tampering and where obstruction remained an ongoing concern, the Second Circuit reversed the district court's release of the defendant on bail conditions because the $1 million bond, which was to be secured by properties owned by the defendant and members of his family, only deterred flight, not danger. *Id.* at 543. More specifically, the Second Circuit found the district court's bail condition intended to address witness tampering—which was a general prohibition that the defendant was not to commit a crime or intimidate a witness—"does not at all impede his ability to do so, and requires no more of him than that which the law already demands from [a defendant] and every other citizen." *Id.* at 544 (quoting *United States v. Colombo*, 777 F.2d 96, 100 (2d Cir. 1985)).

Notably, the defendant's previously proposed conditions do not include provisions related to his access to electronic devices, which, as outlined above, the defendant uses to engage in obstructive conduct. Nor do the proposed conditions include information related to or restrictions on access to the defendant's vast resources—including multiple personal bank accounts, bank

**A-029**

Page 15

accounts in the name of the defendant's business, and deep cash reserves—which could facilitate the defendant's flight.  Similarly, the proposed conditions fail to protect against dissipation of assets which may be subject to forfeiture or penalties on the charges in the Indictment.  Finally, the proposed conditions do not include conditions that would limit the defendant's potential to engage in violence or abuse, such as drug testing and treatment and surrender of all firearms.

### III.   <u>Conclusion</u>

As set forth above, the defendant poses an ongoing and significant danger to the community, has repeatedly engaged in obstructive conduct, and presents a serious risk of flight. The Government respectfully submits that the defendant cannot meet his burden of overcoming the statutory presumption in favor of detention.  There are no conditions of bail that would assure the appearance and compliance of the defendant, or the safety of others.  Accordingly, any application for bail should be denied.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:  ___/s_____
Meredith Foster
Emily A. Johnson
Madison Reddick Smyser
Christy Slavik
Mitzi Steiner
Assistant United States Attorneys
(212) 637-2310/-2409/-2381/-1113/-2284

cc:    Marc Agnifilo, Esq. (by email)
Teny Geragos, Esq. (by email)

A-030

# EXHIBIT A

**(video exhibit)**

**A-031**

Case 1:24-cr-00542-ALC    Document 8    Filed 09/17/24    Page 1 of 10

# AGNIFILO
# INTRATER

September 17, 2024

VIA ECF
The Honorable Robyn F. Tarnofsky
United States Magistrate Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

  Re: United States v. Sean Combs, 24 Cr. 542

Dear Judge Tarnofsky:

  Mr. Sean Combs, through his counsel, submits this letter to the Court for release on certain specified conditions. Yesterday evening, Mr. Combs was arrested on an Indictment charging him with the following offenses: 18 U.S.C. § 1962(d); 18 U.S.C. § 1591(a)(1), 18 U.S.C. § 1591(b)(1), 18 U.S.C. § 1594(a) and 2; 18 U.S.C. § 2421(a) and 2. For the reasons set forth below, we ask this Court to release Mr. Combs pursuant to our proposed bail package.

  This letter will walk the Court through a series of actions taken by Mr. Combs over the past six months that prove that he is not a risk of flight or a danger to anyone in the community. These actions prove that Mr. Combs is eminently trustworthy, that he is demonstrably committed to showing his innocence in Court in the context of this case, and that he should be released, on the conditions proposed, in order to do so.

  The first thing the Court should know is that when it became apparent to his counsel that Mr. Combs would at some point soon be formally charged, he did something extraordinary: He left his home in Miami and travelled *to* New York, the very location of the prosecutors and agents investigating him. Through counsel, Mr. Combs promptly told the Government that he had voluntarily come to New York, offered to tell them specifically where he was, and offered to turn himself in at the appropriate time. Even though Mr. Combs came to New York, authorized his lawyers to tell the Government of his location, and offered to self-surrender, the Government effected an arrest last evening. This, we know, is the Government's right. However, that he travelled to New York to self-surrender is also something the Court should consider.

  This was not the first action Mr. Combs took to show his trustworthiness and lack of flight risk. Indeed, it is part of a pattern since even before the March 25, 2024, searches on Mr. Combs' residences. Mr. Combs and his counsel have been fully aware that the United States Attorney for the Southern District of New York has been conducting an investigation involving allegations concerning Racketeering and Sex Trafficking, and other offenses. Knowing for these many months that he would be indicted, Mr. Combs has done everything (as will be set out below) to work with the prosecutors in ways that are unusual, if not unprecedented.

**445 PARK AVE, 7TH FLOOR | NEW YORK, NY 10022 | WWW.AGILAWGROUP.COM**

## A-032

Case 1:24-cr-00542-ALC   Document 8   Filed 09/17/24   Page 2 of 10

# AGNIFILO
# INTRATER

In light of these circumstances, he can rebut the presumption of detention here due to his extraordinary actions in this investigation. Mr. Combs should be released on the conditions proposed so that he can fight this case in Court effectively.

### The Proposed Package

The defense proposes the following bail package:

a.  A $50,000,000 bond;

b.  Co-signed by Sean Combs, his mother, his sister, the mother of his oldest daughter, and his three adult sons;

c.  Secured by the equity in Mr. Combs' residence located at 2 West Star Island in Miami, Florida:
    a.  The appraised value of the home is about $48,000,000.[1]
    b.  The home is unencumbered. In anticipation of this bail hearing, on August 20, 2024, Mr. Combs paid off the remaining mortgage of about $18,000,000 so that the home could be used to secure a bond and be free of a mortgage.[2]

d.  Secured by the equity of Mr. Combs' mother's home located at ▮▮▮▮▮▮ in Miami, Florida;

e.  Mr. Combs' travel will be restricted to the Southern District of Florida and the Southern District of New York (to attend Court, meet with his counsel, and attend medical appointments, which we will address to the Court in a separate, sealed, submission) as well as the Eastern District of New York or the District of New Jersey (only to the extent that his travel to and from New York involves an airport in those Districts);

f.  Mr. Combs' passport was surrendered to his counsel on April 1, 2024; his counsel advised the prosecutors of this fact in an email dated the same day;[3] counsel will provide this passport to Pretrial Services;

g.  The passports of the following family members, who have already surrendered their passports to counsel after the raids on Mr. Combs' homes:
    a.  Janice Combs;
    b.  Chance Combs;
    c.  Jessie Combs;
    d.  D'Lila Combs; and
    e.  Love Combs.

---

[1] The written appraisal is attached as Exhibit 1.

[2] The satisfaction of the mortgage is attached as Exhibit 2.

[3] The letter to the prosecutors is attached as Exhibit 3.

2

A-033

Case 1:24-cr-00542-ALC     Document 8     Filed 09/17/24     Page 3 of 10

# AGNIFILO
# INTRATER

h. Since at least April 2024, Mr. Combs has been making efforts to sell his airplane. We informed the Government of these efforts in May 2024, as explained further below. Just this weekend, Mr. Combs entered into a Letter of Intent with a party to sell it. Mr. Combs understands he is not to travel to Los Angeles, where the plane had been located this week, and further that the plane is not to be brought to any District in which he is located until it is sold;[4]

i. Home detention with GPS monitoring; and

j. All other standard conditions of pretrial supervision.

**The History of This Investigation Shows a Great Degree of Collaboration Between the Government, Mr. Combs and His Counsel Which Should Weigh Heavily in This Court Releasing Him on the Conditions Proposed**

On March 13, 2024, counsel for Mr. Combs emailed the assigned Assistant United States Attorneys. In this introductory mail, counsel identified himself as counsel for Mr. Combs and stated that he wished to speak with the prosecutors and share information about Mr. Combs and the matters under investigation. See Ex. 4. After not hearing back from the AUSAs, counsel again emailed the prosecutors on March 18, 2024. Counsel did not get a response to this second email either.

On March 25, 2024, search warrants were executed at Mr. Combs' places of residence in Miami and Los Angeles. In addition, he was removed from his airplane and searched. The searches of the residences were unusually public and particularly heavy-handed. The agents had assault rifles trained on the heads and the chests of his children, who were then handcuffed and brought before news cameras and a press helicopter. On the day of the searches, counsel called the prosecutors, and they spoke for the first time. Counsel indicated that he would accept service of two grand jury subpoenas to Mr. Combs' businesses.

1. Counsel Took Possession of Mr. Combs' Passport on April 1, 2024

About a week following the searches, on April 1, 2024, counsel took possession of Mr. Combs' U.S. passport. As noted, on this same day, counsel advised the AUSAs of the fact that counsel had Mr. Combs' passport, that we would not return it to him, and that he would not leave the country during the pendency of the investigation. See Ex. 1. We have, in fact, maintained the passports, and Mr. Combs has not, in fact, left the country – despite knowing the investigation was ongoing, despite having a plane at his disposal, despite not being charged with any crime.

---

[4] As of this morning, the plane is in Teterboro, NJ, for a charter flight.

3

Case 1:24-cr-00542-ALC    Document 8    Filed 09/17/24    Page 4 of 10

# AGNIFILO
# INTRATER

### 2. Counsel Agreed to Advise the Government of All Domestic Travel

Moreover, counsel advised the Government that if Mr. Combs intended to travel domestically, counsel would so inform the AUSAs. See Ex. 1. These two promises have also been kept. For example, on June 9, 2024, counsel advised the AUSAs that Mr. Combs was traveling from Miami to Los Angeles to go on a road trip with his children. See Ex. 5. In addition, we provided the AUSAs with information about when his flight departed and it would land. Id. On June 29, 2024, counsel emailed the prosecutors that Mr. Combs was flying to Wyoming via a chartered aircraft. See Ex. 6 at 3. On July 5, 2024, counsel emailed the prosecutors that he was traveling back to Los Angeles. Id. Two days later, on July 7, 2024, when he traveled back to Miami via a chartered aircraft, we again emailed the AUSAs. Id. at 2. In addition, when Mr. Combs planned travel but not take those trips, we notified the prosecutors of that as well. See id. at 1.

### 3. Counsel Advised the Government of Mr. Combs' Efforts to Sell His Airplane

On May 21, 2024, counsel advised the AUSAs during a phone call that Mr. Combs had commenced efforts to sell his airplane. We followed up on that conversation the next day, on May 22, 2024, with a letter to the AUSAs that efforts were underway to sell the aircraft and reminding the AUSAs that counsel continued to be in possession of his passport. See Ex. 7.

Over the past several months, there have been several potential buyers for the airplane and at least two buyers have signed a Letter of Intent to purchase the aircraft. Just this weekend, a buyer for the aircraft and representatives for Mr. Combs executed a Letter of Intent. Due to the nature of this asset, and the amount of inspection and due diligence that is required for a purchase, it is not a simple asset to offload.

In advance of the plane being sold – which it eventually will be – we have agreed to keep the airplane in Los Angeles while Mr. Combs resides in his home in Florida, if it is not being chartered. Coincidentally, and not at Mr. Combs' request, last night, the airplane was chartered on a Part 135 flight[5] from Los Angeles to Teterboro, NJ. Mr. Combs had no advance knowledge of the flight, nor did he possess any control over its movement last night. Obviously, Mr. Combs agrees to not go to any state – in this case, New Jersey – in which his airplane is located pending its sale, which is actively being pursued.

### 4. Mr. Combs Voluntarily Relocated to New York in Advance of His Arrest

Once it became apparent to counsel that Mr. Combs' arrest was imminent, he promptly relocated to New York City. On September 5, 2024, Mr. Combs arrived in New York, and counsel immediately informed the Government of Mr. Combs' whereabouts. Counsel offered to

---

[5] Pursuant to the Code of Federal Regulations Part 135 ("Part 135"), a private jet may be available to the general public for use. Part 135 pertains to Mr. Combs' airplane, and, therefore, can be chartered by the general public.

4

A-035

Case 1:24-cr-00542-ALC   Document 8   Filed 09/17/24   Page 5 of 10

# AGNIFILO
# INTRATER

continually share Mr. Combs' location with the government. Since arriving in New York on September 5, Mr. Combs has been staying at the Park Hyatt New York. Due to bookings made at the Park Hyatt prior to Mr. Combs' reservation, after today, September 17, 2024, he would no longer be able to stay at the Park Hyatt. Accordingly, Mr. Combs had a reservation to stay at the Carlyle Hotel starting today.[6]

Since Mr. Combs relocated to New York earlier this month, counsel has been looking for a one-month rental for Mr. Combs in New York City. Despite counsel's persistence, it has been challenging to find a rental for many reasons, including because of the numerous events occurring in New York City in September (e.g., the US Open, Fashion Week, and the UN Summit), and some landlords' discomfort with having Mr. Combs as a tenant given the investigation. Last night, counsel had scheduled a viewing of a potential apartment; however, because of Mr. Combs' arrest, counsel and Mr. Combs obviously were not able to view the rental.

5. Counsel Advised the Government That It Was in Possession of the Passports of Members of Mr. Combs' Family

On June 13, 2024, counsel informed the Government that we possessed Mr. Combs' mother's passport. See Ex. 8. We have also informed the Government that we possessed the passports of his four daughters (all of whom were minors at the time we took possession of the passports).

6. Counsel's Assistance to the Government Concerning the Subpoenas

As stated above, counsel accepted service of two subpoenas directed at several of Combs' businesses in March of 2024. Separate counsel for the entities filed a motion to quash those subpoenas in April of 2024. In May of 2024, upon becoming sole counsel in connection with the criminal investigation of Mr. Combs, we advised the Court that it would withdraw the motion to quash the Grand Jury subpoenas and instead that the parties would meet and confer with the Government to minimize the number of requests on which the parties disagreed. Counsel agreed to begin gathering documents responsive to the subpoena.

For the past several months, counsel for Mr. Combs and the AUSAs have had regular discussions about what documents we had, what we did not have and, in regard to the documents we did not have, where the Government may be able to find such documents. We did this for two reasons. First, there was nothing, in counsel's estimation, that would constitute evidence of Mr. Combs being involved in any federal crime. Second, we wanted to be appropriately helpful to the Government in its investigation. To that end, the Combs entities have produced over 144,000 pages of documents to the SDNY in compliance with the subpoena.

---

[6] The confirmation number for this reservation is 153SE224832. Counsel will provide additional confirmatory information upon request.

A-036

Case 1:24-cr-00542-ALC    Document 8    Filed 09/17/24    Page 6 of 10

# AGNIFILO
# INTRATER

6.    Paying Off The Mortgage the 2 West Star Island In Miami

As noted in the discussion about the bail package, on August 20, 2024, Mr. Combs caused the outstanding mortgage to be paid on his primary residence in Miami. This payment of about $18,000,000 was for one reason alone: so that he would have this $48,000,000 residence free and clear of any encumbrances so that it can be used to secure a bond. We submit this is a truly extraordinary measure that shows resoundingly that Mr. Combs is appropriately focused on defending this case on the merits in this Court.

### Legal Standard

Because Mr. Combs is presumed to be innocent, the Supreme Court has observed that "liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." United States v. Salerno, 481 U.S. 739, 755 (1987). As the Supreme Court recognizes, "the function of bail is limited." Stack v. Boyle, 342 U.S. 1, 4 (1954). The underling goal is securing the presence of the defendant rather than "the sum of bail." United States v. Nebbia, 357 F.2d 303, 304 (2d Cir. 1966). When deciding an issue of pretrial release, the Second Circuit has noted that "the court should bear in mind that it is only a limited group of offenders who should be denied bail pending trial." United States v. Shakur, 817 F.2d 189, 195 (2d Cir. 1987). Indeed, the Bail Reform Act requires that the Court impose "the least restrictive . . . condition, or combination of conditions, that will . . . reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. § 3142(c)(1)(B).

While there is a presumption of detention in sex trafficking cases, **this presumption is rebuttable**. The presumption imposes on the defendant a "burden of production," while the "burden of persuasion" remains with the Government. United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001). Although this burden "is not heavy," the defendant must introduce some evidence contrary to the presumed fact. United States v. Rodriguez, 950 F.2d 85, 88 (2d Cir. 1991). A defendant can satisfy this burden by coming forward "with evidence that he does not pose a danger to the community or a risk of flight." Mercedes, 254 F.3d at 436. Even if the defendant presents some evidence satisfying his or her burden, "the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court." Id. In Jessup, the benchmark case defining this burden shift, the court explained:

> Since the presumption is but one factor among many, its continued consideration by the magistrate does not impose a burden of persuasion upon the defendant. And, since Congress seeks only consideration of the general drug offender/flight problem, the magistrate or judge may still conclude that what is true in general is not true in the particular case before him. He is free to do so, and to release the defendant, as long as the defendant has presented some evidence and the magistrate or some judge has evaluated all of the evidence with Congress's view of the general problem in mind.

6

A-037

# AGNIFILO
# INTRATER

United States v. Jessup, 757 F.2d 378, 384 (1st Cir. 1985).

### Section 3142(g) Factors

Acknowledging that sex trafficking has a rebuttable presumption of detention, Mr. Combs can rebut such a presumption with evidence that he does not pose a danger to the community and is not a risk of flight. (18 U.S.C. § 3142(c)(1)(B).) An analysis of the Section 3142(g) factors weigh in favor of releasing Mr. Combs on these conditions.

1. The Nature and Circumstances of the Offense

Mr. Combs is charged with a three-count indictment. The first count charges Mr. Combs with a Racketeering Conspiracy in violation of 18 U.S.C. § 1962(d) ("Count One"). Count One alleges that Mr. Combs "relied on the employees, resources, and influence of the multi-faceted business empire that he led and controlled—creating a criminal enterprise whose members and associates engaged in, and attempted to engage in, among other crimes, sex trafficking, forced labor, kidnapping, arson, bribery, and obstruction of justice," and that the conspiracy lasted "[f]rom at least in or about 2008, through on or about the filing of this Indictment." Indictment ¶¶ 1, 13. As alleged, the "pattern of racketeering" consisted of: (a) "multiple acts involving kidnapping" in violation of California law; (b) "multiple acts of arson" in violation of California law; (c) "multiple acts involving bribery" in violation of California law; (d) "multiple acts indictable under" 18 U.S.C. § 1512, "relating to tampering with a witness, victim, or an informant"; (e) "multiple acts indictable under "18 U.S.C. §§ 1589 and 2, "relating to forced labor"; (f) "multiple acts indictable under" 18 U.S.C. §§ 1591 and 2, "relating to sex trafficking"); (g) "multiple acts indictable under" 18 U.S.C. §§ 2421, 2422, and 2, "relating to transportation and inducement to travel for purposes of prostitution and other illegal sexual activities"; and (f) "multiple offenses involving the possession with intent to distribute, or distribution of narcotics and controlled substances, including cocaine, oxycodone, alprazolam, 3,4-Methylenedioxymethamphetamine, 4-Brono-2, 5-dimethoxyphenethylamine, gamma hydroxybutyric acid, and ketamine," in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), (b)(1)(E), (b)(2), and 846, "distribution and possession with intent to distribute and conspiracy to commit the same" and 18 U.S.C. § 2, "aiding, abetting, and willfully causing." Indictment ¶ 13. Count One also includes a "Notice of Special Sentencing Factor" in connection with Mr. Combs' alleged agreement that "means of force, threats of force, fraud, and coercion . . . would be used to cause the person to engage in a commercial sex act." Id. at ¶ 15.

The second count charges Mr. Combs with Sex Trafficking by Force in violation of 18 U.S.C. §§ 1591(a)(1), (b)(1), 1954(a), and 2 ("Count Two"). Count Two alleges that, "[f]rom at least in or about 2009, up to an including in or about 2018," Mr. Combs "recruited, enticed, harbored, transported, and maintained a person ('Victim-1'), and attempted, aided and abetted, and willfully caused Victim-1, to engage in commercial sex acts, knowing and in reckless disregard of the fact that Victim-1 was engaging in commercial sex acts as a result of force, fraud, and coercion." Indictment ¶ 16.

Case 1:24-cr-00542-ALC     Document 8     Filed 09/17/24     Page 8 of 10

# AGNIFILO
# INTRATER

The third count charges Mr. Combs with Transportation to Engage in Prostitution in violation of 18 U.S.C. §§ 2421(a) and 2 ("Count Three"). Count Three alleges that "[f]rom in or about 2009, up to an including in or about 2024," Mr. Combs "transported, aided and abetted, and willfully caused the transportation of female victims and commercial sex workers in interstate and foreign commerce on multiple occasions with the intent that they engage in prostitution." Indictment ¶ 17.

The Indictment also includes forfeiture allegations pursuant to 18 U.S.C. §§ 1962, 1594, 2428, and 981(a)(1)(C), and 28 U.S.C. § 2461. Indictment ¶¶ 18–20.

2. Defendant's History and Characteristics

Mr. Combs' history and characteristics are best demonstrated by the way he has responded to this investigation from the very inception to his most recent decision to travel to New York when his lawyers told him that the case could soon be starting. He has never run from a challenge, and he will not run from this one. Instead, he takes these challenges head on, he moves toward them confidently and with the assurance that right is on his side. These are not merely the words of his lawyer. Rather, the actions of Mr. Combs over the last several months conclusively prove this.

Aside from his actions since the inception of the investigation, Mr. Combs' character is shown through his demonstrated contributions to society in several important areas. First, he has given generously over his entire life to charitable causes. To name only a few examples, since founding Bad Boy Entertainment in 1993, Mr. Combs has actively supported and donated millions to after school programs and organizations like the Boys & Girls Clubs of America. His commitment stems from the positive influence such programs had on his own childhood, inspiring him to give back to similar initiatives. He has also supported organizations including the National Foundation for Teaching Entrepreneurship ("NFTE"), further emphasizing his dedication to creating opportunities for young entrepreneurs.

A cornerstone of his philanthropy is education, and he fulfilled a lifelong dream when he, with a partner, opened Capital Preparatory Harlem Capital Charter School in 2016, to provide high-quality education to inner-city youth in New York City. The success of this initiative led to the launch of Capital Preparatory Bronx Charter School in 2020, with Combs donating $1 million to support its development. These schools are part of his broader commitment to education, which includes significant contributions to Historically Black Colleges & Universities, such as $2 million to Howard University and $1 million to Jackson State University in 2023.

Mr. Combs has also been proactive in health and disaster relief efforts—having raised over $2 million for New York City public schools and hosting a virtual dance-a-thon that raised more than $4 million to provide personal protective equipment to healthcare workers on the front line of the COVID-19 pandemic. Particularly important in an election year is Mr. Combs' contribution to mobilizing young voters with the "Vote or Die" slogan through Citizen Change, which he founded to significantly increase political awareness and youth voter turnout.

8

**A-039**

# AGNIFILO
# INTRATER

---

Second, few people have done more to advance the cause of black people in the music, entertainment and fashion industries than has Sean Combs. While he has always been controversial, he has also always championed minorities and underrepresented communities. As Chairman of Combs Global, Mr. Combs has used his platform to create "The Excellence Program," an internship initiative with Endeavor in July 2021, a major initiative designed to provide development opportunities for aspiring executives in entertainment, marketing, music, and fashion from underrepresented communities. Mr. Combs' philanthropic work has earned him numerous accolades throughout his career, including the Triumph Award from the National Action Network in 2016, the Superhero Award from Room to Read in 2017, the Child of America Award from the Carver Foundation in 2018 and in 2023 the Icon Award from the Apollo.

Through his multifaceted career, Mr. Combs has not only created thousands of jobs, including valuable internships for young professionals, but has also supported minority and women-owned businesses, leveraging them as key suppliers and vendors for his enterprises.

Counsel will be prepared to address the factors of dangerousness to the community and weight of the evidence in Court at the 2:30 pm initial appearance.

### The Proposed Bail Package Addresses Any Issues with Flight and Danger to the Community

In light of the proposed conditions, the actions Mr. Combs had already taken regarding the investigation, and Mr. Combs' lifetime commitment to live up to his obligations concerning every challenge he has ever faced, he should be released to fight this case in court and prove his innocence.

Sean Combs has never evaded, avoided, eluded or run from a challenge in his life. He will not start now. As he has handled every hardship, he will meet this case head-on, he will work hard to defend himself, and he will prevail.

Recognizing that a bail hearing is not the time to defend the merits of a criminal case, it is relevant to bail that the defendant has made a clear commitment to defend an eminently defensible case. This is such a case.

Finally, several courts in this District have recognized that the conditions at Metropolitan Detention Center in Brooklyn are not fit for pre-trial detention. Just earlier this summer, an inmate

**A-040**

Case 1:24-cr-00542-ALC     Document 8     Filed 09/17/24     Page 10 of 10

# AGNIFILO
# INTRATER

was murdered.[7] At least four inmates have died by suicide there in the past three years.[8] Numerous Courts in this district have raised concerns with the horrific conditions of detention there. See United States v. Chavez, No. 22 Cr. 303 (JMF) (S.D.N.Y. Jan. 4, 2024), Dkt. 31 (describing the conditions at MDC as "dreadful" and "longstanding" and noting that the issues with food contamination and hazardous physical conditions were an "ongoing tragedy"); United States v. Morgan, No. 19 Cr. 209 (RMB) (S.D.N.Y. May 5, 2020), Dkt. 90, Tr. 12-15 (describing the MDC as "dirty," "infested with drugs," and plagued by violence); see also United States v. Boyd, No. 21 Cr. 486 (SHS) (S.D.N.Y. Feb. 3, 2022), Dkt. 74 (describing overcrowding, staffing issues, and lockdowns at the MDC); United States v. Days, No. 19 Cr. 619 (CM) (S.D.N.Y. Apr. 29, 2021), Dkt. 35, Tr. 19 (describing MDC conditions as "disgusting [and] inhuman as anything I've heard about any Colombian prison, but more so because we're supposed to be better than that").

Courts in the Eastern District of New York have shared the same concerns. See United States v. Forbes, No. 22 Cr. 97 (RK) (E.D.N.Y.) (the court noted it was worried about MDC's conditions as one of the reasons for sentencing the defendant to a non-custodial sentence); United States v. Colucci, 23 Cr. 417 (GRB) (E.D.N.Y. Aug 5, 2024) (sentencing a defendant to nine months in prison, but ordering that if BOP designated the defendant to the MDC, the Court would vacate the sentence and resentence to home incarceration.)

## Conclusion

For the reasons set forth above, we move this Court to release Combs under the conditions set forth above. Thank you for your consideration.

Respectfully submitted,

Marc Agnifilo
Teny R. Geragos

cc :     Counsel for the Government (via ECF)

---

[7] See John Annese, Inmate at Brooklyn's Troubled Metropolitan Detention Center Is Stabbed To Death, NY Daily News (Jun. 20, 2024) available at https://www.nydailynews.com/2024/06/20/inmate-at-brooklyns-troubled-metropolitan-detention-center-is-stabbed-to-death-sources/

[8] See Fola Akinnibi & Marie-Rose Sheinerman, Beleaguered Brooklyn Jail Blasted by Candidates in Crowded N.Y. Congressional Race, Bloomberg (Aug. 16, 2022), available at https://www.bloomberg.com/news/articles/2022-08-16/ny-10-democratic-candidates-call-on-feds-to-fix-brooklyn-jail.

10

A-041

# AGNIFILO
# INTRATER

_____

September 18, 2024

VIA ECF
The Honorable Andrew L. Carter
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

      Re:    United States v. Sean Combs, 24 Cr. 542 (ALC)

Dear Judge Carter:

      Mr. Sean Combs, through his counsel, submits this letter in lieu of a formal motion for Mr. Combs' release from custody on the proposed bail package below. As set forth below, the defendant's updated bail package (updated even from yesterday's filing (ECF 8))[1] addresses both risk of flight and danger to the community, and reasonably ensures the defendant's return to Court.

      This letter will walk the Court through a series of actions taken by Mr. Combs over the past six months that we view as unprecedented and that prove that he is not a risk of flight or a danger to anyone in the community. These actions show that Mr. Combs is eminently trustworthy, that he is demonstrably committed to showing his innocence in Court in the context of this case, and that he should be released, on the conditions proposed, in order to do so.

### Mr. Combs flew to New York on September 5, 2024 to Surrender

      The first thing the Court should know is that when it became apparent to his counsel that Mr. Combs would at some point soon be formally charged, he did something extraordinary: He left his home in Miami and travelled _to_ New York to surrender. We told the prosecutors he was in New York to surrender. We asked them for a time for the surrender. They never got back to us. The Government withheld this information solely so they could arrest Mr. Combs and not allow him to surrender, which he flew to New York to do. Instead, the Government effected an arrest two nights ago solely so it could argue for detention. Nonetheless, that Mr. Combs travelled to New York to self-surrender is a major factor that the Court should consider.

      However, surrendering himself to the prosecutors was not the first action Mr. Combs took to show his trustworthiness and lack of flight risk. Indeed, it is part of a pattern since even before the March 25, 2024, searches on Mr. Combs' residences. Mr. Combs and his counsel have been fully aware that the United States Attorney for the Southern District of New York has been conducting an investigation involving allegations concerning Racketeering and Sex Trafficking,

_____

[1] We are mindful that we are giving the court a substantial letter on the same day as the hearing and have endeavored to do so as early in the day as possible. We thank the Court for its willingness to hear our application on short notice.

445 PARK AVE, 7TH FLOOR | NEW YORK, NY 10022 | WWW.AGILAWGROUP.COM

A-042

# AGNIFILO
# INTRATER

and other offenses. Knowing for these many months that he would be indicted, Mr. Combs has done everything (as will be set out below) to work with the prosecutors in ways that are unusual, if not unprecedented.

The law is clear that a district court reviews de novo a magistrate judge's decision to release or detain a defendant pending trial. See United States v. Esposito, 309 F. Supp. 3d 24, 30 (S.D.N.Y. 2018) (Marrero, J.) (citing United States v. Leon, 766 F.2d 77, 80 (2d Cir. 1985)). We respectfully submit that Mr. Combs can rebut the presumption of detention here due to his extraordinary actions in this investigation. Mr. Combs should be released on the conditions proposed so that he can fight this case in Court effectively.

### The Proposed Package

The defense proposes the following bail package, not all of which were proposed as part of our package to the Magistrate Judge. These proposed conditions will assuage any fears of danger to the community and will ensure his return to court:

a.  A $50,000,000 bond;

b.  Co-signed by Sean Combs, his mother, his sister, the mother of his oldest daughter, the mother of his youngest daughter, and his three adult sons;[2]

c.  Secured by the equity in Mr. Combs' residence located at 2 West Star Island in Miami, Florida:
    a.  The appraised value of the home is about $48,000,000.[3]
    b.  The home is unencumbered. In anticipation of this bail hearing, on August 20, 2024, Mr. Combs paid off the remaining mortgage of about $18,000,000 so that the home could be used to secure a bond and be free of a mortgage.[4]

d.  Secured by the equity of Mr. Combs' mother's home in Miami, Florida;

e.  Mr. Combs' travel will be restricted to the Southern District of Florida and the Southern District of New York (to attend Court, meet with his counsel, and attend medical appointments as well as the Eastern District of New York or the District of New Jersey (only to the extent that his travel to and from New York involves an airport in those Districts);

---

[2] The mother of four of his children is deceased. His three adult sons and his sister will be present at today's hearing.
[3] The written appraisal is attached as Exhibit 1.
[4] The satisfaction of the mortgage is attached as Exhibit 2.

2

# AGNIFILO
# INTRATER

f.  Mr. Combs' passport was surrendered to his counsel on April 1, 2024; his counsel advised the prosecutors of this fact in an email dated the same day;[5] counsel will provide this passport to Pretrial Services;

g.  The passports of the following family members, who have already surrendered their passports to counsel after the raids on Mr. Combs' homes:
   a.  Janice Combs;
   b.  Chance Combs;
   c.  Jessie Combs;
   d.  D'Lila Combs; and
   e.  Love Combs.

h.  Since at least April 2024, Mr. Combs has been making efforts to sell his airplane. We informed the Government of these efforts in May 2024, as explained further below. Just last weekend, Mr. Combs entered into a Letter of Intent with a party to sell it. Mr. Combs understands he is not to travel to Los Angeles, where the plane had been located this week, and further that the plane is not to be brought to any District in which he is located until it is sold;[6]

i.  Home detention with GPS monitoring; and

j.  Restrict all visitors to Mr. Combs' residences at 2 West Star Island *and* 1 West Star Island (the adjoining property that Mr. Combs owns) except for family, property caretakers, and friends who are not considered to be co-conspirators;

k.  Restrict female visitors to Mr. Combs' residence except for family, or mothers of his children;

l.  The security company that secures Mr. Combs' person and properties will require any person who enters the property to sign a visitor log, and then the company will produce those logs to Pretrial Services nightly;[7]

m.  No contact with known grand jury witnesses;

n.  Weekly drug testing by Pretrial Services;

o.  All other standard conditions of pretrial supervision.

---

[5] The letter to the prosecutors is attached as Exhibit 3.
[6] As of yesterday, the plane flew to Teterboro, NJ, for a charter flight.
[7] If the Government and the Court prefer that Mr. Combs employ a different security company than the one he has used for the past decade or so, we request a week to engage a new security company to comply with this condition.

3

# AGNIFILO
# INTRATER

___

This combination of conditions will reasonably assure Mr. Combs' appearance in Court and protect the Government's and the Magistrate Judge's stated concerns with respect to the safety of the community. Taken in combination, these conditions present a very substantial, comprehensive bail package for any defendant, much less one who flew to New York to surrender, as this defendant has.

### The History of This Investigation Shows a Great Degree of Collaboration Between the Government, Mr. Combs and His Counsel Which Should Weigh Heavily in This Court Releasing Him on the Conditions Proposed

On March 13, 2024, counsel for Mr. Combs emailed the assigned Assistant United States Attorneys. In this introductory email, counsel identified himself as counsel for Mr. Combs and stated that he wished to speak with the prosecutors and share information about Mr. Combs and the matters under investigation. See Ex. 4. After not hearing back from the AUSAs, counsel again emailed the prosecutors on March 18, 2024. Counsel did not get a response to this second email either.

On March 25, 2024, search warrants were executed at Mr. Combs' places of residence in Miami and Los Angeles. In addition, he was removed from his airplane and searched. The searches of the residences were unusually public and particularly heavy-handed. The agents had assault rifles trained on the heads and the chests of his children, who were then handcuffed and brought before news cameras and a press helicopter. On the day of the searches, counsel called the prosecutors, and they spoke for the first time. Counsel indicated that he would accept service of two grand jury subpoenas to Mr. Combs' businesses.

1.  Counsel Took Possession of Mr. Combs' Passport on April 1, 2024

About a week following the searches, on April 1, 2024, counsel took possession of Mr. Combs' passport. As noted, on this same day, counsel advised the AUSAs of the fact that counsel had Mr. Combs' passport, that we would not return it to him, and that he would not leave the country during the pendency of the investigation. See Ex. 1. We have, in fact, maintained the passports, and Mr. Combs has not, in fact, left the country – despite knowing the investigation was ongoing, despite having a plane at his disposal, despite not being charged with any crime.

2.  Counsel Agreed to Advise the Government of All Domestic Travel

Moreover, counsel advised the Government that if Mr. Combs intended to travel domestically, counsel would so inform the AUSAs. See Ex. 1. These two promises have also been kept. For example, on June 9, 2024, counsel advised the AUSAs that Mr. Combs was traveling from Miami to Los Angeles to go on a road trip with his children. See Ex. 5. In addition, we provided the AUSAs with information about when his flight departed and it would land. Id. On June 29, 2024, counsel emailed the prosecutors that Mr. Combs was flying to Wyoming via a chartered aircraft. See Ex. 6 at 3. On July 5, 2024, counsel emailed the prosecutors that he was traveling back to Los Angeles. Id. Two days later, on July 7, 2024, when he travelled back to

**AGNIFILO**
**INTRATER**

---

Miami via a chartered aircraft, we again emailed the AUSAs. Id. at 2. In addition, when Mr. Combs planned travel but not take those trips, we notified the prosecutors of that as well. See id. at 1.

### 3.   Counsel Advised the Government of Mr. Combs' Efforts to Sell His Airplane

On May 21, 2024, counsel advised the AUSAs during a phone call that Mr. Combs had commenced efforts to sell his airplane. We followed up on that conversation the next day, on May 22, 2024, with a letter to the AUSAs that efforts were underway to sell the aircraft and reminding the AUSAs that counsel continued to be in possession of his passport. See Ex. 7.

Over the past several months, there have been several potential buyers for the airplane and at least two buyers have signed a Letter of Intent to purchase the aircraft. Just this weekend, a buyer for the aircraft and representatives for Mr. Combs executed a Letter of Intent. Due to the nature of this asset, and the amount of inspection and due diligence that is required for a purchase, it is not a simple asset to offload.

In advance of the plane being sold – which it eventually will be – we have agreed to keep the airplane in Los Angeles while Mr. Combs resides in his home in Florida, if it is not being chartered. Coincidentally, and not at Mr. Combs' request, yesterday the airplane was chartered on a Part 135 flight[8] from Los Angeles to Teterboro, NJ. Mr. Combs had no advance knowledge of the flight, nor did he possess any control over its movement last night. Obviously, Mr. Combs agrees to not go to any state – in this case, New Jersey – in which his airplane is located pending its sale, which is actively being pursued.

### 4.   Mr. Combs Voluntarily Relocated to New York in Advance of His Arrest

Once it became apparent to counsel that Mr. Combs' arrest was imminent, he promptly relocated to New York City. On September 5, 2024, Mr. Combs arrived in New York, and counsel immediately informed the Government of Mr. Combs' whereabouts. Counsel offered to continually share Mr. Combs' location with the Government. Since arriving in New York on September 6, Mr. Combs has been staying at the Park Hyatt New York. Due to bookings made at the Park Hyatt prior to Mr. Combs' reservation, after September 17, 2024, he would no longer be able to stay at the Park Hyatt. Accordingly, Mr. Combs had a reservation to stay at the Carlyle Hotel starting yesterday. Mr. Combs and counsel have also been looking for a short term rental for Mr. Combs in New York City so that he could reside here until the Government made the determination as to whether they would charge him.

---

[8] Pursuant to the Code of Federal Regulations Part 135 ("Part 135"), a private jet may be available to the general public for use. Part 135 pertains to Mr. Combs' airplane, and, therefore, can be chartered by the general public.

# AGNIFILO
# INTRATER

5. <u>Counsel Advised the Government That It Was in Possession of the Passports of Members of Mr. Combs' Family</u>

On June 13, 2024, counsel informed the Government that we possessed Mr. Combs' mother's passport. <u>See</u> Ex. 8. We also informed the Government that we possessed the passports of his four daughters (all of whom were minors at the time we took possession of the passports). We will have all passports with us in court at today's hearing.

6. <u>Counsel's Assistance to the Government Concerning the Subpoenas</u>

As stated above, counsel accepted service of two subpoenas directed at several of Combs' businesses in March of 2024. Separate counsel for the entities filed a motion to quash those subpoenas in April of 2024. In May of 2024, upon becoming sole counsel in connection with the criminal investigation of Mr. Combs, we advised the Court that it would withdraw the motion to quash the Grand Jury subpoenas and instead that the parties would meet and confer with the Government to minimize the number of requests on which the parties disagreed. Counsel agreed to begin gathering documents responsive to the subpoena.

For the past several months, counsel for Mr. Combs and the AUSAs have had regular discussions about what documents we had, what we did not have and, in regard to the documents we did not have, where the Government may be able to find such documents. We did this for two reasons. First, there was nothing, in counsel's estimation, that would constitute evidence of Mr. Combs being involved in any federal crime. Second, we wanted to be appropriately helpful to the Government in its investigation. To that end, the Combs entities have produced over 144,000 pages of documents to the SDNY in compliance with the subpoena.

6. <u>Paying Off the Mortgage at 2 West Star Island in Miami</u>

As noted in the discussion about the bail package, on August 20, 2024, Mr. Combs caused the outstanding mortgage to be paid on his primary residence in Miami. This payment of about $18,000,000 was for one reason alone: so that he would have this $48,000,000 residence free and clear of any encumbrances so that it can be used to secure a bond. We submit this is a truly extraordinary measure that shows resoundingly that Mr. Combs is appropriately focused on defending this case on the merits in this Court.

## **Legal Standard**

Because Mr. Combs is presumed to be innocent, the Supreme Court has observed that "liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." <u>United States v. Salerno</u>, 481 U.S. 739, 755 (1987). As the Supreme Court recognizes, "the function of bail is limited." <u>Stack v. Boyle</u>, 342 U.S. 1, 4 (1954). The underling goal is securing the presence of the defendant rather than "the sum of bail." <u>United States v. Nebbia</u>, 357 F.2d 303, 304 (2d Cir. 1966). When deciding an issue of pretrial release, the Second Circuit has noted that "the court should bear in mind that it is only a limited group of offenders who should be denied

6

# AGNIFILO
# INTRATER

---

bail pending trial." <u>United States v. Shakur</u>, 817 F.2d 189, 195 (2d Cir. 1987). Indeed, the Bail Reform Act requires that the Court impose "the least restrictive . . . condition, or combination of conditions, that will . . . reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. § 3142(c)(1)(B).

While there is a presumption of detention in sex trafficking cases, **this presumption is rebuttable**. The presumption imposes on the defendant a "burden of production," while the "burden of persuasion" remains with the Government. <u>United States v. Mercedes</u>, 254 F.3d 433, 436 (2d Cir. 2001). Although this burden "is not heavy," the defendant must introduce some evidence contrary to the presumed fact. <u>United States v. Rodriguez</u>, 950 F.2d 85, 88 (2d Cir. 1991). A defendant can satisfy this burden by coming forward "with evidence that he does not pose a danger to the community or a risk of flight." <u>Mercedes</u>, 254 F.3d at 436. Even if the defendant presents some evidence satisfying his or her burden, "the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court." <u>Id</u>. In <u>Jessup</u>, the benchmark case defining this burden shift, the court explained:

> Since the presumption is but one factor among many, its continued consideration by the magistrate does not impose a burden of persuasion upon the defendant. And, since Congress seeks only consideration of the general drug offender/flight problem, the magistrate or judge may still conclude that what is true in general is not true in the particular case before him. He is free to do so, and to release the defendant, as long as the defendant has presented some evidence and the magistrate or some judge has evaluated all of the evidence with Congress's view of the general problem in mind.

<u>United States v. Jessup</u>, 757 F.2d 378, 384 (1st Cir. 1985).

## Section 3142(g) Factors

Acknowledging that sex trafficking has a rebuttable presumption of detention, Mr. Combs can rebut such a presumption with evidence that he does not pose a danger to the community and is not a risk of flight. (18 U.S.C. § 3142(c)(1)(B).) An analysis of the Section 3142(g) factors weigh in favor of releasing Mr. Combs on these conditions.

1. <u>The Nature and Circumstances of the Offense</u>

Mr. Combs is charged with a three-count indictment. The first count charges Mr. Combs with a Racketeering Conspiracy in violation of 18 U.S.C. § 1962(d) ("Count One"). Count One alleges that Mr. Combs "relied on the employees, resources, and influence of the multi-faceted business empire that he led and controlled—creating a criminal enterprise whose members and associates engaged in, and attempted to engage in, among other crimes, sex trafficking, forced labor, kidnapping, arson, bribery, and obstruction of justice," and that the conspiracy lasted "[f]rom at least in or about 2008, through on or about the filing of this Indictment." Indictment ¶¶ 1, 13. As alleged, the "pattern of racketeering" consisted of: (a) "multiple acts involving

## AGNIFILO
## INTRATER

kidnapping" in violation of California law; (b) "multiple acts of arson" in violation of California law; (c) "multiple acts involving bribery" in violation of California law; (d) "multiple acts indictable under" 18 U.S.C. § 1512, "relating to tampering with a witness, victim, or an informant"; (e) "multiple acts indictable under "18 U.S.C. §§ 1589 and 2, "relating to forced labor"); (f) "multiple acts indictable under" 18 U.S.C. §§ 1591 and 2, "relating to sex trafficking"); (g) "multiple acts indictable under" 18 U.S.C. §§ 2421, 2422, and 2, "relating to transportation and inducement to travel for purposes of prostitution and other illegal sexual activities"; and (f) "multiple offenses involving the possession with intent to distribute, or distribution of narcotics and controlled substances, including cocaine, oxycodone, alprazolam, 3,4-Methylenedioxymethamphetamine, 4-Brono-2, 5-dimethoxyphenethylamine, gamma hydroxybutyric acid, and ketamine," in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), (b)(1)(E), (b)(2), and 846, "distribution and possession with intent to distribute and conspiracy to commit the same" and 18 U.S.C. § 2, "aiding, abetting, and willfully causing." Indictment ¶ 13. Count One also includes a "Notice of Special Sentencing Factor" in connection with Mr. Combs' alleged agreement that "means of force, threats of force, fraud, and coercion . . . would be used to cause the person to engage in a commercial sex act." Id. at ¶ 15.

The second count charges Mr. Combs with Sex Trafficking by Force in violation of 18 U.S.C. §§ 1591(a)(1), (b)(1), 1954(a), and 2 ("Count Two"). Count Two alleges that, "[f]rom at least in or about 2009, up to an including in or about 2018," Mr. Combs "recruited, enticed, harbored, transported, and maintained a person ('Victim-1'), and attempted, aided and abetted, and willfully caused Victim-1, to engage in commercial sex acts, knowing and in reckless disregard of the fact that Victim-1 was engaging in commercial sex acts as a result of force, fraud, and coercion." Indictment ¶ 16.

The third count charges Mr. Combs with Transportation to Engage in Prostitution in violation of 18 U.S.C. §§ 2421(a) and 2 ("Count Three"). Count Three alleges that "[f]rom in or about 2009, up to an including in or about 2024," Mr. Combs "transported, aided and abetted, and willfully caused the transportation of female victims and commercial sex workers in interstate and foreign commerce on multiple occasions with the intent that they engage in prostitution." Indictment ¶ 17.

2.  <u>Defendant's History and Characteristics</u>

Mr. Combs' history and characteristics are best demonstrated by the way he has responded to this investigation from the very inception to his most recent decision to travel to New York when his lawyers told him that the case could soon be starting. He has never run from a challenge, and he will not run from this one. Instead, he takes these challenges head on, he moves toward them confidently and with the assurance that right is on his side. These are not merely the words of his lawyer. Rather, the actions of Mr. Combs over the last several months conclusively prove this.

Aside from his actions since the inception of the investigation, Mr. Combs' character is shown through his demonstrated contributions to society in several important areas. First, he has

# AGNIFILO
# INTRATER

---

given generously over his entire life to charitable causes. To name only a few examples, since founding Bad Boy Entertainment in 1993, Mr. Combs has actively supported and donated millions to after school programs and organizations like the Boys & Girls Clubs of America. His commitment stems from the positive influence such programs had on his own childhood, inspiring him to give back to similar initiatives. He has also supported organizations including the National Foundation for Teaching Entrepreneurship ("NFTE"), further emphasizing his dedication to creating opportunities for young entrepreneurs.

A cornerstone of his philanthropy is education, and he fulfilled a lifelong dream when he, with a partner, opened Capital Preparatory Harlem Capital Charter School in 2016, to provide high-quality education to inner-city youth in New York City. The success of this initiative led to the launch of Capital Preparatory Bronx Charter School in 2020, with Combs donating $1 million to support its development. These schools are part of his broader commitment to education, which includes significant contributions to Historically Black Colleges & Universities, such as $2 million to Howard University and $1 million to Jackson State University in 2023.

Mr. Combs has also been proactive in health and disaster relief efforts—having raised over $2 million for New York City public schools and hosting a virtual dance-a-thon that raised more than $4 million to provide personal protective equipment to healthcare workers on the front line of the COVID-19 pandemic. Particularly important in an election year is Mr. Combs' contribution to mobilizing young voters with the "Vote or Die" slogan through Citizen Change, which he founded to significantly increase political awareness and youth voter turnout.

Second, few people have done more to advance the cause of black people in the music, entertainment and fashion industries than has Sean Combs. While he has always been controversial, he has also always championed minorities and underrepresented communities. As Chairman of Combs Global, Mr. Combs has used his platform to create "The Excellence Program," an internship initiative with Endeavor in July 2021, a major initiative designed to provide development opportunities for aspiring executives in entertainment, marketing, music, and fashion from underrepresented communities. Mr. Combs' philanthropic work has earned him numerous accolades throughout his career, including the Triumph Award from the National Action Network in 2016, the Superhero Award from Room to Read in 2017, the Child of America Award from the Carver Foundation in 2018 and in 2023 the Icon Award from the Apollo.

Through his multifaceted career, Mr. Combs has not only created thousands of jobs, including valuable internships for young professionals, but has also supported minority and women-owned businesses, leveraging them as key suppliers and vendors for his enterprises.

3. <u>Danger to the Community</u>

The Government has argued that Mr. Combs is a danger to the community and that "what makes this defendant even more dangerous is his extensive and exhaustive history of obstruction of justice." (<u>See</u> Ex. 9: 9/17/24 Tr. at 12.) They laid out several allegations that do not in fact amount to obstruction at all. The truth is that Mr. Combs has done nothing to obstruct this

# AGNIFILO
# INTRATER

---

investigation, and the Government does not persuasively argue otherwise. Moreover, while over the past six months the defense has been conducting a defense investigation every bit as rigorous as that being conducted by the Government, we have studiously avoided interviewing grand jury witnesses (even though we have the right to interview anyone) and have done everything in our power to be both effective and mindful of the fact that the Government has been conducting an investigation parallel to our own.

    a. <u>March 5, 2016</u>

The Government proffered "one example" for the Court of Mr. Combs' "exhaustive history of obstruction of justice." (<u>See</u> Ex. 9, 9/17/24 Tr. at 12.) This "obstruction" related to an incident caught on video *eight* years ago and attached to the Government's letter as Exhibit A. However, the circumstances surrounding this incident, even in the light most favorable to the Government, does not amount to obstruction. Obstruction of justice requires that a person act corruptly and in regard to an official proceeding. Even under the facts proffered by the Government, there was no official proceeding in fact or in the contemplation of Mr. Combs or anyone else. This event from 8 years ago simply is not obstruction of justice under Title 18, U.S.C., Sec. 1512.

Second, the Government argued that when the female depicted in the video filed a 35-page civil lawsuit in November 2023 against Mr. Combs, and Mr. Combs publicly responded by saying "I did not do any of the awful things alleged," that these denials were "further attempts by him to obstruct justice and prevent the truth of this event from being known." (<u>Id.</u> at 14.) To be clear, preventing the truth of an embarrassing event in which Mr. Combs is caught on videotape in an alleged assault is not obstruction of justice.

The gravamen of the civil lawsuit was not misdemeanor assault, which is, at most, what is depicted in the recording, but sex trafficking. He denied it then. He denies it now. He will deny it forever.

    b. <u>Contacting "Potential Victims and Witnesses"</u>

The Government argues that Mr. Combs himself has contacted witnesses, including one who received a grand jury subpoena, and at least one victim. (<u>Id.</u> at 16-17.) Again, this is not obstruction of justice, and the Government does not point to any obstructive conduct. Mr. Combs is entitled to gather witnesses to defend himself against the Government's allegations of sex trafficking and racketeering. As part of that defense, he, with counsel's blessing, has called potential defense witnesses to let them know that counsel would reach out to speak with them. Tellingly, the Government does not point to—nor can they—any conversation Mr. Combs has had with a potential witness since he had knowledge of the criminal investigation where he pressured any witness to change their story.

Instead, the Government points to Mr. Combs' contact with a female member of a band called *Diddy – Dirty Money* after the filing of a lawsuit against Mr. Combs by *another* female

# AGNIFILO
# INTRATER

---

member of that band. (Id. at 17.) As counsel stated at yesterday's bail hearing, "this is the furthest thing from witness obstruction I can think of":

> And so someone with the exact point of view of the civil plaintiff comes forward and says, in essence -- and this is -- I thought it was a soft, respectful statement. And the statement was, I am not taking away her experience. That wasn't mine. That wasn't my experience. She is entitled to her experience. I was there. That's not what I saw. That's not what I saw. That's two witnesses having divergent recollections of similar events. And I expect this trial is going to feature exactly that. So there is nothing wrong with that. That's why we have criminal trials and civil trials.

(Id. at 41.)

### c. The Proposed Package Will Address the Government's Stated Concerns for Witnesses

The Government has further argued that "detailed evidence of [] Freak Offs in the form of travel records, communications, hotel records, witnesses, and videos." (Id. at 15.) To be clear, the defendant's companies, through this very counsel, has produced many of these travel records to the Government. To punish the defendant for complying with process (specifically producing travel records) because such travel records have corroborated witnesses stories, is mind boggling.

The Government further argues that their "investigation has yielded evidence of numerous assaults against female victims and other individuals." (Id. at 14.) The proposed package will address the Government's concern here as Mr. Combs will agree to not have any female non-family visitors to his house, and his security company will keep a record of all incoming and outgoing visitors.

### d. To the Extent the Court Is Concerned With Obstruction and Danger, the Proposed Conditions Address These Concerns Completely

Before addressing the proposed conditions that relate to danger and obstruction, it is critical to note that every allegation in the Indictment and every argument in the Government's detention letter is being factually contested in detail. We are not merely making general denials of guilt. Rather, we are advancing detailed, specific facts that undermine the Government's theory at its core.  We will provide examples of this.

First, there is one alleged sex trafficking victim in the Indictment. **One.** The Government can say what it wants, but what is actually charged is one victim. Count Two, charging sex trafficking mentions Victim 1. There is no Victim 2. That one person was in a ten-year romantic relationship with Sean Combs. That one person was an adult woman who lived alone, who never lived with Sean Combs. She had her own friends, she had her own life, as adults tend to do. Mr. Combs and this person were very much in love for a long time, as the many written

11

**A-052**

## AGNIFILO
## INTRATER

---

communications between them show. This one person often expressed anger and jealousy because Mr. Combs had another girlfriend, as will be testified to by many witnesses and as the written communications show. At the end of Mr. Combs and this person's relationship, she started a relationship with her trainer, which prompted Mr. Combs and the woman to break up. He did not force her stay, but instead, released her from any obligation to his record label. A month later, when the mother of four of Mr. Combs' children passed away, this person was present at multiple memorial services around the country to support him. This is not sex trafficking.

Five years later, this woman hired a lawyer to contact Mr. Combs' lawyer. Mr. Combs' lawyer recorded the conversation., which lasted 8 minutes and 12 seconds. The woman's lawyer said the woman wrote a book, it would be a "tell-all" book that would be embarrassing to Mr. Combs. Her lawyer said that she would be meeting with book publishers to publish the book. However, if Mr. Combs wanted to buy the exclusive rights to the book, then he would own the rights and could prevent the book from ever being published. Her lawyer then said that in order to stop the book from being published, Mr. Combs would have to pay $30,000,000.

When that clear extortion proved unavailing, the woman took another tack. She hired a lawyer to bring a civil complaint, taking advantage of an expanded statute of limitations for sex cases. Mr. Combs settled the case. This was not because he raped or sex trafficked anyone, but because of the disastrous consequences a lawsuit of this nature would have on him and his business interests.

We are now in a position where the only person alleged to be a victim in Count Two extorted Combs (on audio tape) and profited millions of dollars (the precise settlement of the civil suit remains confidential). We have countless written communications that tend to negate any lack of consent and any coercion. The evidence shows a long-term loving relationship that became strained by mutual infidelity and jealously. The evidence of this, and this alone, is overwhelming. There was no sex trafficking, there was no sex crime of any sort, and we will conclusively prove that at a trial. If the presumption of innocence means anything, it means that when a proffered, detailed, factual defense is readily apparent, the Court should reserve judgment, and should wait for the facts and the trial.

That all being said, we are willing to agree to significant conditions outlined as though Mr. Combs is a danger, which he is plainly not. As indicated above, we are willing to restrict visitors to his home, we are willing to ensure that he not contact known witnesses and we are willing to have him undergo weekly drug testing, in addition to the other conditions outlined on pages 2 and 3 of this letter.

### A Review of Other Sex Trafficking Cases in the Southern and Eastern Districts Are Not Similar to This Case

At yesterday's bail hearing, the Government argued that this case is in the "heartland of detention cases of this magnitude and this similar [] charged conduct." (Ex. 9 at 19.) This is not accurate:

# AGNIFILO
# INTRATER

---

First, the Government cited to United States v. Jeffrey Epstein, 19 Cr. 490 (RMB), where the defendant was detained pending trial. In Epstein, the defendant was arrested after landing on his private jet at Teterboro airport, having just travelled internationally to France. In contrast, Mr. Combs has not flown internationally since November of 2023, and made a commitment to the prosecutors after the raids on his homes, that he would not travel out of the country during the pendency of the investigation. Additionally, unlike here, where there are *no* allegations that Mr. Combs trafficked minors, Epstein was alleged "to be a serial sexual predator who preyed on dozens of minor girls over a period of years." (United States v. Epstein, 19 Cr. 490 (RMB) (S.D.N.Y. July 12, 2019) (ECF 11-1).

Second, the Government cited to United States v. Keith Raniere, 18 Cr. 204 (NGG), a sex trafficking case in the Eastern District of New York, in which the undersigned were counsel. Mr. Raniere was arrested in a town in Mexico, to which the Government alleged he fled when he learned of the Eastern District of New York's investigation into his alleged conduct. Here, unlike in Raniere, Mr. Combs travelled *to* the District that was investigating him. Moreover, at the time of the bail hearing in Raniere, the Government alleged that he had multiple relationships with minors. Here, there is no such allegation.

The Government turned to United States v. Robert Kelly a/k/a R. Kelly, 19 Cr. 286 (AMD) from the Eastern District of New York, which, like the others above, centered around abuse of minors over a prolonged period of time. We do not have those allegations here.

Additionally, there are significant distinctions between Mr. Combs' compliance with the Government's investigation and defendant Ghislaine Maxwell in United States v. Maxwell, 20 Cr. 330 (AJN), a recent sex trafficking case from this district, where the defendant was not granted bail. There, Judge Nathan denied Maxwell bail where attempted to evade detection by the media and by law enforcement ("the Defendant has demonstrated an extraordinary capacity to evade detection, "[e]ven in the face of what the Defense has acknowledged to be extreme and unusual efforts to locate her." Tr. at 87:4–87:19. Indeed, regardless of whether the Defendant sought to evade the press, rather than law enforcement, in the months leading up to her arrest, her sophistication in evading detection reveals the futility of relying on any conditions, including GPS monitoring, restrictive home confinement, and private security guards, to secure her appearance." United States v. Maxwell, 510 F. Supp. 3d 165, 177 (S.D.N.Y. 2020)). Judge Nathan put significant weight on this factor to support detention. Here, Mr. Combs did the complete opposite. He flew *to* the district investigating him a week ago. He has been pubicly in New York City, captured on social media and blogs. Indeed, given his notoriety, he would be unable to evade law enforcement.

### The Proposed Bail Package Addresses Any Issues with Flight and Danger to the Community

In light of the proposed conditions, the actions Mr. Combs had already taken regarding the investigation, and Mr. Combs' lifetime commitment to live up to his obligations concerning every

A-054

## AGNIFILO
## INTRATER

challenge he has ever faced, he should be released to fight this case in court and prove his innocence. It is significant that Mr. Combs' adult sons, his mother, his sister, and two mothers of his children are willing to sign onto such a significant bond. Those closest to him wholeheartedly believe he will return to Court, and this moral suasion is sufficient to ensure compliance with the proposed conditions of release.

Sean Combs has never evaded, avoided, eluded or run from a challenge in his life. He will not start now. As he has handled every hardship, he will meet this case head-on, he will work hard to defend himself, and he will prevail.

Recognizing that a bail hearing is not the time to defend the merits of a criminal case, it is relevant to bail that the defendant has made a clear commitment to defend an eminently defensible case. This is such a case.

Finally, several courts in this District have recognized that the conditions at Metropolitan Detention Center in Brooklyn are not fit for pre-trial detention. Just earlier this summer, an inmate was murdered.[9] At least four inmates have died by suicide there in the past three years.[10] Numerous Courts in this district have raised concerns with the horrific conditions of detention there. See United States v. Chavez, No. 22 Cr. 303 (JMF) (S.D.N.Y. Jan. 4, 2024), Dkt. 31 (describing the conditions at MDC as "dreadful" and "longstanding" and noting that the issues with food contamination and hazardous physical conditions were an "ongoing tragedy"); United States v. Morgan, No. 19 Cr. 209 (RMB) (S.D.N.Y. May 5, 2020), Dkt. 90, Tr. 12-15 (describing the MDC as "dirty," "infested with drugs," and plagued by violence; see also United States v. Boyd, No. 21 Cr. 486 (SHS) (S.D.N.Y. Feb. 3, 2022), Dkt. 74 (describing overcrowding, staffing issues, and lockdowns at the MDC); United States v. Days, No. 19 Cr. 619 (CM) (S.D.N.Y. Apr. 29, 2021), Dkt. 35, Tr. 19 (describing MDC conditions as "disgusting [and] inhuman as anything I've heard about any Colombian prison, but more so because we're supposed to be better than that").

Courts in the Eastern District of New York have shared the same concerns. See United States v. Forbes, No. 22 Cr. 97 (RK) (E.D.N.Y.) (the court noted it was worried about MDC's conditions as one of the reasons for sentencing the defendant to a non-custodial sentence); United States v. Colucci, 23 Cr. 417 (GRB) (E.D.N.Y. Aug 5, 2024) (sentencing a defendant to nine months in prison, but ordering that if BOP designated the defendant to the MDC, the Court would vacate the sentence and resentence to home incarceration.)

_____

[9] See John Annese, Inmate at Brooklyn's Troubled Metropolitan Detention Center Is Stabbed To Death, NY Daily News (Jun. 20, 2024) available at https://www.nydailynews.com/2024/06/20/inmate-at-brooklyns-troubled-metropolitan-detention-center-is-stabbed-to-death-sources/

[10] See Fola Akinnibi & Marie-Rose Sheinerman, Beleaguered Brooklyn Jail Blasted by Candidates in Crowded N.Y. Congressional Race, Bloomberg (Aug. 16, 2022), available at https://www.bloomberg.com/news/articles/2022-08-16/ny-10-democratic-candidates-call-on-feds-to-fix-brooklyn-jail.

14

A-055

# AGNIFILO
# INTRATER

---

### **Conclusion**

For the reasons set forth above, we move this Court to release Combs under the conditions set forth above. Thank you for your consideration.

Respectfully submitted,

Marc Agnifilo
Teny R. Geragos

cc:     Counsel for the Government (via ECF)

15

**A-056**

# EXHIBIT 1

**A-057**

Advanced Research & Appraisal

File No. 22072602

## APPRAISAL OF



### LOCATED AT:

2 Star Island Dr
Miami Beach, FL  33139

### CLIENT:

Tri Star Sports and Entertainment Group
9255 Sunset Blvd., 2nd Floor
West Hollywood, CA, 90069

### AS OF:

June 28, 2022

### BY:

Orna Sarley
Cert Res RD1541

A-058

Advanced Research & Appraisal

File No. 22072602

08/08/2022

Tri Star Sports and Entertainment Group
9255 Sunset Blvd., 2nd Floor
West Hollywood, CA, 90069

File Number:   22072602

In accordance with your request, I have appraised the real property at:

2 Star Island Dr
Miami Beach, FL  33139

The purpose of this appraisal is to develop an opinion of the defined value of the subject property, as improved. The property rights appraised are the fee simple interest in the site and improvements.

In my opinion, the defined value of the property as of    June 28, 2022                    is :

$48,500,000
Forty-Eight Million Five Hundred Thousand  Dollars

The attached report contains the description, analysis and supportive data for the conclusions, final opinion of value, descriptive photographs, assignment conditions and appropriate certifications.

Respectfully submitted,

Orna Sarley
Cert Res RD1541

Donald J Sarley, ASA, IFA, SRA, Cert Res RD259 - Review Appraiser Did Inspect.

# A-059

Advanced Research & Appraisal

## Residential Appraisal Report

File No. 22072602

The purpose of this appraisal report is to provide the client with a credible opinion of the defined value of the subject property, given the intended use of the appraisal.

### PURPOSE

Client Name/Intended User Tri Star Sports and Entertainment Group    E-mail jwoo@team-tristar.com

Client Address 9255 Sunset Blvd., 2nd Floor    City West Hollywood    State CA    Zip 90069

Additional Intended User(s) 2 West Star Island LLC

Intended Use Net Worth Valuation

### SUBJECT

Property Address 2 Star Island Dr    City Miami Beach    State FL    Zip 33139

Owner of Public Record 2 West Star Island LLC    County Miami-Dade

Legal Description 4 54 42 PB 31-60 CORRECTED PL OF STAR ISLAND LOT 2 & 10FT STRIP LOT SIZE 58232 SQ FT OR 18586-4936 04 1999 1 OR 18586-4936 04 1999 7

Assessor's Parcel # 02-4204-001-0020    Tax Year 2021    R.E. Taxes $ 432,180.59

Neighborhood Name Star Island    Map Reference 54-42-04    Census Tract 981000

Property Rights Appraised [X] Fee Simple    ☐ Leasehold    ☐ Other (describe)

### SALES HISTORY

My research ☐ did [X] did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.

Prior Sale/Transfer: Date 11/01/2003    Price $14,500,000    Source(s) DCPA OR Book 21872-3313

Analysis of prior sale or transfer history of the subject property (and comparable sales, if applicable)    Most recent sale reported above. No other transfers within the past twenty years.

Offerings, options and contracts as of the effective date of the appraisal    MatrixMLS reported no listing activity for the property that is the subject of this report. No known offerings, options or contracts as of the effective date of the appraisal.

### NEIGHBORHOOD

| Neighborhood Characteristics | | | One-Unit Housing Trends | | | | One-Unit Housing | | | Present Land Use % | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Location | ☐ Urban | [X] Suburban | ☐ Rural | Property Values | ☐ Increasing | [X] Stable | ☐ Declining | PRICE $(000) | AGE (yrs) | One-Unit | 95 % |
| Built-Up | [X] Over 75% | ☐ 25-75% | ☐ Under 25% | Demand/Supply | ☐ Shortage | [X] In Balance | ☐ Over Supply | Low 1,995 | 0 | 2-4 Unit | % |
| Growth | ☐ Rapid | [X] Stable | ☐ Slow | Marketing Time | ☐ Under 3 mths | [X] 3-6 mths | ☐ Over 6 mths | High 75,000 | 100 | Commercial | % |
| | | | | | | | | Pred. 30,000 | 72 | Other Vacant | 5 % |

Neighborhood Boundaries See Attached Addendum

Neighborhood Description See Attached Addendum

Market Conditions (including support for the above conclusions) See Attached Addendum

### SITE

Dimensions 37.21'x248.30'x411'x254.48'x410'    Area 58,232 Sq.Ft.    Shape Pie shaped    View Biscayne Bay

Specific Zoning Classification RS-1    Zoning Description Single Family Low Density (up to 2 du/per acre)

Zoning Compliance [X] Legal    ☐ Legal Nonconforming (Grandfathered Use)    ☐ No Zoning    ☐ Illegal (describe)

Is the highest and best use of the subject property as improved (or as proposed per plans and specifications) the present use? [X] Yes ☐ No If No, describe.

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements—Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | [X] | | Water | [X] | | Street Asphalt paved | [X] | |
| Gas | [X] | | Sanitary Sewer | [X] | | Alley None | | |

Site Comments    Site is level and pie shaped with 254.48 linear feet on Biscayne Bay with seawall, dock and deck. Side sides the entry road to the development with no measurable negative impact on the site. The subject is located on a private island community with a guard stationed at entry restricting access to residents and announced guests. The community has private streets and improvements. Streets and improvements leading to the development are public. Typical utility and maintenance easements exist with no negative impact on site.

### IMPROVEMENTS

| GENERAL DESCRIPTION | | FOUNDATION | | EXTERIOR DESCRIPTION | materials | INTERIOR | materials |
|---|---|---|---|---|---|---|---|
| Units ☐ One [X] One w/Acc. unit | | ☐ Concrete Slab [X] Crawl Space | | Foundation Walls Concrete Piling | | Floors Hardwood;Tiles | |
| # of Stories 2 | | ☐ Full Basement ☐ Partial Basement | | Exterior Walls CBS | | Walls Plaster | |
| Type [X] Det. ☐ Att. ☐ S-Det./End Unit | | Basement Area sq. ft. | | Roof Surface Tiles | | Trim/Finish Wood | |
| [X] Existing ☐ Proposed ☐ Under Const. | | Basement Finish 0 % | | Gutters & Downspouts Overhang | | Bath Floor Quary Tiles | |
| Design (Style) Traditional | | ☐ Outside Entry/Exit ☐ Sump Pump | | Window Type Impact Glass | | Bath Wainscot Quary Tiles | |
| Year Built 2002 | | Evidence of ☐ Infestation | | Storm Sash/Insulated Yes;Yes | | Car Storage ☐ None | |
| Effective Age (Yrs) 10 | | ☐ Dampness ☐ Settlement | | Screens Yes | | [X] Driveway # of Cars 10 | |
| Attic ☐ None | | Heating [X] FWA ☐ HW ☐ Radiant | | Amenities ☐ WoodStove(s) #0 | | Driveway Surface Brick paved | |
| [X] Drop Stair ☐ Stairs | | ☐ Other Fuel Electric | | [X] Fireplace(s) # 2 [X] Fence Wall;Iron | | [X] Garage # of Cars 2 | |
| ☐ Floor ☐ Scuttle | | Cooling [X] Central Air Conditioning | | [X] Patio/Deck Brick [X] Porch Roofed | | ☐ Carport # of Cars 0 | |
| ☐ Finished ☐ Heated | | ☐ Individual ☐ Other None | | [X] Pool w/Jacuzzi [X] Att. | | ☐ Att. ☐ Det. ☐ Built-in | |
| Appliances [X] Refrigerator [X] Range/Oven | | ☐ Dishwasher ☐ Disposal ☐ Microwave | | [X] Washer/Dryer [X] Other (describe) Numerous appliances | | | |

Finished area above grade contains:    17 Rooms    7 Bedrooms    7.2 Bath(s)    14,783 Square Feet of Gross Living Area Above Grade

Additional features (special energy efficient items, etc.)    Water front site with 254.48± linear feet on Biscayne Bay offering excellent views and boating amenities. Property is fenced and has an electric gate. Beyond the gate is a courtyard with ample parking. There is a swimming pool and jacuzzi, dock and deck, cabana structure  with a bar and cooking facilities and cabana full bathroom and multiple open showers.

Comments on the Improvements    See Attached Addendum



# A-060

Advanced Research & Appraisal
## Residential Appraisal Report

File No. 22072602

| FEATURE | SUBJECT | COMPARABLE SALE NO. 1 | +(-) $ Adjustment | COMPARABLE SALE NO. 2 | +(-) $ Adjustment | COMPARABLE SALE NO. 3 | +(-) $ Adjustment |
|---|---|---|---|---|---|---|---|
| | 2 Star Island Dr | 34 Star Island Dr | | 8 Star Island Dr | | 46 Star Island Dr | |
| Address | Miami Beach, Fl 33139 | Miami Beach, Fl 33139 | | Miami Beach, Fl 33139 | | Miami Beach, Fl 33139 | |
| Proximity to Subject | | 0.18 miles NE | | 0.13 miles NW | | 0.40 miles NE | |
| Sale Price | $ | | $  30,000,000 | | $  75,000,000 | | $  38,000,000 |
| Sale Price/Gross Liv. Area | $  0.00 sq. ft. | $  4,062.84 sq. ft. | | $  5,072.71 sq. ft. | | $  2,458.43 sq. ft. | |
| Data Source(s) | | MatrixMLS #A11039509/DOM 230 | | MatrixMLS #A11081499/DOM 122 | | MatrixMLS #A10597515/DOM 764 | |
| Verification Source(s) | | Tax Rolls/IMAPP | | Tax Rolls/IMAPP | | Tax Rolls/IMAPP | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sale or Financing | | ArmLth | | ArmLth | | ArmLth | |
| Concessions | | Cash;0 | | Cash;0 | | Cash;0 | |
| Date of Sale/Time | | s01/22;c01/22 | 1,200,000 | s12/21;c12/21 | 3,750,000 | s03/21;c02/21 | 5,700,000 |
| Location | Suburban | Suburban | | Suburban | | Suburban | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 58,232 Sq.Ft. | 40,000 Sq.Ft. | 5,469,600 | 80,000 Sq.Ft. | -6,530,400 | 61,301 Sq.Ft. | -920,700 |
| View | Biscayne Bay | Biscayne Bay | | Biscayne Bay | | Biscayne Bay | |
| Design (Style) | Modern 2 Sty | Traditional 2 Sty | 0 | Traditional 2 Sty | 0 | Traditional 2 Sty | 0 |
| Quality of Construction | Very Good | Very Good | | Excellent | -1,200,000 | Very Good | |
| Actual Age | 20± Yrs 10 eff | 61+/- Yrs 40 eff | 3,000,000 | 29+/- Yrs 10 eff | | 99+/- Yrs 60 eff | 5,000,000 |
| Condition | Very Good | Average Good | 1,000,000 | Excellent | -500,000 | Average Good | 1,000,000 |
| Above Grade | Total | Bdrms | Baths | Total | Bdrms | Baths | |
| Room Count | 17 | 7 | 7.2 | 18 | 9 | 9.1 | -37,500 | 17 | 9 | 8.3 | -37,500 | 20 | 10 | 10.2 | -75,000 |
| Gross Living Area | 300.00  14,783 sq. ft. | 7,384 sq. ft. | 2,219,700 | 14,785 sq. ft. | 0 | 15,457 sq. ft. | -202,200 |
| Basement & Finished | 0sf | 0sf | | 0sf | | 0sf | |
| Rooms Below Grade | 254.5' FF Water | 100' FF Water | 7,725,000 | 202' FF Water | 2,625,000 | 252' FF Water | 125,000 |
| Functional Utility | Good | Good | | Good | | Good | |
| Heating/Cooling | Central | Central | | Central | | Central | |
| Energy Efficient Items | Appliances | Appliances | | Appliances | | Appliances | |
| Garage/Carport | 2 Car Garage | 3 Car Garage | -50,000 | 4 Car Garage | -100,000 | 6 Car Garage | -200,000 |
| Porch/Patio/Deck | Patio/Deck,Porch | Patio,Porch,Dock | | Patio,Porches,Dock | | Patio,Porches,Dock | |
| | F/P; Elevator | F/P; Elevator | | F/P; Elevator | | F/P; Elevator | |
| | Fence,Pool,Balcony | Fence,Pool,Balcony | | Fence,Pool/Spa,Dock | | Fence,Pool/Spa,Balcony | |
| | | Fully furnished | -1,000,000 | | | Detached G.L.A. | Size ??? |
| Net Adjustment (Total) | | X + □ - $ 20,526,800 | | X + □ - $ 2,992,900 | | X + □ - $ 10,427,100 | |
| Adjusted Sale Price | | Net Adj. 68.4% | | Net Adj. -4.0% | | Net Adj. 27.4% | |
| of Comparables | | Gross Adj. 69.0% $ 50,526,800 | | Gross Adj. 21.0% $ 72,007,100 | | Gross Adj. 34.8% $ 48,427,100 | |

Summary of Sales Comparison Approach   Six closed sales, an active listing and a recently expired listing are included in the appraisal analysis.
See additional comparables attached. See Attached Addendum For Comments.

Indicated Value by Sales Comparison Approach $ 48,500,000

### COST APPROACH TO VALUE

Site Value Comments   See Attached Addendum

| | | | | | |
|---|---|---|---|---|---|
| ESTIMATED □ REPRODUCTION OR X REPLACEMENT COST NEW | | OPINION OF SITE VALUE ............................................. = $ | 36,000,000 |
| Source of cost data  Marshall Swift & Boeckh Cost Estimator | | Dwelling    14,783 Sq. Ft. @ $ 650.00 ........... = $ | 9,608,950 |
| Quality rating from cost service  5.0    Effective date of cost data  Current | | Sq. Ft. @ $ .................... = $ | |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | | pools, spa, porches, cabana, bars | 2,000,000 |
| Cost approach has been developed and improvements with | | Garage/Carport   1,793 Sq. Ft. @ $ 200.00 ...... = $ | 358,600 |
| effective age estimated and depreciation with renovations and | | Total Estimate of Cost-New ................................ = $ | 11,967,550 |
| updates over the years. No measurable external obsolescence is | | Less  80  Physical   Functional   External | |
| noted due to location next to entry road. | | Depreciation  $1,495,943   $0   $0 ........... = $( | 1,495,943 ) |
| | | Depreciated Cost of Improvements ........................ = $ | 10,471,607 |
| | | "As-is" Value of Site Improvements ...................... = $ | 2,000,000 |
| | | | |
| | | INDICATED VALUE BY COST APPROACH ................... = $ | 48,471,600 |

### INCOME APPROACH TO VALUE

Estimated Monthly Market Rent $ _____  X Gross Rent Multiplier _____ = Indicated Value by Income Approach $ _____

Summary of Income Approach (including support for market rent and GRM)  Not developed

Methods and techniques employed:  X Sales Comparison Approach   X Cost Approach   □ Income Approach   □ Other:

Discussion of methods and techniques employed, including reason for excluding an approach to value:   The sales comparison approach is developed best reflects the motives of knowledgeable buyers and sellers in an active market. The cost approach has been developed and is given limited reliance as subject is an existing property with physical depreciation. The income approach is not developed as high end properties are not typically used as rentals.

Reconciliation comments:   Reliance is placed on the sales comparison approach as it best reflects the motives of buyers and sellers in this market. The cost approach has been developed and is a supportive indicator. The income approach has not been developed due to the limited rental data in this mostly owner occupied neighborhood and this approach is not needed for credible valuation results.

Based on the scope of work, assumptions, limiting conditions and appraiser's certification, my (our) opinion of the defined value of the real property that is the subject of this report as of   06/28/2022        , which is the effective date of this appraisal, is:

X Single point $  48,500,000    □ Range $ _____ to $ _____    □ Greater than $ _____    □ Less than $ _____

This appraisal is made  X "as is",  □ subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed,
□ subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed  □ subject to the following:



Produced using ACI software, 800.234.8727 www.aciweb.com
Page 2 of 4

This form Copyright © 2005-2016 ACI, a First American Company. All Rights Reserved.
(gPAR™) General Purpose Appraisal Report  3/2017
GPARSUM_17  03272017

# A-061

Advanced Research & Appraisal

## Residential Appraisal Report

File No. 22072602

| FEATURE | SUBJECT | COMPARABLE SALE NO. 4 | | COMPARABLE SALE NO. 5 | | COMPARABLE SALE NO. 6 | |
|---|---|---|---|---|---|---|---|
| Address | 2 Star Island Dr<br>Miami Beach, Fl 33139 | 13 Star Island Dr<br>Miami Beach, Fl 33139 | | 1 Star Island Dr<br>Miami Beach, Fl 33139 | | 276 Bal Bay Dr<br>Bal Harbour, Fl 33154 | |
| Proximity to Subject | | 0.21 miles NW | | 0.03 miles SE | | 8.70 miles NE | |
| Sale Price | $ | | $ 32,500,000 | | $ 35,000,000 | | $ 41,500,000 |
| Sale Price/Gross Liv. Area | $ 0.00 sq. ft. | $ 2,210.28 sq. ft. | | $ 4,381.57 sq. ft. | | $ 4,558.44 sq. ft. | |
| Data Source(s) | | MatrixMLS #A10848236;DOM 98 | | MatrixMLS #A10853066;DOM 238 | | MatrixMLS #A11087353;DOM 181 | |
| Verification Source(s) | | Tax Rolls/IMAPP | | Tax Rolls/IMAPP | | Tax Rolls/IMAPP | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sale or Financing | | ArmLth | | ArmLth | | ArmLth | |
| Concessions | | Cash;0 | | Conv;0 | | Cash;0 | |
| Date of Sale/Time | | s08/20;c07/20 | 7,150,000 | s07/21;c03/21 | 4,900,000 | s06/22;c03/22 | 830,000 |
| Location | Suburban | Suburban | | Suburban | | Suburban | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 58,232 Sq.Ft. | 40,000 Sq.Ft. | 5,469,600 | 58,332 Sq.Ft. | -30,000 | 46,279 Sq.Ft. | 3,585,900 |
| View | Biscayne Bay | Biscayne Bay | | Biscayne Bay | | Biscayne Bay | |
| Design (Style) | Modern 2 Sty | Traditional 2 Sty | | Traditional 2 Sty | | Traditional 2 Sty | |
| Quality of Construction | Very Good | Very Good | | Very Good | | Very Good | |
| Actual Age | 20± Yrs 10 eff | 19+/- Yrs 10 eff | 0 | 82+/- Ys 50 eff | 4,000,000 | 45+/- Yrs 20 eff | 1,000,000 |
| Condition | Very Good | Very Good | | Average-Good | 1,000,000 | Good | 500,000 |
| Above Grade | Total Bdrms. Baths | Total Bdrms. Baths | | Total Bdrms. Baths | | Total Bdrms. Baths | |
| Room Count | 17 7 7.2 | 18 10 10.2 | -75,000 | 17 6 8.2 | -25,000 | 18 9 10 | -50,000 |
| Gross Living Area | 300.00 14,783 sq. ft. | 14,704 sq. ft. | 23,700 | 7,988 sq. ft. | 2,038,500 | 9,104 sq. ft. | 1,703,700 |
| Basement & Finished | 0sf | 0sf | | 0sf | | 0sf | |
| Rooms Below Grade | 254.5' FF Water | 98' FF Water | 7,825,000 | 228.74' FF Water | 1,288,000 | 219' FF Water | 1,775,000 |
| Functional Utility | Good | Good | | Good | | Good | |
| Heating/Cooling | Central | Central | | Central | | Central | |
| Energy Efficient Items | Appliances | Appliances | | Appliances | | Appliances | |
| Garage/Carport | 2 Car Garage | 3 Car Garage | -50,000 | 3 Car Garage | -50,000 | 3 Car Garage | -50,000 |
| Porch/Patio/Deck | Patio/Deck,Porch | Patio,Porches,Dock | | Patio/Deck,Porch | | Patio,Porches,Dock | |
| | F/P; Elevator | F/P; Elevator | | F/P; None | 15,000 | None; Elevator | 0 |
| | Fence,Pool,Balcony | Fence,Pool,Balcony | | Fence,Pool,Balcony | | Fence,Pool,Spa,Balcony | |
| Net Adjustment (Total) | | [X] + [ ] - | $ 20,343,300 | [X] + [ ] - | $ 13,136,500 | [X] + [ ] - | $ 9,294,600 |
| Adjusted Sale Price | | Net Adj. 62.6% | | Net Adj. 37.5% | | Net Adj. 22.4% | |
| of Comparables | | Gross Adj. 63.4% $ 52,843,300 | | Gross Adj. 38.1% $ 48,136,500 | | Gross Adj. 22.9% $ 50,794,600 | |
| Summary of Sales Comparison Approach | | Six closed sales and two listings are included in the appraisal analysis. See additional comparables and comments attached. | | | | | |

SALES COMPARISON APPROACH



Produced using ACI software, 800.234.8727 www.aciweb.com
Additional Comparables

This form Copyright © 2005-2016 ACI, a First American Company. All Rights Reserved.
(gPAR™) General Purpose Appraisal Report  3/2017
GPARSUM_17  032720017

# A-062

Advanced Research & Appraisal
**Residential Appraisal Report**

File No. 22072602

| FEATURE | SUBJECT | COMPARABLE SALE NO. 7 | +(-) $ Adjustment | COMPARABLE SALE NO. 8 | +(-) $ Adjustment | COMPARABLE SALE NO. 9 | +(-) $ Adjustment |
|---|---|---|---|---|---|---|---|
| | 2 Star Island Dr | 30 Palm Ave | | 45 Star Island Dr | | | |
| Address | Miami Beach, Fl 33139 | Miami Beach, Fl 33139 | | Miami Beach, Fl 33139 | | | |
| Proximity to Subject | | 0.46 miles NW | | 0.06 miles SE | | | |
| Sale Price | $ | $ 43,000,000 | | $ 28,900,000 | | $ | |
| Sale Price/Gross Liv. Area | $ 0.00 sq. ft. | $ 4,479.63 sq. ft. | | $ 2,963.19 sq. ft. | | $ sq. ft. | |
| Data Source(s) | | MatrixMLS #A11175166; DOM 154 | | MatrixMLS #A11085852;DOM 341 | | | |
| Verification Source(s) | | Tax Rolls/IMAPP | | Tax Rolls/IMAPP | | | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sale or Financing | | Listing | | Listing | | | |
| Concessions | | ;0 | | ;0 | | | |
| Date of Sale/Time | | Active | 0 | Active | 0 | | |
| Location | Suburban | Suburban | | Suburban | | | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | | |
| Site | 58,232 Sq.Ft. | 32,000 Sq.Ft. | 7,869,600 | 46,429 Sq.Ft. | 3,540,900 | | |
| View | Biscayne Bay | Biscayne Bay | | Biscayne Bay | | | |
| Design (Style) | Modern 2 Sty | Modern 2 Sty | -1,000,000 | Traditional 2 Sty | | | |
| Quality of Construction | Very Good | Excellent | -1,200,000 | Very Good | | | |
| Actual Age | 20± Yrs 10 eff | 9+/- Yrs 5 eff | -1,000,000 | 41+/- Yrs 50 eff | 3,000,000 | | |
| Condition | Very Good | Very Good | | Fair | 2,000,000 | | |
| Above Grade | Total Bdrms. Baths | Total Bdrms. Baths | | Total Bdrms. Baths | | Total Bdrms. Baths | |
| Room Count | 17  7  7.2 | 18  9  8.1 | -12,500 | 18  9  10.2 | -75,000 | | |
| Gross Living Area 300.00 | 14,783 sq. ft. | 9,599 sq. ft. | 1,555,200 | 9,753 sq. ft. | 1,509,000 | sq. ft. | |
| Basement & Finished | | 0sf | | 0sf | | | |
| Rooms Below Grade | 254.5' FF Water | 100 FF Water | 7,725,000 | 190' FF Water | 3,225,000 | | |
| Functional Utility | Good | Good | | Good | | | |
| Heating/Cooling | Central | Central | | Central | | | |
| Energy Efficient Items | Appliances | Appliances | | Appliances | | | |
| Garage/Carport | 2 Car Garage | 4 Car Garage | -100,000 | 4 Car Garage | -100,000 | | |
| Porch/Patio/Deck | Patio/Deck,Porch | Patio,Porch,Dock | | Patio,Porch,Dock | | | |
| | F/P; Elevator | F/P; None | 15,000 | 1 F/P; None | 15,000 | | |
| | Fence,Pool,Balcony | Fence,Pool,Balcony | | Fence,Pool,Balcony | | | |
| Net Adjustment (Total) | | [X] +  [ ] - | $ 13,852,300 | [X] +  [ ] - | $ 13,114,900 | [X] +  [ ] - | $ 0 |
| Adjusted Sale Price | | Net Adj. 32.2% | | Net Adj. 45.4% | | Net Adj. 0.0% | |
| of Comparables | | Gross Adj. 47.6% $ | 56,852,300 | Gross Adj. 46.6% $ | 42,014,900 | Gross Adj. 0.0% $ | 0 |
| Summary of Sales Comparison Approach | Six closed sales and two listings are included in the appraisal analysis. See additional comparables and comments attached. | | | | | | |

*(vertical label: SALES COMPARISON APPROACH)*

Produced using ACI software, 800.234.8727 www.aciweb.com
Additional Comparables

This form Copyright © 2005-2016 ACI, a First American Company. All Rights Reserved.
(gPAR™) General Purpose Appraisal Report  3/2017
GPARSUM_17  032720017



## A-063

Advanced Research & Appraisal
**Residential Appraisal Report**                    File No. 22072602

**Scope of Work, Assumptions and Limiting Conditions**

Scope of work is defined in the Uniform Standards of Professional Appraisal Practice as " the type and extent of research and analyses in an assignment." In short, scope of work is simply what the appraiser did and did not do during the course of the assignment. It includes, but is not limited to: the extent to which the property is identified and inspected, the type and extent of data researched, the type and extent of analyses applied to arrive at opinions or conclusions.

The scope of this appraisal and ensuing discussion in this report are specific to the needs of the client, other identified intended users and the intended use of the report. This report was prepared for the sole and exclusive use of the client and other identified intended users for the identified intended use and its use by any other parties is prohibited. The appraiser is not responsible for unauthorized use of the report.

The appraiser's certification appearing in this appraisal report is subject to the following conditions and to such other specific conditions as are set forth by the appraiser in the report. All extraordinary assumptions and hypothetical conditions are stated in the report and might have affected the assignment results.

1. The appraiser assumes no responsibility for matters of a legal nature affecting the property appraised or title thereto, nor does the appraiser render any opinion as to the title, which is assumed to be good and marketable. The property is appraised as though under responsible ownership.

2. Any sketch in this report may show approximate dimensions and is included only to assist the reader in visualizing the property. The appraiser has made no survey of the property.

3. The appraiser is not required to give testimony or appear in court because of having made the appraisal with reference to the property in question, unless arrangements have been previously made thereto.

4. Neither all, nor any part of the content of this report, copy or other media thereof (including conclusions as to the property value, the identity of the appraiser, professional designations, or the firm with which the appraiser is connected), shall be used for any purposes by anyone but the client and other intended users as identified in this report, nor shall it be conveyed by anyone to the public through advertising, public relations, news, sales, or other media, without the written consent of the appraiser.

5. The appraiser will not disclose the contents of this appraisal report unless required by applicable law or as specified in the Uniform Standards of Professional Appraisal Practice.

6. Information, estimates, and opinions furnished to the appraiser, and contained in the report, were obtained from sources considered reliable and believed to be true and correct. However, no responsibility for accuracy of such items furnished to the appraiser is assumed by the appraiser.

7. The appraiser assumes that there are no hidden or unapparent conditions of the property, subsoil, or structures, which would render it more or less valuable. The appraiser assumes no responsibility for such conditions, or for engineering or testing, which might be required to discover such factors. This appraisal is not an environmental assessment of the property and should not be considered as such.

8. The appraiser specializes in the valuation of real property and is not a home inspector, building contractor, structural engineer, or similar "expert", unless otherwise noted. The appraiser did not conduct the intensive type of field observations of the kind intended to seek and discover property defects. The viewing of the property and any improvements is for purposes of developing an opinion of the defined value of the property, given the intended use of this assignment. Statements regarding condition are based on surface observations only. The appraiser claims no special expertise regarding issues including, but not limited to: foundation settlement, basement moisture problems, wood destroying (or other) insects, pest infestation, radon gas, lead based paint, mold or environmental issues. Unless otherwise indicated, mechanical systems were not activated or tested.

This appraisal report should not be used to disclose the condition of the property as it relates to the presence/absence of defects. The client is invited and encouraged to employ qualified experts to inspect and address areas of concern. If negative conditions are discovered, the opinion of value may be affected.

Unless otherwise noted, the appraiser assumes the components that constitute the subject property improvement(s) are fundamentally sound and in working order.

Any viewing of the property by the appraiser was limited to readily observable areas. Unless otherwise noted, attics and crawl space areas were not accessed. The appraiser did not move furniture, floor coverings or other items that may restrict the viewing of the property.

9. Appraisals involving hypothetical conditions related to completion of new construction, repairs or alteration are based on the assumption that such completion, alteration or repairs will be competently performed.

10. Unless the intended use of this appraisal specifically includes issues of property insurance coverage, this appraisal should not be used for such purposes. Reproduction or Replacement cost figures used in the cost approach are for valuation purposes only, given the intended use of the assignment. The Definition of Value used in this assignment is unlikely to be consistent with the definition of Insurable Value for property insurance coverage/use.

11. The ACI General Purpose Appraisal Report (GPAR™) is not intended for use in transactions that require a Fannie Mae 1004/Freddie Mac 70 form, also known as the Uniform Residential Appraisal Report (URAR).

Additional Comments Related To Scope Of Work, Assumptions and Limiting Conditions
A limited inspection of the interior was made by the appraisers and no interior photos were permitted. The appraisers viewed some of the common rooms and were restricted from private and other interior and exterior areas. Assumptions are made pertaining to the floor plan and room layout as the appraisers relied on information provided by the staff members and is assumed to be accurate.



# A-064

Advanced Research & Appraisal
**Residential Appraisal Report**                                    File No. 22072602

### Appraiser's Certification

The appraiser(s) certifies that, to the best of the appraiser's knowledge and belief:

1. The statements of fact contained in this report are true and correct.

2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are the appraiser's personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3. Unless otherwise stated, the appraiser has no present or prospective interest in the property that is the subject of this report and has no personal interest with respect to the parties involved.

4. The appraiser has no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

5. The appraiser's engagement in this assignment was not contingent upon developing or reporting predetermined results.

6. The appraiser's compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

7. The appraiser's analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

8. Unless otherwise noted, the appraiser has made a personal inspection of the property that is the subject of this report.

9. Unless noted below, no one provided significant real property appraisal assistance to the appraiser signing this certification. Significant real property appraisal assistance provided by:

**Additional Certifications:**

Definition of Value:    [X] Market Value      [ ] Other Value:

Source of Definition: Source of the Market Value Definition is FNMA and or FHLMC.

Market value is the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus.

ADDRESS OF THE PROPERTY APPRAISED:
2 Star Island Dr
Miami Beach, FL 33139
EFFECTIVE DATE OF THE APPRAISAL: 06/28/2022
APPRAISED VALUE OF THE SUBJECT PROPERTY $ 48,500,000

**APPRAISER**

Signature: *(signature)*
Name: Orna Sarley
Company Name: Advanced Research & Appraisal
Company Address: 9240 S Cypress Circle
Miramar, FL 33025
Telephone Number: 954-465-4432
Email Address: osarley@gmail.com
State Certification # Cert Res RD1541
or License #
State: FL                         State #:
or Other (describe):
State: FL
Expiration Date of Certification or License: 11/30/2022
Date of Signature and Report: 08/09/2022
Date of Property Viewing: June 28, 2022
Degree of property viewing:
[X] Interior and Exterior    [ ] Exterior Only    [ ] Did not personally view

**SUPERVISORY APPRAISER**

Signature: *(signature)*
Name: Donald J Sarley, ASA, IFA, SRA
Company Name: Advanced Research & Appraisal
Company Address: 9240 S Cypress Circle
Miramar, FL 33025
Telephone Number: 954-557-3300
Email Address: dsarley@bellsouth.net
State Certification # Cert Res RD259
or License #
State: FL
Expiration Date of Certification or License: 11/30/2022
Date of Signature: 08/09/2022
Date of Property Viewing: June 28, 2022
Degree of property viewing:
[X] Interior and Exterior    [ ] Exterior Only    [ ] Did not personally view



Produced using ACI software, 800.234.8727 www.aciweb.com
Page 4 of 4
This form Copyright © 2005-2016 ACI, a First American Company. All Rights Reserved.
(gPAR™) General Purpose Appraisal Report 3/2017
GPARSUM_17 03272017
Appraisal Report

A-065

| Client: Tri Star Sports and Entertainment Group | File No.: 22072602 |
|---|---|
| Property Address: 2 Star Island Dr | Case No.: |
| City: Miami Beach | State: FL   Zip: 33139 |

**Neighborhood Boundaries**
The subject is accessible via the Macarthur Causeway to the South and is an island community that is surrounded by Biscayne Bay. The island of Miami Beach is located to the East and mainland Miami-Dade County is to the West. The Port of Miami is to the South. Area boundaries are considered to be Macarthur Causeway an E/W artery; the Venetian Causeway to the North an E/W artery. Biscayne Bay provides additional access with water crafts.

**Neighborhood Description**
The subject is a neighborhood in the city of Miami Beach on a man-made island in Biscayne Bay, Florida. Star Island is famous for the residents it attracts including, celebrities, movie stars, sports stars, artists, entertainers and other wealthy individuals seeking luxury and privacy. This is a private community with 33 private residential site off the southern coast of Miami Beach. The subject is convenient to all desired amenities. The location offers convenient access to Downtown Miami, South Beach and the Atlantic Beaches. Downtown Miami Business and Banking district is accessible via the Macarthur Causeway. South Beach is located to the east offering access to recreational amenities, hotels, spas, restaurants and night life. Schools, shops, banks, medical facilities and recreational amenities are within easy access. Star Island is also a part of the Biscayne Bay Aquatic Preserve with estates situated directly on Biscayne Bay with boating amenities for water sports.

**Neighborhood Market Conditions**
Market was affected by COVID-19 and experienced increased demand affecting both pricing and marketing time. Due to the economic conditions interest rates recently increased in an effort to slow down inflation. This affected marketing time as inventory increased. Market is currently considered stable with supply and demand in balance with marketing time of 90 to 180 days. Based on the Federal Housing Finance Agency area values increased 22% between the first quarter of 2021 and the first quarter of 2022. Market values increased up through May 2022 and are currently considered stable.

**Quality and Condition of Property**
The main house is a two story Modern design estate with 5 Bedrooms, 4 full bathrooms and 2 half baths, a piano room, large kitchen with excellent quality appliances including a 10 burner gas stove top with industrial fan hood, multiple ovens including a pizza oven and multiple refrigeration units; informal dining, formal living and dining rooms and family area. Exterior features include balconies, porches, patios, multiple swimming pools and spa, pool house with cabanas. The guest house has 2 Bedrooms and 3 full bathrooms, kitchen, living and dining area. The main house was built 1940 and the guest house with additions to the main house were made in 1995. The estate is fenced with electric gates and has 254.5± linear feet on water with ability to store water crafts and easily navigate to open waters. The overall condition of the improvements is considered good with adequate maintenance over the years. Physical depreciation is due to age with normal wear and tear and the elements due to proximity to salt water. The appraisers made a limited inspection of the exterior and interior; the common areas were available for viewing and no interior photos where permitted. Assumptions are made as to the room count, finishes and condition of the areas that were not available for viewing. The floor plan that has been generated with interior room layout is partly based on the staff description and assumptions are made that the layout on the sketch is accurate.

**Comments on Sales Comparison**
Six closed sales, one active listing and one recently expired listing were included in the appraisal analysis.

Sale 1 is the most recent sale on Star Island that is a smaller estate home with a smaller site and less water front; home is older and in inferior condition. High individual, net and gross adjustments are due to the smaller site with inferior water front.

Sale 2 is a recent sale on Star Island of a slightly older estate home that is similar in size and situated on a larger site with less water front. This property is superior in quality and condition and was sold fully furnished turnkey including personal property.

Sale 3 is a slightly more dated sale of an estate home that is similar in size and quality; property is older and inferior in condition and is situated on a similar site with similar water front. High individual and gross adjustments to sale 3 are due to the time of sale and age difference.

Sale 4 is a dated sale on Star Island that is similar in size and age; situated on a smaller site with less water front. Sale has high individual, net and gross adjustments due to time of sale and smaller site with less water front.

Sale 5 is a dated sale situated next to the subject and is older, smaller and inferior in condition with similar site size and slightly less water frontage. The high individual and net adjustments are due to the time of sale, age and GLA size differences.

Sale 6 is a recent sale from a greater than desired distance on Bal Harbour Island a gated secured community of water front estate homes that is smaller and has slightly smaller site with less water front. This sale is located at a greater distance and is included as it offers many amenities that are similar to Star Island and is equally desirable.

Listing 7 is located on a secured island and is a larger newer home on smaller site with less water front. This sale is included due to the lack of active offerings on Star Island.

Listing 8 is an expired listing on Star Island that was listed for sale as improved and as a vacant site. Property is situated on a smaller site with less water front. This expired listing is included as it was active on the effective date of the appraisal and has since expired. This property was originally listed 06/13/2021 priced $34,000; relisted 08/19/2021 priced $33,900,000; listing expired 08/07/2022.

Most reliance is placed on Sale 3 as it has the most similar site size and 4 being the most similar in size and age. Sale 2 is a recent sale that was sold with personal property and sales 1, 5 are smaller homes and sale 6 is smaller and more distant. Sales 1, 2 and 5 are given secondary reliance and considered supportive indicators. Sale 6 is included due to being a recent sale and considered a supportive indicator. Listing comparables 7 and 8 are included to show current offerings and given reliance as they are not closed transactions. Expired listing 8 is considered supportive of subject site value.

Sales are adjusted for time of sale at 1% per month up thru May 2022 as the market stabilized there after.

A-066

| | |
|---|---|
| Client: Tri Star Sports and Entertainment Group | File No.: 22072602 |
| Property Address: 2 Star Island Dr | Case No.: |
| City: Miami Beach | State: FL    Zip: 33139 |

Sales are adjusted for site size differences at $300 per square foot.
Sales are adjusted for water front feet at $50,000 per linear foot.
Sales are adjusted for age based on estimated effective age at $100,000 per year.
Sales are adjusted for condition at $500,000 and $1,000,000 increments.
Sales are adjusted for bathrooms at $25,000 per full bath and $12,500 per half bath.
Sales are adjusted for GLA size at $300 per sf.
Sales are adjusted for garage space at $50,000.
Sales are adjusted for having an Elevator $15,000.
Sales that were sold furnished, turnkey with personal property adjusted $1,000,000.
Quality difference adjusted at $1,200,000.
No adjustments made for bedroom utility as the size differences of the comparables account for the room count differences.
The applied adjustments are for contributory value not actual cost that may be greater. Condition differences and effective age are supported by MLS comments and photos.

The use of dated sales, sales with higher than desired adjustments and sales that are more distant than desired is unavoidable. The comparables selected are the best and most similar sales to have transpired within the past two years. No other more similar, more current or more proximate sales were found for comparison.

**Support for the Opinion of Site Value**
Vacant Site Sales:

28 Star Island Drive - 40,000 sf site with 100 linear feet - sold 12/15/2020 $13,300,000 - x 1.17 Time = $15,561,000
Plus $5,469,600  (size) + $7,725,000 (waterfront) = $28,755,600

11 Star Island Drive - 80,000 sf site with 200 linear feet - sold 08/19/2020 $37,000,000 - x 1.21 Time = $44,770,000
Minus $6,530,400 (size) + Plus  $2,725,000 (waterfront) = $40,964,600

10 Star Island Drive - 40,000 sf site with 100 linear feet - sold 11/20/2020 $25,000,000 - x 1.18 Time = $29,500,000
Plus $5,469,600 (size) + $7,725,000 (waterfront) +  = $42,599,600

2 Indian Creek Island Rd - 80,000 sf site with 200 linear feet sold 04/09/2021 $37,000,000 - x 1.13 Time = $41,810,000
Minus $6,530,400 (size) + Plus  $2,100,000 (waterfront) = $37,379,600

37 Indian Creek Island Rd - 53,696 sf site with 134 linear feet - sold 07/02/2021 $23,750,000 - x 1.10 Time = $26,125,000
Plus $1,360,800 (size) + Plus  $6,250,000 (waterfront) = $33,735,800

7 Indian Creek Island Rd - 80,000 sf site with 200 linear feet - sold 11/20/2020 $30,000,000 - 1.18 Time = $35,400,000
Minus $6,530,400 (size) + Plus  $2,100,000 (waterfront) = $30,969,000

4 Indian Creek Island Rd - 80,000 sf site with 200 linear feet - sold 12/27/2020 $32,179,413 - x 1.17 Time = $37,649,000
Minus $6,530,400 (size) + Plus  $2,100,000 (waterfront) = $33,219,913

All of the site sales are similar in location and amenities on secured islands with security for residents looking for privacy with water front sites offering boating facilities for large yachts.

Time of sale difference applied at 1% per month up through May 2022 when market stabilized.
Site size differences adjusted at $300 per sf.
Linear feet on water adjusted at $50,000.

The above site sales provide an adjusted indicated value range from a low end of $28,755,600  to high end of $42,599,600.

The most recent sales support an indicated value of $36,000,000 for the vacant site.

**A-067**

| | | |
|---|---|---|
| Client:   Tri Star Sports and Entertainment Group | File No.:   22072602 | |
| Property Address: 2 Star Island Dr | Case No.: | |
| City: Miami Beach | State: FL | Zip: 33139 |



**FRONT VIEW OF
SUBJECT PROPERTY**

Appraised Date: June 28, 2022
Appraised Value: $ 48,500,000



**REAR VIEW OF
SUBJECT PROPERTY**



**STREET SCENE**

# A-068

Subject Photos

| Client: Tri Star Sports and Entertainment Group | File No.: 22072602 |
| Property Address: 2 Star Island Dr | Case No.: |
| City: Miami Beach | State: FL | Zip: 33139 |



Main residence front view



Main residence rear view



Main residence side view



Front guest house



Front guest house side view with stairs



Front guest house first floor entry

# A-069

| Client: Tri Star Sports and Entertainment Group | | File No.: 22072602 |
|---|---|---|
| Property Address: 2 Star Island Dr | | Case No.: |
| City: Miami Beach | State: FL | Zip: 33139 |



Covered areas



Natural roofs on exterior buildings



Natural roofs on exterior buildings



Side view guest house and lush landscaping



Wadding pool



Large pool

# A-070

Subject Photos

| Client: | Tri Star Sports and Entertainment Group | | File No.: 22072602 |
|---|---|---|---|
| Property Address: 2 Star Island Dr | | | Case No.: |
| City: Miami Beach | | State: FL | Zip: 33139 |



Site and amenities



Natural roofs on exterior buildings



Rear of main house with pools and amenities



Dock, deck, seawall



View



Dock, deck, seawall

## A-071

| Client: Tri Star Sports and Entertainment Group | File No.: 22072602 |
|---|---|
| Property Address: 2 Star Island Dr | Case No.: |
| City: Miami Beach | State: FL          Zip: 33139 |



**COMPARABLE SALE #1**

34 Star Island Dr
Miami Beach, Fl 33139
Sale Date: s01/22;c01/22
Sale Price: $ 30,000,000



**COMPARABLE SALE #2**

8 Star Island Dr
Miami Beach, Fl 33139
Sale Date: s12/21;c12/21
Sale Price: $ 75,000,000



**COMPARABLE SALE #3**

46 Star Island Dr
Miami Beach, Fl 33139
Sale Date: s03/21;c02/21
Sale Price: $ 38,000,000

# A-072

| | |
|---|---|
| Client:  Tri Star Sports and Entertainment Group | File No.:  22072602 |
| Property Address: 2 Star Island Dr | Case No.: |
| City: Miami Beach | State: FL     Zip: 33139 |



**COMPARABLE SALE #4**

13 Star Island Dr
Miami Beach, Fl 33139
Sale Date: s08/20;c07/20
Sale Price: $ 32,500,000



**COMPARABLE SALE #5**

1 Star Island Dr
Miami Beach, Fl 33139
Sale Date: s07/21;c03/21
Sale Price: $ 35,000,000



**COMPARABLE SALE #6**

276 Bal Bay Dr
Bal Harbour, Fl 33154
Sale Date: s06/22;c03/22
Sale Price: $ 41,500,000

**A-073**

Case 1:24-cr-00XXX COMPARABLE PROPERTY PHOTO ADDENDUM 24    Page 18 of 31

| Client: Tri Star Sports and Entertainment Group | File No.: 22072602 |
|---|---|
| Property Address: 2 Star Island Dr | Case No.: |
| City: Miami Beach    State: FL    Zip: 33139 | |



**COMPARABLE SALE #7**

30 Palm Ave
Miami Beach, Fl 33139
Sale Date: Active
Sale Price: $ 43,000,000



**COMPARABLE SALE #8**

45 Star Island Dr
Miami Beach, Fl 33139
Sale Date: Active
Sale Price: $ 28,900,000



**COMPARABLE SALE #9**

Sale Date:
Sale Price: $

**A-074**

**FLOORPLAN SKETCH**

| | |
|---|---|
| Client:  Tri Star Sports and Entertainment Group | File No.:  22072602 |
| Property Address: 2 Star Island Dr | Case No.: |
| City: Miami Beach | State: FL     Zip: 33139 |



# A-075

Case 1:24-cr-00542-ALC   Document 13-1   Filed 09/18/24   Page 20 of 31
**DIMENSION LIST ADDENDUM**

| | |
|---|---|
| Client:  Tri Star Sports and Entertainment Group | File No.:  22072602 |
| Property Address: 2 Star Island Dr | Case No.: |
| City: Miami Beach | State: FL          Zip: 33139 |

| GROSS BUILDING AREA (GBA) | | 14,783 | |
|---|---|---|---|
| **GROSS LIVING AREA (GLA)** | | 14,783 | |

| Area(s) | Area | % of GLA | % of GBA |
|---|---|---|---|
| Living | 14,783 | | 100.00 |
| Level 1 | 8,540 | 57.77 | 57.77 |
| Level 2 | 6,243 | 42.23 | 42.23 |
| Level 3 | 0 | 0.00 | 0.00 |
| Other | 0 | 0.00 | 0.00 |
| | GBA | | |
| Basement | ☐ | | |
| Garage | ☐ | 1,793 | |
| Other | ☐ | 1,341 | |

## Area Measurements / Area Type

| Measurements | | Factor | | Total | Level 1 | Level 2 | Level 3 | Other | Bsmt. | Garage |
|---|---|---|---|---|---|---|---|---|---|---|
| 1.00 | x 12.00 | x 1.00 | = | 12.00 | ☐ | X | ☐ | ☐ | ☐ | ☐ |
| 3.00 | x 24.00 | x 1.00 | = | 72.00 | ☐ | X | ☐ | ☐ | ☐ | ☐ |
| 1.00 | x 51.00 | x 1.00 | = | 51.00 | ☐ | X | ☐ | ☐ | ☐ | ☐ |
| 17.80 | x 49.60 | x 1.00 | = | 882.89 | ☐ | X | ☐ | ☐ | ☐ | ☐ |
| 27.10 | x 86.00 | x 1.00 | = | 2,330.61 | ☐ | X | ☐ | ☐ | ☐ | ☐ |
| 11.00 | x 9.70 | x 1.00 | = | 106.70 | ☐ | X | ☐ | ☐ | ☐ | ☐ |
| 51.70 | x 44.00 | x 1.00 | = | 2,274.81 | ☐ | X | ☐ | ☐ | ☐ | ☐ |
| 49.80 | x 23.30 | x 0.44 | = | 512.60 | ☐ | X | ☐ | ☐ | ☐ | ☐ |
| 14.10 | x 12.50 | x 1.00 | = | 176.25 | X | ☐ | ☐ | ☐ | ☐ | ☐ |
| 1.50 | x 13.90 | x 1.00 | = | 20.85 | X | ☐ | ☐ | ☐ | ☐ | ☐ |
| 17.80 | x 55.80 | x 1.00 | = | 993.24 | X | ☐ | ☐ | ☐ | ☐ | ☐ |
| 2.60 | x 25.90 | x 1.00 | = | 67.34 | X | ☐ | ☐ | ☐ | ☐ | ☐ |
| 27.10 | x 89.60 | x 1.00 | = | 2,428.16 | X | ☐ | ☐ | ☐ | ☐ | ☐ |
| 14.60 | x 18.70 | x 1.00 | = | 273.02 | X | ☐ | ☐ | ☐ | ☐ | ☐ |
| 51.70 | x 44.00 | x 1.00 | = | 2,274.80 | X | ☐ | ☐ | ☐ | ☐ | ☐ |
| 49.80 | x 23.30 | x 0.44 | = | 512.60 | X | ☐ | ☐ | ☐ | ☐ | ☐ |
| 4.90 | x 5.60 | x 1.00 | = | 27.30 | ☐ | ☐ | ☐ | ☐ | ☐ | X |
| 20.50 | x 15.00 | x 1.00 | = | 307.07 | ☐ | ☐ | ☐ | ☐ | ☐ | X |
| 40.00 | x 19.70 | x 1.00 | = | 786.84 | ☐ | ☐ | ☐ | ☐ | ☐ | X |
| 13.40 | x 7.10 | x 1.00 | = | 94.75 | ☐ | ☐ | ☐ | ☐ | ☐ | X |
| 9.80 | x 4.60 | x 0.50 | = | 22.32 | ☐ | ☐ | ☐ | ☐ | ☐ | X |
| 11.70 | x 10.50 | x 0.50 | = | 61.60 | ☐ | ☐ | ☐ | ☐ | ☐ | X |
| 15.40 | x 26.40 | x 0.33 | = | 134.90 | ☐ | ☐ | ☐ | ☐ | ☐ | X |
| 33.90 | x 39.20 | x 0.25 | = | 333.71 | ☐ | ☐ | ☐ | ☐ | ☐ | X |
| 7.10 | x 10.00 | x 0.35 | = | 25.00 | ☐ | ☐ | ☐ | ☐ | ☐ | X |
| 4.90 | x 5.60 | x 1.00 | = | 27.30 | X | ☐ | ☐ | ☐ | ☐ | ☐ |
| 20.50 | x 15.00 | x 1.00 | = | 307.07 | X | ☐ | ☐ | ☐ | ☐ | ☐ |
| 40.00 | x 19.70 | x 1.00 | = | 786.84 | X | ☐ | ☐ | ☐ | ☐ | ☐ |
| 13.40 | x 7.10 | x 1.00 | = | 94.75 | X | ☐ | ☐ | ☐ | ☐ | ☐ |
| 9.80 | x 4.60 | x 0.50 | = | 22.32 | X | ☐ | ☐ | ☐ | ☐ | ☐ |
| 11.70 | x 10.50 | x 0.50 | = | 61.60 | X | ☐ | ☐ | ☐ | ☐ | ☐ |
| 15.40 | x 26.40 | x 0.33 | = | 134.90 | X | ☐ | ☐ | ☐ | ☐ | ☐ |
| 33.90 | x 39.20 | x 0.25 | = | 333.71 | X | ☐ | ☐ | ☐ | ☐ | ☐ |
| 7.10 | x 10.00 | x 0.35 | = | 25.00 | X | ☐ | ☐ | ☐ | ☐ | ☐ |

**A-076**

**PLAT MAP**

| | |
|---|---|
| Client:   Tri Star Sports and Entertainment Group | File No.:   22072602 |
| Property Address: 2 Star Island Dr | Case No.: |
| City: Miami Beach | State: FL          Zip: 33139 |



**A-077**

Case 1:24-cr-00542-ALC   Document 13-1   Filed 09/18/24   Page 22 of 31



A-078

**LOCATION MAP**

| | |
|---|---|
| Client:  Tri Star Sports and Entertainment Group | File No.:   22072602 |
| Property Address: 2 Star Island Dr | Case No.: |
| City: Miami Beach | State: FL | Zip: 33139 |



A-079

**AERIAL MAP**

| Client: Tri Star Sports and Entertainment Group | | File No.: 22072602 | |
| Property Address: 2 Star Island Dr | | Case No.: | |
| City: Miami Beach | State: FL | | Zip: 33139 |



# A-080

## Market Conditions Addendum to the Appraisal Report

File No. 22072602

The purpose of this addendum is to provide the lender/client with a clear and accurate understanding of the market trends and conditions prevalent in the subject neighborhood. This is a required addendum for all appraisal reports with an effective date on or after April 1, 2009.

| | | | | |
|---|---|---|---|---|
| Property Address 2 Star Island Dr | | City Miami Beach | State FL | Zip Code 33139 |
| Borrower 2 West Star Island LLC | | | | |

**Instructions:** The appraiser must use the information required on this form as the basis for his/her conclusions, and must provide support for those conclusions, regarding housing trends and overall market conditions as reported in the Neighborhood section of the appraisal report form. The appraiser must fill in all the information to the extent it is available and reliable and must provide analysis as indicated below. If any required data is unavailable or is considered unreliable, the appraiser must provide an explanation. It is recognized that not all data sources will be able to provide data for the shaded areas below; if it is available, however, the appraiser must include the data in the analysis. If data sources provide the required information as an average instead of the median, the appraiser should report the available figure and identify it as an average. Sales and listings must be properties that compete with the subject property, determined by applying the criteria that would be used by a prospective buyer of the subject property. The appraiser must explain any anomalies in the data, such as seasonal markets, new construction, foreclosures, etc.

| Inventory Analysis | Prior 7-12 Months | Prior 4-6 Months | Current - 3 Months | Overall Trend | | |
|---|---|---|---|---|---|---|
| Total # of Comparable Sales (Settled) | 43 | 16 | 13 | Increasing | Stable X | Declining |
| Absorption Rate (Total Sales/Months) | 7.17 | 5.33 | 4.33 | Increasing | Stable | Declining X |
| Total # of Comparable Active Listings | 39 | 41 | 45 | Declining | Stable | Increasing X |
| Months of Housing Supply (Total Listings/Ab. Rate) | 5.44 | 7.69 | 10.39 | Declining | Stable | Increasing X |
| **Median Sale & List Price, DOM, Sale/List %** | **Prior 7-12 Months** | **Prior 4-6 Months** | **Current - 3 Months** | **Overall Trend** | | |
| Median Comparable Sale Price | 12,250,000 | 10,425,000 | 13,600,000 | Increasing | Stable X | Declining |
| Median Comparable Sales Days on Market | 71 | 67 | 68 | Increasing | Stable | Declining |
| Median Comparable List Price | 21,500,000 | 16,999,000 | 16,500,000 | Increasing | Stable | Declining X |
| Median Comparable Listings Days on Market | 203 | 155 | 116 | Declining X | Stable | Increasing |
| Median Sale Price as % of List Price | 91.42% | 93.71% | 97.14% | Increasing X | Stable | Declining |
| Seller-(developer, builder, etc.)paid financial assistance prevalent? | Yes | X No | | Declining | Stable X | Increasing |

Explain in detail the seller concessions trends for the past 12 months (e.g., seller contributions increased from 3% to 5%, increasing use of buydowns, closing costs, condo fees, options, etc.).
MatrixMLS reported 3 sales had closed in the past year from the defined market with seller contributions that were last than 1%. Based on data seller contributions are not common or needed in this market.

Are foreclosure sales (REO sales) a factor in the market? Yes X No If yes, explain (including the trends in listings and sales of foreclosed properties).
MatrixMLS reported NO REO or SHORT SALES had closed in the past year from the defined market and NO ACTIVE REO or SHORT SALE LISTINGS reported as of the effective date of the appraisal report.

Cite data sources for above information. MatrixMLS was used for current and historic sales and listings data of residential properties located in Miami-Beach on Bay Front Sites.

Summarize the above information as support for your conclusions in the Neighborhood section of the appraisal report form. If you used any additional information, such as an analysis of pending sales and expired and withdrawn listings, to formulate your conclusions, provide both an explanation and support for your conclusions.
For the purpose of this report analysis a trend is defined as two or more consecutive quarters of statistical movement in the same direction. Area values were increasing up thru May 2022 as interest rates increased. Market is currently stabilizing. The total number of settled sales and the absorption rate declined. The total number o9f active listings and months of housing supply increased. The median sales price fluctuated and is reported as stable. The median listing price declined slightly. The days on market for well priced listings has been within 90 days or less but can take longer for the higher priced properties. The list to sale ratio increased. Overall this market appears to be stabilizing and current supply is considered to be in balance with current demand.

**If the subject is a unit in a condominium or cooperative project, complete the following:** Project Name:

| Subject Project Data | Prior 7-12 Months | Prior 4-6 Months | Current - 3 Months | Overall Trend | | |
|---|---|---|---|---|---|---|
| Total # of Comparable Sales (Settled) | | | | Increasing | Stable | Declining |
| Absorption Rate (Total Sales/Months) | | | | Increasing | Stable | Declining |
| Total # of Active Comparable Listings | | | | Declining | Stable | Increasing |
| Months of Unit Supply (Total Listings/Ab. Rate) | | | | Declining | Stable | Increasing |

Are foreclosure sales (REO sales) a factor in the project? Yes No If yes, indicate the number of REO listings and explain the trends in listings and sales of foreclosed properties.

Summarize the above trends and address the impact on the subject unit and project.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature | Signature |
| Name Orna Sarley | Name Donald J Sarley, ASA, IFA, SRA |
| Company Name Advanced Research & Appraisal | Company Name Advanced Research & Appraisal |
| Company Address 9240 S Cypress Circle | Company Address 9240 S Cypress Circle |
| Miramar, FL 33025 | Miramar, FL 33025 |
| State License/Certification # Cert Res RD1541    State FL | State License/Certification # Cert Res RD259    State FL |
| Email Address osarley@gmail.com | Email Address dsarley@bellsouth.net |

A-081

| Client: Tri Star Sports and Entertainment Group | | File No.: 22072602 | |
| Property Address: 2 Star Island Dr | | Case No.: | |
| City: Miami Beach | State: FL | | Zip: 33139 |

**Market Analysis Comments**

The number of sales considered to be "comparable" to the subject that are located within the subject's market area may be too small to be statistically significant and no reliable trends may be identified from limited data. To profess to identify trends based on small data pool can lead to misleading interpretation, analysis and conclusions a violation of the Conduct Section of the Ethics Rule of USPAP. At times the defined area has to be expanded to provide an adequate number of area sales and may exceed the defined neighborhood area boundaries. Based on Fannie Mae's FAQ's when there is limited data that is statistically meaningful no weight should be attributed to the Overall Trend boxes checked on the 1004MC or to the conclusion of the market trends reported on page 1 of the URAR. Additionally, the number of "comparable sales and listings" reported on page 2 of the URAR may not always be the same as the numbers reported on the 1004MC and is most likely due to the different criteria used in generating the statistical reports. The reported number of competing listings reported on page 2 may not always equal the total number of listings reported on the 1004MC as this data also includes sales that have closed, expired, were cancelled, etc., while the number of listings reported on page 2 of the URAR includes only properties that are "comparable" and available as of the effective date of the appraisal.

Local area values experienced a decline in towards the end of 2006 and early 2007; the decline continued thru 2010. Between 2011 thru the current date market conditions stabilized and various periods of stability with some small increased were observed; currently market conditions appear stable and are projected to remain stable. Currently there is a 10.4+-month's supply of housing inventory. Sellers are receiving approximately 97% of list price as of the most recent quarterly data. Seller concessions although not prevalent or needed in this market. Sales of these type properties are usually all cash transactions and current increase in interest rates will not have an affect on the high end market.

The World Health Organization declared the Novel Coronavirus (COVID-19) a global pandemic March 11, 2020. The influence COVID-19 has, and will have, on capital markets, real estate in general, and the asset / subject property being analyzed is currently unknown and will largely depend on the scale and duration of the outbreak. Under these current conditions, it is particularly difficult to quantify and assess the influence on market value(s). Importantly, the appraisal is based on the information available as of the current effective date of valuation. Changes in the physical status of the subject property, income and expenses, investment criteria, availability of financing, and overall market conditions may change rapidly and materially for the foreseeable future, and perhaps much longer.

* The uncertainties around the effects of the COVID-19 pandemic on Real Estate created very dynamic and changeable market conditions that may vary between markets. Market uncertainty may well have an effect on property values and property use, utility, occupancy, marketability, income-producing capacity and marketing times going forward. The client may consider having the property re-appraised once market conditions have stabilized and the current levels of uncertainty have abated.

Federal Housing Finance Agency reports area values increased 22% between the first quarter of 2021 and the first quarter of 2022. With the recent interest rate increase the market appears to stabilize after May 2022.

A-082

## USPAP ADDENDUM

File No. 22072602

| | |
|---|---|
| Borrower: 2 West Star Island LLC | |
| Property Address: 2 Star Island Dr | |
| City: Miami Beach    County: Miami-Dade    State: FL    Zip Code: 33139 | |
| Lender/Client: Tri Star Sports and Entertainment Group | |

### APPRAISAL AND REPORT IDENTIFICATION

This appraisal report is one of the following types:

[X] Appraisal Report — This report was prepared in accordance with the requirements of the Appraisal Report option of USPAP Standards Rule 2-2(a).

[ ] Restricted Appraisal Report — This report was prepared in accordance with the requirements of the Restricted Appraisal Report option of USPAP Standards Rule 2-2(b). The intended user of this report is limited to the identified client. This is a Restricted Appraisal Report and the rationale for how the appraiser arrived at the opinions and conclusions set forth in the report may not be understood properly without the additional information in the appraiser's workfile.

### ADDITIONAL CERTIFICATIONS

I certify that, to the best of my knowledge and belief:
- The statements of fact contained in this report are true and correct.
- The report analyses, opinions, and conclusions are limited only by the reported assumptions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.
- I have no (or the specified) present or prospective interest in the property that is the subject of this report and no (or specified) personal interest with respect to the parties involved.
- I have no bias with respect to the property or the parties involved with this assignment.
- My engagement in this assignment was not contingent upon developing or reporting predetermined results.
- My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
- My analyses, opinions, and conclusions were developed and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.
- This appraisal report was prepared in accordance with the requirements of Title XI of FIRREA and any implementing regulations.

### PRIOR SERVICES

[X] I have NOT performed services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

[ ] I HAVE performed services, as an appraiser or in another capacity, regarding the property that is subject of this report within the three-year period immediately preceding acceptance of this assignment. Those services are described in the comments below.

### PROPERTY INSPECTION

[ ] I have NOT made a personal inspection of the property that is the subject of this report.

[X] I HAVE made a personal inspection of the property that is the subject of this report.

### APPRAISAL ASSISTANCE

Unless otherwise noted, no one provided significant real property appraisal assistance to the person signing this certification. If anyone did provide significant assistance, they are hereby identified along with a summary of the extent of the assistance provided in the report.
None

### ADDITIONAL COMMENTS

Additional USPAP related issues requiring disclosure and/or any state mandated requirements:
See Attached Addendum

### MARKETING TIME AND EXPOSURE TIME FOR THE SUBJECT PROPERTY

[X] A reasonable marketing time for the subject property is 180-365+ day(s) utilizing market conditions pertinent to the appraisal assignment.

[X] A reasonable exposure time for the subject property is 180-365+ day(s).

| APPRAISER: | SUPERVISORY APPRAISER (only if required): |
|---|---|
| Signature: *Orna Sarley* | Signature: *Donald J Sarley* |
| Name: Orna Sarley | Name: Donald J Sarley, ASA, IFA, SRA |
| Date Signed: 08/09/2022 | Date Signed: 08/09/2022 |
| State Certification #: Cert Res RD1541 | State Certification #: Cert Res RD259 |
| or State License #: | or State License #: |
| or Other (describe):        State #: | State: FL |
| State: FL | Expiration Date of Certification or License: 11/30/2022 |
| Expiration Date of Certification or License: 11/30/2022 | Supervisory Appraiser inspection of Subject Property: |
| Effective Date of Appraisal: June 28, 2022 | [ ] Did Not  [ ] Exterior-only from street  [X] Interior and Exterior |

Produced using ACI software, 800.234.8727 www.aciweb.com

USPAP_14GP 05042020

A-083

ADDENDUM

| Client: Tri Star Sports and Entertainment Group | | File No.: 22072602 |
|---|---|---|
| Property Address: 2 Star Island Dr | | Case No.: |
| City: Miami Beach | State: FL | Zip: 33139 |

**Additional Comments**
Clarification of Intended Use and Intended User:

The Intended User of this appraisal report is the Named Clients 'Tri Star Sports and Entertainment Group and 2 West Star Island LLC'. The Intended Use is to evaluate the property that is the subject of this appraisal for Net Worth Valuation, subject to the stated Scope of Work, purpose of the appraisal, reporting requirements of this appraisal report form, and Definition of Market Value. No additional Intended Users are identified by the appraiser.

Source of the Market Value Definition is FNMA and or FHLMC.
Highest and Best Use is determined based on the legal use per zoning and referenced to surrounding uses on similar sites.
Highest and best use is based on area surrounding like uses in this zoning classification in this neighborhood.
Highest and best use is defined as "the reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value."*
*The Dictionary of Real Estate Appraisal, 4th Edition, pg. 93

A limited inspection of the interior was made by the appraisers and no interior photos were permitted. The appraisers viewed some of the common rooms and were restricted from private and other interior and exterior areas. Assumptions are made pertaining to the floor plan and room layout as the appraisers relied on information provided by the staff members and is assumed to be accurate.

A-084

## Appraiser Independence Certification
File No.: 22072602

| | |
|---|---|
| Borrower: | 2 West Star Island LLC |
| Property Address: | 2 Star Island Dr |
| City: Miami Beach | County: Miami-Dade     State: FL     Zip Code: 33139 |
| Lender/Client: | Tri Star Sports and Entertainment Group |

I do hereby certify, I have followed the appraiser independence safeguards in compliance with Appraisal Independence and any applicable state laws I may be required to comply with. This includes but is not limited to the following:

- I am currently licensed and/or certified by the state in which the property to be appraised is located. My license is the appropriate license for the appraisal assignment(s) and is reflected on the appraisal report.

- I certify that there have been no sanctions against me for any reason that would impair my ability to perform appraisals pursuant to the required guidelines.

I assert that no employee, director, officer, or agent of the Lender/Client, or any other third party acting as joint venture partner, independent contractor, appraisal company, appraisal management company, or partner on behalf of the Lender/Client, influenced or attempted to influence the development, reporting, result, or review of the appraisal through coercion, extortion, collusion, compensation, inducement, intimidation, bribery, or in any other manner.

I further assert that the Lender/Client has never participated in any of the following prohibited behavior in our business relationship:

1. Withholding or threatening to withhold timely payment or partial payment for the appraisal report;

2. Withholding or threatening to withhold future business, or demoting or terminating, or threatening to demote or terminate my services;

3. Expressly or implicitly promising future business, promotions, or increased compensation for my services;

4. Conditioning the ordering of the appraisal report or the payment of the appraisal fee or salary or bonus on my opinion, conclusion or valuation reached, or on a preliminary value estimate requested;

5. Requesting an estimated, predetermined, or desired valuation in the appraisal report, prior to the completion of the appraisal report, or requesting estimated values or comparable sales at any time prior to the completion of the appraisal report;

6. Providing an anticipated, estimated, encouraged or desired value for the subject property, or a proposed or target amount to be loaned to the Borrower, except that a copy of the sales contract may have been provided if the assignment was for a purchase transaction;

7. Providing stock or other financial or non-financial benefits to me or any entity or person related to me, my appraisal or appraisal management company, if applicable;

8. Any other act or practice that impairs or attempts to impair my independence, objectivity or impartiality, or violates law or regulation, including but not limited to, the Truth in Lending Act (TILA)  and Regulation Z, or the Uniform Standards of Professional Appraisal Practice (USPAP).

Additional Comments:

| APPRAISER: | SUPERVISORY APPRAISER (only if required): |
|---|---|
| Signature: | Signature: |
| Name: Orna Sarley | Name: Donald J Sarley, ASA, IFA, SRA |
| Date Signed: 08/09/2022 | Date Signed: 08/09/2022 |
| State Certification #: Cert Res RD1541 | State Certification #: Cert Res RD259 |
| or State License #: | or State License #: |
| or Other (describe): State #: | State: FL |
| State: FL | Expiration Date of Certification or License: 11/30/2022 |
| Expiration Date of Certification or License: 11/30/2022 | |

Produced using ACI software, 800.234.8727 www.aciweb.com                    AIRCS_14  04082014

Appraisal Report

Case 1:24-cr-00542-ALC    Document 13-1    Filed 09/18/24    Page 30 of 31

File No.: 22072602    Zip: 33139
Case No.:
State: FL

Appraiser License

Client: Tri Star Sports and Entertainment Group
Property Address: 2 Star Island Dr
City: Miami Beach

Ron DeSantis, Governor

Halsey Beshears, Secretary

Florida **dbpr**

**STATE OF FLORIDA**
**DEPARTMENT OF BUSINESS AND PROFESSIONAL REGULATION**

**FLORIDA REAL ESTATE APPRAISAL BD**

THE CERTIFIED RESIDENTIAL APPRAISER HEREIN IS CERTIFIED UNDER THE
PROVISIONS OF CHAPTER 475, FLORIDA STATUTES

**SARLEY, ORNA**

7979 MIRAMAR PARKWAY SUITE B
MIRAMAR          FL 33023

**LICENSE NUMBER: RD1541**

**EXPIRATION DATE:  NOVEMBER 30, 2022**

Always verify licenses online at MyFloridaLicense.com

Do not alter this document in any form.

This is your license. It is unlawful for anyone other than the licensee to use this document.

A-086

Case 1:24-cr-00542-ALC    Document 13-1    Filed 09/18/24    Page 31 of 31

**Appraiser License**

Client: Tri Star Sports and Entertainment Group
Property Address: 2 Star Island Dr
City: Miami Beach     State: FL     Case No.:     File No.: 22072602     Zip: 33139

Ron DeSantis, Governor                    Halsey Beshears, Secretary

dbpr Florida

**STATE OF FLORIDA**
**DEPARTMENT OF BUSINESS AND PROFESSIONAL REGULATION**

**FLORIDA REAL ESTATE APPRAISAL BD**

THE CERTIFIED RESIDENTIAL APPRAISER HEREIN IS CERTIFIED UNDER THE
PROVISIONS OF CHAPTER 475, FLORIDA STATUTES

**SARLEY, DONALD J**

7979 MIRAMAR PARKWAY SUITE B
MIRAMAR          FL 33023

**LICENSE NUMBER: RD259**

**EXPIRATION DATE: NOVEMBER 30, 2022**

Always verify licenses online at MyFloridaLicense.com

Do not alter this document in any form.

This is your license. It is unlawful for anyone other than the licensee to use this document.

A-087

# EXHIBIT 2

**A-088**

CFN: 20240657305 BOOK 34383 PAGE 1101
DATE:08/28/2024  11:53:47 AM
JUAN FERNANDEZ-BARQUIN
CLERK OF THE COURT & COMPTROLLER
MIAMI-DADE COUNTY, FL

Prepared by and after recording
please return to:

Nathan M. Eisler, Esq.
Greenberg Traurig, LLP
1 North Lexington Avenue, Suite 800
White Plains, NY 10601

_____

(Space Above for Recorder's Use)

## SATISFACTION OF MORTGAGE

THIS SATISFACTION OF MORTGAGE is executed as of the 20TH of August, 2024, by BANK OF AMERICA, N.A., national banking association (the "Lender").

WHEREAS, the Lender is the owner and holder of that certain Mortgage dated May 7, 2021 (the "Mortgage"), made by 2 West Star Island LLC, a Florida limited liability company (the "Borrower"), in favor of the Lender, securing that certain Adjustable Rate Note dated May 7, 2021 (the "Note"), made by the Borrower in favor of the Lender in the original principal amount of $18,850,000.00, which Mortgage was recorded on June 1, 2021 at File No. 20210387335 in Official Records Book 32538, Page 4782 of the Public Records of the Clerk of Court for Miami-Dade County, Florida, encumbering certain property situated in Miami-Dade County Florida as more particularly described on Exhibit A attached hereto and made a part hereof (the "Property").

NOW THEREFORE, in consideration of the foregoing premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Lender hereby agrees as follows:

1.  Truth of Recitals.  The foregoing recitals are true and correct and are incorporated herein by this reference, as though recited in full herein.

2.  Satisfaction of Note and Termination of Mortgage.  The indebtedness under the Note in the principal amount of $18,850,000.00 secured by the Mortgage has been fully satisfied as of the date hereof, and the Note and the Mortgage shall hereafter be of no further force or effect.  The Lender hereby directs the Clerk of the Circuit Court in and for Miami-Dade County, Florida to cancel the Mortgage of record.

[THIS SPACE IS INTENTIONALLY LEFT BLANK]

ACTIVE 701004432v1

**A-089**

CFN: 20240657305 BOOK 34383 PAGE 1102

IN WITNESS WHEREOF, the Lender has caused this instrument to be executed as of the date first above written.

<u>**LENDER**</u>:

BANK OF AMERICA, N.A.,
a national banking association

By: _____ SVP

    Name: DANIEL B. BUTLER
    Title: SENIOR VICE PRESIDENT

STATE OF _Rhode Island_ )
                           SS:
COUNTY OF _Providence_ )

The foregoing instrument was acknowledged before me, by means of [ ] physical presence or [ ] online notarization, this _20th_ day of August, 2024, by _Daniel D. Butler_, as _Sr. Vice President_ of Bank of America, N.A., a national banking association, on behalf of such parties. He/She personally appeared before me and is personally known to me or produced _____ as identification.

[NOTARIAL SEAL]

Notary: _____
Print Name: _Ann M. Soares_
Notary Public
My Commission Expires: _April 6, 2025_
Commission Number: _54810_

ANN M. SOARES
NOTARY PUBLIC
STATE OF RHODE ISLAND
MY COMMISSION EXPIRES APRIL 06, 2025

[Signature Page to Satisfaction of Mortgage]

**A-090**

CFN: 20240657305 BOOK 34383 PAGE 1103

## EXHIBIT A

Legal Description

The Land referred to herein below is situated in the City of Miami Beach, County of MIAMI-DADE, State of Florida, and is described as follows:

Lot 2, CORRECTED PLAT STAR ISLAND, according to the plat thereof, as recorded in Plat Book 31, at Page 60, of the Public Records of Miami-Dade County, Florida, as altered in the Circuit Court of the Eleventh Judicial Circuit, in and for Dade County, Florida, at Law No. 60L1986, Final Judgment, Renwick vs. Fransella, more particularly described as follows:

Commence at a concrete monument being the Northeast corner of said Lot 2; thence run Southeastwardly along the Westerly right-of-way line of West Drive as shown on said CORRECTED PLAT STAR ISLAND and along the arc of a curve to the left, having for its elements a radius of 100 feet, a central angle of 21° 39' 10" and a chord bearing of S 16°39'35" E. an arc distance of 37.21 feet to a concrete monument, being the Point of Beginning of the following described parcel of land; thence run Northwestwardly along the aforementioned curve to the right an arc distance of 37.21 feet, through a central angle of 21°19'10" and a chord bearing of N 16°32'35" W to a concrete monument, said concrete monument being the Northeast corner of said Lot 2; thence run S 84°00'00" W along the North boundary of said Lot 2 and along a line radial to the last mentioned curve a distance of 400 feet to a concrete monument lying on a curve having a radius of 500 feet and being concentric to the last mentioned curve, said concrete monument being the Northwest corner of said Lot 2; thence run Southeastwardly along the arc of said curve to the left, having for its elements a radius of 500 feet, a central angle of 28°34'04" and a chord bearing of S 20°17'02" E. an arc distance of 249.3 feet to a concrete monument, said concrete monument being 249.3 feet Southeastwardly from the Northwest corner of said Lot 2, as measured along the arc of the last mentioned curve having a radius of 500 feet and along the Southwesterly boundary of said CORRECTED PLAT STAR ISLAND, said arc having a central angle of 28°34'04" and a chord bearing of S 20°17'02" E; thence run N 53°17'29" E along the center line of badge as set forth in said Final Judgment a distance of 152.70 feet to a concrete monument, thence run N 53°50'13" E along the center line of badge as set forth in said Final Judgment a distance of 248.30 feet to the Point of Beginning.

Together with the exclusive right to occupy and appropriate a 10.00 foot strip of land contiguous with the Southwesterly line of the CORRECTED PLAT STAR ISLAND, lying Southwesterly thereof, the dedication of said strip of land recorded in Deed Book 1858, at Page 377, of the Public Records of Miami-Dade County, Florida.

ACTIVE 701004432v1

**A-091**

# EXHIBIT 3

# AGNIFILO
# INTRATER

April 1, 2024

<u>VIA EMAIL</u>
AUSA Emily Johnson
AUSA Mitzi Steiner
AUSA Madison Smyser
United States Attorney's Office
Southern District of New York
1 St. Andrews Plaza
New York, NY 10007

Re:    <u>Investigation of Sean Combs</u>

Dear AUSAs Johnson, Steiner and Smyser:

As you know, we represent Mr. Sean Combs with respect to the ongoing investigation by your Office into violations of Title 18, United States Code, Sections 1962(d), 1589, 1591, 1594, 2421 through 2422, 1512, and 2, and Title 21, United States Code, Section 846. We write to inform you that Teny Geragos, partner at this law firm, has taken physical custody of Mr. Combs' passport and will retain the passport.  Mr. Combs will not secure any other travel documents and will remain in the United States during the pendency of this investigation.

In terms of domestic travel, we will advise you in advance of any travel within the continental United States.  Thank you.

Very Truly Yours,

_____
Marc Agnifilo

**MARC AGNIFILO**
marc@agilawgroup.com    |    **ZACH INTRATER**
zach@agilawgroup.com    |    **TENY GERAGOS**
teny@agilawgroup.com

445 PARK AVE, 7TH FLOOR | NEW YORK, NY 10022 | WWW.AGILAWGROUP.COM

**A-093**

# EXHIBIT 4

# A-094

Case 1:24-cr-00542-ALC    Document 13-4    Filed 09/18/24    Page 2 of 2

**Tuesday, September 17, 2024 at 00:36:56 Eastern Daylight Time**

---

**Subject:** Re: Sean Combs
**Date:** Monday, March 18, 2024 at 1:35:36 PM Eastern Daylight Time
**From:** Marc Agnifilo
**To:** emily.johnson@usdoj.gov, mitzi.steiner@usdoj.gov
**CC:** Zach Intrater, Teny Geragos

Hello AUSAs Johnson and Steiner –

Just following up on the email from last Wednesday.  If you have a few minutes to touch base, I would really appreciate it.  There is a situation that I would like to bring to your attention.   Thank you.  Marc

Marc Agnifilo
Agnifilo Intrater LLP
445 Park Avenue, 7th Fl.
New York, NY 10022
marc@agilawgroup.com
www.agilawgroup.com

---

**From:** Marc Agnifilo <marc@agilawgroup.com>
**Date:** Wednesday, March 13, 2024 at 4:33 PM
**To:** emily.johnson@usdoj.gov <emily.johnson@usdoj.gov>, mitzi.steiner@usdoj.gov <mitzi.steiner@usdoj.gov>
**Subject:** Sean Combs

Good afternoon AUSAs Johnson, Steiner and Smyser (I apologize AUSA Smyser, I could not find your email address)

My name is Marc Agnifilo and I represent Sean Combs in connection with your investigation.  I know we have never met, but I would like to speak with you and provide you with information that has come to my attention over the last couple of weeks.  My cell phone is 917.399.9742.  Thank you.  I look forward to meeting you.

Marc

1 of 1

**A-095**

# EXHIBIT 5

**A-096**

Tuesday, September 17, 2024 at 00:43:32 Eastern Daylight Time

---

**Subject:** RE: Combs Travel
**Date:** Monday, June 10, 2024 at 10:48:20 PM Eastern Daylight Time
**From:** Steiner, Mitzi (USANYS)
**To:** Teny Geragos, Johnson, Emily (USANYS) 2, Smyser, Madison (USANYS), Foster, Meredith (USANYS)
**CC:** Marc Agnifilo

> CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Received, thanks Teny.

**From:** Teny Geragos <teny@agilawgroup.com>
**Sent:** Monday, June 10, 2024 10:35 PM
**To:** Johnson, Emily (USANYS) 2 <EJohnson2@usa.doj.gov>; Steiner, Mitzi (USANYS) <MSteiner@usa.doj.gov>; Smyser, Madison (USANYS) <MSmyser@usa.doj.gov>; Foster, Meredith (USANYS) <MFoster@usa.doj.gov>
**Cc:** Marc Agnifilo <marc@agilawgroup.com>
**Subject:** [EXTERNAL] Re: Combs Travel

Good evening – Mr. Combs departed OPF at 10:24pm EDT and is expected to land at VNY at 12:17am PDT.

Teny R. Geragos
Agnifilo Intrater LLP
445 Park Avenue, 7th Fl.
New York, NY 10022
o: (646) 205 - 4350
c: (213) 440 - 4401
teny@agilawgroup.com
www.agilawgroup.com

*admitted in NY & CA

**From:** Johnson, Emily (USANYS) 2 <Emily.Johnson@usdoj.gov>
**Date:** Sunday, June 9, 2024 at 8:15 PM
**To:** Teny Geragos <teny@agilawgroup.com>, Steiner, Mitzi (USANYS) <Mitzi.Steiner@usdoj.gov>, Smyser, Madison (USANYS) <Madison.Smyser@usdoj.gov>, Foster, Meredith (USANYS) <Meredith.Foster@usdoj.gov>
**Cc:** Marc Agnifilo <marc@agilawgroup.com>
**Subject:** Re: Combs Travel

> CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Thanks for letting us know.

1 of 3

**A-097**

Emily A. Johnson
Assistant United States Attorney
United States Attorney's Office
Southern District of New York
One Saint Andrew's Plaza
New York, NY 10007
212.637.2409
emily.johnson@usdoj.gov

_____

**From:** Teny Geragos <teny@agilawgroup.com>
**Sent:** Sunday, June 9, 2024 7:54:30 PM
**To:** Johnson, Emily (USANYS) 2 <EJohnson2@usa.doj.gov>; Steiner, Mitzi (USANYS) <MSteiner@usa.doj.gov>; Smyser, Madison (USANYS) <MSmyser@usa.doj.gov>; Foster, Meredith (USANYS) <MFoster@usa.doj.gov>
**Cc:** Marc Agnifilo <marc@agilawgroup.com>
**Subject:** [EXTERNAL] Combs Travel

Dear all –

Mr. Combs will be departing from Miami at 6pm tomorrow on his plane for Los Angeles. Tuesday, he and his family will depart on their road trip. They will go to Sedona, the Grand Canyon, Lake Powell, Zion, and Death Valley. We will be in touch with his flight information back to Miami. We hope you all had a nice weekend.

Best,
Teny

Teny R. Geragos
Agnifilo Intrater LLP
445 Park Avenue, 7th Fl.
New York, NY 10022
o: (646) 205 - 4350
c: (213) 440 - 4401
teny@agilawgroup.com
www.agilawgroup.com

*admitted in NY & CA
This message is a PRIVATE communication. This message and all attachments are a private communication sent by a law firm and may be confidential or protected by attorney-client privilege or work product protection. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of the information contained in or attached to this message is strictly prohibited. Please notify the sender of the delivery error by replying to this message, and then delete it from your system. Thank you.
This message is a PRIVATE communication. This message and all attachments are a private communication sent by a law firm and may be confidential or protected by attorney-client privilege or

A-098

work product protection. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of the information contained in or attached to this message is strictly prohibited. Please notify the sender of the delivery error by replying to this message, and then delete it from your system. Thank you.

**A-099**

# EXHIBIT 6

# A-100

**Tuesday, September 17, 2024 at 00:44:55 Eastern Daylight Time**

---

**Subject:** Re: Mr. Combs Travel
**Date:** Wednesday, August 21, 2024 at 10:51:45 AM Eastern Daylight Time
**From:** Teny Geragos
**To:** Steiner, Mitzi (USANYS), Smyser, Madison (USANYS), Johnson, Emily (USANYS) 2, Foster, Meredith (USANYS)
**CC:** Marc Agnifilo

Good morning, Mr. Combs is no longer traveling to New York this week.

Teny R. Geragos
Agnifilo Intrater LLP
www.agilawgroup.com

sent from my iPhone

---

**From:** Teny Geragos <teny@agilawgroup.com>
**Sent:** Friday, August 16, 2024 11:18:55 AM
**To:** Steiner, Mitzi (USANYS) <Mitzi.Steiner@usdoj.gov>; Smyser, Madison (USANYS) <Madison.Smyser@usdoj.gov>; Johnson, Emily (USANYS) 2 <Emily.Johnson@usdoj.gov>; Foster, Meredith (USANYS) <Meredith.Foster@usdoj.gov>
**Cc:** Marc Agnifilo <marc@agilawgroup.com>
**Subject:** Re: Mr. Combs Travel

Good morning, all:

Mr. Combs will not be flying this week, instead, he will be flying to New York on August 21st and leaving on August 25th.

Thanks,
Teny

---

**From:** Teny Geragos <teny@agilawgroup.com>
**Date:** Thursday, August 8, 2024 at 3:04 PM
**To:** Steiner, Mitzi (USANYS) <Mitzi.Steiner@usdoj.gov>, Smyser, Madison (USANYS) <Madison.Smyser@usdoj.gov>, Johnson, Emily (USANYS) 2 <Emily.Johnson@usdoj.gov>, Foster, Meredith (USANYS) <Meredith.Foster@usdoj.gov>
**Cc:** Marc Agnifilo <marc@agilawgroup.com>
**Subject:** Re: Mr. Combs Travel

Good evening, all – Mr. Combs will be traveling to New York next week. I will let you know the exact date when I have it.

Teny

1 of 4

## A-101

**From:** Steiner, Mitzi (USANYS) <Mitzi.Steiner@usdoj.gov>
**Date:** Monday, July 8, 2024 at 3:50 AM
**To:** Teny Geragos <teny@agilawgroup.com>, Smyser, Madison (USANYS) <Madison.Smyser@usdoj.gov>, Johnson, Emily (USANYS) 2 <Emily.Johnson@usdoj.gov>, Foster, Meredith (USANYS) <Meredith.Foster@usdoj.gov>
**Cc:** Marc Agnifilo <marc@agilawgroup.com>
**Subject:** RE: Mr. Combs Travel

> CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Received, thanks.

**From:** Teny Geragos <teny@agilawgroup.com>
**Sent:** Sunday, July 7, 2024 9:22 PM
**To:** Steiner, Mitzi (USANYS) <MSteiner@usa.doj.gov>; Smyser, Madison (USANYS) <MSmyser@usa.doj.gov>; Johnson, Emily (USANYS) 2 <EJohnson2@usa.doj.gov>; Foster, Meredith (USANYS) <MFoster@usa.doj.gov>
**Cc:** Marc Agnifilo <marc@agilawgroup.com>
**Subject:** [EXTERNAL] Re: Mr. Combs Travel

Good evening all – Mr. Combs will be traveling back to Miami tomorrow via a charter plane.

Teny R. Geragos
Agnifilo Intrater LLP
445 Park Avenue, 7th Fl.
New York, NY 10022
o: (646) 205 - 4350
c: (213) 440 - 4401
teny@agilawgroup.com
www.agilawgroup.com

*admitted in NY & CA

**From:** Steiner, Mitzi (USANYS) <Mitzi.Steiner@usdoj.gov>
**Date:** Friday, July 5, 2024 at 6:15 PM
**To:** Teny Geragos <teny@agilawgroup.com>, Smyser, Madison (USANYS) <Madison.Smyser@usdoj.gov>, Johnson, Emily (USANYS) 2 <Emily.Johnson@usdoj.gov>, Foster, Meredith (USANYS) <Meredith.Foster@usdoj.gov>
**Cc:** Marc Agnifilo <marc@agilawgroup.com>
**Subject:** Re: Mr. Combs Travel

> CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Thanks Teny.

A-102

**From:** Teny Geragos <teny@agilawgroup.com>
**Sent:** Friday, July 5, 2024 4:55:08 PM
**To:** Steiner, Mitzi (USANYS) <MSteiner@usa.doj.gov>; Smyser, Madison (USANYS) <MSmyser@usa.doj.gov>; Johnson, Emily (USANYS) 2 <EJohnson2@usa.doj.gov>; Foster, Meredith (USANYS) <MFoster@usa.doj.gov>
**Cc:** Marc Agnifilo <marc@agilawgroup.com>
**Subject:** [EXTERNAL] Re: Mr. Combs Travel

Good evening - Mr. Combs will be traveling back to LA today.

Teny R. Geragos
Agnifilo Intrater LLP
www.agilawgroup.com

sent from my iPhone

**From:** Steiner, Mitzi (USANYS) <Mitzi.Steiner@usdoj.gov>
**Sent:** Monday, July 1, 2024 1:08:05 AM
**To:** Teny Geragos <teny@agilawgroup.com>; Smyser, Madison (USANYS) <Madison.Smyser@usdoj.gov>; Johnson, Emily (USANYS) 2 <Emily.Johnson@usdoj.gov>; Foster, Meredith (USANYS) <Meredith.Foster@usdoj.gov>
**Cc:** Marc Agnifilo <marc@agilawgroup.com>
**Subject:** RE: Mr. Combs Travel

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Received, thanks Teny.

**From:** Teny Geragos <teny@agilawgroup.com>
**Sent:** Saturday, June 29, 2024 2:10 PM
**To:** Steiner, Mitzi (USANYS) <MSteiner@usa.doj.gov>; Smyser, Madison (USANYS) <MSmyser@usa.doj.gov>; Johnson, Emily (USANYS) 2 <EJohnson2@usa.doj.gov>; Foster, Meredith (USANYS) <MFoster@usa.doj.gov>
**Cc:** Marc Agnifilo <marc@agilawgroup.com>
**Subject:** [EXTERNAL] Mr. Combs Travel

Good afternoon all,

Mr. Combs is flying via a charter plane to Jackson Hole, Wyoming today until Wednesday. We'll let you know when he flies back.

Thanks,
Teny

Teny R. Geragos

**A-103**

Agnifilo Intrater LLP

445 Park Avenue, 7th Fl.

New York, NY 10022

o: (646) 205 - 4350

c: (213) 440 - 4401

teny@agilawgroup.com

www.agilawgroup.com

*admitted in NY & CA

This message is a PRIVATE communication. This message and all attachments are a private communication sent by a law firm and may be confidential or protected by attorney-client privilege or work product protection. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of the information contained in or attached to this message is strictly prohibited. Please notify the sender of the delivery error by replying to this message, and then delete it from your system. Thank you.

This message is a PRIVATE communication. This message and all attachments are a private communication sent by a law firm and may be confidential or protected by attorney-client privilege or work product protection. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of the information contained in or attached to this message is strictly prohibited. Please notify the sender of the delivery error by replying to this message, and then delete it from your system. Thank you.

This message is a PRIVATE communication. This message and all attachments are a private communication sent by a law firm and may be confidential or protected by attorney-client privilege or work product protection. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of the information contained in or attached to this message is strictly prohibited. Please notify the sender of the delivery error by replying to this message, and then delete it from your system. Thank you.

# EXHIBIT 7

A-105

# AGNIFILO
# INTRATER

---

May 22, 2024

<u>VIA EMAIL</u>
AUSA Emily Johnson
AUSA Mitzi Steiner
AUSA Madison Smyser
AUSA Meredith Foster
United States Attorney's Office
Southern District of New York
26 Federal Plaza, 37th Floor
New York, NY 10278

     Re:   <u>Investigation of Sean Combs</u>

Dear AUSAs Johnson, Steiner, Smyser and Foster:

As we discussed last week, Mr. Combs will be traveling from Miami to Los Angeles on May 27, 2024, to attend his daughter's high school graduation. He will be traveling to Los Angeles in his private airplane. On this point, we write to follow up on our phone call yesterday, where we advised you that efforts have begun to sell this airplane, which is owned by a single member LLC called Love Air. Because selling a plane takes some time, we will keep you updated as to the progress of this sale. As we advised you in early April 2024, this firm took possession of, and continues to have possession of, Mr. Combs's passport.

Please let us know if you have any further questions.

Res ectfull

Marc Agnifilo
Teny Geragos

---

**MARC AGNIFILO** | **ZACH INTRATER** | **TENY GERAGOS**
marc@agilawgroup.com | zach@agilawgroup.com | teny@agilawgroup.com

445 PARK AVE, 7TH FLOOR | NEW YORK, NY 10022 | WWW.AGILAWGROUP.COM

A-106

# EXHIBIT 8

A-107

# AGNIFILO
# INTRATER

June 13, 2024

<u>VIA EMAIL</u>
AUSA Emily Johnson
AUSA Mitzi Steiner
AUSA Madison Smyser
AUSA Meredith Foster
United States Attorney's Office
Southern District of New York
26 Federal Plaza, 37th Floor
New York, NY 10278

Re:    <u>Investigation of Sean Combs</u>

Dear AUSAs Johnson, Steiner, Smyser and Foster:

This letter is to follow up on our letters advising you of Mr. Combs' travel and our possession of his passport. We write to inform you that we have also taken possession of several of his family members' passports. These include his mother Janice Combs, his daughter Chance Combs, and his daughter Love Combs. His twin daughters, Jessie and D'Lila's passports have been sent into the Department of State for renewal. When they are renewed, we will take possession of those passports and let you know when we have them. We will update you as we receive more.

Please let us know if you have any questions.

Respectfully,

Marc Agnifilo
Teny Geragos

**MARC AGNIFILO**
marc@agilawgroup.com

**ZACH INTRATER**
zach@agilawgroup.com

**TENY GERAGOS**
teny@agilawgroup.com

445 PARK AVE, 7TH FLOOR | NEW YORK, NY 10022 | WWW.AGILAWGROUP.COM

**A-108**



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

September 18, 2024

**BY ECF**
The Honorable Andrew L. Carter Jr.
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

Re:    *United States v. Sean Combs, a/k/a "Puff Daddy," a/k/a "P. Diddy," a/k/a*
       *"Diddy," a/k/a "PD," a/k/a "Love," 24 Cr. 542 (ALC)*

Dear Judge Carter:

    The Government respectfully submits this letter in advance of the bail appeal by defendant
Sean Combs, a/k/a "Puff Daddy," a/k/a "P. Diddy," a/k/a "Diddy," a/k/a "PD," a/k/a "Love."  For
the reasons set forth below, and in the Government's September 17, 2024 detention letter (Dkt. 5
(the "September 17 Letter")) and argument before the Magistrate Court (Dkt. 13-9 ("Tr.") at 11-
23, 48-50), the defendant presents a danger—to victims and others, both through physical violence
and through obstructive conduct—and a risk of flight.  He must be detained.

    I.    **Additional Background**

    The relevant factual background is set forth in detail in the September 17 Letter and
incorporated by reference herein.  (September 17 Letter at 1-6).  The defendant was arrested on
September 16, 2024, and arraigned on September 17, 2024 before the Honorable Robyn F.
Tarnofsky, United States Magistrate Judge.  Following arraignment, the Government sought the
defendant's detention on three grounds: dangerousness, obstruction, and risk of flight.  (Tr. 9-10).
Pretrial Services similarly recommended detention for the defendant.

    After an extended bail argument, the Court found that the defendant had failed to rebut the
presumption of detention in this case.  (Tr. 54).  Judge Tarnofsky noted that the crime of sex
trafficking is "a crime that happens behind closed doors" and expressed concern that such conduct
could not be monitored by Pretrial Services.  (Tr. 54).  The Court further found that detention was
warranted based on the defendant's history and characteristics:

    There are also indications in your history and characteristics that I think are a reason
    why the presumption in favor of detention has not been rebutted; prior substance
    abuse and the fact that the alleged violence seems to occur hand in hand with times
    when you are not necessarily in control of your actions because of that substance
    abuse.  Your lawyer asked me to trust you and to trust him, and I don't know that I
    think you can trust yourself, and I don't believe that counsel has the ability to

**A-109**

Page 2

control you, given the very significant concerns I have, particularly because of substance abuse and what seem like anger issues.

(Tr. 54-55).  In addition, the Court noted that the "weight of the evidence is significant given that the government has proffered that there are multiple witnesses who are saying that they have witnessed significant serious violence."  (Tr. 55).  Finally, the Court concluded that the danger posed by the defendant was "quite serious," due to the defendant's access to weapons, use of violence, and the coercion of witnesses.  (Tr. 55).

This Court should reach the same conclusions.  Judge Tarnofsky's findings are well supported by the record before the Court today and demonstrate why the presumption of detention is not rebutted in this case.  Moreover, defense counsel's most recent letter fails to seriously contend with the findings, most glaringly related to the defendant's unpredictable dangerousness and inability to be monitored or controlled.

## II.    The Defendant Poses a Significant and Ongoing Danger

Despite public statements by counsel minimizing the defendant's conduct, both to Judge Tarnofsky and the media,[1] the defendant has committed incredibly serious crimes.  As alleged in Counts One and Two of the Indictment, among other crimes, the defendant used violence, threats of violence, and coercion to cause women to engage in commercial sex acts.  In other words, the defendant committed sex trafficking—a crime so serious that Congress has determined that there is presumptively no condition or combination of conditions that will reasonably assure the safety of the community and the defendant's appearance in court.  18 U.S.C. § 3142(e)(3)(D).  The defendant's crimes have spanned over a decade and continued through this year, putting others around him, including both victims and witnesses, at risk.

The nature of the offenses and the defendant's history and characteristics demonstrate the danger he poses and weigh heavily in favor of detention.  18 U.S.C. § 3142(g)(1), (3).  The defendant's repeated acts of domestic violence, which are recurrent and, as noted by Judge Tarnofsky, often occur behind closed doors, are not disconnected to the offense conduct—they are an element of it.  The physical force and coercion the defendant repeatedly used, during and apart from the Freak Offs, caused victims to engage in the sexual activity.  That is sex trafficking.  These acts of physical force—of violence—are corroborated not only through victim testimony, but also through, among other things, victim communications with the defendant spanning years of the charged time period; witness testimony, including witnesses who were present during and after Freak Offs; video footage; photographs capturing victim injuries; and law enforcement records, among other things.  The same is true of the defendant's coercion.  The communications between the defendant and multiple victims, which include communications sent as recently as this year, capture victim resistance to engaging in Freak Offs even in light of the defendant's abusive tactics.  The defendant's years-long use of force and coercion speaks directly to dangerousness.

---

[1] *See, e.g.*, CNN, *Sean 'Diddy' Combs' Attorney on Whether The Star Was Surprised By His Arrest*, YouTube (Sept. 18, 2024), https://www.youtube.com/watch?v=0s75LAia5RA (characterizing the March 5, 2016 incident a "misdemeanor assault").

**A-110**

Page 3

To be clear, despite the Indictment naming one victim in Count Two, this case is not about just one victim. The Government's evidence to date—including the defendant's own communications—demonstrates that the defendant has used force and coercion against *multiple* victims. In addition to these women, the defendant has assaulted a host of other individuals, including his employees and witnesses to his violence. For example, the defendant directed his rage toward his employees and those close to Victim-1 who had seen him physically abuse Victim-1, including by throwing these witnesses against walls and onto the ground, choking them, and throwing objects at them, among other things, particularly when they attempted to protect Victim-1. In doing so, the defendant has demonstrated that he is not only a danger to victims and witnesses but is also obstructive and willing to engage whatever is necessary—including physical violence—to instill fear in witnesses to keep them silent. *All* of this violence, against victims, witnesses, and others, factors into the analysis of the defendant's dangerousness.

### III.    The Defendant Has Consistently Obstructed Justice

Equally, as outlined in the Government's September 17 Letter, the defendant poses a significant risk of obstruction. (September 17 Letter at 9-11). The defendant's argument that his recent contacts with witnesses to the charged conduct should not be considered "obstruction" because he was unaware of the Government's investigation simply cannot be credited.[2] The defendant has been aware of the Government's investigation of this case since at least in or about January 2024. And even earlier, directly following the filing of a civil lawsuit in November 2023, the defendant was aware of the potential for criminal charges. Nevertheless, since that time, the defendant has continued his long-standing pattern of engaging in obstructive conduct.

Defense counsel acknowledges that the defendant has contacted witnesses in this investigation—apparently with "counsel's blessing"—but claims that the defense has "studiously avoided" interviewing grand jury witnesses. (Dkt. 13 at 10). The fact is, the defendant has personally and repeatedly contacted multiple witnesses, including at least one he *himself* knew was a grand jury witness. The defendant contacted these witnesses, including at least one whom he had not been in contact with for years, after they were served and leading up to the date they were required to appear before the grand jury. The defendant's behavior illustrates Judge Tarnofsky's point that counsel cannot control their client. (Tr. 54).

Moreover, contrary to counsel's protestations to the contrary, there is ample evidence from which to infer that the defendant's contacts are not innocuous. Indeed, the Government has multiple examples of the content of such communications between the defendant and/or his intermediaries and victims and witnesses. These communications include feeding victims and witnesses false narratives of events that they observed and/or personally experienced. (*See*

---

[2] The defendant's arguments with respect to his obstructive intent are equally unavailing. Specifically, the defendant claims that his actions on March 5, 2016 do not amount to obstruction because there was "no official proceeding in fact or in the contemplation of Mr. Combs or anyone else." (Def. Ltr. at 10). First, there need not be an official proceeding at the time of the obstructive acts to satisfy 18 U.S.C. § 1512. *See United States v. Reich*, 479 F.3d 179, 185-86 (2d Cir. 2007). Second, there is no "official proceeding" requirement with respect to obstruction under 18 U.S.C. § 1591(d) (obstruction of justice in connection with a sex trafficking matter).

**A-111**

Page 4

September 17 Letter at 10).  And they include communications were even made in the aftermath of the November 2023 civil lawsuit, during which the defendant was clearly concerned about the possibility of potential law enforcement scrutiny, as during several calls, the defendant expressed his concern that his communications may be monitored.  (*See, e.g.*, "You know I can't really talk on this phone.  You feel me."; "I'm not even supposed to be talking on the phone."; "I can't be on these phones and shit like that . . . you feel me."; "I-I can't even talk on the phone.  Like, please don't send no texts or d-do nothing.  People misread and shit.").

Finally, it bears noting that within the first 24 hours of this case's unsealing, there are already new concerns about witness interference as well as interference with a fair trial based on the defendant and his counsel's attempts to publicly discredit one of the victims.  As Judge Tarnofsky noted in her ruling, one of the pertinent concerns here is the "power imbalance" in the case.  (Tr. 54).  The defendant, as alleged in the indictment and publicly known, is a man of immense power and influence.  Consequently, his ability to coerce victims and to influence witnesses is outsized.  Just yesterday, during the bail argument and a subsequent appearance on CNN, defense counsel impugned the allegations made by a statutory victim—challenging the motivation and timing of her claims.  In addition to being factually inaccurate, this sort of attack comes close the limits set forth in L. Crim. R. 23.1.  It also can be expected to intimidate other witnesses who may feel tremendous pressure not to go up against the defendant.  The Government therefore requests that the Court caution the defendant and counsel not to violate L. Crim. R. 23.1, including by publicly challenging the credibility of prospective witnesses or by publicizing information counsel knows to be likely inadmissible at trial.  Moreover, the Government submits that this is yet another example of the defendant's ability to obstruct these proceedings, even though the media.  *Cf. United States v. Bankman-Fried*, No. 22 Cr. 673 (LAK) (S.D.N.Y. Aug. 11, 2023) (Dkt. 224) (remanding defendant who disseminated materials to the media in an effort to discredit and intimidate a trial witness).

## IV.     The Defendant Poses a Risk of Flight

Both at argument yesterday and in the press, the defendant has emphasized his supposed "cooperation" with the Government, including his willingness to surrender.  The Court should take that argument for what it truly is: attorney-crafted theatre designed to convince this Court that the defendant can be trusted and is not a risk of flight.  Make no mistake—the defendant's recent behavior shows that he cannot be trusted or controlled, particularly now that he is facing serious charges that carry significant penalties.  As Judge Tarnofsky observed, "Your lawyer asked me to trust you and to trust him, and I don't know that I think you can trust yourself, and I don't believe that counsel has the ability to control you."  (Tr. 54).  Indeed, since at least in or about January 2024—when the defendant was unquestionably aware of the criminal investigation—the evidence shows that he has engaged in multiple Freak Offs (some involving the interstate transportation of individuals to participate), has continued to use narcotics, and has contacted multiple witnesses.  Some of this conduct has even taken place since the defendant arrived in New York City, allegedly

**A-112**

Page 5

to "sit it out" and wait to be arrested.  (Tr. 25).  The defendant's conduct is demonstrably not cooperative, and indeed, highlights his inability to abide by the law or counsel's directives.

## V.    The Defendant's Detention Is Consistent with Case Law

The defendant's attempts to distinguish recent sex trafficking cases in which defendants were detained pending trial are unavailing.  A review of the case law confirms that pre-trial detention in this case is consistent with the rulings in other similar cases—particularly cases in which obstruction was a concern.  For instance, in *Epstein*, Judge Berman ordered the defendant detained on dangerousness, obstruction, and risk of flight grounds, despite the fact that the charged conduct—as well as the bulk of the obstructive conduct—took place approximately one decade prior.  *See United States v. Epstein*, No. 19 Cr. 490 (RMB) (S.D.N.Y. July 18, 2019) (Dkt. 32).  Specifically, Judge Berman found that the defendant's pattern of sexual misconduct, as well as his long history of attempting to intimidate, harass, and buy off potential victims and witnesses, made him a danger to the community.  *See id.*  Similarly, in *United States v. Kelly*, No. 19 Cr. 286 (AMD) (E.D.N.Y.), the defendant was detained on dangerousness, obstruction, and risk of flight grounds.  There, the court found the defendant's dangerousness based on the seriousness of the charges, which dated back more than a decade, and included sexual and physical abuse of minors and adults alike, such as hitting, slapping, punching, and spanking.  *Id.*, Dkt. 40 at 7.  The court also found that the defendant's obstructive conduct and witness tampering, which related to the matters charged, were grounds for detention.  *See id.* at 31-32.  Judge Garaufis denied the defendant bail in *United States v. Raniere*, No. 18 Cr. 204 (NGG) (E.D.N.Y.), noting that the defendant posed a danger to the community due to the nature and circumstances of the charged sex trafficking conduct (which did not, at the time of the bail determination, include allegations involving minors) and crediting the Government's representations that NXIVM critics and defectors faced harassment.  *See id.*, Dkt. 222 at 13-14; *see also United States v. Ray*, No. 20 Cr. 110 (LJL) (S.D.N.Y. Mar. 2, 2020) (Dkt. 17-1) (detaining defendant in one-victim sex trafficking case after Government argued, among other things, that the defendant intimidated and threatened witnesses).  Far from supporting the defendant's position, these cases instead stand for the proposition that sex trafficking defendants—regardless of the age of their victims—are routinely detained pre-trial, especially when they have engaged in repeated obstructive conduct.

## VI.    The New Proposed Bail Conditions Fail to Adequately Address the Risk of Danger or Obstruction

Finally, the new conditions proposed by the defendant fail to adequately protect the community against his dangerousness and ability to interfere with witnesses.  Indeed, these conditions do not speak at all to the defendant's risk of obstruction.  Further, considering that the defendant's proposed conditions still contemplate him having staff and visitors, they cannot adequately protect against dangerousness.  The Government's evidence, as described above and in the Indictment, includes numerous instances of assaults on his employees, as well as the involvement of his high-ranking supervisors, personal assistants, security, and household staff—

## A-113

Page 6

all of whom frequently work in his homes—in offense conduct.  Accordingly, the defendant has failed to rebut the presumption in favor of detention.

**VII.    Conclusion**

For the reasons set forth above, there are no conditions of bail, or combination of conditions, that would reasonably assure the defendant's appearance and compliance, or the safety of the community.   Accordingly, the defendant's application for bail should be denied.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:  ___/s_____
  Meredith Foster
  Emily A. Johnson
  Madison Reddick Smyser
  Christy Slavik
  Mitzi Steiner
  Assistant United States Attorneys
  (212) 637-2310/-2409/-2381/-1113/-2284

cc: Marc Agnifilo, Esq. (by email)
  Teny Geragos, Esq. (by email)

1

O9HLComC                                    **A-114**

```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------x

 3  UNITED STATES OF AMERICA,

 4            v.                         24 Cr. 542 (RFT)

 5  SEAN COMBS,

 6     a/k/a "Puff Daddy,"
       a/k/a "P. Diddy,"
 7     a/k/a "Diddy,"
       a/k/a "PD,"
 8     a/k/a "Love,"

 9            Defendant.
                                         Presentment
10  ------------------------------x

11                                       New York, N.Y.
                                         September 17, 2024
12                                       2:30 p.m.

13  Before:

14              HON. ROBYN F. TARNOFSKY,

15                                  U.S. Magistrate Judge

16                        APPEARANCES

17  DAMIAN WILLIAMS
         United States Attorney for the
18       Southern District of New York
    BY:  EMILY JOHNSON,
19       CHRISTINE SLAVIK,
         MADISON SMYSER,
20       MITZI STEINER
         MEREDITH FOSTER
21       Assistant United States Attorneys

22  AGNIFILO INTRATER LLP
         Attorneys for Defendant
23  BY:  MARC AGNIFILO
         TENY GERAGOS

24
    Also Present: Sean Quinn, Homeland Security Investigations
25
```

O9HLComC **A-115**

```
 1            (Case called)
 2            MS. JOHNSON:  Good afternoon, your Honor.  Emily
 3    Johnson, Christine Slavik, Madison Smyser, Mitzi Steiner, and
 4    Meredith Foster for the government.  We are joined at counsel
 5    table by Special Agent Sean Quinn of Homeland Security
 6    Investigations.
 7            THE COURT:  Good afternoon, everyone.
 8            MR. AGNIFILO:  Good afternoon, your Honor.  My name is
 9    Marc Agnifilo.  I am with Teny Geragos, and we represent Sean
10    Love Combs, the defendant who is before the Court today.  Good
11    afternoon, your Honor.
12            THE COURT:  Good afternoon, everyone.  Thank you for
13    being here today.
14            My name is Magistrate Judge Tarnofsky, and Mr. Combs,
15    you are here because you have been charged with certain crimes
16    in an indictment.  The purpose of today's proceeding is to
17    advise you of certain rights that you have, to inform you of
18    the charges against you, and to decide under what conditions,
19    if any, you should be released pending trial.
20            I am going to explain certain constitutional rights
21    that you have.  You have the right to remain silent.  You are
22    not required to make any statements.  Even if you have already
23    made statements to the authorities, you don't need to make any
24    more statements.  Any statements you make can be used against
25    you.
```

O9HLComC                                    **A-116**

1          You have the right to be released, either

2    conditionally or unconditionally, pending trial, unless I find

3    there are no conditions that would reasonably assure your

4    presence at future court appearances, and the safety of the

5    community.

6          If you are not a U.S. citizen, you have a right to

7    request that a colsular officer from your country of origin be

8    notified of your arrest.  In some cases a treaty or other

9    agreement may require the U.S. Government to give that notice,

10   whether you request it or not.  And I am required by law to

11   tell you this even if you are a U.S. citizen and it doesn't

12   apply to you.

13         You have the right to be presented by a lawyer during

14   all court proceedings, including this one, and during all

15   questioning by the authorities.  You have the right to hire

16   your own attorney, but if you can't afford one, I would appoint

17   one to represent you.

18         I have in front of me an indictment containing the

19   charges against you, and it has three counts.  You are charged

20   with racketeering conspiracy, conspiring to create a criminal

21   enterprise whose members and associates engaged in and

22   attempted to engage in, among other crimes, sex trafficking,

23   forced labor, kidnapping, arson, bribery, and obstruction of

24   justice.

25         In addition, you are charged with sex trafficking by

O9HLComC                    **A-117**

1    force, fraud, or coercion.  And the charge is that from at

2    least in or about 2009 through in or about 2018, in this

3    district and elsewhere, of recruiting, enticing, harboring,

4    transporting, and maintaining a person, Victim 1, and

5    attempting, aiding and abetting, and willfully causing Victim 1

6    to engage in commercial sex acts, knowing and in reckless

7    disregard of the fact that Victim 1 was engaging in commercial

8    sex acts as a result of force, fraud, and coercion.

9           And Count Three:  From at least 2009 through and

10   including around 2024, in this district and elsewhere, of

11   knowingly transporting an individual in interstate and foreign

12   commerce with the intent that the individual engage in

13   prostitution, and attempting, aiding and abetting, and

14   willfully causing the same, that is, transporting, aiding and

15   abetting, willfully causing the transportation of female

16   victims and commercial sex workers in interstate and foreign

17   commerce on multiple occasions with the intent that they engage

18   in prostitution.

19           Counsel, have you received a copy of the indictment?

20           MR. AGNIFILO:  I have, your Honor.

21           THE COURT:  Okay.  And have you reviewed it with your

22   client?

23           MR. AGNIFILO:  I have, your Honor.

24           THE COURT:  Okay.  So do you waive the public reading

25   of the charges?

O9HLComC                    **A-118**

1          MR. AGNIFILO:  I do, your Honor.

2          THE COURT:  Okay.  And Mr. Combs, are you prepared to

3   enter into a plea to the indictment at this time?

4          THE DEFENDANT:  Not guilty.

5          THE COURT:  Okay.  A plea of not guilty will be

6   entered, and the record should reflect that the defendant is

7   now arraigned.

8          For the government, in accordance with Federal Rule of

9   Criminal Procedure 5(f), I remind the prosecution of your

10  obligation under *Brady v. Maryland* and its progeny to disclose

11  to the defense all information, whether you believe it or not,

12  whether it's admissible or not, that's favorable to the

13  defendant, material either to guilt or to punishment, and known

14  to the prosecution.  Possible consequences for noncompliance

15  may include dismissal of individual charges or of the entire

16  case, exclusion of evidence, and professional discipline or

17  court sanctions on the responsible attorneys.

18         I will be entering a written order that more fully

19  describes the obligation and the possible consequences of

20  failing to meet it, and I direct the prosecution to review and

21  comply with that order.

22         Does the prosecution confirm that it understands its

23  obligations and will fulfill them?

24         MS. JOHNSON:  Yes, your Honor.  The government

25  confirms that it understands our obligations in this vein and

O9HLComC                    **A-119**

1    will abide by them.

2                    THE COURT:  Okay.  Has Judge Carter set a conference

3    date?

4                    MS. JOHNSON:  Yes, he has, your Honor.  It is next

5    Tuesday, September 24, at 11:00 a.m.  10:00 a.m.  I'm sorry,

6    your Honor.

7                    THE COURT:  At 10:00 a.m.  Okay.

8                    Is there a request to exclude time?

9                    MS. JOHNSON:  Yes, your Honor.  The government would

10   move to exclude time between today and the conference date of

11   next Tuesday.  Such an exclusion of time would be in the

12   interest of justice because it would allow the parties to begin

13   discussing initial discovery steps like entering a protective

14   order, and the like, before we see the district court that day.

15                   THE COURT:  Okay.  And does the defendant consent?

16                   MR. AGNIFILO:  We do, your Honor.

17                   THE COURT:  Okay.  So with the agreement of the

18   parties, I will exclude time through and including

19   September 24, 2024.  I find that the ends of justice served by

20   taking this action outweigh the interest of the public and the

21   defendant in a speedy trial.

22                   I take it there is no agreement regarding release

23   pending trial.  Is that correct?

24                   MS. JOHNSON:  That's correct, your Honor.

25                   THE COURT:  Okay.  Then we will have a detention

O9HLComC                    **A-120**

1    hearing.

2              On what basis is the government seeking detention?

3              MS. JOHNSON:  The government is seeking detention on

4    multiple bases.  The indictment alleges a violation of 18,

5    United States Code, Section 1591, and that's a basis under 18,

6    United States Code 3142(f)(1)(A).  The indictment also charges

7    a crime for which the maximum sentence is life imprisonment or

8    death.  That is 18, United States Code 3142(f)(1)(B).  The

9    government is also moving under 18, United States Code

10   3142(f)(2)(A), that is, the serious risk of flight; and 18,

11   United States Code 3142(f)(2)(B), which is a serious risk that

12   the person will obstruct or attempt to obstruct justice, or

13   threaten, injure, or intimidate or attempt to threaten, injure,

14   or intimidate a prospective witness or juror.

15             THE COURT:  Okay.  And is this a presumption case?

16             MS. JOHNSON:  It is, your Honor.

17             THE COURT:  Okay.  And why is that?

18             MS. JOHNSON:  Detention is presumed under the Bail

19   Reform Act because the defendant is charged with sex

20   trafficking, which is an offense under Chapter 77 of Title 18,

21   and the cite for that is 18, United States Code 3142(e)(3)(D).

22             THE COURT:  Okay.  Thank you, counsel.

23             So I am required under the law to release you, either

24   with or without conditions imposed, unless I determine that

25   there are no conditions that will reasonably assure your

O9HLComC                    **A-121**

```
 1    appearance in court as required, and the safety of the

 2    community.  In this case, the government has asked that you be

 3    detained without bail, and they are entitled to make that

 4    request because the government contends that you present a

 5    serious risk of flight and obstruction of justice, and because

 6    of the nature of the charges against you, which include sex

 7    trafficking, and a crime for which the maximum sentence is life

 8    imprisonment or death.

 9              So we are having a bail hearing, and I have to

10    determine whether there are any conditions, any combination of

11    conditions of release that will protect the safety of the

12    community and reasonably assure your appearance at trial.  In

13    making this determination, I am required to consider several

14    factors, including the nature and circumstances of the charged

15    offense, including whether there are crimes of violence

16    charged, crimes involving firearms, controlled substances, the

17    weight of the evidence, and your history and characteristics,

18    which include character, physical and mental condition, family

19    ties, employment, financial resources, length of residence in

20    the community, community ties, past conduct, history of

21    substance abuse, criminal history, and record concerning

22    appearances at prior court proceedings.  I have also have to

23    consider the nature and seriousness of any danger to any person

24    in the community that would be posed by release.

25              Because this is a presumption case, because you are
```

O9HLComC                          **A-122**

```
 1   accused of one of several specified crimes, there is a
 2   presumption that no conditions of release will reasonably
 3   ensure the safety of the community, but -- and because if there
 4   is probable cause to believe that you have committed certain
 5   enumerated offenses, including sex offenses, there is a
 6   presumption that no conditions of release will reasonably
 7   ensure your appearance and the safety of the community.  But
 8   the presumption is rebuttable, and the government bears the
 9   burden of establishing by clear and convincing evidence that
10   you are a danger to the community or establishing by a
11   preponderance of the evidence that you are a risk of flight.
12           I will now hear from counsel.  First I would like to
13   hear from the government as to why it believes that detention
14   is warranted.
15           MS. JOHNSON:  Your Honor, the defendant, Sean Combs,
16   physically and sexually abused victims for decades.  He used
17   the vast resources of his company to facilitate his abuse and
18   to cover up his crimes.  Simply put, he is a serial abuser and
19   a serial obstructer.
20           As I just mentioned to your Honor, the government is
21   seeking detention, which I note is also the conclusion that
22   pretrial services has reached in its report after interviewing
23   the defendant.  The government submits that the defendant
24   should be detained pending trial because he is an extreme
25   danger to the community.  He poses a serious risk of
```

O9HLComC                          **A-123**

1    obstruction of justice, which also makes him a danger to the

2    community, and he poses a serious risk of flight because now

3    he's facing significant charges, some with mandatory prison

4    time.

5            As your Honor mentioned, detention is presumed here

6    under the Bail Reform Act.  It's the starting point, and it's

7    the defendant's burden to rebut that presumption, which the

8    government, respectfully, submits that the defendant cannot do

9    here.  The government is going to respectfully request that the

10   Court enter an order of detention.

11           As the Court knows, the government submitted a

12   detailed letter to your Honor this morning outlining the facts

13   and bases for detention, so I will highlight some of those

14   here.  The facts are set forth in detail in the letter, but in

15   short, the defendant used force, threats of force, and coercion

16   to cause female victims to engage in sexual activity with male

17   commercial sex workers that he termed Freak Offs.  These were

18   elaborate sex performances that the defendant arranged,

19   directed, masturbated during, and often electronically

20   recorded.  They began at least in and around 2009, lasted

21   through at least this year, 2024, and often took place over

22   multiple days, and involved more than one commercial sex

23   worker.

24           These Freak Offs were enabled and arranged with

25   members and associates of his enterprise who set up the hotel

O9HLComC                         **A-124**

1    rooms, stocked them with supplies, arranged travel for victims

2    and sex workers, and delivered bulk cash and narcotics to the

3    hotel rooms, among other tasks.  And those narcotics that were

4    delivered or stocked in the room were used at least in part so

5    that female victims could continue to participate in Freak Offs

6    despite exhaustion and fatigue from these events happening for

7    sometimes multiple days.  The defendant was violent with women

8    both inside Freak Offs and outside Freak Offs.  At least a

9    dozen witnesses who we have spoken to will confirm that they

10   personally observed the defendant's violence towards women or

11   injuries sustained by female victims as a result of his

12   violence.

13          In addition to this violence directed toward women,

14   the defendant committed a host of other violent acts.  He

15   committed other physical assaults against other individuals,

16   and with the assistance of members and associates of his

17   enterprise, he committed kidnapping and he committed arson.

18          The defendant also surrounded himself with and used

19   firearms.  Those include the three defaced AR-15s that the

20   government seized from his residences in March of 2024.  One of

21   those was found in his residence in Los Angeles, and two were

22   found in his bedroom closet, disassembled, in Miami.  In Miami,

23   the magazines were loaded with ammunition.  And in Los Angeles,

24   we also seized a high-capacity drum magazine what was loaded

25   with 60 rounds of ammunition.  And all of those AR-15s I just

O9HLComC                          **A-125**

1    mentioned had the serial number bored through, so they were

2    defaced.

3              And as if that were not enough, your Honor, what sets

4    this case apart from so many others and what makes this

5    defendant even more dangerous is the defendant's extensive and

6    exhaustive history of obstruction of justice.  The indictment

7    charges acts of bribery and witness tampering as predicate

8    offenses for the charged racketeering conspiracy.  And just

9    like the violence I just outlined, the defendant and his

10   coconspirators have engaged in years-long efforts to cover up

11   the defendant's crimes and to tamper with witnesses.

12             So to get a sense of what I am talking about, I want

13   to use one example to the Court, and that example is March 5,

14   2016 at the InterContinental Hotel in Los Angeles.  The

15   government attached to its submission this morning a video clip

16   that had previously been publicly disclosed by the media in or

17   about May of this year.  This incident is critical to

18   understanding both the physical danger of the defendant and the

19   obstruction efforts that he goes to.  It is a recorded example

20   of his use of force in connection with a Freak Off.  And when

21   we get to the end of this example, the defendant was eventually

22   forced to acknowledge that he, in fact, is the individual

23   featured in that video, despite multiple previous denials that

24   this incident occurred.

25             So, in short, the evidence would show this:  Following

O9HLComC                          **A-126**

1    a Freak Off at the InterContinental Hotel, the defendant

2    violently assaulted the victim who was trying to leave the

3    hotel room and was walking down the hall to the elevators.  He

4    punched her, he threw her to the ground, he kicked her.  He

5    attempted to drag her back to the hotel room, and then later he

6    threw a vase at her.  And it's after this assault that the

7    coverup started.

8           After the victim managed to leave the hotel, or --

9    pardon me.  When hotel security was helping the victim leave

10   the hotel, the defendant attempted to bribe a hotel security

11   officer with a handful of cash in exchange for that officer's

12   silence.  That security guard, however, refused to be bought.

13          Next, the defendant directed his staff to contact the

14   hotel security staff in an apparent effort to obtain the

15   surveillance video that recorded every moment of that assault

16   that I just described, and as your Honor can see on Exhibit A

17   to our letter from this morning.  These same employees of the

18   defendant were in contact with the victim at the same time to

19   ensure that she would stay quiet and she wouldn't say anything.

20   And within days of that March 5, 2016 violent attack that was

21   caught on video, the surveillance video disappeared from the

22   hotel server.  That's just not a coincidence.  That is a result

23   of the defendant's effort to obtain it through his staff

24   members.  And the coverup of that incident continued for nearly

25   another eight years -- seven years.  I apologize, your Honor.

O9HLComC          **A-127**

1          A civil suit was filed in mid November 2023 that,

2     among other allegations, detailed this assault at the

3     InterContinental.  The defendant issued a public response to

4     that lawsuit, which I will quote.  Quote, "I did not do any of

5     the awful things alleged."  Through counsel, the defendant

6     released an even more strident response where he denied, quote,

7     "offensive and outrageous allegations" and described the

8     lawsuit as, quote, "riddled with baseless and outrageous lies."

9          These are unequivocal denials of the defendant's

10    participation in this incident.  This happened in November of

11    2023.  And these denials are also further attempts by him to

12    obstruct justice and prevent the truth of this event from being

13    known.

14          So we fast forward to May of 2024 when this

15    surveillance video is obtained by the media and publicized.  It

16    is only then, only when there is indisputable proof caught on

17    video and published to the world that the defendant admitted

18    that he was involved in this assault.  The sequence of events

19    makes crystal clear that you cannot take the defendant at his

20    word.  You cannot believe him when he denies his criminal

21    conduct.  He lies to cover things up.

22          And make no mistake, March 5, 2016, is just one

23    incident of violence and obstruction that we have investigated

24    and would prove.  This investigation has yielded evidence of

25    numerous assaults against female victims and other individuals.

O9HLComC **A-128**

1 These assaults include choking, hitting, kicking, and dragging

2 victims, often by their hair.  The investigation has yielded,

3 which I will talk in a little bit more detail later, detailed

4 evidence of these Freak Offs in the form of travel records,

5 communications, hotel records, witnesses, and videos.

6 So this is the kind of conduct I am talking about when

7 I argue that the defendant is a danger to the community.  This

8 Freak Off activity is core to this case.  It's a way of

9 controlling female victims' lives, method of using physical

10 force against them, all to compel them to engage in sex acts

11 that the defendant wants.  And this decades-long history of

12 violent conduct makes clear that even the most stringent bail

13 conditions will not suffice to ensure the safety of this

14 community.

15 The danger inquiry is focused on danger to any real

16 person, and the evidence shows that the risk of danger in this

17 case is acute.  The risk of danger is acute towards victims,

18 towards some of the defendant's staff, towards other -- and

19 towards other witnesses.  His past assaults have caused

20 significant injuries and required periods of physical recovery

21 for individuals who have been injured.  And what's more, this

22 conduct takes place behind closed doors typically.  It

23 typically takes place in settings that are not easily monitored

24 by even stringent conditions of release.  And the investigation

25 has further showed that this defendant's violence was both

O9HLComC **A-129**

1    premeditated, but often spontaneous, and the spontaneity

2    exacerbates the difficulty of crafting conditions of release.

3    It's very difficult to ensure the safety of any person when the

4    defendant has the propensity to become violent at the slightest

5    provocation.  No bail conditions can address that.

6         It's this longstanding pattern of abuse that is really

7    critical here, your Honor.  This pattern has been entirely

8    undeterred by over a decade, by threats of public exposure, and

9    by law enforcement intervention, and it's incredibly probative

10   of whether the defendant will continue to act the way he has

11   done for the past few decades.

12        And the risk of obstruction is also incredibly

13   significant.  The defendant's power gives him a unique ability

14   to influence and intimidate witnesses and victims.  Witnesses

15   we have interviewed have universally expressed their fear of

16   the defendant.  His influence makes it extremely difficult to

17   convince people that they will be safe from his actions.  And

18   evidence like the March 5, 2016 incident that I just outlined

19   makes it clear that the defendant is willing to deflect, to

20   minimize, and to lie about his conduct.

21        And March 5 is not the only incident of obstruction in

22   this case.  Following the November civil suit that I mentioned,

23   the defendant and his coconspirators continued their efforts by

24   reaching out to potential victims and witnesses.  This outreach

25   has included several different types of contact.  The defendant

O9HLComC                                    **A-130**

```
 1   himself has contacted witnesses, including those who received

 2   grand jury subpoenas from the government in this case, and that

 3   contact has occurred prior to dates of testimony or meetings

 4   with the government, and in one case with an individual who

 5   hadn't spoken to the defendant in years prior to this reachout.

 6   The defendant also directly contacted at least one victim,

 7   which I will circle back to momentarily.

 8           This constant contact with witnesses is important to

 9   understand, and so just one example from this past week is

10   illustrative.  On September 10, which is one week ago, Dawn

11   Richard filed a civil complaint detailing abuse she experienced

12   and observed from the defendant.  And the allegations in

13   Ms. Richard's complaint overlap in time period with the events

14   charged in this criminal case.  Several days later, on

15   September 13, another member of a band that Ms. Richard had

16   been in with the defendant, an individual named Kalenna Harper,

17   released a statement that, in sum and substance, denied that

18   she saw some of the same things that Richard's complaint

19   alleges.  And so where does the defendant's contact come in?

20           Well, in between September 10, the date of the filing

21   of the lawsuit, and September 14, the day after the public

22   statement by Ms. Harper, the defendant and Ms. Harper had 128

23   total phone contacts.  The defendant called or texted

24   Ms. Harper 58 times in four days.  There hasn't been any

25   contact since September 14.  This incident is just one way of
```

O9HLComC                    **A-131**

1    making clear that this defendant has the ongoing ability to

2    keep witnesses, even witnesses who might have been around for

3    very distant-in-time abuse, in his pocket and at his disposal.

4              Some of the ways in which the defendant contacts

5    victims and witnesses are also chosen deliberately to avoid

6    detection.  Occasionally intermediaries are used to reach out

7    to individuals.  And in one case, the call, the reach-out to

8    the victim I mentioned earlier, that communication was recorded

9    on another individual's cell phone.  It's ways like this that

10   make this obstruction incredibly difficult to detect.  And from

11   our investigation, we know what's happened on some of these

12   calls.  We know that at least one purpose is to spread false

13   narratives and to get witnesses on his side, and by telling

14   them -- sometimes gaslighting them into making them think that

15   something happened that didn't happen.

16             So in the calls with the victim that I mentioned,

17   there are two calls.  This victim is financially supported by

18   the defendant, and two calls are recorded.  The defendant asked

19   for the victim's support and friendship, and attempts to

20   convince the victim that she had willingly engaged in sex acts

21   with him.  In this call, the defendant ensures the victim that

22   if she continues to be on his side and provide support and

23   friendship, that she doesn't have to worry about anything else,

24   which is just a thinly-veiled reference to continuing that

25   financial support.  And that call happened, I believe, three

O9HLComC                                 **A-132**

```
 1   days -- sorry, those two calls happened three days after the

 2   filing of that November lawsuit.

 3          So in sum, this long history of obstruction and

 4   violence demonstrates that the defendant simply cannot overcome

 5   the presumption that no condition or combination of conditions

 6   can ensure the safety of the community.

 7          And I will note that, at least with respect to

 8   obstruction specifically, courts have denied or revoked bail in

 9   similar situations in this circuit.  For example, *United States*

10   *v. Lafontaine*, 210 F. 3d 125 (2nd Cir. 2000) at page 134,

11   that's where bail was revoked when the defendant contacted a

12   potential witness and attempted to feed that witness a false

13   narrative with the hope that that witness would adopt it as her

14   own testimony.

15          And this case is truly in the heartland of detention

16   cases of this magnitude and this similar -- similar charged

17   conduct.  I will just briefly review some similar cases.  R.

18   Kelly in the Eastern District of New York was also charged with

19   racketeering and sex trafficking.  He was detained on all three

20   grounds:  Danger, obstruction, and risk of flight.  Like this

21   case, there was a pattern of obstruction that had occurred, and

22   like this case, the sexual abuse that was alleged was violent

23   and repeated.

24          Jeffrey Epstein from this district was charged with

25   sex trafficking, and detained on dangerousness, obstruction,
```

O9HLComC                      **A-133**

1   and risk of flight grounds.  In that case, the charged conduct

2   was much less recent, and so was the obstruction, yet,

3   nevertheless, Jeffrey Epstein was detained on those grounds as

4   well.

5        Keith Raniere in the Eastern District as well, also

6   charged with racketeering and trafficking, again, detained on

7   all three grounds.  While the violence in that case was

8   serious, it was not personally committed by Raniere, but the

9   Court still found that the defendant was a danger to the

10  community.

11       And finally I will turn to risk of flight.  The

12  defendant's incentives to flee changed substantially when he

13  was arrested last night.  Those incentives are markedly

14  different today than they were yesterday, and his risk of

15  flight is much more significant and much more pronounced.  He

16  is now charged with serious offenses carrying significant, in

17  some cases mandatory terms of imprisonment.  And as I will get

18  to next, the evidence is strong and the possibility of a

19  substantial sentence is one factor to be weighed in assessing

20  risk of flight.

21       He's also charged with crimes that are highly

22  sensitive and that risk serious reputational harm to him, and

23  it's the same things that he has spent the last decade trying

24  to sweep under the rug and trying to cover up.  The defendant

25  is a wealthy man.  You can see that in the pretrial services

O9HLComC                    **A-134**

```
1    report.  It's also widely known.  That wealth allows him the
2    ability to flee quickly and without detection should he so
3    choose.  His counsel have taken steps during this investigation
4    to minimize flight risk.  They have taken his passport,
5    attempted to sell his jet, and reported his locations and
6    travel to the government.  All of those things have been to set
7    them up for the argument here today, to be able to say today
8    that he is not a risk of flight.  Those things were done when
9    his incentives were entirely different.
10           And as I expect you will hear from defense counsel,
11   the defendant did fly to New York two weeks ago at his
12   counsel's advice, and has been living in a hotel in the city
13   for the past two weeks, waiting, potentially, for his arrest.
14   So instead of fleeing from the district, he came to the
15   district.  But while he is sitting in a hotel, waiting to be
16   arrested on federal charges, at a time when he should be on his
17   very, very best behavior, he had what appears to be narcotics
18   at his hotel room that was found after his arrest last night.
19   The test results have not yet -- are not yet conclusive, so I
20   don't want to suggest that we have conclusive test results, but
21   they are bags of pink powder that are visually similar to bags
22   of pink powder that we have seized before from the defendant
23   that have tested positive for ecstasy and other drugs.
24           So just one quick note on the defendant's proposed
25   bail package.  My focus in the argument now is on detention
```

O9HLComC                     **A-135**

1   because, as I mentioned, this really is a heartland detention

2   case.  I am happy if the Court has questions to address my

3   concerns in more detail, but from the government's perspective,

4   the defendant's bail package is woefully inadequate.  Its focus

5   is on risk of flight alone, and there is not a proposed

6   condition that addresses many of the concerns of danger and

7   obstruction.  And, in fact, the government submits that there

8   is no way to successfully curtail the type of obstruction that

9   the defendant has been engaging in here.

10          So finally, just a note on the strength of the

11  government's evidence, which is another factor that the Court

12  may consider in its decision.  The government has spoken to

13  over 50 witnesses, many of whom have personally witnessed the

14  defendant's abuse or seen signs of it.  The government has

15  sworn out multiple search warrants for cloud accounts, for

16  electronic devices, and for the defendant's person and

17  premises.  The government has received voluntary productions of

18  electronic evidence from coconspirators, victims, and

19  witnesses.  Some of these searches have yielded an incredible

20  amount of electronic evidence, over 90 cell phones, laptops,

21  and cloud storage accounts, as well as 30 other electronic and

22  storage devices, such as hard drives, thumb drives, cameras,

23  and a surveillance system.  We seized physical evidence from

24  the defendant's residences, the guns, the ammunition, and the

25  extended magazine I mentioned, and other evidence that

O9HLComC                          **A-136**

1    corroborates the victim's account of the Freak Offs.  We also

2    obtained documentary evidence from over 300 grand jury

3    subpoenas that have been issued, and other voluntary

4    productions.

5            Altogether, this evidence, the electronic evidence,

6    the documentary evidence, and the witness testimony, it is

7    going to be used to prove exactly what we charged in our

8    indictment.  And for Freak Offs specifically, we have

9    communications about setting up the room, communications with

10   male escorts about getting to the rooms, about traveling to the

11   rooms.  We have the supplies that were used in the Freak Offs.

12   We have hotel records, often showing extensive damages, and

13   frequently showing reservations made in the names of his

14   employees, and we have videos sometimes of the acts themselves.

15   This is the evidence we will use to prove this case, and it

16   confirms that the defendant is a danger to the community and

17   poses a serious risk to the integrity of these proceedings

18   through his continued efforts at obstruction.

19           Your Honor, for the reasons I have stated here and in

20   our letter, the government respectfully submits that the

21   defendant should be detained pending trial.

22           THE COURT:  Thank you, counsel.

23           Mr. Agnifilo.

24           MR. AGNIFILO:  Yes.  May I use the podium, your Honor?

25           THE COURT:  Of course.

24

O9HLComC        **A-137**

```
 1          MR. AGNIFILO:  Thank you, your Honor.  I am going to

 2     address the government's letter and some of the arguments they

 3     made in a second, but I want to go through first some things

 4     that I think are very important.  And the first is this:

 5     Something very significant in this case, and for the purposes

 6     of what we are all here today to decide, happened on

 7     September 5 of this year, about 12 days ago.  And as my

 8     colleague with the United States alluded to, that's the day

 9     that Mr. Combs flew from where he was living in Miami to

10     New York.

11          We had told the government before he left Miami that

12     we -- let me back up for a second.  It became apparent to us,

13     because this isn't our first rodeo, that we were getting close

14     to an indictment.  We met with the prosecutors and their

15     chiefs, and we left that meeting realizing that an indictment

16     was probably coming down soon.  We didn't know if it was a week

17     away, two months away, but it was going to be in the fall.

18     That's what it seemed to us.

19          I spoke to my client.  I said, My recommendation is

20     that you come New York.  I think less than 20 hours later, he

21     flew to New York.  He landed in New York.  I told my colleagues

22     with the government, Just so you know, Mr. Combs is in

23     New York, and I would like the opportunity for him to turn

24     himself in.  He has come to New York to turn himself in.

25     That's why he is here, and if he doesn't turn himself in, just
```

O9HLComC **A-138**

1    let me know if you want to know where he is -- he wasn't

2    hiding; he was in a hotel -- and I will tell you, and the case

3    will start.  Twelve days later, the case has now started.

4         So we were here because he did the exact opposite of

5    what we see defendants do when they are presenting problems to

6    the Court by any means, whether it be risk of flight or danger.

7    He actually came to the district voluntarily.  At the time, I

8    don't know if there was an indictment returned or not.  It's

9    none of our business, but we didn't know whether there was.  He

10   came here to sit it out, to wait.  If he had to wait six

11   months, he would have waited six months.  He only had to wait

12   12 days, as it turns out.  But that is a very significant step,

13   and it's only the last of many, many steps.

14        We got involved in this case -- Ms. Geragos and I got

15   involved in this case in March of 2024.  And I want to go

16   through -- the government, I thought, did a very full job going

17   through parts of their investigation.  We have been doing an

18   investigation also.  And on March 13, I reached out to my

19   colleagues at the U.S. Attorney's Office.  I never met any of

20   them.  I don't think they met me.  I introduced myself, and I

21   said I wanted to talk to them about certain aspects of the case

22   because I had an idea even then where this was going.  And I

23   had an idea.  And we will take a step back even further.  And

24   this is all in the public record by now.

25        A lawsuit was unsealed in November of 2023.  It was

O9HLComC **A-139**

1   unsealed for a very short period of time before it was settled,

2   but it involves one -- it involves -- I don't want to get into

3   it because no one is being named -- but someone who seems to

4   play a prominent role in the indictment. And so what seemed to

5   me -- and I think I was absolutely right -- is that this -- the

6   unsealing of this lawsuit and the settling of that case

7   garnered a tremendous amount of public attention. And I

8   concluded that my colleagues with the government read the same

9   newspapers I did, saw that there was talk of sex trafficking in

10  this civil complaint, which was settled, and started an

11  investigation. And by the time we really got wind of it a few

12  months later, the investigation seemed to be in high gear.

13          So I contacted my colleagues with the U.S. Attorney's

14  Office before the searches. The searches were on March 25 of

15  2024, and the searches consisted of searches of the residence

16  in Florida, the residence in California. And Mr. Combs was

17  flying with certain members of his family in his plane. They

18  searched him. They got cell phones. They got a lot of phones

19  from the different houses. They got a lot of different items

20  from the different houses, and I will talk about some of that

21  in a second. And that was the day that I first spoke to the

22  prosecutors in that case. And it was apparent to me -- because

23  I got the search warrants on that day, and the search warrants

24  had the identical charges, most of the serious ones, that we

25  have in the indictment today.

O9HLComC **A-140**

1      So when my colleague says that the world changed

2  yesterday, the world really didn't change yesterday very much

3  because we knew on March 25 where all this was headed, because

4  what was apparent to us, based on our conversations with the

5  prosecutors, on our review of the search warrant, is this was

6  an investigation into racketeering conspiracy, into sex

7  trafficking, and into violations the Mann Act, among other

8  things.  Three of those things are now in the indictment.  So

9  there's been no dramatic change in circumstances.

10      About a week after the search, Ms. Geragos and I flew

11  down to Florida.  We met with Mr. Combs for a period of time,

12  and Ms. Geragos and I took his passport.  We took physical

13  possession of his passport on April 1, 2024.  I called my

14  colleagues with the United States Attorney's Office.  I said, I

15  want you to know Ms. Geragos and I have Mr. Combs' passport.

16  We sent them an e-mail, and we said, We are going to have his

17  passport for the duration of this investigation.  He is not

18  going to fly internationally.  You won't have to worry about

19  that.  You are going to know that he is in the United States

20  because we have his passport.  And not only that; if he travels

21  domestically during the course of this investigation, we will

22  tell you.  And we did, without fail.

23      He went to a graduation of some of his children in

24  California.  We said, He is traveling from Florida to

25  California.  We sent them an e-mail.  He went on a whitewater

O9HLComC **A-141**

1    rafting trip at one point, and we sent them an e-mail. Anytime

2    he traveled domestically in the United States during the entire

3    course of this investigation, we told the government where he

4    was going. I have been doing this 35 years. I don't know that

5    I know the last time that that happened, much less us taking

6    his passport.

7        We then took the passports of several of his family

8    members. I have in my hands Mr. Combs' passport plus five, and

9    we have had these for months, and we told them that we have had

10    these for months. And this isn't a show. This isn't, Oh, they

11    are just doing this so they can do better at a detention

12    hearing one day. This is because we took this investigation

13    absolutely seriously, as serious as one can take an

14    investigation, from the earliest stages. And we made what we

15    think to be prudent decisions with Mr. Combs. We don't do

16    these things without him. We are a team here. And we made

17    these decisions together to show the government, to try to earn

18    the government's trust, truthfully; to try to earn the

19    government's trust, to say, Hey, you know what, we know it's

20    coming -- back in March we knew it was coming -- we know it's

21    coming, and when that day comes, we are going to want you to do

22    two things. They haven't done either of them, but we wanted

23    them to do two things: We want you to let him surrender -- and

24    let me just back up for one second.

25        And I am not here to find fault with anything or to

O9HLComC                                    **A-142**

```
 1    say anything controversial.  The searches that were done on
 2    March 25 were very scary for people who had no involvement in
 3    this investigation whatsoever.  Semiautomatic rifles were
 4    pulled on completely innocent people.  You can see videos of
 5    the orange lasers on the chest of one of his children.  You
 6    could see what seems to be an AR-15 at the head of another one
 7    of his children.  And the kids were marched out, and other
 8    people were marched out, not through the back of the house
 9    where there wasn't dozens of reporters and a news helicopter,
10    but the front of the house so that these young, completely
11    innocent people could be seen on the international news with --
12    handcuffed for two hours.  Handcuffed for two hours.
13    Completely innocent, not involved in the investigation at all.
14    And we did not want that to happen again.  We took great pains
15    so that that would not happen again.
16          And that is one of the reasons he flew to New York.
17    You want me.  I know you want me.  Here I am.  Here I am.  And
18    he came to New York and we told them so that nobody else would
19    be afraid, so that, God forbid, God forbid, there be no tragedy
20    by accident.  The agents in this case are fine people.  I have
21    gotten to know many of them.  They took good care of Mr. Combs
22    last night.  I want to say that.  Things happen when people are
23    afraid, and I didn't want anyone to be afraid.  He didn't want
24    anyone to be afraid.  The case is about him, and here he is
25    because he came here to face it.
```

O9HLComC                                    **A-143**

```
 1          We were worried that he had an airplane because, of
 2     course, we are.  I can't remember when it started, but
 3     Ms. Geragos and I said, You know what, we have to sell that
 4     plane.  We have to sell that plane.  And we started efforts --
 5     there is essentially a financial management company that deals
 6     with a lot of these sorts of issues.  I barely own a car.  I
 7     certainly don't own a plane.  But it's hard to sell a plane,
 8     apparently.  And we have been trying to sell the plane for
 9     about four or five months.  We currently have a letter of
10     intent, which I am told is a good thing when you are trying to
11     sell a plane, so maybe we will actually sell it this time.  But
12     we are trying to sell the plane.  Why are we trying to sell the
13     plane?  Because it's not our first rodeo, and we know it's
14     better if he doesn't have access to a plane.
15          So what's the deal with the plane at the moment?  Luck
16     would have it, it's being chartered.  So I guess what happens
17     with these planes is if you are not going to fly on the plane a
18     lot yourself, a plane needs to be active or else it falls into
19     disrepair, so folks charter it, and that's what's happening
20     here.  So some unrelated party is flying in the plane from
21     Los Angeles to Teterboro Airport, I think landing in Teterboro
22     Airport tonight.  That's really a headache I need.  The plane
23     that I am trying to keep on the West Coast is flying to
24     Teterboro, but we have nothing to do with it.
25          And the government, to their credit, hasn't made a big
```

O9HLComC **A-144**

1   deal out of the plane because they see we are trying to sell

2   the plane. But that's a significant act, I think, of goodwill

3   and trustworthiness that we are trying to sell the plane. I

4   wouldn't have the -- I don't know if temerity is the right

5   word. I wouldn't be foolish enough, I think, to come before

6   your Honor one day -- I didn't know it would be your Honor; I

7   didn't know when this day would come -- with us having this

8   airplane, with us not collecting all these passports, without

9   Mr. Combs coming to New York and saying, Hey, Judge let him go.

10  Well, why would I do that, Mr. Agnifilo? What have you shown

11  me? What trust, what trust have you earned in the eyes of the

12  Court? And the answer would be, None. But we have. And trust

13  is earned, and we have earned it.

14       And my colleagues with the government, we couldn't win

15  them over. We tried, and we couldn't win them over. We

16  couldn't agree on a very substantial bail package. We couldn't

17  get them to turn himself in, and I get it. That's their right.

18  But, you know, we have your Honor. So we have been trying to

19  sell the plane.

20       But coming back to the New York situation just for a

21  second. One of the things that I notice from the indictment

22  is, there is one victim in Count Two, in the sex trafficking

23  charge. There is one victim. One of the things that's

24  happened -- and I will take my third step back. When the

25  complaint of the civil case was unsealed around Thanksgiving

O9HLComC                    **A-145**

1   last year, November of last year, there was a flurry of other

2   civil cases, many, many of them.  I think 12, 15.  We don't do

3   the civil stuff, Ms. Geragos and I, but there is another lawyer

4   who does.  We were getting a new civil case every week,

5   sometimes two a week.  And what it seemed to us -- and I am not

6   disparaging anything -- is people were jumping on a bandwagon

7   of sorts.  I think someone noticed, Wow, Mr. Combs wrote a --

8   the settlement is confidential, so I am not going to say what

9   it was, but it was large.  Mr. Combs wrote a very large check

10  to someone who he was in a relationship with for ten years, who

11  is the person in Count Two.  And I will get to that in a

12  second.  Ten-year relationship.  If he is writing checks, I

13  want my check, and everyone lined up to get their checks.  And

14  we were getting an endless supply of civil lawsuits.

15          So I had no idea when this indictment came down, I had

16  no idea, are we going to have one victim or are we going to

17  have 12 victims.  I didn't know.  I was ready for 12 victims.

18  I was happy to see there was only one.  So it is not as though

19  this indictment is somehow worse than we imagined.  It's, if

20  anything, better than we imagined, and eminently manageable,

21  from our perspective.

22          I won't belabor the point.  I notice in the pretrial

23  services report, I think they say that Mr. Combs should be

24  detained because he has a criminal history.  I don't know that

25  that's right.  He went to trial in a New York state court in

O9HLComC                                                **A-146**

```
 1   2001 and was acquitted, fully acquitted.  And one thing that I
 2   think is noteworthy, and I would be derelict in my duties if I
 3   didn't bring it up, is that was quite a serious case, and he
 4   went to every court appearance.  He went to every court
 5   appearance for the year or so that that case was pending, and
 6   he went to every court appearance.  And then a jury of 12
 7   New Yorkers, just like a jury of 12 New Yorkers one day will
 8   hear this case, acquitted him.  So he knows what that's like.
 9   He knows what that involves.  And it looks like he is going to
10   have to do that again.  And he is ready to do it again, and he
11   came here to do it again.  So I don't think he does have a
12   criminal history in terms of felony convictions.  I don't think
13   he has any felony convictions.  I think there might be a
14   misdemeanor that goes back some period of time, but I think
15   that's it.
16           One of the other things that's in the pretrial
17   services report that I just want to mention briefly -- and this
18   is mostly a confidential matter, so I don't want to get too
19   much into it.  One of the things that Mr. Combs is doing in
20   New York is getting treatment and therapy for things that, most
21   respectfully, he needs treatment and therapy for.  And I say
22   that as his lawyer.  And he is getting that.  And I notice that
23   in the pretrial services report they had that as a reason to
24   detain him.  I don't see the world that way at all.  I think
25   everybody has flaws.  I think that some of what the
```

O9HLComC **A-147**

1    government's presentation this afternoon relates to is that

2    Mr. Combs is not a perfect person.  There's been drug use.

3    There's been toxic relationships that I think were mutual in

4    their toxicity, as these things tend to be.  And if he has seen

5    fit at the ripe old age of 54 to really take things into his

6    own hands and try to be better for the rest of his days, I

7    think that is only a positive, only a good thing.  I don't see

8    anything negative in that.  And I think if there is one thing

9    that we have seen as a country and as a justice system, is if

10   someone wants to stand up for themselves to try to get the help

11   that they need, we stand with them.  We stand with them.  We

12   don't say, Wow, you are trying to get the help that you need;

13   we think you should be in jail now because you are trying to

14   get the help you need.  So I appreciate the efforts of pretrial

15   services and their observations and the hard work that they do

16   and always do, but I very much disagree with that aspect of the

17   report.

18        I want to talk a little bit about the government's

19   sentencing letter.  I think many of the things that my

20   colleague talked about in terms of obstructing justice is not

21   actually obstructing justice.  And let me name a few.  They

22   talk about -- my colleague talks about March of 2016.  And this

23   is an unfortunately fairly well-known event because somehow --

24   we will never know how exactly -- this hotel footage found its

25   way to CNN and found its way to the rest of the world.  I

O9HLComC                              **A-148**

1  wonder how that happened.  We didn't have it.  The government

2  had it.  It got to CNN on a day that Donald Trump wasn't having

3  any court proceedings, on a day that was sort of a slow news

4  day.  The news picked it up because CNN got this videotape.

5  And we all saw it and I saw it.  Mr. Combs saw it.  Mr. Combs

6  issued an apology.  Is that a wise thing?  Was that not a wise

7  thing?  I don't know.  He wanted to do it.  It meant something

8  to him, and he apologized.  And that's what he did.

9          Now, one thing that's important about the video -- and

10 since the government talked about some of the evidence, we have

11 to talk about some of the evidence.  What I think the evidence

12 is going to show about the events leading up to this video

13 being made is that two people are in a hotel room, Mr. Combs

14 and Victim Number 1 from Count Number Two.  Having looked

15 through more text messages and e-mails than I care to, and I

16 think the government would agree, one of the major issues in

17 that couple's relationship at that point, and at many other

18 points, is that Mr. Combs had more than one girlfriend, okay.

19 And Victim Number 1 was looking through Mr. Combs' telephone

20 when Mr. Combs was asleep, found evidence that Mr. Combs had

21 more than one girlfriend.  She was not the only one.  She hit

22 him in the head, while he was sleeping, with his own cell phone

23 and then took his clothes.  She has two bags as she runs into

24 the hallway.  In one of those bags is Mr. Combs' clothing.  All

25 of it.  She has left him in a hotel with no clothes, having hit

O9HLComC                                **A-149**

1   him in the head in his sleep with a cell phone, which is why he

2   comes out into the hallway in a towel.

3           Now, I am not going to comment on the video because my

4   client commented on the video, and we all know what we saw, but

5   to the extent that the government says that this is somehow

6   evidence of sex trafficking, it's evidence of Mr. Combs having

7   more than one girlfriend and getting caught. And that will be

8   shown resoundingly not just by my words, but by the written

9   communications between those two people. And let me talk about

10  that for a second.

11          This is a ten-year relationship. This sex trafficking

12  is a ten-year relationship. These two people were in love.

13  That will be made abundantly clear by the way they speak to

14  each other, by the way other witnesses described their time

15  together, and by the circumstances of how they broke up. They

16  were in love, but Mr. Combs wasn't always faithful. There was

17  someone else. One person, maybe more than one person. This

18  was a source of great hurt to Victim Number 1. At the end of

19  the day, there was mutual philandering, and Victim Number 1

20  ended up marrying the trainer that Mr. Combs got for her, and

21  had two children. That signaled the end of the relationship.

22  They had been cheating on each other for years, but now she had

23  two kids with the trainer, and that was the bridge too far that

24  led to their relationship coming apart.

25          Years and years and years later, when I submit Victim

O9HLComC                    **A-150**

1    Number 1 realizes she had a pretty good thing for ten years

2    with Mr. Combs -- they were in love, it was exciting, she was a

3    recording artist, he had a recording studio, things -- I don't

4    want to comment on her present life.  I have no idea what it's

5    like.  Maybe things with the trainer weren't quite the same as

6    they were with Mr. Combs, and she does something that is very

7    significant, if we are going to talk about the evidence in this

8    case.  She has her lawyer call Mr. Combs' lawyer, and in a

9    recorded conversation for eight minutes and 12 seconds, where

10   her lawyer says, My client has written a book.  It's about your

11   relationship.  She is not talking about sex trafficking and she

12   is not talking about sex crimes.  My client has written a book,

13   and she is going to publish it, but if you want to buy the

14   rights, then you will have the exclusive rights, and she won't

15   be able to publish it.  And you know what, you can buy the

16   rights for $30 million.  A recorded conversation.  The

17   government has it.  We have it.

18           That conversation, I guess, didn't go so well for her

19   and the lawyer.  So the next thing we know, it's now November

20   of 2023, and she has a different lawyer.  This lawyer is not so

21   interested in intellectual property for $30 million.  This

22   lawyer is saying, I am going to bring a civil sex case because

23   the statute of limitations allow me to do that, because there's

24   been a change in the statute of limitations that allows me to

25   do that, and that's what I am going to do.  So I am not really

O9HLComC **A-151**

1　here to embarrass you anymore to the tune of $30 million; I am

2　going to bring this civil sex claim against you.

3　　　　　It's negotiated. Ms. Geragos and I are not involved

4　in the case yet because there is no criminal component to it,

5　and that's significant to what I am about to get to in a

6　second. The case settles for an undisclosed and large amount

7　of money, and then we have the torrent of other civil claims.

8　　　　　Now, one of the things the government talked about,

9　and they talked about obstruction of justice, is things that

10　seem to have happened around the time that this lawsuit settled

11　and other lawsuits were coming in. Certainly, Mr. Combs did

12　not know about any Southern District investigation at this time

13　period. I mean, absolutely nothing.

14　　　　　And one of the important -- my colleagues mentioned

15　this case called Lafontaine, and they cited it to you. And I

16　read Lafontaine just before we came today, and the difference

17　in Lafontaine is Lafontaine was charged. Lafontaine was in

18　jail. Lafontaine was released, and he was told, Don't contact

19　any of the witnesses in this case. So what does Lafontaine do?

20　He gets released and he starts calling witnesses. So that is a

21　drastically different situation than we have here, where

22　Mr. Combs doesn't even know that there is a criminal case. No

23　one knew there was a criminal case afoot. So I called the

24　prosecutors in March. My colleagues were saying these things

25　happened in November of 2023. There is no criminal lawyer

O9HLComC **A-152**

1   involved.  I am not involved.  Mr. Combs has no idea that there

2   is a criminal case going on.  So I don't see any of these

3   things as obstruction of justice.

4          What I do see, looking at things in the light most

5   favorable to the government, is there is a tremendously

6   embarrassing event for Mr. Combs; not something he thinks is

7   criminal, not something that's under investigation.  What

8   happened on March 5, 2016, I know of no DA investigation, no

9   police investigation, no federal investigation surrounding this

10  video that we all saw from March of 2016.  The problem isn't

11  that.  The problem is, it's embarrassing.  And this is a man

12  that's involved in very significant business deals and in very

13  significant business transactions, and he can't afford, quite

14  frankly, to be seen in a towel hitting a girlfriend.  He is not

15  trying to stop a criminal investigation.  There is no criminal

16  investigation.  He and this person had a mutually toxic

17  relationship for quite awhile.

18         Shortly after the events that are depicted on the

19  videotape that we all saw, Mr. Combs checks himself into a

20  rehab facility because he is doing too many drugs, and he has

21  an unhealthy relationship, and he knew it, and he had the

22  wherewithal to try to go get help.  And this person -- other

23  person, I believe, got help around the same time.  So this is

24  not a one-sided thing.  Now, why would it be depicted as a

25  one-sided thing?  There's 30 million reasons.  There's

O9HLComC                              **A-153**

1    30 million reasons for this to be depicted as a one-sided

2    thing; one for each dollar that he was being sued for.  These

3    people didn't go to the cops.  These people didn't go to law

4    enforcement.  This woman didn't say, My goodness, I am the

5    victim of sex trafficking; I am going to go tell law

6    enforcement.  The first thing she did is say, I am going to

7    write a book, but for $30 million, you can buy the rights.

8    That's the first thing she did.  And the second thing she did

9    is she brought a civil suit.

10           So when they talk about the evidence in this case

11   being strong, I respectfully descent.  The evidence in this

12   case is deeply problematic.  Now, this is not the time to

13   litigate a very complicated criminal case, but the strength of

14   the evidence is one of the factors that we are told we have to

15   think about, so that's why I am talking about it.

16           In terms of what happened recently with this Dawn

17   Richard lawsuit and someone named Kalenna Harper coming out and

18   saying what her experience was, this is the furthest thing from

19   witness obstruction I can think of.  A person brings a civil

20   lawsuit.  Another person from the same band that the person who

21   brought the civil lawsuit was in -- and the civil lawsuit is

22   all about, Combs was hard on us, he drove us, he made us work

23   all the time, you know, he did a couple of inappropriate

24   things.  And so someone with the exact point of view of the

25   civil plaintiff comes forward and says, in essence -- and this

O9HLComC **A-154**

1    is -- I thought it was a soft, respectful statement.  And the

2    statement was, I am not taking away her experience.  That

3    wasn't mine.  That wasn't my experience.  She is entitled to

4    her experience.  I was there.  That's not what I saw.  That's

5    not what I saw.  That's two witnesses having divergent

6    recollections of similar events.  And I expect this trial is

7    going to feature exactly that.  So there is nothing wrong with

8    that.  That's why we have criminal trials and civil trials.

9           I take the obstruction of justice seriously,

10   obviously.  And one thing I note -- and my colleague said that

11   there is nothing your Honor can do to stop Mr. Combs from

12   obstructing justice.  One thing that I think is noteworthy --

13   and my colleagues have investigated this case exhaustively for

14   several months, and I give them credit for that -- is that the

15   only thing they can say since the time Ms. Geragos and I have

16   been involved in this case is that another witness said

17   something different than a first witness.  And I am not even

18   sure Dawn Richard is a witness in this case.  I am not asking,

19   but I don't really see how she would play a role.  So I have to

20   say, quite frankly, your Honor doesn't have to do anything to

21   make sure that he doesn't obstruct justice because he hasn't

22   done a darn thing since we have been involved in this case.

23   And even taking everything that the government says as true,

24   that's true.

25           Okay.  There is a section in the government's letter

O9HLComC                    **A-155**

```
 1    called Sex Trafficking and Abuse, and I want to talk about that
 2    because sex trafficking is a very serious crime and I want to
 3    address it head on.  One victim, ten-year relationship.  It
 4    seems like what their theory is, is that as part of the way
 5    that these two adults wanted to be intimate together is that on
 6    occasion, a third person, a male, would come into their
 7    situation and have sexual contact with the woman.  And from
 8    what I heard the government say -- and Mr. Combs would not have
 9    sexual contact with the male.  But, you know, this male would
10    come and have sex with the woman.  All right.
11            So Ms. Geragos and I have interviewed a half a dozen
12    of these males.  We have been as busy as the government has
13    over the last six months.  And I can represent to your Honor, I
14    have asked all the questions I could think of, of, Did anything
15    ever, ever seem remotely nonconsensual?  Was anybody too drunk?
16    Was anybody too high?  Did anyone express any hesitation?  Was
17    there the slightest inkling that possibly, possibly the woman
18    wasn't consenting?  No.  No.  No.  No.  I think my colleagues
19    spoke to some of the same people, and I expect that they heard
20    the same thing.
21            One thing that I didn't see in the government's very
22    carefully written detention letter, they never say anybody
23    didn't consent.  They don't say it.  They suggest a lot of
24    things.  They suggest that because Mr. Combs is rich, because
25    Mr. Combs took care of his girlfriend financially -- they never
```

O9HLComC                    **A-156**

1    lived together, and that's important for a reason that I will

2    talk about in a second.  But because Mr. Combs provided for

3    this woman, because they were in love, he was in love with her

4    and she with him, that somehow this exerted some sort of

5    control that overwhelmed her free will.  And they certainly

6    suggest that, but they are very good writers, and if someone

7    didn't consent, they would have written that in a sentence, and

8    they didn't.  And it's because I think they are speaking to the

9    same people we are, and no one is talking about lack of

10   consent.

11        Is it, maybe, unusual -- I shouldn't say that.  That's

12   a judgment word.  Does everybody have experience with being

13   intimate this way?  No.  Is it sex trafficking?  No, not if

14   everybody wants to be there.  If everybody wants to be there --

15   the federal government -- we are not all better off if the

16   federal government comes into our bedrooms.  They don't do

17   great there, and that's what's happening there.  They are

18   coming into this man's bedroom, and they are making not just

19   judgments; they are charging him with statutes that, as they

20   said, could put him in jail for life.  I don't think these

21   things are going to pan out.  I just don't think they are going

22   to pan out.

23        They talk about other violence in their bail letter,

24   and they are talking about a kidnapping from 2011, and I know

25   exactly what they are talking about because we interviewed -- I

O9HLComC                    **A-157**

1   know who the person was who was allegedly kidnapped.

2   Ms. Geragos and I interviewed her in Los Angeles.  We took a

3   statement from her.  She certainly didn't use the word

4   "kidnapping" with us.  I won't get into what she did say, but

5   let's suffice it to say there is another side to that story,

6   and one day that other side might be told.

7           Okay.  Firearms.  Mr. Combs employs a professional

8   security company that provides his security.  He is at a point

9   in his life where he has that ability, and he has the ability

10  to employ a security company to keep him and anybody who might

11  be in his home safe.  Now, why would he do that?  I don't think

12  you have to necessarily be Sean Combs to need personal safety

13  anymore.  I mean, what we see is that, you know, people --

14  homes especially, you know, in Los Angeles and all the areas of

15  Los Angeles, including where Mr. Combs keeps his house, and in

16  Miami, responsible personal security is important, and that's

17  what we are talking about.  That's what we are talking about.

18          These aren't his guns, you know.  He has nothing to do

19  with how guns are kept in his house.  And my suggestion to the

20  Court is, if the government really thought that these were his

21  guns, they would have charged him with them, and they didn't.

22  He is not charged with firearms.  There's a part in the Methods

23  and Means section of the racketeering count where they say

24  there were firearms in the house.  We know there are firearms

25  in the house.  We know there are firearms in the house because

1    he has a professional security company that keeps firearms in

2    the house.  How they do it, whether they did it right, whether

3    they did it wrong, whether they should have an AR-15 with no

4    serial number, you know what, not for us to say.  Not his gun.

5    And if it was his gun and they can prove it was his gun, I

6    think they would have charged him with a defaced AR-15, and

7    they didn't because it is not his gun, because he has a

8    professional security company that does all of this work.

9         A couple of other observations.  My colleague

10   mentioned the R. Kelly case.  R. Kelly involved children, flat

11   out.  Different.  Night and day different.  And the reason it's

12   night and day different is because children, thank goodness,

13   cannot consent.  There is no issue.  There is no issue of

14   consent when you are talking about a kid.  A kid is a kid, and

15   kids can't consent.  End of story.  Epstein, children.  Keith

16   Raniere, children.  Very, very, very different.  Very

17   different.  Children to adult, very different.  Children to

18   ten-year adult relationship, not even in the same ball park.

19        So where are we?  Where we are is we have a

20   substantial, substantial bail package.  Some members of

21   Mr. Combs' family are here.  If you can just -- there you go.

22   They have come here on short notice.  They are here.  They love

23   him.  They support him.  I won't go through it because it's in

24   our bail letter, your Honor.  We are talking about a

25   $50 million bond secured by a $50 million -- $48 million piece

O9HLComC                        **A-159**

1    of property.

2              One thing that I think is very significant is, knowing

3    this day would come, on August 20, just less than a month ago,

4    we saw that there was, I think, $18 million of mortgage left on

5    that house in Florida.  It's called Two Star.  It was a

6    terrible business decision for Mr. Combs and his people.  We

7    paid off the mortgage.  Why?  Because we knew this day was

8    coming, and I wanted him to say one day -- one day I want to be

9    able to tell the judge in the Southern District of New York

10   that we have a $50 million bond secured by a $48 million house

11   with no mortgage.  So we paid off the mortgage because that is

12   what it means to build trust.  And we have done these things to

13   build trust in a real and substantial sense.  There is nothing

14   about this as a show.  No one makes bad financial decisions

15   just for a show.  It was important.  And I told him this is an

16   important thing to do.  You want to show the Court that you are

17   taking it seriously?  If we weren't taking this investigation

18   seriously back on August 20, we wouldn't have done it, and we

19   did do it.  If we didn't take this investigation seriously on

20   April 1, we wouldn't have taken his passport, and we took his

21   passport.

22             We have been taking this investigation seriously each

23   and every day since I have been involved in this case in March,

24   and yet, and yet, he flew here, and yet, he came here.  And so

25   we can trust him and we can trust him because he earned his

O9HLComC                    **A-160**

1    trust through actions.  This isn't just the words of his

2    lawyer; this is him undertaking action to show your Honor that

3    he is trustworthy, that he is a man of his word.  He is not

4    going to obstruct justice.  He is not going to run away.

5         One day I expect we are going to have a trial, and my

6    colleagues from Southern District of New York, I know them

7    well.  They know me well.  We will have a fair trial, and this

8    will be adjudicated in the only way it possibly can; in a

9    courtroom, with evidence.  And I expect -- we have substantial

10   defenses, substantial defenses to these charges, to every

11   single one of them, every single one of them, and that is how

12   Mr. Combs is handling this case.  He is handling it head on,

13   the way he's done everything else in his life.

14        He's become a controversial figure.  He's become sort

15   of a punching bag for these civil suits, but he has also built

16   these tremendous businesses from scratch, doing things that

17   it's difficult for anyone to do.  I mean, Mr. Combs has

18   overcome tremendous odds.  His father was killed when he was

19   two years old, grew up in Harlem, and through hard work he has

20   earned everything that he has gotten.  He earned it.  And one

21   of the things that I submit wholeheartedly to your Honor is

22   that one of the things he's earned, and maybe the most

23   important thing that he has earned in his life -- and that's a

24   lot -- is he has earned this Court's trust.  He has earned this

25   Court's trust through his actions, the way he has always earned

O9HLComC                               **A-161**

1    everything.  There's no difference.  And so I am asking your

2    Honor to release him on the very, very stringent and very

3    demanding bail proposal that we have on our letter on page 2

4    and page 3.

5            And I am here for your Honor's questions, but I have

6    nothing else to say at this point.

7            THE COURT:  Okay.  Thank you, counsel.

8            Ms. Johnson, do you have any rebuttal?

9            MS. JOHNSON:  Your Honor, I will be brief.  Just four

10   brief points.  Defense counsel has spoken extensively just now

11   about his view of the evidence, his thoughts on the defendant's

12   relationship, and his critique of law enforcement's operations

13   in this investigation, but I submit to the Court what he has

14   not done is rebutted the presumption that the defendant should

15   be detained.

16           In terms of the obstruction points that Mr. Agnifilo

17   raised, there does not need to be an existing investigation,

18   and the defendant does not need to know about it, but we have

19   evidence that he does know, or he does suspect.  Three days

20   after the settlement of that November civil suit, he is

21   recorded speaking about how he is fearful of talking on the

22   phone because it might be tapped.  And he is using someone

23   else's phone in that regard.  He -- we know, as of at least

24   February -- knew about the existence of this very

25   investigation, and has continued since February to contact

O9HLComC **A-162**

1  witnesses. He has contacted Ms. Harper last week, as I

2  mentioned, multiple times. There are at least two other

3  witnesses who received grand jury subpoenas this summer who

4  were reached out to multiple times by the defendant.

5  THE COURT: I think what he was saying is those

6  witnesses wouldn't necessarily have any insight into the

7  behavior that's actually charged in the indictment.

8  MS. JOHNSON: The witnesses who received grand jury

9  subpoenas have firsthand knowledge of the behavior that's

10  charged in the indictment. I think that -- I obviously haven't

11  spoken to Ms. Harper, but the allegations in Ms. Richard's

12  complaint certainly are of the same time period and relate to

13  some of the same violent acts that the government intends to

14  prove at trial.

15  And just a brief note on weapons. I don't dispute

16  that Mr. Combs has used armed security, but it is incredulous

17  that armed security in a professional security company would

18  use defaced AR-15s and store them in pieces in the defendant's

19  personal closet. That is absurd.

20  And finally, defense counsel spent a lot of time

21  talking about the individual identified as Victim 1 in this

22  case, and spent some time alleging that the government is not

23  proceeding on a theory that there was no consent. And I want

24  to clarify the record that to the extent it was not clear,

25  based on the fact that Count Two is charged as sex trafficking

O9HLComC                                    **A-163**

1    by force, fraud, and coercion, we are most certainly proceeding

2    on the theory of lack of consent.  We are proceeding on a

3    theory that Victim 1 was forced, and that she was coerced to

4    participate in these sex acts.

5          And the relevant question here today is not that

6    consent question.  The relevant question here today is the

7    defendant's danger, and is he dangerous to the community.

8          THE COURT:  Would he not -- he wouldn't be a danger,

9    would he, if he only engaged in these kind of behaviors with

10   consenting adult partners?

11         MS. JOHNSON:  Well, we do have the video which shows

12   him assaulting a partner on video.  That video speaks for

13   itself.  And abuse and long-term relationships are not mutually

14   exclusive.  And a single instance, even where a defendant has

15   no criminal history, a history of domestic violence has been

16   found sufficient to detain a defendant, and that's the *Mercedes*

17   case which is cited in our letter.

18         And my last point, your Honor, is that despite

19   Mr. Agnifilo laboring over Victim 1, this is not a case about

20   one victim; this is a case about multiple victims and dozens of

21   witnesses who saw Mr. Combs' violence, who saw it during and in

22   connection with Freak Offs.  Multiple victims have been abused

23   in Freak Offs.  There's been violence, drugging, and coercion

24   through the date of the indictment in 2024.

25         THE COURT:  Thank you, counsel.

O9HLComC                    **A-164**

```
 1          MR. AGNIFILO:  Just very briefly.  One of the things

 2     that we have been very transparent about -- and we have been

 3     transparent in our conversations with the prosecutors, and I

 4     think I have even been transparent with your Honor.  Mr. Combs

 5     and this woman -- I am not picking on anybody; it is the

 6     centerpiece of the indictment -- had a mutually difficult --

 7     the whole relationship was actually quite good.  There was a

 8     dark period for both of them, and it was mutual, and it was not

 9     something that Mr. Combs imposed on anybody.  She was a

10     successful recording artist in her own right.  She was very

11     much an adult.  She had her own house.  Mr. Combs paid for the

12     house, but they didn't live together.  So to the extent that

13     there's this sort of veneer of control, Mr. Combs is a busy,

14     busy man, and one of the things he is busy doing, frankly, is

15     having more than one girlfriend.  So if this person wasn't

16     controlled, this person was a willing participant in a loving,

17     though toxic, relationship.  And we will never say anything

18     different.  But that doesn't -- that's our defense.  That

19     doesn't make it sex trafficking.

20          And what we are doing here, we are really, sort of, on

21     a slippery slope because the government is going to say, Well,

22     you know, she didn't consent because she was coerced.  She

23     didn't say that.  She didn't say that until she stood to get

24     $30 million from saying that, because that's what she needed to

25     say to get it in under the statute of limitations.  So where we
```

O9HLComC **A-165**

1    are is, it's a very serious case, and we don't say anything

2    different than that, which is why we have a very serious bail

3    package, but it's a case that he is going to defend, and he has

4    shown that from the very first minute that he realized this was

5    a case when I told him that in March. This has been a case.

6    We have done things a certain way since then. Are we going to

7    continue to interview witnesses? Of course, we are. We take

8    pains to stay out of the governments way. We don't know who

9    the grand jury witnesses are, you know. And honestly -- I

10    won't get into the details. If I think they are talking to

11    someone, I will pull up short. I don't want any problems. You

12    know, do I want to speak -- we both know pretty much

13    everything, you know.

14         They want to talk to 50 people; we want to talk to the

15    same 50 people. If I find out they are a grand jury witness, I

16    make a strategic decision to not interview that person, you

17    know. And we have done that consistently for the last six

18    months, you know. So this is -- we are trying. We really are.

19    We are trying to walk the fine line of doing a responsible

20    defense investigation in a very serious case, and not running

21    afoul of my colleagues with the U.S. Attorney's Office. And I

22    think we have done it, for the most part, and we will continue

23    to do it.

24         And the one thing that I hope your Honor can see,

25    because this is really the heart of our presentation, is

O9HLComC                      **A-166**

```
 1   Mr. Combs has done a lot of things to show that he is
 2   trustworthy.  Lots of lawyers get up and say lots of stuff.
 3   He's done things to show that he is trustworthy.  All he needs
 4   to know is what he can't do, and he won't do it.  He will not
 5   do it.  We will do it.  This will be a hard fought case, very
 6   hard fought from both sides.  Obviously means a lot to the
 7   prosecutors.  It means an awful lot to us.  It will be handled
 8   well.  It will be handled with lawyers with a lot of experience
 9   who know the difference.  And I think you should absolutely
10   trust Mr. Combs.  And I will go one step further.  I am going
11   to ask you to trust me.  I am with him.  I mean, I am with him.
12   I have my eye on him.  I know where he is.  We speak five times
13   a day, and I will make sure that everything goes the right way.
14   And so I really want to thank your Honor for all the time you
15   have given us.
16          THE COURT:  Thank you, counsel.  Is there anything
17   further?
18          MS. JOHNSON:  Nothing from the government.
19          THE COURT:  Okay.  Thank you both for your argument.
20   It was very helpful.  I am going to take a short recess, and I
21   am going to invite the representative from pretrial services to
22   join me in the robing room.
23          (Recess)
24          THE COURT:  I want to thank counsel again for their
25   helpful argument.
```

O9HLComC **A-167**

```
 1          In this case, I find that the presumption has not been

 2    rebutted and there are no conditions I can impose that would

 3    reasonably assure the appearance in court and the safety of the

 4    community.  I make this decision based on all the information

 5    presented to me, which includes the arguments and information

 6    provided by counsel, which includes the letters submitted in

 7    the pretrial services report.

 8          You are charged with a crime of sex trafficking, so

 9    there is a rebuttable presumption in favor of detention, and my

10    concern is that this is a crime that happens behind closed

11    doors, even where pretrial services is monitoring.  The alleged

12    victims are people with whom there is a power imbalance, who

13    are susceptible to coercion, not necessarily threats, but

14    concern about losing benefits that they have been provided in

15    the past.

16          There are also indications in your history and

17    characteristics that I think are a reason why the presumption

18    in favor of detention has not been rebutted; prior substance

19    abuse and the fact that the alleged violence seems to occur

20    hand in hand with times when you are not necessarily in control

21    of your actions because of that substance abuse.  Your lawyer

22    asked me to trust you and to trust him, and I don't know that I

23    think you can trust yourself, and I don't believe that counsel

24    has the ability to control you, given the very significant

25    concerns I have, particularly because of substance abuse and
```

O9HLComC **A-168**

1    what seem like anger issues.

2        I think the weight of the evidence is significant,

3    given that the government has proffered that there are multiple

4    witnesses who are saying that they have witnessed significant

5    serious violence, and the danger, I think, is quite serious.

6    There have been weapons around.  There has been significant

7    violence, and I also think it's significant that there has, I

8    think, been a proffer of significant evidence of coercion of

9    witnesses; maybe not brutal coercion, but gentle coercion can

10   be just as effective.

11       I have considered alternatives, such as monitoring,

12   home detention, a significant bond as your counsel proposed,

13   and I just don't think it's sufficient because so much of what

14   would happen, the types of behavior we are talking about,

15   happens behind closed doors.

16       I appreciate the willingness of your family and

17   friends to support Mr. Combs, including by a willingness to

18   cosign a bond.  I thank you for coming to court today, for

19   offering to be part of the process, but in this case, due to

20   Mr. Combs' own characteristics and own history, I find even

21   with a cosigned bond, I can't reasonably assure his return to

22   court or the safety of the community, or a lack of witness

23   tampering.

24       A preliminary hearing isn't necessary, and I know

25   there is a first conference.  I believe that that covers it.

O9HLComC                          **A-169**

1          Is there anything else for the government?

2          MS. JOHNSON:  Your Honor, just one thing.  I don't

3     recall the Court asking for the date and time of arrest, so I

4     just wanted to put that on the record.

5          THE COURT:  Yes.  Thank you.

6          MS. JOHNSON:  Mr. Combs was arrested yesterday,

7     September 16, at 8:25 p.m.

8          THE COURT:  Okay.  Counsel?

9          MR. AGNIFILO:  No, nothing from us.  Thank you.

10         THE COURT:  Okay.  Thank you very much.  I will put

11    out the bail disposition sheet.  And we are adjourned.

12         (Adjourned)

13

14

15

16

17

18

19

20

21

22

23

24

25

O9IHComC                    **A-170**

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4             v.                          24 Cr. 542 (ALC)

 5   SEAN COMBS,

 6      a/k/a "Puff Daddy,"
        a/k/a "P. Diddy,"
 7      a/k/a "Diddy,"
        a/k/a "PD,"
 8      a/k/a "Love,"

 9             Defendant.
                                           Bond Appeal
10   ------------------------------x

11                                         New York, N.Y.
                                           September 18, 2024
12                                         3:30 p.m.

13   Before:

14                    HON. ANDREW L. CARTER, JR.

15                                         District Judge

16                         APPEARANCES

17   DAMIAN WILLIAMS
          United States Attorney for the
18        Southern District of New York
     BY:  EMILY JOHNSON
19        CHRISTINE SLAVIK
          MADISON SMYSER
20        MITZI STEINER
          MEREDITH FOSTER
21        Assistant United States Attorneys

22   AGNIFILO INTRATER LLP
          Attorneys for Defendant
23   BY:  MARC AGNIFILO
          TENY R. GERAGOS
24
     Also Present:  Francesca Tessier, Pretrial Services Officer
25                  Joshua Rothman, Pretrial Services Officer
```

O9IHComC                    **A-171**

| | |
|---|---|
| 1 | THE DEPUTY CLERK:  Criminal cause for a bail appeal |
| 2 | hearing in case No. 24 Cr. 542, United States v. Sean Combs. |
| 3 | Counsel, please state your appearances for the |
| 4 | government. |
| 5 | MS. JOHNSON:  Good afternoon, your Honor.  Emily |
| 6 | Johnson, Madison Smyser, Christy Slavik, Mitzi Steiner, and |
| 7 | Meredith Foster, for the government.  Behind us, from Pretrial |
| 8 | Services, are Officers Francesca Tessier and Joshua Rothman. |
| 9 | THE COURT:  And for the defendant. |
| 10 | MR. AGNIFILO:  Yes.  Good afternoon, your Honor.  Marc |
| 11 | Agnifilo with Teny Geragos and Mr. Sean "Love" Combs is with us |
| 12 | today as well. |
| 13 | THE COURT:  OK.  All right.  Good afternoon. |
| 14 | I've seen the submissions.  I reviewed the previous |
| 15 | submissions that the parties made to Magistrate Judge |
| 16 | Tarnofsky.  I've looked at the transcript from the bail hearing |
| 17 | yesterday.  Let me just share with you my initial thoughts to |
| 18 | help counsel perhaps cabin your comments appropriately. |
| 19 | The government primarily seeks detention based on a |
| 20 | risk of flight and the danger of obstruction of justice or |
| 21 | witness tampering.  Regarding those two bases, first, my lesser |
| 22 | concern here is risk of flight, although that is a concern. |
| 23 | Certainly, Mr. Combs is a risk of flight.  Defense counsel has |
| 24 | submitted evidence regarding the efforts that he and his client |
| 25 | have made to try to show the Court and the government that he |

O9IHComC                                    **A-172**

```
 1   is not a risk of flight.  The government has again attempted to
 2   prove that he is a risk of flight, and the government has to do
 3   more than just simply prove he's a risk of flight.  They must
 4   prove that he is a risk of flight such that no condition or
 5   combination of conditions will reasonably assure his return to
 6   court.
 7          The package that's been submitted by Mr. Combs, I
 8   think, does not give the Court a reasonable assurance that he
 9   would return to court.  Regarding the issue of whether or not
10   the government has proven risk such that no condition or
11   combination of conditions would reasonably assure his return to
12   court remains a bit of an open question in my mind, but
13   certainly, the package that's been submitted is not sufficient
14   to reasonably assure his return to court given his wealth.
15          My bigger concern deals with the danger of obstruction
16   of justice and the danger of witness tampering.  That is a real
17   concern that I have here.  And I've seen the parties'
18   submissions, but I just wanted to give counsel my thoughts as
19   to what I am primarily concerned about.
20          Having said that, I'll now hear from the parties,
21   starting with the government, since the government has the
22   ultimate burden here.
23          MS. JOHNSON:  Thank you, your Honor.  Would it be
24   acceptable if I spoke from the lectern?
25          THE COURT:  You can speak from the lectern.  You can
```

4

O9IHComC **A-173**

1    stand there.  You can sit there.  Wherever you're comfortable

2    is fine with me.

3            MS. JOHNSON:  Thank you, Judge.

4            Your Honor, this case is about Sean Combs' physical

5    and sexual violence against women and others.  This physical

6    and sexual violence has gone on for decades.  It's also about

7    the vast efforts he undertook, using his extensive resources,

8    to cover up his crimes.  In other words, the very conduct he's

9    charged with shows his dangerousness, his resources, and his

10   willingness to lie and obstruct.

11           Yesterday, Judge Tarnofsky recognized this when she

12   found that there were no conditions or combination of

13   conditions that could assure the safety of the community or the

14   defendant's appearance in court, and she detained the

15   defendant.  The government respectfully submits that your Honor

16   should reach the same conclusion today.

17           As the Court just said, you have, obviously, read our

18   papers in detail and the transcript from yesterday.  I want to

19   be clear that we are seeking detention on, in addition to risk

20   of flight and risk of obstruction of justice, but also just on

21   dangerousness generally.  All of those factors to be considered

22   in ordering detention weigh in our favor here.

23           As I know the Court knows, in this case detention is

24   presumed under the Bail Reform Act because the defendant is

25   charged with sex trafficking, which is an offense under Chapter

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O9IHComC     **A-174**

1    77 of Title 18.  It's the defendant's burden to rebut that

2    presumption, and the magistrate court already found that he did

3    not do so.

4            So I want to start with dangerousness and obstruction,

5    and I'd like to talk about the seriousness of the offenses

6    first, which reflects both the defendant's dangerousness and

7    the risks of obstruction if released.  Many of the facts are

8    set forth in our submission and were on the record yesterday,

9    so I only want to briefly review a few with your Honor before I

10   dive in.

11           The defendant used force, threats of force, and

12   coercion to cause female victims to engage in sexual activity

13   with male commercial sex workers that he referred to as "freak

14   offs."  These were elaborate sexual performances that he

15   arranged, directed, masturbated during, and often

16   electronically recorded.  These began in and around 2009, at

17   least, and lasted until at least this year and often took place

18   over multiple days and frequently with more than one escort.

19   These freak offs were arranged with the assistance of members

20   of his enterprise who set up the rooms, stocked the rooms with

21   supplies, arranged the travel, delivered the cash to pay the

22   escorts, among other tasks.

23           The defendant used narcotics so that female victims

24   could continue to participate in freak offs despite exhaustion

25   and fatigue that they began to experience as these were

O9IHComC                              **A-175**

1   sometimes multiday events.  These narcotics included ketamine,

2   ecstasy, GHB, and others.  And victims themselves, in

3   communications that the government has seized, described

4   themselves as being "drugged" during these freak offs.

5        I mentioned that the defendant electronically recorded

6   the freak offs, and he did that at least in part so he could

7   keep the recordings and use them as blackmail against his

8   victims, so I want to pause on that for a moment.  In addition

9   to witnesses who would testify to this fact, it's also in black

10  and white in communications that the government has seized.

11  For example, in December of 2015, a victim texted the defendant

12  and makes explicit reference to this type of extortion.  This

13  is the quote:

14       "You know what sick and disgusting shit I was reminded

15  of the other day?  You forcing me to" — do something else,

16  which I'm not going to mention on the public record — "or you

17  were going to leak some FO shit."  FO standing for freak off.

18       The defendant recorded these women engaged in freak

19  offs.  He threatened them with those very videos to get them to

20  engage in even more.  And the defendant makes a lot of claims

21  yesterday and in his papers about the victims' motives in

22  speaking up now, but that message is from nine years ago.  And

23  I suspect that we'll hear that we should ignore these types of

24  things because they're old, but this isn't the only time

25  there's communications that explicitly reference this kind of

O9IHComC **A-176**

1    blackmail.  In fact, the same thing happened much more recently

2    several years later, after 2015, when a different victim said,

3    and here's a quote:  "He just threatened me about my sex tapes

4    that he has of me on two phones.  He said he would expose me,

5    mind you these sex tapes where I am heavily drugged and doing

6    things he asked of me for the past three years."

7        That's just two examples of the defendant's egregious

8    conduct in extorting and blackmailing victims that happened

9    years apart, and so it's rich when the defense submission filed

10   today accuses the victim of extorting the defendant.  Let me be

11   clear.  The only person who is engaged in extortion in this

12   case repeatedly is the defendant.

13       At least a dozen witnesses will confirm that they

14   personally observed the defendant's violence towards women or

15   the injuries that were sustained as a result.  And in addition

16   to that physical violence towards women, there's also evidence

17   of other violent acts, including physical assaults on other

18   individuals, including employees and witnesses to violence,

19   kidnapping, and arson.

20       The defendant surrounded himself with and used

21   firearms, including three defaced AR-15s and a high-capacity

22   magazine loaded with 59 rounds of ammunition that was seized

23   from his LA and Miami residences this year.  Yesterday, defense

24   counsel argued that these were the same guns used by the

25   defendant's professional security team, but what we hadn't told

O9IHComC                           **A-177**

1   the Court yet was that we did seize the guns used by his

2   professional security team.  We took six of them.  They were

3   licensed guns that were registered to the security team.  They

4   were stored in the defendant's homes, and he had access to

5   them.  But, for obvious reasons, we're much more concerned

6   about the defaced firearms hidden in his personal closet, and

7   that was our focus.  But it's worth noting that the defaced

8   guns have nothing to do with security and have everything to do

9   with dangerousness.  And even beyond that, when we consider the

10  additional guns that his security team has, he has even greater

11  access to firearms.

12          One more point on this is that the security team is

13  now the same team that he suggests be allowed to monitor him

14  while he's on bail.  His head of security was served yesterday

15  with a search warrant for his devices because of what our

16  investigation has revealed about his own personal involvement

17  in the offense conduct and in offenses under investigation by

18  the government.

19          As the Court knows from the transcript of yesterday's

20  proceeding, I spoke then about an incident that occurred on

21  March 5, 2016, at the InterContinental Hotel in Los Angeles,

22  and yesterday the government attached publicly released

23  surveillance footage to our submission as an exhibit.  And as I

24  said yesterday, this is a critical incident to assessing both

25  danger and obstruction.  I'm going to talk about it a little

9

O9IHComC                                      **A-178**

1    bit more today with some additional detail.

2              Contrary to defense counsel's argument yesterday,

3    which attempted to inaccurately recast this incident as just a

4    fight in a relationship, the events of March 5, 2016, are

5    powerful evidence of trafficking, a recorded example of

6    defendant's use of force in connection with a freak off.  So

7    I'm going to summarize the evidence again with some additional

8    details that I did not mention yesterday.

9              In short, the evidence shows that the defendant had a

10   freak off at the InterContinental Hotel in Los Angeles on

11   March 5, 2016.  The defendant contends that this incident only

12   involves the defendant and the victim, but this is wrong.  We

13   have multiple sources of evidence that demonstrate there was at

14   least one commercial sex worker who was with the defendant and

15   the victim in the hotel room prior to the assault that's

16   recorded on camera and remained in the room while the assault

17   was being captured.

18             Following the freak off, the defendant violently

19   assaulted a victim who was sneaking out of the room to leave

20   the hotel.  You can see in the hallway surveillance video that

21   she isn't even wearing shoes as she is leaving.  She's leaving

22   as fast as she can because she's trying to get out of there.

23   She's in danger.  In the video, the defendant storms out of the

24   room in nothing but a towel.  He comes up to her, he punches

25   her, he throws her to the ground, he kicks her, he attempts to

O9IHComC                    **A-179**

1    drag her back to the hotel room, and then he throws a vase at

2    her.

3              Text messages in the hours and days that follow

4    confirm the injuries caused by the incident.  These are quotes:

5              "I have a black eye and a fat lip.  You are sick for

6    thinking it's OK to do what you've done."

7              "I still have crazy bruising."

8              This is clear evidence of the dangerousness of the

9    defendant, and it's evidence that he has to try to minimize it.

10   He casts it as a misdemeanor assault arising out of a lover's

11   quarrel based on the fact that he wanted to get his clothes

12   back, but that's not what happened here.  The evidence shows

13   that the victim tried to escape the hotel room where the

14   defendant and an escort were without even putting on her shoes.

15   The defendant then violently beat her and tried to drag her

16   back to the hotel room.  It was only when hotel security staff

17   intervened that the victim was able to leave the hotel.

18             So this is just one example of violence being used in

19   connection with a freak off, but this incident is also

20   important because of everything that happened after the

21   assaults, because that's when the cover-ups started.

22             First, the defendant tried to bribe a hotel security

23   officer with a handful of cash in exchange for that officer's

24   silence.  The security guard refused to be bought.  Then the

25   defendant's staff got involved, contacting hotel security to

O9IHComC          **A-180**

1   get the footage of the incident and keep it from being seen by

2   anyone.  And by March 8, three days later, the surveillance

3   video somehow disappeared from the hotel server.

4         The defense has argued that there was no criminal

5   investigation, so there couldn't have possibly been

6   obstruction, and the defendant was just trying to prevent

7   something embarrassing from becoming public.  But that's not

8   what the evidence shows.  In fact, what the defendant himself

9   was saying immediately after the assault on March 5, here's a

10   few messages he sent right after that timestamp on the

11   surveillance video recording:

12         "Call me.  The cops are here."

13         "I got six kids."

14         "Yo, please call.  I'm surrounded."

15         "You gonna abandon me all alone?"

16         While we don't have evidence that the police were

17   actually there, the point is that the defendant knew he had

18   done something that could elicit a law enforcement response,

19   and he had to cover it up.  And critically, his staff knew that

20   police had responded to the victim's apartment.  They have

21   photographs of the responding officer's Los Angeles Police

22   Department business card in their text messages, and those

23   staff members remained in contact with the victim to ensure

24   that she would not talk to the police.

25         So these communications, the video disappearing, none

1  of this is a coincidence.  It's a result of defendant's

2  employees trying to cover up his crimes, all at his direction.

3  And the cover-up continued until last year, after the civil

4  suit was filed in November that, among other allegations,

5  detailed this assault at the InterContinental.  The defendant

6  responded, and I quote:  "I did not do any of the awful things

7  alleged."

8        There is no other way to read this but as an

9  unequivocal denial of his participation in this incident.  It's

10  also yet another way that he continued obstructing and covering

11  up what he did.  In this year, after CNN released the

12  surveillance video, the defendant ultimately admitted that he

13  was actually the person on that video, but only after it was

14  leaked to the media and only after there was indisputable proof

15  of his identity on tape and his violence on tape.

16        But yesterday we got more to the story.  That

17  apparently this assault was precipitated by the defendant being

18  hit in the head, while he was sleeping, by a cell phone and his

19  clothes being taken in a small overnight bag that you can see

20  the victim walking down the hall with in addition to her purse.

21  This is apparently why he runs out of the hotel in nothing but

22  a towel.  But our evidence will show that's just not what

23  happened.  Assuming, for the sake of argument, that it did,

24  which it didn't, but assuming that, punching, kicking, and

25  dragging someone in and of itself is a crime, and covering that

O9IHComC                          **A-182**

up is an act of obstruction.  And if it's about the clothes and
wanting to get the clothes back, which again it's not, why drag
the victim back down the hall to the room?  And you can see
that on the tape.  That's what he does.  This explanation is
just another cover-up.  It's just more lies, and it's just more
obstruction.

This sequence of events and all the indisputable
evidence — from the videos to the text messages to the
photographs that are in communications — makes clear that you
cannot take the defendant at his word when he denies his
criminal conduct.  But make no mistake, March 5, 2016, is far
from the defendant's lone act of violence and obstruction, so
let's talk a little bit more about that.

Freak-off activity is the core of this case, and freak
offs are inherently dangerous.  They use force, coercion, and
drugs to coerce the victims into doing the freak offs.  The
defendant controlled aspects of their lives, used significant
physical force against them, and all to compel them to engage
in these lengthy sex acts.

Yesterday, the defense said they interviewed about
half a dozen escorts who would dispute the government's account
of what happened during the freak offs.  Our investigation is
ongoing, and so I can't say too much about this, but I will
note that half a dozen escorts is just the tip of the iceberg
of the number of escorts who have participated in freak offs.

O9IHComC **A-183**

1      And yesterday, the defense also spent a lot of time

2  talking about how these freak offs were between consenting

3  adults and how the government was not claiming sex without

4  consent.  Abuse occurred in the context of at least one

5  long-term relationship, which we acknowledge, but the

6  government's theory does involve a lack of consent.  This case

7  is charged, at least in part, in Count Two as sex trafficking

8  by force, fraud, and coercion.  When a woman is being beaten

9  and coerced in order to get her to engage in commercial sex

10  activity, those sex acts are not consensual.

11      And as I said yesterday, it is really important to

12  note that long-term relationships and abusive relationships are

13  not mutually exclusive.  The government expects to introduce

14  the testimony of expert witnesses regarding the dynamics that

15  appear in almost all sex trafficking and sex abuse cases.

16  Similar testimony has been introduced in several cases in this

17  district.  A few examples are *United States v. Hadden*, *United*

18  *States v. Ray, United States v. Maxwell*, and *United*

19  *States v. Rivera.*

20      We expect that these expert witnesses will explain

21  issues of apparent consent and how abusers control their

22  victims, even in the context of long-term relationships in

23  which the victims express love for their abusers and continue

24  to go back to them.  We further expect that these expert

25  witnesses will discuss various forms of coercion, including

O9IHComC **A-184**

 1   isolation, intimidation, violence, manipulation, surveillance,

 2   narcotics, grooming behaviors, and others, and generally why

 3   victims do not leave their abusers and immediately report their

 4   crimes.

 5           The focus of today's proceeding, however, is not and

 6   should not be on the dynamics of abusive relationships.

 7   Today's proceeding is squarely focused on the defendant alone

 8   and whether the defendant presents a danger to the community,

 9   whether the defendant threatens the integrity of these

10   proceedings, and whether the defendant presents a risk of

11   flight, all of which he does.

12           Defense counsel has made much yesterday and today in

13   his letter about his misinformed view that there was not a sex

14   crime here, and therefore, the nature of this offense doesn't

15   weigh in favor of detention.  He's argued, in essence, that

16   anyone who was participating in a freak off wanted to be there.

17   That flies in the face of the evidence in this case, much of

18   which we've laid out to the Court, but it also shows a

19   misunderstanding of the law.

20           When participants in commercial sex activity are

21   threatened with the release of collateral videos, like those

22   two text messages I read, when they are threatened with the

23   loss of their livelihood and housing —— we'll get to that in a

24   minute —— and when they're beaten both during and outside freak

25   offs —— you saw video of that —— they cannot consent.  That is

O9IHComC                                **A-185**

trafficking.  This view was especially evident when counsel

spent time minimizing and horrifically understating the

defendant's violence.  The video from March 5, 2016, is far

more than a misdemeanor assault, as he claims.  When force or

coercion is used in connection with commercial sex, as it is

here, again, that's trafficking.

          The defendant's decades-long history of violent

conduct makes clear that even the most stringent bail

conditions will not suffice to ensure the safety of the

community.  The inquiry in this context is focused on the

danger to any real person, and the evidence shows that there is

a risk of physical danger towards victims, employees, and other

individuals.

          The investigation has revealed evidence of numerous

assaults against female victims and other individuals.  These

assaults involved choking, hitting, kicking, dragging victims

sometimes by their hair.  They sometimes occurred in cars where

victims heads were slammed against the car window or on the

floor of a car.  And again, independent evidence like text

messages confirms this type of violence.  Without attributing

any of these messages, I'm going to read four that make my

point:

          "I turn my head for a second, and you get fucked up,

and you drag me down the hall by my hair."

          "I have bleeding cuts."

O9IHComC **A-186**

```
1          "You hit me in the head two good times."
2          "When you get fucked up the wrong way, you always want
3    to show me that you have the power and you knock me around.
4    I'm not a rag doll.  I'm someone's child."
5          And we don't just have the texts.  We also have
6    witnesses who can confirm, because they witnessed this violence
7    and they witnessed the injuries.  And this conduct took place
8    behind closed doors —— in houses, in hotel rooms, in cars, in
9    settings that are not easily monitored by even the most
10   stringent conditions of release.  And I note that Judge
11   Tarnofsky was particularly concerned about this point and also
12   about the next one: that the defendant's violence was
13   premeditated and spontaneous.  And I think the text messages I
14   just read highlight that.  And the defendant's violence, the
15   spontaneity exacerbate the difficulty of crafting conditions of
16   release to ensure the safety of any person.  How do you craft
17   bail conditions that can address the defendant's tendency to
18   become violent at the slightest provocation and to become
19   violent, as the text messages say, when he "gets fucked up the
20   wrong way"?
21         In fact, Judge Tarnofsky found that she did not
22   believe defense counsel had the ability to control the
23   defendant, given his substance abuse and anger issues.  There
24   is a long-standing pattern of abuse here, a pattern that has
25   been entirely undeterred by threat of public exposure or law
```

O9IHComC                    **A-187**

1  enforcement intervention, and it's probative of whether the

2  defendant will continue to engage in that pattern.

3        I note we cite this case in our paupers, but the

4  *Mercedes* case in the Second Circuit, 254 F.3d 433 (2d Cir.

5  2001), talks about the danger of releasing defendants with a

6  history of domestic violence, noting that a domestic violence

7  history is probative of a dangerousness determination because a

8  willingness to strike a loved one is evidence of a tendency to

9  be violent and dangerous towards others.  And in that case, the

10 circuit reversed the district court's order of release for a

11 defendant with a history of domestic violence but no criminal

12 history.

13       So let's turn to obstruction now, and I know that your

14 Honor is particularly interested in this point.

15       So the risk of obstruction in this case is heightened

16 because of the defendant's power.  It gives him a unique

17 ability to influence people and to intimidate witnesses and

18 victims.  Witnesses have universally, one for one, expressed to

19 us their extreme fear of the defendant, extreme.  His influence

20 makes it so difficult to convince witnesses to share their

21 experiences and to trust that the government can keep them safe

22 from him.

23       I talked about some of it before with the March 5

24 incident, but we have evidence that further indicates that the

25 defendant and his coconspirators will deflect, minimize, and

O9IHComC **A-188**

1  lie about his conduct.  Defense counsel spent time trying to

2  recast his, what I submit to the Court are obvious, obstructive

3  efforts as just maintaining contact with people.  So before we

4  dive in, I want to be clear about a few principles of

5  obstruction based on the statutes that have been charged in

6  this case.

7  There need not be an existing investigation or

8  official proceeding, and the defendant need not know about it.

9  What we will also show that the defendant knew about this

10  investigation at least as of January 2024, and he certainly

11  suspected the possibility of an investigation after November of

12  2023 when civil lawsuits were filed alleging, among other

13  offenses, sex trafficking.

14  So following that November civil suit, when the

15  defendant certainly had reason to suspect the possibility of an

16  investigation, he and his coconspirators continued their

17  efforts to reach out to potential victims or witnesses.  This

18  outreach has included directly contacting at least one victim

19  in November of 2023, constant contact with witnesses to the

20  charged conduct, and with contacting of witnesses, including

21  those who received grand jury subpoenas, prior to dates of

22  testimony or government meetings.  And this contact is as

23  recent as July of 2024, so well after the government has

24  definitive proof that the defendant knew about this

25  investigation.

1          So two of those examples are there were communications

2     between the defendant and a witness who received a grand jury

3     subpoena.  These communications are both prior to and following

4     the witness' meeting with the government, and the government

5     has evidence that the defendant knew that this witness had

6     received a grand jury subpoena.  And both between — before the

7     meeting with the government and after the meeting with the

8     government, there were 14 total contacts between the two of

9     those people.

10          In another case, a witness was served with a grand

11    jury —

12          THE COURT:  Hold on just a second.  Go back for a

13    second.  You said there were 13 contacts between two of those

14    people.  You mean two witnesses or just between the defendant

15    and the witness?

16          MS. JOHNSON:  I'm sorry for not being precise, your

17    Honor.  There were 14 total contacts between the defendant and

18    the witness.

19          THE COURT:  OK.

20          MS. JOHNSON:  And my second example, a witness was

21    served with a grand jury subpoena in June of 2024; thereafter

22    was contacted multiple times by the defendant by phone and text

23    in June and July of 2024, despite the fact that the two had not

24    spoken in several years.  They were suddenly back in contact

25    leading up to the defendant's — sorry, in the aftermath of the

1    witness receiving a grand jury subpoena.

2              And these efforts by the defendant were also crafted

3    to avoid detection.  He used intermediaries to reach out to

4    people.  And in an instance I'll describe in detail, he

5    recorded conversations with a victim on the device of a

6    coconspirator.  These kinds of efforts, these kinds of means,

7    make obstruction even more difficult to detect when it's being

8    done through other people and on other devices.

9              We know from the evidence we've collected that the

10   purpose of these calls was to spread false narratives.  So

11   here's an example.  The instance that I mentioned where the

12   defendant directly contacted a victim in November 2023, he

13   placed two calls to the victim, both of which are recorded on

14   the coconspirator's phone.  And as background that will help

15   explain some of the things that are discussed in the call, the

16   defendant provides financial support to this person.  So early

17   on November 19, which is three days after the filing of the

18   civil lawsuit by another victim, the defendant received a text

19   from this other person in response.  It reads:

20             "I feel like I'm reading my own sexual trauma.  It

21   makes me sick how three solid pages, word for word, is exactly

22   my experiences and my anguish."

23             The defendant then called the victim twice.  Those are

24   the recordings.  And in those recordings, he gaslit her and he

25   attempted to convince her that she had willingly engaged in sex

O9IHComC **A-191**

1    acts with him, but she pushed back.  She told him she felt

2    manipulated and clarified that what his description of events

3    was, was "not how she saw things."

4          Throughout these recorded calls, the defendant

5    repeatedly talks about how he was not supposed to be speaking

6    on the phone and not supposed to be using the phone, and he

7    instructs the victim not to text him.  These statements clearly

8    show his state of mind.  They show that he was on notice that

9    there could be an investigation into the claims raised in the

10   lawsuit that had been filed three days earlier.

11         And at the end of that second call, the defendant

12   ensured the victim that if she continued to support him, she

13   ain't got anything to worry about, which is a thinly veiled

14   reference to his continuing his financial support.  And

15   subsequent text messages make explicitly clear that that's what

16   he was talking about because two days later he texts a

17   coconspirator in reference to the financial support that he

18   provides to this victim and said:  "Make sure that" —— and he

19   uses a name here.  The name is an individual who is his

20   financial adviser —— "is not doing anything dumb, like not

21   having that rent paid on time."  The defendant made sure that

22   that financial coercion continued, clearly, to keep the victim

23   close and in his control.

24         The defendant's long history of obstruction and

25   violence demonstrates that he simply cannot overcome the

O9IHComC                    **A-192**

1    presumption that no condition or combination of conditions can

2    ensure the safety of the community or the integrity of this

3    proceeding.  Courts have denied bail in similar situations.

4    We've cited some cases in our letter.  Of particular interest,

5    I think, is *United States v. Lafontaine*.  And this is a

6    slightly different posture because it's a revocation, but the

7    facts of that case are that the defendant contacted a potential

8    witness and attempted to feed that witness a false narrative

9    with the hope that the witness would adopt it as that person's

10    testimony, and that's exactly what's going on here.

11    In the government's request for detention is

12    consistent with other cases of this kind in this district and

13    in this circuit.  These cases stand for the proposition that

14    sex trafficking defendants, regardless of the age of their

15    victims, are routinely detained pretrial, particularly when

16    they have engaged in repeated obstruction.  I went over some of

17    these cases yesterday.  I'll touch on them lightly again.

18    THE COURT:  That's not necessary.  I'm familiar with

19    those cases.

20    MS. JOHNSON:  OK.

21    THE COURT:  Let me ask you this:  In the record, the

22    government had previously indicated that there was another

23    potential witness that the defendant contacted between

24    September 10 and September 14 some 58 times.  Can you give me a

25    little further elucidation on that?

O9IHComC                          **A-193**

1          MS. JOHNSON:  Oh, sure.  So that requires a little

2     explanation of a recent civil suit.

3          So on September 10, so last week, an individual named

4     Dawn Richard filed a civil suit against the defendant and other

5     individuals and entities.  Ms. Richard was formerly in a band

6     with the defendant and a third individual named Kalenna Harper.

7     The allegations in Ms. Richard's lawsuit focus on some of the

8     time period of the charged conspiracy.  They focus on

9     particular events starting in 2009 and for some time period

10    thereafter.  Among other things, Ms. Richard alleges witnessing

11    violence by the defendant towards a victim, including assaults

12    and the like.

13         So that lawsuit is filed on September 10.  On

14    September 13, the other member of the band, Ms. Harper,

15    released a statement where she, in sum and substance, sort of

16    says what Ms. Richard's experience wasn't what I experienced.

17    But between those two dates, between September 10 and

18    September 14, the defendant and Ms. Harper had 128 total phone

19    contacts.  He called or texted Ms. Harper 58 separate times in

20    four days.  There has been no contact since September 14.

21    Granted, that's only been a few days.  But I think what's

22    highlighted about that incident is that it makes clear that the

23    defendant has an ongoing ability to keep witnesses, even

24    witnesses to very distant abuse and very distant things, in his

25    pocket and at his disposal.

O9IHComC **A-194**

1    One other —— your Honor, we had discussed some cases

2    yesterday.  We didn't discuss *Lawrence Ray*, which I think is

3    another case that does support our argument here.  I don't

4    think we've touched on that, so I'll just briefly ——

5    THE COURT:  The case dealing with the official

6    proceeding requirement?

7    MS. JOHNSON:  No.  *Lawrence Ray* is a racketeering and

8    sex trafficking case in this district, and Magistrate Judge Fox

9    ordered detention based on risk of flight and dangerousness.

10   And I think one thing that's similar about the *Lawrence Ray*

11   case to this case is that, in the bail argument, there's

12   allegations by the defense that the sex trafficking case was

13   weak because there was only one victim, and Magistrate Judge

14   Fox again detained on the basis that the victims were

15   corroborated not only by other witnesses but also by

16   documentary evidence.

17   THE COURT:  Anything else from the government?

18   MS. JOHNSON:  Just a few additional things, your

19   Honor, briefly.

20   THE COURT:  How many more additional things?  We've

21   gone about 45 minutes.  Give me a sense of what else you need

22   to touch upon.

23   MS. JOHNSON:  I can finish this in under five minutes;

24   maybe even three.

25   THE COURT:  OK.  Go ahead.

O9IHComC **A-195**

1      MS. JOHNSON:  OK.  I will just touch briefly on risk

2  of flight.  The circumstances are different than when Mr. Combs

3  flew here to sit in New York, which defense counsel has made a

4  lot of hay about.  And with respect to his offer to surrender,

5  there are extremely valid law enforcement reasons why the

6  government did not take him up on this offer, including the

7  risk of evidence destruction and allowing for further

8  obstruction.  So to the extent that this surrender and travel

9  argument has any force at all, it really only applies to risk

10  of flight.  It does not, does not, grapple with dangerousness

11  and obstruction.  Surrender has nothing to do with those two

12  things.  And the defendant really does not grapple with those

13  two things.  He doesn't talk about his ongoing danger and his

14  ongoing obstruction.  So coming to this jurisdiction and

15  offering to surrender simply does not vitiate those concerns.

16      The Court expressed concerns with the bail package.

17  The government has significant concerns with the bail package.

18  Again, I'm here seeking detention, so I'm not going to get into

19  those, but I note for the record that we do think that even the

20  supplemented bail package does not have enough conditions that

21  focus on obstruction, and we don't think there are conditions

22  that can really keep the defendant from doing the types of

23  things he's been doing, particularly because he's been

24  involving other people in them.

25      You'll hear later today about how much evidence we

O9IHComC                          **A-196**

```
 1   have, and it was in the record yesterday.  There's a massive
 2   amount of evidence.  There's a massive amount of witnesses, a
 3   massive amount of electronic evidence.  There's a massive
 4   amount of physical evidence that we seized.  We have witnesses
 5   saying things, and these witnesses are powerfully corroborated
 6   by communications, by photographs, by videos, by
 7   contemporaneous documentary records, by text messages, and the
 8   like.  And this is the evidence that we will use to prove the
 9   charges in the indictment.  This is the same evidence, some of
10   which, just a little bit of which I've highlighted today,
11   confirms that the defendant is a danger to the community and
12   poses a serious risk to the integrity of these proceedings
13   through his efforts at obstruction.
14            So for all the reasons I've stated here and in our
15   letters, the defendant should be detained pending trial.
16            THE COURT:  Thank you.
17            Defense counsel, again, you can stand there, you can
18   stand at the lectern, or you can be seated — whatever you feel
19   comfortable doing.
20            MR. AGNIFILO:  I'll come to the lectern, Judge.  Thank
21   you.
22            THE COURT:  OK.
23            MR. AGNIFILO:  Your Honor, I'm going to address one
24   thing that my colleague said, and then I hope to address your
25   Honor's opening remarks directly.
```

O9IHComC                          **A-197**

1          The situation that my colleague just discussed with

2     Dawn Richard and Kalenna Harper I can shed some light on.  At

3     one point I myself got a phone call from Kalenna Harper and her

4     lawyer.  Without going too much down this rabbit hole, Kalenna

5     Harper said:  I would like to make a statement on behalf of

6     your client.  Her lawyer was on the phone saying:  I'm worried

7     that my client, Kalenna, is going to embroil herself in this

8     big mess that has public elements to it and all that.  And I'm

9     prepared to give the lawyer's name to the government and I'm

10    prepared to give, to the extent they don't have Kalenna

11    Harper's phone number, to the government, and they can follow

12    up on this.  And what I said to Ms. Harper and the lawyer is

13    you should do whatever you want.  You should feel free, if you

14    want to make a statement, to make a statement; and you should

15    feel free, if you don't want to make a statement, to not make a

16    statement.  I don't remember offhand what day it was.  It was

17    between the 10th and the 13th.  And then at one point I found

18    out she made a statement.

19          THE COURT:  The acoustics aren't great.

20          MR. AGNIFILO:  I'm sorry, Judge.

21          THE COURT:  You don't remember what?

22          MR. AGNIFILO:  I don't remember the exact —— it was

23    either the 11th or the 12th of September that I spoke to the

24    lawyer and Ms. Harper.  And at the end of that conversation, it

25    was not clear whether Ms. Harper wanted to make a statement or

O9IHComC                          **A-198**

1   not.  Sometime later —— and I think it was the next day or it

2   could have been two days later —— I saw in press reporting that

3   she had made a statement.

4          So the reason I bring this to your Honor's attention

5   is there's a lawyer in the mix.  Ms. Harper has a lawyer.  I

6   spoke to the lawyer.  I will make the lawyer available to the

7   government if the government wants to speak to the lawyer.  So

8   to the extent that the government raises this because there's

9   some suggestion that because Mr. Combs contacted Ms. Harper ——

10  and I would note that they were in the same band for a period

11  of time —— but these contacts were around the time of the

12  statement.  She seemed to be pained about whether she wanted to

13  make a statement.  She told me she wanted to make a statement

14  because she believed Dawn Richard's statements were not

15  accurate.  And she wanted to say something, yet she didn't want

16  to get overly involved.

17         THE COURT:  When she told you that, that was either

18  September the 11th or the 12th?

19         MR. AGNIFILO:  I believe that's right.

20         THE COURT:  Which is after the 10th, after the

21  defendant first reached out to her?

22         MR. AGNIFILO:  I don't know about the defendant's

23  contacts with her.  I don't know.  I just know when her and her

24  lawyer called me, it was the 11th.

25         (Counsel conferred)

O9IHComC                              **A-199**

1         MR. AGNIFILO:  I'm told by the keeper of the facts

2    that it was the 11th.  So I think it was probably September 11.

3         But let me address —— so I wanted to point that out

4    just because that was the last thing that my colleague said.

5         THE COURT:  Let me ask you, why does that matter?

6         MR. AGNIFILO:  Because the government brought it up,

7    and the government brought it up, I think, to suggest that

8    somehow Mr. Combs coerced or forced or pressured Kalenna Harper

9    into —— let me take a step back, because I don't think —— the

10   entire context might not be clear.

11        I don't know what role Dawn Richards plays in this

12   case.  I don't.  She filed a civil complaint, so this is all

13   about a civil complaint.  When the civil complaint hit the

14   news, Kalenna Harper, who was in the same band as Dawn

15   Richards, obviously, said to herself:  I was in the same band

16   as Dawn Richards.  I don't think —— I didn't see any of those

17   things.

18        THE COURT:  Let me just ask you something.

19        MR. AGNIFILO:  Yeah, sure.

20        THE COURT:  Hypothetically speaking, if your client

21   reached out to this person on September 10, hypothetically

22   speaking ——

23        MR. AGNIFILO:  Right.

24        THE COURT:  —— said, I want you to say this.  Again,

25   very hypothetically saying —— let's say he said, I want you to

O9IHComC                    **A-200**

```
1   lie about what happened.  I want you to tell this story, and

2   gives that information to her on the 10th.  And then on the

3   11th, you get a call from her lawyer saying that she's

4   interested in maybe making a statement, but he's not clear if

5   she could make a statement.

6        If that hypothetical situation happened, wouldn't that

7   still be evidence of an obstructive mind, mindset, of a

8   willingness to tamper with a potential witness?  I'm sure that

9   you're going to say that that person is not necessarily a

10  witness in this proceeding, and therefore I shouldn't consider

11  that.  But wouldn't that be evidence of a mindset that's

12  willing to tamper with witnesses or obstruct justice.  Because

13  I'm sure you would agree, you don't have to coerce someone in

14  order to obstruct justice, correct?

15       MR. AGNIFILO:  I agree with you.  I agree with your

16  Honor.  And I think if your —— your hypothetical is a

17  hypothetical, and I accept your hypothetical as that.

18       Yes, you might be right.  I wouldn't necessarily know.

19  But what I —— the reason I wanted to speak to her —— and

20  Ms. Geragos remind me that we spoke to her on the 10th as well.

21  And she's coming with her computer.  We're going to get some

22  accurate facts, probably more specific than I'm saying.

23       MS. GERAGOS:  Your Honor, I just want to say we did

24  speak to her.  I spoke to her, I'll say, for 30 minutes on the

25  early morning of the 11th so that she could recount her facts
```

O9IHComC                        **A-201**

```
 1    to us as to her —— she's mentioned in the lawsuit about 34
 2    times, so she felt that her name was also being besmirched in
 3    terms of she had witnessed violent acts by Mr. Combs against
 4    the Victim-1 of Count Two.  And so I believe the contact with
 5    this potential witness was also a potential defense witness for
 6    us to speak to because she was mentioning violent acts with
 7    respect to the person who is now Victim-1 of Count Two.  So we
 8    did speak to her that night because we thought it was important
 9    in terms of our defense investigation.
10          That's all I have to say.  I'll let ——
11          THE COURT:  I'm sorry.
12          MS. GERAGOS:  I'll let Mr. Agnifilo ——
13          THE COURT:  Go ahead and continue.  I didn't mean to
14    cut you off.
15          MS. GERAGOS:  No, I'll let Mr. Agnifilo continue.  He
16    wasn't on that call, so I just wanted to make that
17    representation.
18          THE COURT:  That was on the 11th?
19          MS. GERAGOS:  That was, I think, maybe even 2:00 in
20    the morning on the 11th.
21          THE COURT:  OK.  But after speaking to defense counsel
22    on the 11th, what would be the reason for her and Mr. Combs to
23    keep in contact?  I saw in the record here defense counsel was
24    making a statement that Mr. Combs was reaching out to witnesses
25    just to line witnesses up.  If this witness has already spoken
```

O9IHComC **A-202**

1    to defense counsel, what would be the purpose of Mr. Combs

2    continuing to speak to that witness after September 11?

3            MS. GERAGOS: After —— after ——

4            THE COURT: After your conversation with the witness,

5    why would he need to reach out to her?

6            MS. GERAGOS: Your Honor, I can't speculate only to

7    say that I think that this witness was really upset by the fact

8    that she kept getting publicized in many different articles

9    about incidents that she was supposedly present at that she

10    just was not —— that she stated, at least to us, that she was

11    not present for. And that's my speculation. I don't know

12    if ——

13            MR. AGNIFILO: No, I understand your Honor's question,

14    and I don't know that all of these things resulted in

15    conversations. I don't have access to the government's

16    evidence on this point, so I don't know that all these things

17    resulted in conversations. Obviously, she wanted to speak to

18    Mr. Combs because her name was in this civil suit, and she

19    didn't want the name in the civil suit. And she also wanted to

20    say I didn't see any of these things happen.

21            To the point that Ms. Geragos raised, in addition to

22    being named in the civil suit, she also may be an important

23    defense witness for conduct that may or may not be charged as

24    part of the indictment because it relates to the person who's

25    in Count Two. So this is an important defense witness. It's

O9IHComC **A-203**

1   someone we will speak to.

2           But I want to allay the Court's larger concerns, and

3   then we can come back to this.  Because I am hearing the Court

4   loud and clear, and I have actual proposals that I think will

5   assist in showing the Court that we are taking the Court's

6   concerns very seriously.

7           I have brought to court today, in the fourth row, the

8   handsome man who lost his hair at some point is there.  His

9   name is Herman Weisberg.  Herman Weisberg owns SAGE

10  Intelligence.  He's a former New York Police Department

11  detective.  He worked in the DA squad, and he's had SAGE

12  Intelligence for, I think, about 15 years.  And here's what we

13  are proposing, in addition to all of the other conditions that

14  we have in our bail proposal:

15          That SAGE, personnel from SAGE Intelligence —— all of

16  whom will be former law enforcement officials, either federal

17  law enforcement officials or state law enforcement officials ——

18  will be monitoring the residence of Mr. Combs 24 hours a day;

19  24 hours a day, seven days a week.  Here's what this will

20  involve.

21          They will have at least one, and probably two, SAGE

22  employees there at all times.  They will basically have full

23  control of who enters and who doesn't enter.  There will be a

24  visitor's log that is kept and that we could have it shared

25  with Pretrial Services every week or every day or whatever we

O9IHComC                              **A-204**

1    would like to do in those regards.

2              Mr. Combs will not have access to a cell phone.  Since

3    there will be a SAGE personnel on-site, if we want to reach

4    him, we can reach him that way.  He won't have access to the

5    Internet.  So what I am trying to fashion is a situation where

6    any witness intimidation, if that is the Court's concern, and I

7    see that it is, would be completely nullified.  It would be

8    virtually impossible.  And SAGE would monitor these things ——

9    make sure he doesn't have a cell phone, make sure that anybody

10   who comes to the house is on the preapproved list of visitors,

11   would keep track of all the visitors.  And we can make that

12   list of visitors and provide it to the government, to pretrial,

13   and the Court.

14             SAGE would establish communications with local law

15   enforcement in Florida, if need be.  If there is some emergent

16   matter, SAGE would contact local law enforcement.  And what we

17   could do, Judge, and what we're willing to do is put together a

18   protocol so that the Court is absolutely satisfied and

19   comfortable that there is quite literally no way that Mr. Combs

20   would be able to conduct any kind of contact, have any —— do

21   anything with a witness of any nature.

22             One thing that I want to make clear, in light of the

23   government's proffer today —— and I'm not going to go through

24   all of the things that I said yesterday.  Your Honor read the

25   transcript, and I don't need to go through them all again —— is

O9IHComC                        **A-205**

1  we believe we have very significant defenses to everything that

2  the government has said, and we have been conducting, on the

3  defense side, a very significant investigation for six months.

4  And I anticipate that is only going to increase as we get

5  closer and closer to a trial.

6           So we will conduct the investigation, meaning the

7  lawyers and the investigators.  Obviously, Mr. Combs will have

8  no role in that.  Mr. Combs will not contact anybody who is not

9  on the preapproved list.  We will ensure that that's the case.

10  And if he fails to do that in any way, shape, or form, we would

11  explain to Mr. Combs that that would be a violation of his

12  release conditions, and he should expect to be incarcerated.

13  And that is an obviously real concern because, getting ready

14  for this — Mr. Combs would be in the special housing unit if

15  he was incarcerated in the MDC.  That presents tremendous

16  challenges to us.  Given the amount of electronic evidence,

17  it's a very difficult place to be as an inmate, and it's a very

18  difficult place to get ready for any trial, much less a trial

19  with a tremendous amount of discovery, as this case has.

20           So he knows the stakes.  I will put something in place

21  that would give the Court and Pretrial Services and the

22  government assurance that nobody will be contacted unless that

23  person is on the preapproved list.  That would be monitored by

24  the people at SAGE.  And we are at risk of Mr. Combs being

25  incarcerated if anybody falls down on the job.  If Mr. Combs

O9IHComC                    **A-206**

1    does something he's not supposed to do, if SAGE somehow misses

2    Mr. Combs doing something he's not supposed to do, if his

3    lawyers miss Mr. Combs doing something he's not supposed to do,

4    we know what the consequences would be.

5            So I'm listening to your Honor loud and clear.  And

6    I'm going to address risk of flight in a second because the

7    government's still moving on that theory, but I do want to

8    assure the Court that we are prepared to put in strenuous and

9    maybe unusual conditions to meet the Court's concern when it

10   comes to these important matters.

11           Now, that is not to say that I agree with the

12   government's assessment of whether these things are obstruction

13   or not obstruction.  That's an issue for another day, and I'll

14   take it up on the other day.  What I'm here to do today is to

15   address your Honor's concern.  When your Honor came out on the

16   bench, your Honor shared your Honor's thoughts with us, and I

17   listened loud and clear.  And I want to address those thoughts,

18   and I want to address those concerns directly.  And through

19   having SAGE Intelligence, their former law enforcement

20   officers, on-site 24 hours a day —— and we'll do whatever needs

21   to be done.  If we need two of them, we'll have two of them.

22   If we need three of them, we'll have three of them.  And we'll

23   put everything in place that we need in terms of visitors

24   coming in, visitors who aren't on the list and who can't come

25   in, that will all be done.  That will all be monitored, and we

O9IHComC                                    **A-207**

1    will all know what's being done in that regard.  So that is how

2    I intend to deal with that.

3            Mr. Combs, like I said, would not have a cell phone.

4    He would not have any ability to use the Internet.  And that

5    would, I think, come a long way to giving the Court greater

6    comfort in this regard.

7            I do want to address another issue, because I don't

8    believe that the actions that Mr. Combs has taken in regard to

9    surrendering his passport and coming to New York are only in

10   regard to risk of flight.  I disagree with my colleague's

11   assessment in that regard.  Because I think what it shows is

12   that he is deeply respectful of the Court's authority.  He is

13   willing to show that he is responsible, that he can follow

14   these directions, and that he is mindful and has been mindful

15   — and this is important — he is mindful and has been mindful

16   for a very long time that this is a significant investigation

17   and that the charges could be significant; not significant

18   because they're true, but significant just because they're

19   weighty charges.  And with the sex trafficking count, at a

20   minimum, it has a rebuttable presumption of detention, so I

21   want to put these in somewhat of a different light.  And I

22   won't belabor it because I know your Honor read this already.

23           When we told the government on April 1, all those

24   months ago, that we had Mr. Combs' passport, we were giving the

25   government an assurance:  He was not going to travel

O9IHComC                    **A-208**

```
 1    internationally, which he hasn't, and that the government would

 2    know where he is.  Mr. Combs was willing to do that because he

 3    understood that this was a significant investigation.

 4         Now what I want to point out in this regard is this:

 5    Back on April 1, when we sent the email to the government and

 6    said that we have Mr. Combs' passport, we specifically went

 7    through the charges that we believed they were looking into,

 8    and we specifically mentioned racketeering conspiracy, we

 9    specifically mentioned sex trafficking, and we specifically

10    mentioned violation of the Mann Act.  We mentioned all three

11    counts that ended up being in the indictment.

12         So back on April 1, we knew exactly the nature of this

13    investigation, and it turns out we were right.  But the

14    significance isn't that we're right.  The significance is that

15    we knew it was substantial, and even in the face of a

16    substantial investigation, Mr. Combs surrendered his passport.

17    Now, but that wasn't all.

18         THE COURT:  Just to be clear, when you're saying "we,"

19    you're including your client, Mr. Combs, in that; that he was

20    aware of that at least by April 1?

21         MR. AGNIFILO:  100 percent.  Just to make it clear,

22    Ms. Geragos and I flew to Florida.  We sat with Mr. Combs in

23    his house in Florida, and we said:  You are being investigated

24    by the Southern District of New York for a number of serious

25    charges.  Let me tell you what they are.  It's racketeering
```

O9IHComC                    **A-209**

1    conspiracy.  It's sex trafficking.  It's obstruction of

2    justice.  It's prostitution, Mann Act-type prostitution.  I

3    mean, we were right because we knew what they were looking

4    into.  We also knew it because there was a search warrant, and

5    the search warrant had crimes in it.  So he knew.  He knew on

6    April 1 exactly what they were looking into.

7            Now, the government in their letter to your Honor

8    today somehow makes an argument that this is like defense

9    lawyer — I think they call it defense lawyer theater, but it's

10   not theater at all.  It's actually a person showing tremendous

11   respect for the process and showing the Court that he can be

12   trusted because what he also — what we went also on to do is

13   we took the passports of five of his family members.  And

14   members of his family and friends are here today in the second

15   row.  They love him.  They support him.  And many of them gave

16   us their passports over the last several months.

17           We also made efforts to sell his airplane, which is in

18   the process.  We have a letter of intent to sell the airplane.

19   Because I was concerned that, if he had access to an airplane,

20   that would give your Honor concern; that would give the

21   government concern.  I credit the government for not raising it

22   as a concern, and I think it's not a concern because we're

23   selling it.  But the significant thing is we had the foresight

24   to try to sell it.  Apparently, selling an airplane is not an

25   easy thing to do.  We've had three different buyers who didn't

 1    work out.  We're on, I think, the fourth buyer, but, hopefully,

 2    we'll actually sell it this time.  In the meantime, we will

 3    make sure that Mr. Combs is not ─── so let me just back up for a

 4    second.

 5            Because he is not using the plane, no plan on using

 6    the plane anytime in the near future, it gets chartered,

 7    because the plane has to keep flying or the plane apparently

 8    starts to fall apart.  So it gets chartered, and it's being

 9    chartered.  It's being chartered by other people in sort of a

10    public way.

11            THE COURT:  Can you just get to the point where you

12    said that this doesn't relate simply to risk of flight.

13            MR. AGNIFILO:  Yeah.

14            THE COURT:  Can you tell me what this relates to

15    otherwise.

16            MR. AGNIFILO:  It shows respect for the Court.  It

17    shows that he's trustworthy.  It shows that he is showing that

18    this is a serious process to him.  Your Honor must have seen

19    defendants who thumb their nose at the court and say:  Come

20    find me.  I'm not going to show the court the due respect that

21    it deserves.  I'm not going to do the things to show the Court

22    that I'm trustworthy.  Some defendants flee outright.  In some

23    of the cases that are distinguishable and your Honor's read,

24    like *Maxwell* and *Epstein* ───

25            THE COURT:  How does that relate to dangerousness

O9IHComC                        **A-211**

1  generally or danger of obstruction?  Because it seems to me

2  that it may — what you've said relates to danger of

3  obstruction, but not in a good way for you.  If he's aware of

4  this April 1, 2024, then, again, why is he contacting witnesses

5  in June and July of 2024?

6      MR. AGNIFILO:  So I have an answer.  A witness

7  contacted him.  I think I know what they're talking about.  And

8  a person contacted my client on Signal, so it doesn't show up,

9  and wanted to talk to him, and he spoke to her.  And the

10  witness — I'll tell you exactly what happened.  And the

11  witness told him I'm a grand jury witness.  He told us that,

12  Ms. Geragos and I, and we said:  Don't talk to her anymore.

13  And he didn't talk to her anymore, and that was that.

14      She contacted him, if it's the thing that I'm thinking

15  about, and I think I'm right.  So that is not him reaching out

16  to a witness.  He did not reach out to grand jury witnesses.  I

17  dispute that wholeheartedly.  He didn't do it and he wouldn't

18  do it.  And he wouldn't do it because he has the sense not to

19  do it, and he wouldn't do it because we wouldn't let him do it,

20  you know.  So as much as we —

21      THE COURT:  OK.  Let's get back to, again, this point

22  that you're making.  This all seems to be that this is just

23  related — this is again cabined to risk of flight.  So tell me

24  again why surrendering of the passports and everything has

25  something to do with danger.  You're saying it shows respect

O9IHComC **A-212**

1    for the court, respect for the proceedings.  That seems

2    quintessentially like risk of flight.

3             MR. AGNIFILO:  Because I think part of —— defendants

4    who are dangers, once the court process starts, are people who

5    have disregard for the court.  It's contemptuous of the court.

6    They are doing things, they're engaging in conduct that they

7    know is contemptuous of the court.  And everything that

8    Mr. Combs has done has shown he is not and has never been

9    contemptuous of the court.  In fact, his whole life has been

10   the exact opposite.

11            And it's important that I bring this up to your Honor

12   because I think it's a serious consideration.  It's not on his

13   rap sheet because he was acquitted, but it's well known that

14   between 1999 and 2001, he had a very significant criminal case

15   in Manhattan.  He went to trial, and he was acquitted.  And

16   during that over one-year period, he went to court every time

17   he was supposed to.  During that over one-year period, there

18   were no issues with witnesses.  There were no issues with

19   danger.  And he abided by the process.  He showed respect for

20   the court.  He came to court every day.  He went to trial, and

21   a jury of 12 New Yorkers found him not guilty.

22            So this is someone who actually has shown that, when

23   the chips are down, when the pressure is on, he doesn't do

24   anything that he's not supposed to do.  He shows up on time.

25   He shows up every day.  He didn't do anything with witnesses.

O9IHComC                                   **A-213**

```
 1    He didn't do anything dangerous.  And that is a track record.

 2    That happened.  That's not just his lawyer making an argument.

 3    That's the truth, and that's in the record.  That happened.

 4    There is no issues with him for that over one-year period, and

 5    he went to trial and was acquitted.  And he's going to show the

 6    exact same respect for this Court.

 7            So the reason it relates to danger and the reason it

 8    relates to the government's concerns of witness intimidation is

 9    because he hears the Court loud and clear.  There's a case now,

10    and he is going to do everything right from this point forward.

11    And I'm not asking your Honor just to trust him.  I am asking

12    your Honor to trust him, I am, but not that alone.  I'm saying

13    that if we put in place the different measures that I have in

14    the bail package and the letter that we submitted to the Court,

15    along with SAGE Intelligence — which we didn't name them, so I

16    understand why the government thought that we were going to use

17    the same security service that's been in place all this time,

18    but that was never the plan.  The plan was always to use a

19    company like SAGE Intelligence, and that's the plan now —

20    that, in addition to the fact that he's shown that he is

21    trustworthy — and I believe he has because I believe the

22    incidents that the government's talking about do not amount to

23    witness intimidation in the slightest — that we have in place

24    a foolproof system that will give the Court what it needs.  He

25    is not going to contact anybody.  He is not going to reach out
```

O9IHComC                          **A-214**

1   to anyone, and he's going to let his lawyers do the defense

2   investigation, as we should.

3        THE COURT:  But tell me more about this allegedly

4   foolproof system that you're proposing.  Under the system,

5   would Mr. Combs still have employees?

6        MR. AGNIFILO:  He will have employees.  He has

7   employees.  He has, you know, people who manage his finances.

8   They're not necessarily in the same house.  They're located in

9   California.  But he does have employees.

10       THE COURT:  Would it be necessary for him to speak

11  with these employees or have someone on his behalf speak with

12  these employees?

13       MR. AGNIFILO:  We could work that out.  There's going

14  to have to be some way of communicating with the employees,

15  some form or fashion of doing that.  I mean —

16       THE COURT:  And under your proposal, would Mr. Combs

17  be able to leave the residence?

18       MR. AGNIFILO:  No, I don't anticipate that he will.

19       THE COURT:  Would your proposal be the security

20  company — you said they'd be there.

21       MR. AGNIFILO:  Yes.

22       THE COURT:  What does "there" mean?

23       MR. AGNIFILO:  So there is — his home in Florida is

24  the one that we're looking to secure the bond.  It is in Miami.

25  He would live there and the security personnel would live there

O9IHComC **A-215**

1    as well.  I mean, they would probably do it in shifts.  I don't

2    exactly know how, but they'll probably do it in eight-hour

3    shifts and rotate in and out.  But there will be ——

4    THE COURT:  But the proposal is that they would just

5    be in the house, not sitting there looking at him the whole

6    time, correct?

7    MR. AGNIFILO:  I don't know that they would need to

8    sit there and look at him.  I think what we could do is we

9    could put cameras.  We could put cameras at the entrances that

10    are filming 24 hours a day, and they would be in the house and

11    aware of the goings-on.  If there were requirements that he

12    don't have a cell phone, we could find ways of doing

13    spot-checks to make sure that he's not on a cell phone.  If the

14    requirement is that he doesn't use the Internet, we can do

15    spot-checks that he doesn't use the Internet.  But we can make

16    it as secure as we need to make it.

17    And let me just add, there are already —— and the

18    government knows this because I think they took a lot of the

19    footage back on March 25 —— there are cameras in different

20    parts of the house, so all we would need to do is kind of keep

21    those cameras rolling.  I'm happy to share the footage with

22    anybody who wants it.  But what we would do is we would monitor

23    those cameras, in addition to physically monitoring the

24    situation with the officers on-site.

25    THE COURT:  Who would be living in the home with him?

O9IHComC                              **A-216**

1          MR. AGNIFILO:  One second.

2          (Counsel conferred with defendant)

3          MR. AGNIFILO:  I think we can arrange things so he's

4    the only one living there and that SAGE would be working there,

5    doing security, and he'd be the only one actually residing at

6    the house.

7          THE COURT:  But there would be visits from family

8    members and employees and friends and the like, correct?

9          MR. AGNIFILO:  Assuming that those people are —— we

10   will put a list together, we will share it with everybody who

11   wants to see it, and those would be the people who visit.  And

12   nobody else would visit because SAGE won't let them in.

13         THE COURT:  Go ahead.  Is there anything else?  You

14   want to address the violence and danger more generally?

15         MR. AGNIFILO:  Sure.  Yes, Judge.

16         THE COURT:  I know you made some statements before

17   regarding the 2016 video incident.

18         MR. AGNIFILO:  Yes, Judge.

19         THE COURT:  Again, that video is quite disturbing.

20   And it was eight years ago, but he's still 46, 47 years old at

21   the time this is taking place.

22         MR. AGNIFILO:  He was.

23         THE COURT:  And this was after his acquittal on the

24   state court charges.

25         MR. AGNIFILO:  It was.  So let me shed some light.

O9IHComC                          **A-217**

```
 1    Your Honor asks a good question.  I think there's an answer to
 2    it.
 3            In the weeks and months after the video, Mr. Combs
 4    realized he has a problem with drug addiction and he has a
 5    problem with anger, and he went and —— he went into a rehab
 6    program for a period of time.  I don't want to get too much
 7    into this, but it's significant.  The person —— the woman in
 8    the video also went into rehab around the same time.
 9            The point is this was a ten-year relationship that was
10    very loving at times.  These people loved each other, and I
11    don't think there's any other view of the relationship than
12    that because they're just —— the written messages are —— it's
13    heartbreaking.  It's sort of a heartbreaking relationship in
14    many ways because they really did love each other.  And I think
15    what the government is doing —— and I'm not saying this in a
16    bad way —— but I think the dynamic of the case that I object to
17    most, most respectfully, is this:  The sex and the violence
18    were totally separate and motivated by totally different
19    things.  The way that this couple chose to be intimate was the
20    way that is —— they would bring a third party into their
21    intimacy.  That was their thing.  That is how these two adults
22    chose to be intimate.  And the written communications, Judge,
23    are overwhelming, overwhelming, that this is so.  Not only that
24    it was with consent, it was —— it was a sought-after, special
25    part of their relationship.  And in some ways ——
```

O9IHComC                    **A-218**

```
 1          THE COURT:  What does this have to do with him
 2   punching her, throwing a vase at her, kicking her?  What's love
 3   got to do with that?
 4          MR. AGNIFILO:  It's a good question, and the answer is
 5   it has nothing to do with because that's not what motivated
 6   that stuff.  The intimacy is over here, OK?  All of the
 7   problems are not related to the intimacy.  The problems are
 8   related to jealousy from infidelity.  That is where the
 9   problems come.  You have jealousy from infidelity.  You have
10   arguments.  You have fights.  You have things like you saw on
11   the video because of jealousy due to infidelity in both
12   directions, in both —— on the part of both participants,
13   Mr. Combs and this other person.  It's mutual.  And the
14   violence is from that 100 percent, and the written
15   communications make that clear.
16          THE COURT:  Let me just make sure I understand your
17   point on this.
18          MR. AGNIFILO:  Yes, your Honor.
19          THE COURT:  What is your point on this?  You're saying
20   that that's the reason that he —— because of jealousy, that's
21   the reason, because they had an argument, that that's the
22   reason that he punched her, threw a vase at her, and kicked
23   her?
24          MR. AGNIFILO:  I'm saying it's not sex trafficking.
25   The government is linking the two, and in the linkage they find
```

O9IHComC          **A-219**

1    sex trafficking.

2         THE COURT:  The government's also talking more

3    generally about violence against women and violence against

4    this particular woman who the government claims was sex

5    trafficked.

6         And let me ask you this thing:  If you're talking

7    about — to the extent that you claim that this sort of

8    behavior was — that inviting another person into the

9    relationship was somehow consensual, if that person is a sex

10   worker or prostitute and travels across state lines, isn't that

11   a problem regarding Count Three of the indictment?

12        MR. AGNIFILO:  It may or may not be.  I have spoken to

13   the people from this agency, and what they uniformly say is we

14   are not paid to have sex.  We are paid for our time.  And if we

15   meet somebody and it goes in that direction and everybody wants

16   to do this and there is sexual contact, then that sometimes

17   happens.

18        And, listen, at the end of the day, the one-time

19   governor of New York was investigated by the Southern District

20   of New York because he was sleeping with $5,000-an-hour

21   prostitutes while he was the governor, and they didn't

22   prosecute him.  They are prosecuting Mr. Combs for the exact

23   same type of conduct.

24        So, yes, let's assume for a second — let's assume for

25   a second your Honor's question is right.  OK?  That is — it's

O9IHComC          **A-220**

1    not sex trafficking.  It's not sex trafficking, that's my

2    point.  The reason we're really here and ——

3        THE COURT:  That would be a crime.  That would be a

4    federal offense.

5        MR. AGNIFILO:  No, I don't think that's true because I

6    don't know that, if you read the Mann Act, the consumer of the

7    intimacy is within the purview of the Mann Act.  My read of the

8    Mann Act is that it's about the business of sex, and there is

9    no argument that Mr. Combs was involved in the business of sex.

10   That's not the argument.

11       THE COURT:  Let's get back to that video and the

12   physical beating.

13       MR. AGNIFILO:  Yes.

14       THE COURT:  Why isn't that relevant to a consideration

15   as to danger to the community more generally and acts of

16   violence against women and what the government has alleged

17   here?

18       MR. AGNIFILO:  Judge, I think it's relevant.  I think

19   it is relevant.  I haven't said it wasn't relevant.  I'm saying

20   it's not part of the sex trafficking.  That's my theory, that

21   it's not part of the sex trafficking.  Is it relevant?  Your

22   Honor's going to look at the video the way everybody looked at

23   the video, the way Mr. Combs looked at the video.  Mr. Combs

24   issued an apology after the video, and I'm not going to undo

25   his apology.  It's a hard video to watch.  It's an upsetting

O9IHComC **A-221**

1  video to watch.  It was an upsetting video to watch for

2  everyone, but that doesn't mean he should be incarcerated.

3       It's eight and a half years ago.  He went into rehab

4  since then.  He has done tremendous things to try to change as

5  a person since then, and he's not the same person he was then.

6  He was in a relationship that was a toxic relationship.  And

7  probably the best single thing, both for him and the woman

8  involved, is that they broke up and they both went their

9  separate ways seven years ago at this point — six years ago.

10  Six years ago they broke up at this point, and sometimes that

11  happens in life.

12       You know, Mr. Combs has the unfortunate reality that

13  one of the worst things he's ever done was on videotape.  I'm

14  glad that didn't happen to me.  None of us should be that

15  unlucky.  But one of the worst things he ever did happens to be

16  on videotape, and it will one day be played at his federal

17  trial, and we'll deal with it when it is.  So I'm not asking

18  your Honor to ignore it.  I'm not ignoring it.  But I don't

19  think it's dispositive, and I don't think, in and of itself, it

20  means that he should be detained pretrial.

21       We have defenses to the charges.  That's the point.

22  We have defenses to the charges, real defenses.  This is going

23  to be a trial one day, 100 percent.  He's not going to plead

24  guilty to racketeering and sex trafficking and those things.

25  He's not.  So this is going to be a trial.  And I am asking

O9IHComC                          **A-222**

1    you, because it's so critically important, we have proffered,

2    your Honor, a very substantial bail package.  And him coming to

3    New York, Judge, I think, also is not just important in terms

4    of risk of flight; I think it's important for every aspect of

5    what we consider when we think about bail.

6            I mean, this is a man — we had a meeting with the

7    government.  Ms. Geragos and I met with my colleagues to my

8    right here, I think it was, September 3.  It was a day after

9    Labor Day, the Tuesday after Labor Day.  And Ms. Geragos and I

10   left that meeting, and I realized they were going to return an

11   indictment soon.  I didn't know if soon was a week.  I didn't

12   know if soon was a month.  I didn't know if soon was three

13   months.  I got on the phone with Mr. Combs the next day, and I

14   said you should consider coming to New York because I think

15   they're going to charge you soon.

16           He got on a plane on September 5 and came to New York,

17   and he came to New York to turn himself in.  He came to

18   New York to surrender.  And I told my colleagues, he's here.

19   He wants to surrender.  Just give him a time, and he'll be

20   there.  I understand that they don't have to do it, and they

21   didn't do it.  They told me they would get back to me, and then

22   he got arrested.  And that's OK.  That's OK.  But the fact that

23   he got on an airplane to come to New York when so many

24   defendants, Judge, get on an airplane or a bus or a train, or

25   whatever, and run as far away from the place of danger as

O9IHComC                          **A-223**

1    possible.  The fact that he did the exact opposite is a weighty

2    consideration of him in general.  And so when I say to the

3    Court that I want the Court to trust him, he has earned the

4    Court's trust.

5           And even if the Court doesn't fully trust him, trust

6    the package as a whole that I'm proposing with a $50 million

7    bond, which is a tremendous bond, secured by about $50 million

8    in equity with the cosigners that we've proposed; with the

9    passport surrendered that we've proposed, including his own

10   passport; with electronic monitoring; he stays in the house;

11   SAGE Intelligence supervises the house; we have a list of

12   permitted visitors; he doesn't have a cell phone; he doesn't

13   have any Internet access.  And I believe that will do two very

14   important things:  (1) It will give the Court comfort that he's

15   not a flight risk due to the conditions, he's not a danger,

16   he's not a danger of any witness obstruction with these

17   conditions, and it allows him to prepare for his trial in a

18   fair way.

19          And everything that we have been doing, we have known

20   this was coming.  If he was going to run, if he was going to do

21   something reckless and stupid, he would have done it in March,

22   and he didn't.  Instead, he gave us his passport, and we told

23   the government we had it.

24          This is someone who has worked hard his whole life.

25   We haven't gotten too much into his personal characteristics,

O9IHComC                    **A-224**

1   but I think it's actually somewhat important.

2          He has —— first of all, he has one misdemeanor

3   conviction from 29 years ago.  That's it.  He's 53 years old.

4   One misdemeanor conviction from 29 years ago.  He was an actual

5   altar boy growing up.  He's a very religious man.

6          THE COURT:  How far back are you going now?

7          MR. AGNIFILO:  The man has —— I'm going back and I'm

8   talking about him as a person because it's all one continuum.

9          THE COURT:  OK.

10         MR. AGNIFILO:  He watches a sermon every day.  He's

11  religious.  He comes from a religious family.  His father,

12  unfortunately, was killed when he was two years old.  He was

13  raised by his mother, who did a wonderful job with him.  And he

14  has worked hard, and he has earned everything that he's ever

15  gotten in his life.

16         And the one thing that I'm asking your Honor for is to

17  see that he has done everything to earn the Court's trust.  He

18  has done a great deal to earn the Court's trust.  And I am

19  submitting that this very, very substantial package, both

20  what's in the written letter supplemented by what I said today,

21  and supplemented still further by SAGE Intelligence being

22  on-site —— and we can have any protocol that your Honor sees

23  fit.  We'll certainly suggest one, but if your Honor wants

24  something more or different, we can do whatever your Honor

25  thinks is necessary —— that that, in combination, that

O9IHComC          **A-225**

1  substantial package means that he should be released to work on

2  his case, to meet with his lawyers.  If we need to speak to him

3  by flying to Florida, we'll do that.  He'll stay in his house

4  in Florida, and he'll do nothing but prepare for his trial.

5          So I'm asking you to release him on these very, very

6  strenuous conditions, Judge.  Thank you.

7          THE COURT:  Thank you.

8          All right.  I've heard from the parties.  I've

9  reviewed everything.  I find that the government has proven

10 that the defendant is a danger regarding obstruction of justice

11 and witness tampering by clear and convincing evidence.

12          I also find that the government has proven that the

13 defendant is a danger to the safety of others in the community

14 more generally by clear and convincing evidence.

15          I need not reach the issue of risk of flight.  Again,

16 I find that the government has carried its burden of persuasion

17 by clear and convincing evidence on dangerousness both for

18 obstruction and witness tampering, as well as danger more

19 generally, even if the defense has rebutted the presumption by

20 coming forward with their burden of production.

21          Regarding the bail package that has been proposed by

22 defense counsel in terms of risk of flight, I think it's

23 insufficient.

24          In terms of overcoming what the government has proven,

25 again, I'll say it this way:  Again, the government has proven

O9IHComC **A-226**

```
 1    by clear and convincing evidence that there is no condition or
 2    combination of conditions that will reasonably assure the
 3    safety of a person in the community, as well that he will not
 4    obstruct justice or tamper with witnesses.
 5           There are issues also with what the defense has
 6    suggested in terms of this SAGE Intelligence.  Certainly, the
 7    defendant would still have access to employees and other
 8    individuals.  And given what the government has proffered, he
 9    could certainly obstruct justice and intimidate witnesses
10    through those folks, through even coded messages if necessary.
11           So I am denying bail, and I am granting the
12    government's motion.
13           We are scheduled to have an initial conference on the
14    24th.  Since we're here, I don't know if we need to do that.
15    Perhaps we can just find out how counsel wish to proceed.  I
16    know that Mr. Combs was already arraigned on the indictment.
17    So how do counsel wish to proceed?  Let me hear from the
18    government first.
19           MS. SMYSER:  Thank you, your Honor.  Happy to give the
20    Court an overview of the discovery in the case and also the
21    government's proposed schedule.
22           So, first, I think it's important to note that your
23    Honor probably has seen this from the record so far, but there
24    is going to be a huge amount of discovery in the case.  It's
25    going to consist of dozens of terabytes of data.  Then I want
```

O9IHComC                    **A-227**

1    to cover some of those categories of the Rule 16 discovery that
2    we'll be disclosing to the defense.
3              First, it will include grand jury subpoena returns.
4    For some context as to the volume of those returns, we have
5    served over 300 grand jury subpoenas in the case and gotten
6    returns from over 100 individuals and entities, including phone
7    companies, tech companies, social media companies, hotels,
8    airlines, some companies related to Mr. Combs himself.
9              Second, the Rule 16 discovery will also include search
10   warrants. We've obtained over 20 search warrants in the case,
11   including warrants for electronic devices and iCloud accounts,
12   including warrants for his historical and prospective cell
13   phone information and for a variety of persons, as well as for
14   Mr. Combs' residences.
15             Third, the discovery will include photographs of
16   physical evidence, including evidence that was collected from
17   his residences in March 2024, as well as from his hotel room a
18   few days ago, which includes freak-off supplies, narcotics,
19   firearms, and ammunition.
20             The discovery will also include a variety of law
21   enforcement reports and records, including from local law
22   enforcement.
23             And finally, there are a large number of electronic
24   devices in the case. Specifically, over the course of the
25   investigation, including in the past few days, the government

O9IHComC                           **A-228**

1   has been collecting electronic devices and, in total, has

2   seized over 100 phones, laptops, tablets, and iCloud accounts,

3   as well as over 30 other kinds of devices.  And here, I'm

4   talking about things like hard drives, flash drives, cameras,

5   DVRs.  These devices are often large, sometimes hundreds of

6   gigabytes, sometimes terabytes, especially in relation to the

7   iCloud accounts.

8           Already the government has extracted approximately

9   half of those phones, laptops, tablets, and iCloud accounts.

10  And these devices are in the process of a privilege review,

11  varying stages of it, and they will then be reviewed for

12  identified data and —— review, and we will produce that

13  identified data on a rolling basis to defense counsel as it

14  becomes available.

15          So although this is a large amount of discovery, we

16  have a plan for producing it to defense counsel.

17          First, before producing any discovery, as your Honor

18  might anticipate, we will need a signed protective order given

19  that the discovery will contain sensitive victim and witness

20  information, and we have, as we've discussed, real concerns

21  about witness tampering as well as with the sensitivity of the

22  victim information and statements that have been given to the

23  media so far.  So we will start engaging in those discussions

24  with defense counsel today about negotiating the protective

25  order, and we'll let your Honor know if there are any issues

O9IHComC                          **A-229**

1    with that process.

2              Second, soon after getting the protective order

3    signed, we plan to produce the affidavits related to the search

4    warrants that we've obtained in the case.  As I said, there are

5    over 20 of them.  Many of them have lengthy affidavits which

6    lay out large portions of the case and will assist the defense

7    in assessing whether there are motions that we would like to

8    make.

9              Third, within approximately 30 days of having a

10   protective order, the government would intend to make a large

11   production of discovery to the defense consisting of a variety

12   of things, including grand jury subpoena returns.  But,

13   importantly, we are prepared to produce many of Mr. Combs' own

14   devices and accounts.  We have approximately 35 full

15   extractions ready to produce to the defense.  We anticipate

16   that the copying of those devices, given their size, will take

17   some time, but we will engage in that process as soon as we

18   can.

19             And, finally, our plan would be, after this initial

20   large production, to continue to make productions on a rolling

21   basis.  And I just want to note for the Court that our

22   investigation in this case is very much ongoing, and we will

23   continue to produce the information that is in our possession.

24   And as we get more related to the new investigation, we will

25   also review that in accordance with our discovery obligations

O9IHComC                    **A-230**

1    to produce to the defense.

2            We think it makes sense, in order to give defense

3    counsel sufficient time to review this discovery, to have a

4    status conference in approximately 90 days.

5            THE COURT:  OK.  Defense counsel, let me hear from

6    you.

7            MR. AGNIFILO:  Yes, your Honor.  I am —— without

8    speaking to Mr. Combs in greater detail, in light of the fact

9    that he's going to be in the SHU of the MDC, I'm not in a place

10   where I'm prepared to consent to a speedy trial.  I'm not

11   saying that I won't in the future, but this is a serious

12   conversation we have to have.  And the fact that he is going to

13   be incarcerated is a significant factor.  So I don't know that

14   I can consent to a 90-day adjournment for a status conference.

15   I think we want to reserve the right of moving much quicker

16   than that.  The government arrested him, the government wants

17   him detained, and we're going to have to do everything possible

18   to move this along.

19           So where I am today is I'd like some time to speak

20   with him, and more than just a few minutes here.  We need to go

21   through this in real detail.  I also need to see what's going

22   to be possible in the SHU, and I don't know that I exactly know

23   that now in terms of what computer facilities are going to be

24   possible.  And so at this point I'm not prepared to waive

25   speedy trial.

O9IHComC                              **A-231**

| | |
|---|---|
| 1 | THE COURT:  So what do you want to do at this point? |
| 2 | Do you want to set a trial date?  Do you want to, because I |
| 3 | would — well, I don't know. |
| 4 | Do you want time to review the discovery that's going |
| 5 | to be produced, do you want to come back in 45 days, or do you |
| 6 | want me to set a trial date?  I can set a trial date if you |
| 7 | want me to set a trial date — |
| 8 | MR. AGNIFILO:  I understand. |
| 9 | THE COURT:  — whenever you want it.  And if I can't |
| 10 | try it, I'll find a colleague who can if you want to set a |
| 11 | trial date. |
| 12 | MR. AGNIFILO:  Can I just talk to the government for a |
| 13 | second?  I just have a question. |
| 14 | THE COURT:  Yes. |
| 15 | (Counsel conferred) |
| 16 | MR. AGNIFILO:  I have a proposal.  Would your Honor be |
| 17 | amenable to a status conference in somewhere between 14 and 20 |
| 18 | days?  And in the interim, what I think we'll have a better |
| 19 | handle on is how Mr. Combs would be able to look at the |
| 20 | discovery, what discovery will be available when, and what, |
| 21 | from a technical perspective, he'll be able to look at and with |
| 22 | what level of difficulty. |
| 23 | So my ask of the Court is that we have a shorter |
| 24 | turnaround time for a status conference, and whatever's good |
| 25 | for the Court in that general period of time of two to three |

O9IHComC                          **A-232**

1    weeks.

2              THE COURT:  OK.  We can do that.

3              What's your position on speedy trial time between now

4    and that two- to three-week period?

5              MR. AGNIFILO:  Without a much more in-depth

6    conversation with my client, I'm not prepared to waive it.

7              THE COURT:  OK.  What's the government's position on

8    whether or not I should exclude ⸺ well, let's get the date,

9    first of all.

10             How about October the 9th?  Are counsel available

11   then?

12             MR. AGNIFILO:  One second, Judge.

13             THE COURT:  Let's say 2 o'clock.

14             MR. AGNIFILO:  That's fine, Judge.  Thank you.

15             THE COURT:  Does that work for the government?

16             MS. SMYSER:  Yes, your Honor.

17             THE COURT:  OK.  Let's set this down for October 9 at

18   2 o'clock.

19             I know the defendant says you don't want to waive

20   speedy trial time.  Fine.  What is the government's position on

21   whether or not time should be excluded, and what's defense

22   counsel's position on that?

23             MS. SMYSER:  Your Honor, the government would move to

24   exclude time under the Speedy Trial Act.  The ends of justice

25   outweigh the interests of the public and the defendant in a

O9IHComC                              **A-233**

1   speedy trial here given the complexity of the case, given the

2   need for the government to produce discovery to the defendant,

3   and for the defendant and his counsel to begin to review that

4   discovery.

5           THE COURT:  All right.  So, defense counsel, I

6   understand your position.  You don't want to waive speedy trial

7   time.  I get that.  But would you be prepared to try this case

8   on October the 9th?

9           MR. AGNIFILO:  No, no, I'm not saying that I am.  What

10  I'm saying is I need more information to come to the Court with

11  an intelligent position on this, and the things that we don't

12  know is what his ability to look at the stuff will be where he

13  is.  I don't know where he will be in the MDC.  Where they

14  designate him is significant to that.  I think the government

15  is — it might help in the process of trying to make sure that

16  he gets what he needs, and I think by October 9 we'll have a

17  better idea of what they can produce and when.

18          So, no, I'm not looking to try the case on October 9.

19  That would be irresponsible.  I'm not asking to do that.  But

20  what I am asking is — the government's going to move with all,

21  you know, urgency to get me everything, and then October 9, I

22  think we'll have our arms around the situation a little bit

23  better.

24          THE COURT:  OK.  I will exclude time under the Speedy

25  Trial Act from today's date until October 9 so the defense

O9IHComC                    **A-234**

1    counsel gets an opportunity to consult with his client, gets an

2    opportunity to start reviewing the discovery, gets an

3    opportunity to decide how they want to proceed with this case,

4    and also to be better prepared for trial in this case.  I find

5    that the interests of Mr. Combs and the interests of justice

6    support exclusion of time under the Speedy Trial Act from

7    today's date until October 9.  I further find that the

8    interests of Mr. Combs and the interests of justice outweigh

9    the public's interest in a speedy trial.  I will enter an order

10   to that effect.

11           Let me also just share something with counsel.  We

12   received a couple of calls in chambers today from people who

13   claimed to have information relevant to the prosecution of this

14   case.  We did not engage with those individuals other than my

15   staff instructed them to reach out to the U.S. Attorney's

16   Office.  I just wanted to let counsel know that.

17           The other thing is that, in their most recent

18   submission, the government made an allusion to Local Criminal

19   Rule 23.1.  Is there anything that anybody wants me to do about

20   that now, counsel for the government?  Again, that relates to

21   statements allegedly made by defense counsel on some news

22   channel recently.

23           MS. JOHNSON:  We're not asking the Court to do

24   anything right now, your Honor.  We just wanted to put a marker

25   down that we thought some of the comments got a little bit

66

O9IHComC                    **A-235**

1   close to the line under the local rule, particularly with

2   respect to issues regarding the victim and potentially

3   inadmissible evidence.  So we just wanted to flag that for the

4   Court.

5           THE COURT:  OK.  Anything else from defense counsel on

6   that?

7           MR. AGNIFILO:  I'm not sure that this is something

8   that the Court ——

9           THE COURT:  They're not asking me to do anything.  You

10  don't have to say anything.

11          MR. AGNIFILO:  No, no, it's not about that.

12          THE COURT:  Go ahead.

13          MR. AGNIFILO:  I believe —— and I know that courts

14  sometimes do this in terms of sentencing.  I've never actually

15  asked a court to do it on a pre-sentencing posture.  I think

16  Essex County would be preferable to the MDC, and I know that

17  they do house certain defendants, even in Southern District and

18  the Eastern District cases, in Essex County.

19          I don't know what your Honor can do to help in that

20  regard.  I've never made this request of a court at a pretrial

21  setting.  But I don't —— if your Honor would say you don't have

22  any objection to it, if that was consistent with the protocols

23  that existed, that might even be helpful, and then I'll take

24  the weight on myself to try to make that happen if I can.  So

25  any little thing could help me.

O9IHComC                          **A-236**

```
 1          THE COURT:  OK.  Government, what's your view on this?

 2          MS. JOHNSON:  I don't have the cite off the top of my

 3   head, but I know that in the regulations there's — that the

 4   designation authority is entirely within — given to the BOP.

 5   I think this gets a little complicated, and I think — I don't

 6   know that there's anything that the Court can do to put the

 7   thumb on the scale of where he's placed.  I think that's

 8   ultimately a decision of the Bureau of Prisons.

 9          THE COURT:  My sense is that what defense counsel is

10   asking is it's akin to, at sentencing, even though the Court

11   has no authority to dictate where someone is held, basically

12   akin to the Court making a recommendation that someone be

13   housed at a particular facility.  Again, I'm not aware of that

14   being done pretrial, so perhaps what we should do is have

15   counsel file a joint status report regarding this issue,

16   regarding what, if anything, the Court can do in that regard.

17   Certainly, defense counsel, you can look into this on your own.

18   Let's get that by Monday, September 23.

19          Does that work for the defense?

20          MR. AGNIFILO:  Yes, your Honor.  Thank you.

21          THE COURT:  Does that work for the government?

22          MS. JOHNSON:  It does, your Honor.

23          THE COURT:  That will be a joint submission.

24          Is there anything else today from the government?

25          MS. JOHNSON:  No, your Honor.  Thank you.
```

O9IHComC                                **A-237**

```
 1              THE COURT:  Is there anything else today from the
 2    defense?
 3              MR. AGNIFILO:  No, thank you.
 4              THE COURT:  Let me just —— I will say this:  We have a
 5    status conference date for October the 9th, and I'll be around,
 6    and we can certainly do that.  I know that the —— being placed
 7    in the MDC will be difficult, and often when prisoners are
 8    taken to court, they're often woken up at 3:00 or 4:00 in the
 9    morning and taken to court.  If counsel have discussed matters
10    with themselves and come to some agreement as to how we should
11    move forward, I will not object to counsel submitting a joint
12    report a couple of days ahead of time, because there's no
13    reason to have a court appearance just to simply adjourn it for
14    another day.
15              Anything from the government on that?
16              MS. JOHNSON:  Understood, your Honor.  We'll speak
17    with counsel and see if we can reach any resolutions prior to
18    October 9.
19              THE COURT:  Anything from the defense on that?
20              MR. AGNIFILO:  I understand the Court's position.
21              THE COURT:  All right.  We're adjourned.  Thank you.
22              (Adjourned)
23
24
25
```