UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
- - - - - - - - - - - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA

       Appellee,

 - v. -

SEAN COMBS,

  Defendant-Appellant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

: Dkt. No. 24-2606

: **AFFIRMATION IN OPPOSITION**
**TO DEFENDANT'S APPEAL**
: **OF AN ORDER DENYING**
**PRE-TRIAL RELEASE**
:
:
:

STATE OF NEW YORK        )
COUNTY OF NEW YORK    : ss.:
SOUTHERN DISTRICT OF NEW YORK  )

       CHRISTY SLAVIK, pursuant to Title 28, United States Code, Section

1746, hereby declares under penalty of perjury:

       1.     I am an Assistant United States Attorney in the Office of Damian

Williams, United States Attorney for the Southern District of New York, and I

represent the United States of America in this matter. I submit this affirmation in

opposition to defendant-appellant Sean Combs's appeal from the District Court's

order denying pre-trial release.

## PRELIMINARY STATEMENT

       2.     Combs appeals from an order denying him pre-trial release that

was entered in the United States District Court for the Southern District of New York

on September 18, 2024, by the Honorable Andrew L. Carter, United States District Judge. (A-226).[1]

3.     Indictment 24 Cr. 542 was filed on September 12, 2024, charging Combs in three counts: (1) racketeering conspiracy, in violation of 18 U.S.C. § 1962(d); (2) sex trafficking, in violation of 18 U.S.C. §§ 1591 and 2; and (3) interstate transportation to engage in prostitution, in violation of 18 U.S.C. §§ 2421(a) and 2.

4.     Combs was arrested on September 16, 2024, and was presented and arraigned the following day by the Honorable Robyn Tarnofsky, United States Magistrate Judge. Following the arraignment, Judge Tarnofsky denied Combs bail after a hearing. (A-167).

5.     Combs appealed Judge Tarnofsky's decision to Judge Carter, to whom the case was assigned at that time. The parties appeared before Judge Carter on September 18, 2024, and after another bail hearing, Judge Carter denied Combs bail. (A-226). Combs timely appealed.

6.     Combs's trial is scheduled for May 5, 2024, before the Honorable Arun Subramanian, to whom the case was reassigned on October 3, 2024.

---

[1] "Mot." refers to Combs's brief on appeal; "A" refers to the Appendix filed by Combs; and "Exhibit A" refers to the video exhibit submitted by disc with this affirmation. Unless otherwise noted, case text quotations omit all internal quotation marks, citations, and previous alterations.

## STATEMENT OF FACTS

**A.    The Offense Conduct and Evidence**

7.    The Indictment charges Combs with participating in a racketeering conspiracy since at least 2008.  As alleged, Combs and other members and associates of the racketeering enterprise (the "Enterprise") wielded the power and prestige of Combs's reputation in the entertainment industry to commit federal crimes, including racketeering, sex trafficking, and other offenses including crimes of violence.  (A-003-009).  From at least 2009 through 2024, Combs used force, threats of force, and coercion to cause female victims to engage in sexual activity, which included sex acts with male commercial sex workers that Combs referred to as "Freak Offs."  (A-006).  Freak Offs, which sometimes lasted days, were elaborate sex performances that Combs directed, masturbated during, and often electronically recorded.  (*Id.*).  Combs ensured that female victims participated in Freak Offs through coercion and violence, including by supplying female victims with controlled substances; subjecting female victims to physical, emotional, and verbal abuse; controlling female victims' careers, livelihoods, and housing; and threatening to disseminate recordings of Freak Offs.  (A-006-007).

8.    In addition, as charged in the Indictment, Combs engaged in other acts of violence, often assisted by members and associates of the Enterprise, including kidnapping, arson, and physical violence. (A-008). Throughout the

charged racketeering conspiracy, Combs threw people to the ground, and hit, dragged, and choked others.  (A-007-008).

9.      As the Government explained below, the allegations in the Indictment are supported by detailed and credible testimony of dozens of victims of, and witnesses to, Combs's physical and sexual abuse, as well as extensive documentary and electronic evidence.  (*See, e.g.*, A-025-026, A-135-136, A-196). This includes financial and billing records, travel records, electronic media (*e.g.*, videos, photos, and audio files), and voluminous communications, including communications by and with Combs.  (*See id.*).  It also includes evidence seized after executing multiple search warrants for cloud accounts, electronic devices, and Combs's person and premises, which yielded cellphones, laptops, cloud storage accounts, as well as physical evidence such as Freak Off supplies, firearms, and ammunition.  (A-135-136).

### B.      The Initial Bail Hearing

10.      Following Combs's arraignment, the Government moved for Combs's detention under multiple provisions of the Bail Reform Act: (1) 18 U.S.C. § 3142(f)(1)(A), because Combs was charged with sex trafficking; (2) 18 U.S.C. § 3142(f)(1)(B), because Count Two carries a maximum sentence of life imprisonment; and (3) 18 U.S.C. § 3142(f)(2)(A) and (B), because Combs is a serious risk of flight and there is a serious risk that Combs will obstruct justice, or

threaten, injure, or intimidate a prospective witness or juror (or attempt to do so). (A-120). Because Combs was charged with sex trafficking, detention was presumed. *See* 18 U.S.C. § 3142(e)(3)(D).

11.    The Government argued before Judge Tarnofsky that Combs posed a danger to the community and a risk of flight. The Government provided an overview of the conduct charged in the Indictment that demonstrated Combs's dangerousness, including Combs's decades-long pattern of physical and sexual abuse of victims, as well as other violent acts perpetrated by Combs and members of the Enterprise. (A-124-125). The Government also highlighted Combs's obstructive conduct charged in the Indictment, including bribery and witness tampering. (A-125).

12.    The Government highlighted an incident that took place in March 2016 during a Freak Off at the InterContinental Hotel in Los Angeles, California. (A-125-127). During that incident, Combs violently assaulted a female victim in the public elevator bank as she attempted to leave the hotel. (A-126). Combs punched the victim, threw her to the ground, kicked her, attempted to drag her back to the hotel room, and then threw a vase at her. (*Id.*). This violent incident was captured on hotel surveillance footage, which was publicly released by the media earlier this year. (A-030 (Exhibit A (video exhibit))). When hotel security staff intervened, Combs attempted to bribe the security officer, offering him a stack

5

of cash in exchange for his silence. (A-126). When that security officer refused Combs's bribe, Combs directed his staff to contact other members of the hotel security staff to obtain the surveillance video and to reach out to the victim to ensure that she would not report Combs's assault. (*Id.*). Within days of the incident, as a result of Combs's bribery efforts, video surveillance of the incident disappeared from the hotel's server. (*Id.*).

13.     Combs continued his obstruction well into 2024. (A-127). After a civil lawsuit was filed against Combs in November 2023 detailing, among other allegations, the March 2016 InterContinental assault, Combs—personally and through his attorney—denied assaulting the victim. (*Id.*). After the video of the March 2016 incident was obtained and published by a media outlet in 2024, however, Combs was forced to admit that he had, in fact, engaged in the assault that he had described as "baseless and outrageous lies" only months before. (*Id.*).

14.     The Government also described evidence of multiple additional assaults by Combs against victims, including choking, hitting, kicking, and dragging victims, often by their hair. (A-127-128). These assaults caused significant injuries to victims, which often required long periods of recovery. (A-128).

15.     The Government detailed multiple incidents in which Combs or people acting on Combs's behalf reached out to potential victims and witnesses, including witnesses who had received grand jury subpoenas. (A-129-130). The

6

Government described Combs's attempt in November 2023 to feed a potential victim a false narrative in exchange for Combs's continued financial support. (A-131). As the Government also proffered, after another civil lawsuit—which detailed violent incidents during the period of the charged racketeering conspiracy—was filed on September 10, 2024, Combs was in contact with a potential witness to the lawsuit's allegations 128 times between September 10, 2024, and September 14, 2024. (A-130). On September 13, 2024, the witness made a public statement denying that she had witnessed the abuse described in the civil lawsuit. (*Id.*).[2]

16.    Combs's counsel focused primarily on the measures taken prior to Combs's arrest to address his risk of flight. (A-137-144). Counsel also argued that the March 2016 assault was about infidelity, and not sex trafficking, and that Combs's subsequent actions were about avoiding being "seen in a towel hitting a girlfriend." (A-148-149; A-152). Combs's counsel likewise sought to minimize the other examples of Combs's obstructive conduct. (A-153-154). Combs's counsel also asserted that all parties in the Freak Offs participated consensually. (A-155-156).

---

[2] Combs accuses the Government of "concealing" the fact that Combs and the potential witness had been in contact earlier in the year. (Mot. at 9). While Combs was in contact with the potential witness prior to March 2024, phone records showed no contact between March 25, 2024 until September 10, 2024. After that, they had 128 phone contacts in a span of four days. (A-197-200). This evidence supported the inference that Combs contacted the potential witness about the civil lawsuit and pressured her to make a public statement in support of Combs.

17.     After hearing argument, Judge Tarnofsky found that Combs had not rebutted the presumption in favor of detention, and that there were no conditions that would reasonably assure Combs's appearance or the safety of the community. (A-167).

18.     Judge Tarnofsky emphasized the serious nature and circumstances of the charged conduct, which largely happened behind closed doors and was therefore difficult to monitor. (A-167-168). Judge Tarnofsky noted "indications in [Combs's] history and characteristics" that he would present a danger to the community and dismissed as inadequate the exhortations from Combs's counsel to trust him and his client given Combs's drug abuse and anger issues. (*Id.*). Judge Tarnofsky highlighted that the weight of the evidence was "significant," given that multiple witnesses observed firsthand Combs's violence and coercion. (A-168).

## C.    The Bail Hearing Before Judge Carter

19.     Combs appealed Judge Tarnofsky's decision to Judge Carter, and a bail hearing before Judge Carter proceeded on September 18, 2024, in advance of which the parties filed additional written submissions. (A-041-107, A-108-113).

20.     At the outset, Judge Carter made clear that he had reviewed the extensive record created to date, including the written submissions to him and to Judge Tarnofsky, and the transcript from the prior bail hearing. (A-171). Judge Carter indicated that his "lesser" concern was risk of flight, but noted that "[t]he

8

package that's been submitted by Mr. Combs . . . does not give the Court a reasonable assurance that he would return to court. . . given his wealth." (A-171-72). Judge Carter's "bigger" concern, however, "deals with the danger of obstruction of justice and the danger of witness tampering." (A-173).

21.    The Government focused on the conduct with which Combs was charged, which showed "his dangerousness, his resources, and his willingness to lie and obstruct." (A-173). The Government then walked through the "seriousness of the offenses," "which reflects both the defendant's dangerousness and the risks of obstruction if released." (A-174). The Government described the Freak Off activity, which occurred for over a decade, and as recently as 2024, during which Combs supplied female victims with illegal drugs and used violence to coerce sexual activity. (A-174, A-183). And the Government described Combs's attempts to blackmail victims, including by threatening to release recordings he made of the Freak Offs. (A-175-176). The Government also highlighted the acts of violence—witnessed by dozens—perpetrated by Combs against multiple victims, as well as the fact that Combs hid defaced semi-automatic weapons in his bedroom closet. (A-176-177, A-185-86).

22.    With respect to the March 2016 incident at the InterContinental Hotel, the Government rebutted Combs's argument that the incident did not happen in the context of a Freak Off and that his attempted bribery was not obstructive. (A-

177-178).  Based on multiple sources of evidence, the Government proffered that immediately prior to Combs's assault of the victim, there was a male commercial sex worker in the hotel room with Combs and the victim, who remained inside the hotel room during the assault.  (A-178).  The Government then read text messages between Combs and the victim, which confirmed the victim's severe injuries.  (A-179).  The Government highlighted text messages sent by Combs himself immediately after the assault suggesting that Combs feared a law enforcement response, including the following: "Call me.  The cops are here" and "Yo, please call.  I'm surrounded."  (A-180).  The Government emphasized that whatever the context, the undisputed conduct captured on video—punching, kicking, and dragging the victim—underscored Combs's dangerousness.  (A-181-82).

23.    The Government detailed additional examples of Combs's obstructive conduct: directly contacting a victim following the November 2023 civil lawsuit that accused Combs of sex trafficking, repeatedly contacting witnesses to the charged conduct (directly and through intermediaries), and contacting witnesses who received grand jury subpoenas, including as recently as July 2024.  (A-188-190).

24.    The Government provided additional information about the obstructive calls described to Judge Tarnofsky.  After the civil lawsuit was filed against Combs in November 2023, another potential victim texted Combs about her "own sexual trauma."  (A-190-191).  Combs then called her and recorded the calls

10

on an employee's phone. (*Id.*). During those calls, Combs told the victim repeatedly not to text him and that he was not supposed to be using the phone. (*Id.*). Combs also attempted to convince the victim that she had willingly engaged in sex acts with him, but she pushed back telling him that she felt "manipulated." (A-191). Combs told the victim that if she continued to support him, she would not have anything to worry about, referring to the financial support that Combs provided the victim. (*Id.*). Combs then texted an employee to ensure that Combs's financial adviser would not do "anything dumb" like failing to pay the victim's rent on time. (*Id.*).

25. Combs's counsel advocated for bail under certain proposed conditions, including restricted communications with third parties and monitoring by a private security firm. (A-202-206). Judge Carter engaged in an extended back and forth with defense counsel, expressing skepticism about the proposed bail conditions. (A-214-216).

26. With respect to the March 2016 incident at the InterContinental Hotel, Combs's counsel characterized the relationship between the victim and Combs as "very loving" and Freak Offs as a "sought-after, special part of their relationship." (A-217). Judge Carter responded: "What does this have to do with him punching her, throwing a vase at her, kicking her? What's love got to do with that?" (A-218). Combs's counsel continued to argue that there was no sex trafficking, but Judge Carter pressed him to respond to the argument that Combs's

violent conduct was relevant to Combs's dangerousness more generally.  (A-219-220).  Combs's counsel conceded: "I think it's relevant.  I think it is relevant.  I haven't said it wasn't relevant.  I'm saying it's not part of the sex trafficking."  (A-220).  Combs's counsel nonetheless urged Judge Carter that "even if the Court doesn't fully trust [Combs], trust the [bail] package as a whole."  (A-223-224).

27.    Judge Carter denied Combs bail based on clear and convincing evidence that Combs "is a danger regarding obstruction of justice and witness tampering" and that Combs "is a danger to the safety of others in the community more generally."  (A-225).  Judge Carter also found that there was no set of conditions that would reasonably assure the safety of the community or that Combs would not obstruct justice or tamper with a witness.  (A-226).

28.    Judge Carter did not reach the question of risk of flight but made clear that he did not view the proposed bail package as sufficient to assure Combs's future appearance.  (A-225).  He also found the proposed package insufficient with respect to obstruction, given that Combs "would still have access to employees and other individuals," and that Combs could obstruct justice and intimidate witnesses through these third parties, including with "coded messages if necessary."  (A-226).

## **ARGUMENT**

### **The District Court Properly Denied Combs's Motion for Bail**

29.     Judge Carter properly denied Combs's motion for bail, just as Judge Tarnofsky did before him. Combs cannot demonstrate that Judge Carter clearly erred when he found—after considering lengthy written submissions, reviewing a transcript of the bail hearing before Judge Tarnofsky, and presiding over extended oral argument—that the Government had established by clear and convincing evidence that Combs posed a danger to the community and that no bail conditions could reasonably assure the safety of the community.

### A.     **Applicable Law**

30.     If a judicial officer concludes after a hearing that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial." 18 U.S.C. § 3142(e).

31.     In seeking pretrial detention, the Government bears the burden of showing, by a preponderance of the evidence, that the defendant poses a risk of flight or, by clear and convincing evidence, that the defendant poses a danger to the community, and that no condition or combination of conditions can sufficiently address those risks. *See* 18 U.S.C. § 3142(f); *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007).

32.    Additionally, pretrial detention on the grounds of obstruction or witness tampering is appropriate when the Government can establish by "clear and convincing evidence" that "there exists a serious risk" that the defendant would "threaten, injure, or intimidate . . . a prospective witness or juror." *United States v. Leon*, 766 F.2d 77, 82 (2d Cir. 1985).

33.    Where, as here, the defendant is charged with certain offenses, including sex trafficking by force, fraud or coercion, there is a statutory presumption "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. § 3142(e)(3)(D).  In such a case, the defendant "bears a limited burden of production—not a burden of persuasion—to rebut that presumption by coming forward with evidence that he does not pose a danger to the community or a risk of flight." *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001).  Even where a defendant produces sufficient evidence to rebut the statutory presumption of detention, the presumption does not disappear; instead, it becomes a factor to be weighed and considered like all the others in deciding whether to release the defendant.  *See United States v. Rodriguez*, 950 F.2d 85, 88 (2d Cir. 1991).

34.    In determining bail, the court must consider several factors, including: (1) "the nature and circumstances of the offense charged, including whether the offense is . . . a violation of section 1591"; (2) "the weight of the

14

evidence against the person"; (3) the "history and characteristics of the person," including the person's criminal history; and (4) the "nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g).

35.    This Court applies "deferential review to a district court's order of detention." *United States v. Watkins*, 940 F.3d 152, 158 (2d Cir. 2019).  This Court "review[s] a district court's findings as to the accused's risk of flight and potential danger to the community for clear error." *United States v. English*, 629 F.3d 311, 319 (2d Cir. 2011).  On appeal, this Court will reverse only if "on the entire evidence," it is "left with the definite and firm conviction that a mistake has been committed." *Sabhnani*, 493 F.3d at 75; *United States v. LaFontaine*, 210 F.3d 125, 130 (2d Cir. 2000).

## B.    Discussion

### 1.    Judge Carter's Dangerousness Finding Was Supported by Clear and Convincing Evidence

36.    The record amply supported Judge Carter's finding that Combs is a danger to the community.

37.    In arguing that Judge Carter erred, Combs entirely ignores the serious and violent nature of the charges against him, and the strength of the evidence against him.  As alleged, since at least 2008, Combs has engaged in serious acts of violence, including forcing and coercing women to participate in sex acts with

commercial sex workers by using physical force, financial pressure, emotional abuse, and narcotics. (A-003-009). On multiple occasions, Combs assaulted others by throwing objects at them, choking them, pushing them, kicking them, and slamming them against walls and onto the ground. (*Id.*). Combs and other members and associates of the Enterprise also engaged in kidnapping and arson, and carried firearms to intimidate and threaten others. (*Id.*).

38.     Although Combs claims on appeal, as he did below, that the Freak Offs involved "adults voluntarily engaged in consensual sex" (Mot. 5), the Grand Jury found probable cause otherwise, and the District Court properly credited the allegations in the Indictment and the Government's detailed evidentiary proffers. *See LaFontaine*, 210 F.3d at 131 (proffers are "permissible both in the bail determination and bail revocation contexts"). Moreover, undisputed video evidence corroborated that Combs used brutal violence against his victims, including by hitting, punching, kicking, and dragging them. (*See, e.g.*, A-030 (Exhibit A), A-185-86 (contemporaneous text messages detailing physical abuse)). Even if the evidence did not support the conclusion that Combs's assault at the InterContinental Hotel was related to sex trafficking—which it did (A-177-178)—Combs's counsel conceded that Combs's violent conduct against women was nonetheless "relevant" to his dangerousness. (A-219-220). As Judge Carter recognized (A-218), Combs's claims that he was in a "decade-long consensual relationship with Victim-1" (Mot.

16

14), does not get Combs very far: "A willingness to strike loved ones offers probative evidence of a tendency to violence and dangerousness toward others." *See Mercedes*, 254 F.3d at 437 (reversing grant of pretrial release to defendant with history of domestic violence charged with violent offenses).

   39. As Judge Carter found, the Government also established a serious risk of obstruction and witness tampering by clear and convincing evidence. In arguing that evidence of obstruction was "thin" and that the Government "provided no basis to believe" that Combs tampered with witnesses, Combs primarily quibbles with the strength of the Government's evidence that Combs made inappropriate contact with Government witnesses. (Mot. 14-16). But Combs ignores altogether the serious and substantial allegations of obstruction, bribery, and witness tampering charged in the Indictment as part Combs's pattern of racketeering activity that amply supported Judge Carter's determination. (A-010; A-005 (describing one purpose of the Enterprise as protecting Combs "from detection and prosecution by law enforcement authorities through acts of intimidation, manipulation, bribery, and threats of retaliation" against witnesses to Combs's crimes); A-007 (describing Combs's use of explicit videos as "collateral to ensure the continued obedience and silence" of his victims); A-008-009 (Combs and his associates "pressured witnesses and victims, including through attempted bribery, to stay silent and not report what they experienced to law enforcement" and "provided

these victims and witnesses with a false narrative of events in an effort to conceal Combs' crimes")). Combs's longstanding and sophisticated methods of obstructing justice and silencing witnesses more than established his dangerousness. *See United States v. Kelly*, 20-1720, 2020 WL 7019289 at *2 (2d Cir. Sept. 8, 2020) (affirming district court's denial of bail when defendant was charged with serious crimes spanning years, including obstruction and witness tampering).

40.    While Combs offered "competing" explanations for Combs's assault at the InterContinental Hotel, his bribery of hotel security staff, and his contacts with witnesses after the civil lawsuits and grand jury subpoenas (Mot. 14-15), the District Court reasonably rejected these efforts to explain away one of the most devastating pieces of physical evidence and Combs's long-running obstructive conduct. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous," *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985), and here, Combs's explanations were simply implausible. The facts, including Combs's text messages that the "[t]he cops are here" (A-180), supported the inference that Combs wanted to destroy the hotel surveillance video to avoid prosecution for a vicious assault. And while Combs argues that witness contacts were "minimally relevant or entirely innocuous" because they concerned civil suits (Mot. 14), the suits alleged years of physical and sexual abuse, including sex trafficking—allegations that Combs was plainly aware could subject him to

18

criminal investigation and prosecution.[3]  Moreover, as the Government made clear, Combs continued to contact witnesses, including witnesses who have received grand jury subpoenas, into the summer of 2024, when he undoubtedly knew about the Government's criminal investigation.  (A-188-189).

41.    Regardless, attempting to feed a witness a false narrative so that they adopt it as their own is witness tampering.  *See LaFontaine*, 210 F.3d at 128; *see id.* at 134 ("In *Gotti*, we held that a single incident of witness tampering . . . was sufficient to revoke bail."); *United States v. Millan*, 4 F.3d 1038, 1048 (2d Cir. 1993) (district court not required to identify a particular trial witness that might be "the object of influence or intimidation" where credible testimony presented that defendant attempted to tamper with witnesses).  And a defendant's obstructive conduct in a separate proceeding may support pretrial detention as "[a]ll bail decisions rest on predictions of a defendant's future behavior" and such conduct may "shed considerable light on his motive, capacity and propensity to commit certain acts if free on bail."  *United States v. Gotti*, 794 F.2d 773, 779 (2d Cir. 1986).

---

[3] Combs makes much of the timing, which was before an "official proceeding" was initiated.  (Mot. 19).  But there need not be an official proceeding at the time of the obstructive acts to satisfy 18 U.S.C. § 1512.  *See* 18 U.S.C. § 1512(f)(1).  And there is no "official proceeding" requirement under 18 U.S.C. § 1591(d) (obstruction in connection with sex trafficking).

**2.    Judge Carter Did Not Clearly Err by Rejecting Combs's
Proposed Conditions**

42.    Combs argues that Judge Carter erroneously rejected Combs's
proposed bail package, which was "plainly sufficient" to address any obstruction
concerns.  (Mot. 17).  But Judge Carter did not clearly err in deciding that the
proposed conditions, including a private security firm, would not sufficiently
eliminate the risks of obstruction and danger to the community.

43.    The Government established that Combs used methodical and
sophisticated means to silence and intimidate witnesses throughout the racketeering
conspiracy and during the Government's investigation.  Combs often used loyal
intermediaries to accomplish his objectives, and wielded violence and blackmail, as
well as his substantial wealth and influence relative to his victims and employees, to
achieve compliance.  Judge Carter therefore rightly concluded that the proposed
conditions were inadequate because they would still permit Combs to "obstruct
justice and intimidate witnesses" through "employees and other individuals" and
"even coded messages." (A-226).  Combs baldly asserts that there was "not a shred
of evidence" that Combs used coded messages.  (Mot. 19).   As only one example,
however, Combs tried to ensure a victim's silence about her "sexual trauma" by
telling her that he "needed" her, and that if she "needed" Combs too, she "ain't got
worry about nothing else," alluding to a promise of financial security in exchange
for loyalty.  (A-190-191).  While Combs asserts that this incident did not involve an

intermediary (Mot. 19), Combs then texted an employee to ensure that his financial advisor kept paying the victim's rent. (A-191). The evidence therefore supported the conclusion that even if confined to his home, Combs has the means and the influence to evade even seemingly restrictive bail conditions.[4]

44.     The District Court rightly rejected Combs's effort to pay his way out of detention, when the record established that no set of conditions could ensure the safety of the community. This Court has "expressly h[e]ld that the Bail Reform Act does not permit a two-tiered bail system in which defendants of lesser means are detained pending trial while wealthy defendants are released to self-funded private jails." *United States v. Boustani*, 932 F.3d 79, 82 (2d Cir. 2019); *see also United States v. Banki*, 369 F. App'x 152, 153-54 (2d Cir. 2010) (this Court is "troubled" by the possibility of "allow[ing] wealthy defendants to buy their way out by constructing a private jail."). And Combs's effort to characterize private security as foolproof is incompatible with this Court's recognition that private jail proposals "at best elaborately replicate a detention facility without the confidence of security such a facility instills." *United States v. Orena*, 986 F.2d 628, 632 (2d Cir. 1993).

---

[4] Moreover, the District Court was rightly less sanguine that a restriction on electronic devices would prevent obstruction; such a restriction could be easily evaded if even one visitor on Combs's approved visitor list of family, caretakers, and friends covertly provided Combs access to a device.

45.    Combs relies on *Sabhnani*, 493 F.3d at 75, which endorsed release involving a private-security condition with the Government's approval. (Mot. 18).  But as this Court has since explained, *Sabhnani* involved a case where the defendant was detained on risk of flight (not dangerousness), and "*but for* his wealth, he would not have been detained."  *Boustani*, 932 F.3d at 82.  *Boustani* distinguished circumstances like those here, where courts should not be "*granting* bail to defendants because of their wealth," when "similarly situated defendants of lesser means would be detained." *Id.*; *see also Rodriguez*, 950 F.2d at 89 (a bail package that "may reasonably assure the appearance of [defendant] at trial, will not [necessarily] assure the safety of the community").[5]

### 3.  Judge Carter Did Not Commit Legal Error

46.    Given the thorough proceedings below, this Court should swiftly reject Combs's argument that Judge Carter committed legal error by failing to make factual findings or to weigh required factors.  (Mot. 21).  While the Bail Reform Act includes a provision requiring "written findings of fact and a written statement of the reasons for the detention," 18 U.S.C. § 3142(i)(1), this Court has explained that

---

[5] This case is also nothing like *United States v. Mattis*, 963 F.3d 285, 292 (2d Cir. 2020), on which Combs relies.  (Mot. 23). *Mattis* affirmed the pretrial release of defendants with no criminal history who had thrown a Molotov cocktail into an unoccupied police vehicle. *Id.* at 289-90. Here, the Indictment alleges, and the Government proffered evidence of, a violent conspiracy that lasted over a decade and involved a long-running pattern of obstruction and tampering.

where, as here, "the court's findings and reasons for issuing a detention order are clearly set out in the written transcript of the hearing, the requirement of a writing is satisfied." *English*, 629 F.3d at 321.

47.     At the end of the hearing, Judge Carter denied bail only after reiterating, "I've heard from the parties," and "I've reviewed everything" (A-225), which included written submissions from the parties and the transcript of Judge Tarnofsky's bail hearing.  As memorialized in the transcript, Judge Carter then specifically found that Combs posed a danger to the community and a risk of obstruction based on the evidence put before him.  (A-225-226).  This is therefore not a case where the detention order contained "only implicit findings" or "no finding whatsoever."  (Mot. 24 (quoting *United States v. Friedman*, 837 F.2d 48, 49-50 (2d Cir. 1988)).

### 4. **This Court May Affirm on Risk of Flight Grounds**

48.     Even though not reached by Judge Carter, this Court may also affirm on the basis that Combs presents a risk of flight based on the significant penalties he faces, the serious reputational harm that may result from trial, and Combs's substantial resources. *United States v. Cramer*, 777 F.3d 597, 603 (2d Cir. 2015) (this Court can "affirm a decision on any grounds supported in the record, even if it is not one on which the trial court relied"); (*see* A-025-027, A-111-112, A-133-134).

## **CONCLUSION**

49.     Judge Carter's order denying Combs's pretrial release should be affirmed.

Dated:      New York, New York
            October 16, 2024

/s/ Christy Slavik
MEREDITH FOSTER
EMILY A. JOHNSON
CHRISTY SLAVIK
MADISON REDDICK SMYSER
MITZI STEINER
Assistant United States Attorneys
Southern District of New York
Telephone: (212) 637-1113

24

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this opposition complies with the type-volume limitation of the Federal Rules of Appellate Procedure. As measured by the word processing system used to prepare this opposition, there are 5,184 words in this opposition.

/s/ Christy Slavik
CHRISTY SLAVIK
Assistant United States Attorney
Southern District of New York
Telephone: (212) 637-1113
